UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| RICHARD CAMPFIELD and ULTRA BOND, INC. | Case No. 2:15-cv-2733 |
| Plaintiffs | |
| *v.* | **COMPLAINT**<br>**WITH JURY DEMAND** |
| SAFELITE GROUP, INC., SAFELITE SOLUTIONS LLC, and SAFELITE FULFILLMENT, INC. | |
| Defendants | |

Plaintiffs, Richard Campfield and Ultra Bond, Inc. (collectively "Ultra Bond"), by and through their undersigned counsel, bring this action against Defendants Safelite Group, Inc., Safelite Solutions LLC, and Safelite Fulfillment, Inc. (collectively "Safelite"), and allege as follows based on (a) personal knowledge; (b) the investigation of their counsel; and (c) information and belief.

## I.   NATURE OF THE ACTION

1.      This action seeks damages and additional relief under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which prohibits, *inter alia*, any "false or misleading description of fact, or false or misleading representation of fact which . . . in commercial advertising or promotion, misrepresents the nature characteristics, [or] qualities . . . of . . . goods, services, or commercial activities."

2.      Safelite is the largest retailer in the country of vehicle glass repair and replacement ("VGRR") services.  Safelite is also the nation's largest third party administrator ("TPA") for processing and adjusting policyholders' vehicle glass damage claims pursuant to their automobile insurers' non-collision glass breakage programs. Safelite's role as the nation's largest TPA gives it unique access to and control over customers of VGRR services.

1

3.     The heart of this case is Safelite's long-running and egregiously misleading advertising and promotional scheme in which it falsely tells consumers that cracks longer than six inches cannot be repaired. Instead, Safelite falsely tells consumers that their windshield must be replaced when a crack is longer than six inches. This misstatement misleads consumers to replace their damaged windshield which costs many times more than a repair, in addition to the fact that replacement is also demonstrably less structurally safe than repairing a factory installed windshield. Safelite's intent in making these misrepresentations to consumers is to lead consumers towards utilizing its own products and services.

4.     VGRR services are a huge business. Safelite serves more than 4.1 million customers each year, has over 500 domestic locations, and has annual sales of approximately $825 million.

5.     The vast majority of Safelite's profits stem from the approximately 3 million windshields that Safelite replaces each year using its own replacement windshields and those made by other manufacturers. Replacing a windshield as opposed to repairing it is many times more profitable for Safelite. Safelite has a financial interest in convincing consumers that replacement is their only option.

6.     In most instances, consumers foot the bill for the replacement windshield because the deductible on their insurance policy (assuming they have insurance) is normally not waived in that circumstance.

7.     Plaintiff Richard Campfield, the founder of Ultra Bond, is an inventor who has been actively involved in the windshield repair and replacement industry since 1986. Campfield is the immediate past President of the National Windshield Repair Association (which is an organization whose members consist of vehicle glass repair manufacturers and auto glass repair

and replacement shops from across the country). Together, he and Ultra Bond hold (or have held) several patents related to the repair of windshield cracks longer than six inches. Windshield cracks longer than six inches are commonly referred to in the VGRR industry as "Long Cracks." The patents held by Campfield and Ultra Bond cover methods of repairing Long Cracks, the tools to be utilized when repairing Long Cracks, and the specific viscosities of chemical resins which are suitable for repairing Long Cracks in windshields. Campfield's patented techniques and resins are used worldwide to repair Long Cracks.

8.      As set forth below, to better protect consumers, the VGRR industry has established standards governing the servicing of windshield damage which, *inter alia*, were approved by the American National Standards Institute ("ANSI") in 2007. These industry standards were meticulously developed by participants in the VGRR industry, including Safelite, and specifically endorse Long Crack repair.

9.      Defendants' misrepresentations and nondisclosures to consumers about Long Crack repair options in the situation of non-collision windshield damage fail to follow these basic industry standards, and are intentionally undertaken by Defendants to dramatically boost their profits by causing the sale and installation by Safelite of as many replacement windshields as possible irrespective of the cost to, or safety of, the consuming public.

10.      In addition to depriving consumers of their freedom of choice to repair Long Cracks, Defendants' unlawful conduct in misrepresenting and failing to disclose the availability of Long Crack repair services has directly damaged the businesses of Plaintiffs, who are competitors of Defendants that manufacture, license and sell specialized resins and tools to auto-glass shops and related-businesses across the world in order for them to be able to perform Long Crack repairs.

11.     Plaintiffs seek relief under the Lanham Act for the damages they sustained including, but not limited to, lost profits, and other available equitable relief, as well as for injunctive relief to enjoin Safelite from continuing to make false and misleading statements about Long Crack repair that are contrary to established VGRR standards governing the servicing of this type of windshield damage.

## II.    PARTIES

12.     Plaintiff Ultra Bond, Inc., is a California corporation, which has its principal place of business in Grand Junction, Colorado.  Ultra Bond, Inc., is a windshield repair manufacturer that both licenses and sells its products to auto-glass shops and related-businesses across the country in order for them to be able to perform Long Crack repairs.  These shops and businesses, who are customers of Ultra Bond, Inc., compete to provide VGRR services to both retail and insurance customers.

13.     Ultra Bond, Inc., sells repair kits consisting of specialized tools, specially manufactured resins, primers, additives, and pre-treatment chemicals used for repairing (versus replacing) windshields damaged by Long Cracks.  Additionally, Ultra Bond, Inc., sells stand-alone resins to re-supply its customers. (The tools, resins, and chemicals can also be used for repair of cracks under six inches).

14.     The tools and resins manufactured and sold by Ultra Bond, Inc., are geared to be utilized with a unique methods developed by Mr. Campfield and patented by Ultra Bond.  Independent testing has confirmed the effectiveness of the Ultra Bond method for repairing windshields with Long Cracks.  Upon information and belief, Ultra Bond is the dominant provider of Long Crack repair products and services holding between 50-75% of the U.S. market for Long Crack repair products.

4

15.     Plaintiff Richard Campfield ("Campfield") is a citizen of Colorado and of Pennsylvania, a 50% stockholder of Ultra Bond, Inc. (along with his wife, Joanna Campfield, who owns the remaining 50% of outstanding stock), and the sole proprietor of a number of additional businesses that, in conjunction with the equipment and resins sold by Ultra Bond, Inc., sell licenses related to certain patented elements of the Ultra Bond Long Crack repair process. Those additional businesses are Ultra Bond Licensing and a retail glass repair and replacement business doing business as Ultra Bond Windshield Repair and Replacement in Grand Junction, Colorado.  In addition, Campfield has expanded his retail repair business into the Northeastern Pennsylvania region.

16.     In addition, on July 1, 2015, Campfield completed a two-and-one-half year term as the President of the National Windshield Repair Association (which is an organization whose members consist of vehicle glass repair shops from across the country).

17.     Defendant Safelite Group ("Safelite") is a Delaware Corporation with its principal place of business in Columbus, Ohio.  Safelite Group is a multi-faceted automobile glass and claims management service organization that is composed of four major operations: (1) Safelite Fulfillment, Inc. (operating under the names Safelite AutoGlass® and Giant Glass™), which provides VGRR services to retail and insurance customers; (2) Safelite Glass Corp., which manufactures aftermarket windshields; (3) Service Auto Glass, which provides wholesaler vehicle glass and vehicle glass-related products; and (4) Safelite Solutions LLC, which serves as a third party administrator and provides complete claims management solutions for the nation's leading fleet and insurance companies.  Safelite Group is a subsidiary of Belron S.A., which is one of the world's leading providers of auto glass repair and replacement services, operating globally in 34 countries across five continents.

5

18.     Defendant Safelite Solutions LLC ("Safelite Solutions") is a Delaware limited liability company with its headquarters in Columbus, Ohio.  Among other services, Safelite Solutions processes automobile glass claims for its insurance company clients as a third party administrator.  Safelite Solutions operates two national call centers in Columbus, Ohio, and one in Chandler, Arizona, that are staffed 24/7 by customer service representatives trained to handle the first call from a policyholder reporting a vehicle glass claim (known as the first-notice-of-loss ("FNOL") call) to Safelite Solutions' insurance company clients.  These three national call centers are staffed 24 hours a day, 365 days a year and seat approximately 2,000 employees in total.  Safelite Solutions currently serves as a third-party administrator of auto glass claims for more than 175 insurance and fleet companies, including 19 of the top 30 property and casualty insurance companies.

19.     Defendant Safelite Fulfillment is a Delaware Corporation with its principal place of business in Columbus, Ohio. Safelite Fulfillment is the largest retail vehicle glass repair and replacement organization in the United States, operating under the trade names of Safelite AutoGlass® and Giant Glass™.

20.     Safelite Fulfillment operates in all 50 states, and is available to more than 95% of all drivers. Safelite Fulfillment serves more than 4.1 million customers each year, has over 500 locations, and has annual sales of approximately $825 million.

## III.     <u>JURISDICTION AND VENUE</u>

21.     This Court has proper subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, *et seq.,* because Defendants are located in this District, Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and the acts giving rise to the claims at issue in this lawsuit occurred, among other places, in this District.

IV.     **FACTUAL ALLEGATIONS**

    A.     **A Properly Functioning Windshield Is Vital To the Safety of Automobile Occupants**

23.     By far, the highest percentage of all vehicle glass damage occurs to windshields as opposed to side or back window vehicle glass.  Further, damage to windshields is one of the leading, if not the leading, cause of automotive insurance claims in the United States.

24.     Windshield breakage in the situation of non-collision glass damage typically consists of a chip or crack caused by a flying stone flicking up from a roadway and striking the vehicle's front window.  Windshields may also chip or crack because they are poorly designed, manufactured or installed.

25.     Windshields—unlike side and back window vehicle glass—are made of two sheaths of safety glass that are designed to offer optimum safety by being sandwiched around an inner plastic (polyvinyl butyral, or PVB) film that acts as a barrier either to prevent passenger ejection from a vehicle when in a crash or to prevent passenger injury from an object penetrating the windshield when being driven.

26.     A vehicle's original factory sealed windshield glass (referred to as "original equipment manufactured" or "OEM" glass) is also an integral part of a vehicle's overall passenger safety system.  Among other things, a factory sealed windshield is part of a vehicle's airbag crash pulse system and serves as an airbag backboard—both of which are necessary for proper deployment of airbags in the event of a collision.  A factory sealed windshield also serves

7

as part of the vehicle's structural system to prevent roof collapse in the event of a rollover crash, providing up to 60% of the roof's support.  In fact, Safelite's Windshield Safety Video states that, "after your seatbelt and airbags what do you think is the next most important safety feature on your vehicle? Your brakes, your tires, . . . In fact, the answer is right before your eyes, your windshield. . . ."

### B. Non-OEM Aftermarket Windshields Manufactured and Installed by Safelite Are Less Expensive, Less Safe, But More Profitable to Safelite Than OEM Windshields

27.     OEM windshields are meticulously designed by collaboration between the windshield manufacturer and the automobile manufacturer.   By comparison, non-OEM replacement windshields, such as those manufactured and sold in the aftermarket (generally known as auto replacement glass ("ARG")) by Safelite and other non-OEM ARG manufacturers, are not.  ARG windshields are typically reverse-engineered by non-OEM ARG manufacturers from an automaker's OEM windshield, in order to be substitutable for a vehicle's original factory-sealed OEM glass (*i.e.*, relative to the make, model and year of the vehicle), if damaged.

28.     Windshield manufacturers producing OEM glass are bound to strictly adhere to a "quality assurance document" jointly developed between the car manufacturer and the windshield manufacturer, which sets strict quality specifications. By comparison, non-OEM ARG windshield manufacturers are not.

29.     OEM windshields are also installed at the factory using robotic, temperature and humidity controlled methods to ensure a meticulous seal of the windshield to the car's frame. By comparison, ARG windshields are not.  If a replacement windshield is poorly installed, the force of the airbag can easily push it out of the vehicle's frame during a crash.

30. OEM windshields can be purchased (typically from automakers' dealerships) for installation in the event that an original factory-installed OEM windshield has been damaged and requires replacement. Because OEM windshields are of higher quality, OEM windshields sold in the aftermarket for purposes of replacement cost more than non-OEM ARG windshields.

31. On information and belief, the average cost of purchasing and installing a non-OEM ARG windshield is about $350. The cost to a consumer of purchasing and installing an OEM replacement windshield can be two or three times that average amount, depending on the make, model and year of the vehicle.

**C.** **When A Windshield Chips or Cracks, Repairing the Windshield Is the Best Option For Repairing the Damage**

32. When a vehicle windshield is damaged, three options exist: a) replacing the entire windshield, b) repairing the damage without replacing the windshield, or c) leaving the damage as is.

33. Leaving the damage as is can be extremely dangerous because if left untreated, windshield damage will eventually spread and cause the inner PVB film to be exposed to atmospheric conditions, which in turn degrades the film's strength as an effective barrier to prevent passenger ejection or object penetration. Thus, untreated windshield damage can quickly compromise the structural integrity of a vehicle's windshield and risk the safety of vehicle occupants.

34. Of the other two options, windshield repair is in most instances preferable, because a properly repaired windshield restores the structural integrity of a windshield, *without* the need of replacing a vehicle's factory sealed OEM windshield. A repair also makes any visible damage to the glass invisible to the driver, unless viewed perpendicularly to the slope of the windshield (called the "Head-On Angle").

9

35. Conversely, entirely replacing the windshield has a number of substantial drawbacks, including the inferior quality of a large portion of replacement windshields.

36. Significantly, the majority of replacements do not utilize OEM manufactured windshields; rather they utilize non-OEM ARG windshields, which again, are generally lower in quality than OEM windshields.

37. This is the result of a number of causes, including that a large portion of ARG windshields come from factories that do not manufacture any OEM windshields for automobile manufacturers and instead solely manufacture non-OEM ARG windshields and therefore are not privy to the precise specifications utilized by the automobile manufacturers.

38. Additionally, even not taking into account the inferior nature of a large portion of ARG windshields, the replacement process itself requires breaking the seal between an OEM windshield and the automobile and thereby requires taking the unnecessary risk of disturbing the original sealed OEM glass.

39. Nothing can duplicate the factory seal of an original installed windshield since it is sealed with a symmetrical bead of urethane into a vehicle's frame pursuant to an automated machine process under strict quality control conditions, including indoor temperature, humidity and cleanliness regulation—all of which greatly reduces the number of human and environmental variables that can detrimentally impact the quality of the installation. If a windshield is not installed under robotically climate controlled factory conditions, human error can cause any number of potentially fatal windshield failure scenarios (*e.g.*, by materially altering torsional rigidity, air bag crash pulse, installation stress, and roof support).

40. Apart from these two safety concerns, a second reason that repairing a damaged windshield is preferable to entirely replacing the windshield is because repair costs much less than windshield replacement.

41. Repairs are relatively inexpensive to perform, the material costs for the resin that fills and seals the damaged area are low, and the process usually takes less than an hour (depending on the number of chips or cracks, and their size and length). In general, the cost of repairing stone-chip damage is usually no more than $65, while the cost of repairing a crack is generally $100-$150.

42. On the other hand, an OEM or non-OEM ARG windshield replacement requires purchase of an entirely new windshield typically costing a consumer hundreds of dollars and is many times the cost of performing a routine glass repair. It involves a vehicle owner's purchase from, and installation by, an auto shop of a windshield that is substitutable for the vehicle's original factory-sealed OEM windshield (i.e., relative to the make, model and year of the vehicle).

### D. **The VGRR Industry**

43. The VGRR industry services insurance, retail and commercial customers. The claims in this complaint relate to those individual insurance and retail consumers for whom Defendants had (and have) a legal duty to refrain from making false or misleading descriptions of fact, or false or misleading representations of fact, as required by the Lanham Act.

44. "Insurance customers" generally refers to those repair or replacement jobs where the cost of the glass service to fix any windshield damage is covered by a customer's automobile insurance policy and will be paid *less any applicable deductible* by the customer's insurance company.

45. "Retail customers" generally refers to those repair or replacement jobs where the cost of the glass service to fix any windshield damage is paid by a customer out-of-pocket without the use of insurance (usually because the customer has not purchased insurance coverage for glass damage or the customer is concerned that a glass repair or replacement claim processed using insurance will be reported in his or her individual loss history (CLUE Report) and possibly cause a future premium increase[1]).

46. "Commercial customers" generally refers to service accounts for businesses or governmental agencies who operate a fleet of vehicles that require periodic glass repair and replacement work (such as car rental agencies, delivery companies, etc.).

47. "Insurance customers" account for the largest percentage of all repair and replacement jobs in the estimated $3.2 billion per year VGRR service industry.[2] Furthermore, according to Safelite AutoGlass, "windows create more insurance claims than any other part of the car."[3]

### E. Insurance and Non-collision Windshield Damage

48. Most auto insurance policies cover insureds' claims for damage caused to their vehicles' windshield glass as first-party property damage claims under their insurers' "comprehensive" coverage provisions. Comprehensive coverage indemnifies "non-collision"

---

[1] On information and belief, windshield repair or replacement claims reported to insurers for handling as part of their non-collision, glass breakage programs are memorialized in each claimant's individual loss history as part of an insurer-shared "Comprehensive Loss Underwriting Exchange" database (known as "CLUE").

[2] This same source states that "[m]ore than 11 million auto glass service incidents take place every year, and that 70 percent of these are influenced by the insurance industry." *See* http://industrytoday.com/article_view.asp?ArticleID=93.

[3] *See* http://www.autoinsuresavings.org/automobile-insurance-companies-have-auto-glass-claims-than-any-other-claim/.

automobile damage, such as theft and vandalism, and accidental occurrences, such as hitting a deer, a toppling tree or glass breakage due to chips or cracks.

49.     When there is a deductible limit under "comprehensive" coverage, the obligation of an insurer to indemnify an insured for the cost to repair or replace the damaged property is reduced by the deductible amount.  Therefore, any amount up to and including the deductible is an out-of-pocket cost paid by the insured and is not covered by the insurance company.

50.     Most insured drivers who have comprehensive coverage also have deductible limits.  On information and belief, a significant percentage, if not more than half, of all insureds' policies contain deductible limits of $500 and higher for comprehensive coverage.

51.     Most insurers agree to waive their policyholders' deductibles in connection with doing windshield repair (and will fully pay this relatively small cost).

52.     By comparison, no insurance company has a policy to waive insurance deductibles for windshields replacements (although Florida, Kentucky, Massachusetts, and South Carolina have specifically legislated that deductible limits must also be waived by operation of law in this situation).  Consequently, a significant percentage of policyholders end up having to pay out-of-pocket in whole or in part for windshield replacements because they have a deductible.

53.     In addition, most insurers' non-collision comprehensive coverage for automobile glass damage does not offer indemnity for the purchase and installation of higher priced OEM replacement windshields. On information and belief, OEM windshields represent only a very small percentage (between three to five percent) of the total annual number of windshields that are purchased in association with insurance replacement claims.

F. **Marketplace Competition for the Insurance Segment Of The VGRR Industry**

54.     The windshield repair and replacement insurance industry has undergone significant changes over the last two decades.  Historically, the industry was comprised of small, independent glass shops and larger businesses that competed amongst themselves by offering either repair or replacement services (but usually not both) to potential insurance and retail customers with damaged windshields.

55.      This landscape has changed as insurance companies began to use third party administrators ("TPAs") to process the large volume of their policyholders' non-collision windshield breakage claims, in an effort to reduce administrative costs by centralizing claims handling and payment processing.

56.     In general, TPAs are equipped to provide much of the administrative services related to insurance claims that the insurance company would otherwise be required to handle in house including, but not limited to: 1) maintaining toll-free telephone numbers dedicated to insurance company clients' vehicle glass claims; (2) staffing national call centers with trained customer service representatives ("CSRs") to answer agent, policyholder, and insurance company calls; (3) answering the first-notice-of-loss ("FNOL") call from the policyholder, agent, claims representative or glass shop reporting a vehicle glass claim; (4) adjusting the claim by obtaining information regarding a policyholder's vehicle glass claim, including vehicle and damage information, so that the repair or replacement can be performed; (5) assisting with scheduling the repair or replacement services; and, (6) managing and processing invoices and payments between the insurance company and VGRR shops.  Additionally, a TPA might maintain a website that allows for insurance claims to be adjusted and processed "online".

57.     For any given insurance company, the TPA might provide some or all of these services.

58.     Another significant aspect of the relationship between a TPA, the insurer, and the policyholders is that TPAs often create a network of glass shops that enter into network participation agreements ("NPAs") with TPAs to provide *both* repair and replacement services for the insurance policyholders whose claims are processed through the TPA.

59.     While the TPAs operate their glass shop networks under the guise of the insurance company, they are in fact operated and maintained by the TPA. Furthermore, each participating glass shop -- in exchange for the benefit of possibly being referred more business via the TPA --agrees to abide by the parameters and standards dictated by the TPA for providing both repair and replacement services.

60.     As a result of the development of these windshield manufacturer TPA-run glass networks, not only has the independent windshield repair only market been subsumed by the replacement industry, but TPAs that are also windshield manufacturers have in effect become the gatekeepers that control the parameters and standards for performing windshield repairs and replacements around the country.

61.     Safelite Group's TPA-run network consists of approximately 500 Safelite Fulfillment-owned shops and 9000 independent automotive glass shops who have executed NPAs with Safelite Solutions.

62.     Among other things, non-Safelite Fulfillment participant shops agree under their executed NPAs to maintain adequate liability insurance, warranty their glass replacement work, indemnify Safelite (and its insurer clients) for any warranty damages, perform Safelite Solutions' TPA-requested windshield repair and replacement services in accordance with accepted industry

standards, and be paid for all performed automotive repair and replacement work at the pricing levels which Safelite Solutions negotiates with its insurance company clients to pay on behalf of their insureds (net of any deductible).

63. Independent VGRR shops in many ways have a difficult decision in terms of deciding whether or not to execute a TPA's NPA since the price of joining a network is steep. For example, Safelite is a business competitor of the independent VGRR shops and the Safelite Solutions' NPA does not obligate Safelite Solutions to provide the independent participant shops that join its TPA-run network with any guaranteed minimum level of repair and replacement work. Moreover, the pricing terms are non-negotiable and typically set at below market rates.

64. But not joining a TPA's network results in lost business opportunity because TPAs are the threshold portal for an enormous volume of insurer-referred VGRR business and, by virtue of their control of the initial (FNOL) conversation with policyholders, TPA's have tremendous influence over insureds' choices, including shop selection.

65. Safelite Group's TPA-run network of automotive shops currently handles at least forty percent (40%) of all insurance VGRR claims reported per year across the entire United States.

**G.** **The "Six Inch Rule" and the Repair Segment of the VGRR Industry**

66. It had been historically believed since the beginning of the windshield repair industry in the 1970s that repair of Long Cracks was infeasible. In the VGRR industry, this arbitrary, unscientific accepted rule of thumb was always that a damaged windshield had to be replaced (and could not be repaired) if the damage was longer than six inches (which eventually became colloquialized in the industry as the size of a "dollar bill" rule).

67.     However, in 1989, Campfield invented groundbreaking repair theories and technologies that debunked the "six inch rule" and allowed any automotive glass repair technician to repair all cracks regardless of length (only using the proper method, tools, and resins).

68.     Specifically, Campfield and/or Ultra Bond hold (or have held) several patents that cover (or have covered) methods of repairing Long Cracks, the tools to be utilized when repairing Long Cracks, and the specific viscosities of chemical resins which are suitable for repairing Long Cracks.

69.     The method originally developed by Campfield is known as the "Ultra Bond" process, which uses his invention of a previously unutilized "multi-viscosity" resin method.

70.     As more fully outlined in United States Patent 5,116,441 (the "441" Patent), 5,425,827 (the "827" Patent), and 5,429,692 (the "692" Patent) (issued between May 26, 1992 and July 4, 1995, the Ultra Bond process involves using a series of specialized tools and multi-viscosity resins to repair a Long Crack. *See* Exhibit A; collectively the "1990s Patents")

71.     The 1990s Patents have expired but, in September 2012, Campfield was awarded United States Patent 8,268,104 (the "2012 Patent") which employs a method of using UV cationic epoxy to repair cracks and breaks in windshields.  The UV cationic epoxy method is even easier to use by eliminating oxygen inhibition, shrinkage and dark cures after any exposure to UV.  *See* Exhibit B.

72.     The vast majority of windshield damage occurs from stones hitting the windshield and causing a fracture that will result in two types of damage:  either a stone-chip, or, an edge crack.

17

73.     If a stone hits the outer two inch perimeter edge area of a windshield, it will typically result in an edge crack over six inches due to the combined effect of a number of manufacturing defects and mechanical stresses that are acting on the windshield.  First, a manufacturing defect (residual stress) causes the outer perimeter edge to be the windshield's weakest area, so that this area fractures much easier than the rest of the windshield when struck by a stone.  Second, the black Frit on the inside layer causes heat and thermal stress in this already weakened zone and Third, a mechanical stress induced by installing and gluing the windshield into the vehicle's frame causes a stone-chip as small as a pin-head which occurs in this weak zone to elongate instantaneously to about eight to ten inches (which is when the overall strength of glass from being bonded to the inner PVB laminate exceeds the induced mechanical stress, and arrests the crack from continuing).

74.     The edge crack is by far the most prevalent type of windshield crack, is the number one cause of replacements and, manifests itself as a Long Crack 95% of the time.

75.     Campfield's "Ultra Bond" process involved his development of specific edge crack resins and tools to inject them which make the edge crack repairable regardless of its length, by effectively overcoming the mechanical stresses induced at the windshield's edge area. The tools developed by Campfield slide along the crack and inject the proper resins (including multiple viscosity resins) into the crack to match the gap and different stresses which are exerted along the gap as the crack elongates and seals the PVB.

76.     Prior to the development of the "Ultra Bond" process, edge cracks could not be repaired because the stresses were greater than the resins used at the time could withstand and the resins used would not stay bonded to the PVB. However, with the advent of the original Ultra

Bond multi-viscosity method under the 1990s Patents, the resin issues were completely solved and made repair of edge cracks possible (and indeed preferable to windshield replacement).

77.     Competitors have acknowledged that the Ultra Bond method of using multiple viscosities to repair Long Cracks as covered by the 1990s Patents is effective:  Paul Syfko, an executive with Glass Medic, which is a Belron-owned sister company of Safelite that markets and sells Belron's Glass Medic repair system (the repair system used by Safelite) has acknowledged in sworn deposition testimony that Glass Medic has told people looking to fix longer cracks to use multiple viscosities (which again was covered under the 1990s Patents) to fix Long Cracks. *See* Exhibit C (exhibit highlighted in relevant part).

78.     By comparison to an edge crack, a stone-chip originates when a stone hits beyond the outer two inch perimeter edge area of the windshield (meaning, closer to the middle of the windshield).  Stone-chips are generally smaller than the size of a dime and are almost never larger than the size of a quarter.  This is because stone-chips only occur beyond the windshield's outer two inch perimeter edge area (which is the windshield's weakest zone), and there are no manufacturing or mechanical stresses being exerted on the initial glass fracture to cause the stone-chip to instantaneously elongate into a Long Crack.

79.     A stone-chip only elongates into a crack greater than the size of a quarter when there is extreme temperature or a sudden temperature change.  When this occurs, it is called a floater crack because the crack does not occur along the outer edge of the windshield, but instead appears to float within the body of the windshield itself.  And similar to an edge crack, a floater crack will manifest itself as a Long Crack 90% of the time.

80.     Prior to the development of Campfield's "Ultra Bond" process in 1989, only chips and floater cracks which did not elongate into Long Cracks due to temperature extremes or

sudden temperature changes were repaired, since repair system manufacturers did not market a tool which would enable the repair of floater cracks longer than six inches with resins that would seal the PVB.

81.     Beginning in 1989, however, the Ultra Bond method allowed any trained automotive glass repair technician to repair any floater crack regardless of its length by using the Ultra Bond sliding tools for injection of these thicker and stronger resins.

82.     The effectiveness of the Ultra Bond method is proven. Testing has shown that windshields with Long Cracks that have been repaired using the Ultra Bond tools and repair process pass the same structural integrity tests (Federal Motor Vehicle Safety Standard 205 (American National Standards Institute ("ANSI") Z.26.1)) as new OEM windshields and in fact have been tested to be as strong  as new OEM windshields.

83.     Additionally, the historical rates of customer satisfaction, as judged by warranty claims and customer complaints, is over 99% for windshields repaired using the Ultra Bond method. The improved Long Crack repair method covered by the 2012 Patent is even easier to use than the methods covered by the 1990s Patents.

**H.     The VGRR Industry's Newly Established Standards for Servicing of Long Cracks Reveals that Adherence to the "Six Inch Rule" is a Misrepresentation.**

84.     On June 20, 2007, the American National Standards Institute approved windshield repair standards jointly developed by the National Glass Association and the National Windshield Repair Association.  These industry standards, entitled the "Repair of Laminated Automotive Glass Standards" (hereinafter "ROLAGS" or "ROLAG Standards") established that windshield cracks up to and including 14 inches are repairable. *See* Exhibit D at p. 4 (exhibit highlighted in relevant part).

85.     ROLAGS represents the auto glass industry's statement of best practices as compiled under ANSI guidelines, by a committee of windshield repair system manufacturers, auto glass manufacturers, windshield repair and replacement retail practitioners, Insurance TPAs, the three auto glass trade associations and other interested parties.

86.     At the time, the Standards Development Committee for ROLAGS included David Erwin, of Safelite AutoGlass, as well as Paul Syfko, of Glass Medic America/Belron. *See* Ex. D Foreword at p. iii (exhibit highlighted in relevant part).  Mr. Syfko was active during the development of the ROLAG Standards and in advocating for Long Crack Repair. Both he and Safelite's representative, David Erwin, voted in favor of the newly adopted June 20, 2007 ROLAGS 14 inch Long Crack windshield repair standard.

87.     The 2007 standards expressly dictate that the intention of the ROLAGS committee was that the standards be used "to consistently evaluate damages on laminated auto glass in order to aid in the decision to repair or replace the glass"; and furthermore state "that the "Scope of th[e] standard shall be to define: Repairable damages[.]" Ex. D at p. 1.

88.     On February 11, 2014, the American National Standards Institute approved an updated version of ROLAGS that again established that cracks up to and including 14 inches can be repaired. *See* Exhibit E at p. 4 (exhibit highlighted in relevant part).

89.     In spite of this industry standard, as detailed below, Safelite continues to make false and misleading statements to its retail and insurance customers about the option and benefits of Long Crack repair, and persists in utilizing an arbitrary, unsupported "Six Inch Rule" cut off for windshield repairs.

I.    **Safelite Misleads Policyholders and Retail Customers About the Need For Windshield Replacement and the Propriety of Long Crack Repairs**

a)    **Safelite's Customer Service Communications with Policyholders**

90.    Defendant Safelite Group is a vertically-integrated automobile glass and claims management service organization that is constituted by four major business operations.  This fact alone makes it unique in regard to its provision of VGRR services to the consuming public.

91.    Besides providing third-party administrative services to insurers with its own dedicated network of VGRR shops for the handling of policyholders' non-collision glass claims (through Safelite Solutions), Safelite Group also manufactures non-OEM ARG windshields (through Safelite Glass Corporation), sells replacement windshields across the country wholesale to VGRR shops (through Service Auto Glass), and operates the largest retail repair and replacement organization in the United States (through Safelite Fulfillment shops).

92.    These interdependent operations have helped Safelite Group to become the largest TPA of automobile insurance glass claims in the country (servicing more than a hundred different insurance companies' glass breakage programs).

93.    When policyholders of carriers who have joined the Safelite Group TPA-run claims organization call their carrier to report a glass claim, the incoming call is automatically routed to a Safelite Solutions CSR at one of Safelite Solutions' national call centers.  Safelite Solutions answers these FNOL calls with a recorded greeting that informs the caller that Safelite Solutions is answering the call on behalf of the insurance company, and that the call may be monitored or recorded.

94.    Safelite Solutions' computer and phone systems are synced to recognize the incoming FNOL calls, so that the answering CSRs will process the policyholder's call by

following a series of scripted cues (or prompts) that are displayed in stages along an "insurance" track that is automatically shown on each CSR's computer terminal.

95.    The CSR reads the first portion of the "insurance" track's computer-generated script, takes or provides information as commanded by the script, and is then presented with the next stage of the script based upon the caller's prior response.

96.    CSRs are trained and are required to read the script precisely as written, and to strictly follow the sequenced stages as they are shown on their computer screens without deviation.  Safelite Solutions supervisors constantly monitor the CSRs to ensure that that this is done; and for additional compliance and quality assurance purposes, all calls are recorded by Safelite Solutions and retained for a number of years as business records.  Failure by a CSR to adhere to the computer-generated script will result in disciplinary action or termination.

97.    The Safelite Solutions computer and phone systems are also synced to permit policyholder insurance information (available from the insurer) to be accessed electronically by the answering CSRs.  This information typically includes the make, model and year of the insured vehicle, the automobile coverages in effect for the policyholder, the policyholder's deductible limit (if any) for those coverages, and the policyholder's address and telephone number.

98.    Following the "insurance" track's scripted prompts to adjust the policyholder's glass claim as an insurance customer typically takes a CSR less than 10 minutes.

99.    In the appropriate sequence, the "insurance" track's computer displayed script will prompt the CSR, among other things, to:  (a) verify the policyholder's insurance coverage using the insurer's provided electronic data, (b) confirm the caller's deductible limits (if any), (c) describe select features of the insurer's glass program, (d) ascertain the make, model and year of

the caller's vehicle and any special attributes about the damaged windshield glass (such as the existence of logos or rain sensors imbedded in windshield glass), (d) adjust the claim by collecting information about the size of the windshield damage, as well as how it occurred, and (e) assist the policyholder in scheduling work with a glass shop to have the damaged windshield repaired or replaced.

100.    While certain aspects of the scripted language may vary somewhat based upon the specific insurance company client of Safelite, the Safelite script uniformly fails to include any information that permits a CSR who is processing and adjusting an insurance damage claim to disclose to the policyholder the option or benefits of performing a windshield repair when the size of the windshield crack is larger than a dollar bill (six inches).  Rather, when a windshield has a Long Crack, Safelite's script automatically compels the CSR to simply process the insurance claim as requiring a windshield replacement.

101.    In a recent public filing in the United States District Court for the District of Connecticut, Safelite acknowledged that it has a policy of omitting any and all discussion of a Long Crack windshield repair.  Safelite stated: "if a policyholder indicates during the call that his car's windshield has a crack that is smaller than a dollar bill, the script will prompt the customer service representative to discuss with the policyholder the possibility of repairing the windshield, rather than replacing it…[b]ut if the policyholder indicates that the crack is larger than a dollar bill, the script will skip the discussion of repair options and show the operator the next section of the script."[4]

_____

[4]    *See Safelite Group Inc. v Jespen*, Case 3:13-cv-01068, Doc. 2-1, USDC, District of Connecticut, at p. 7.

102.    In the event that a policyholder does inquire or request of his or her own volition about the possibility of repairing a crack longer than six inches, Safelite Solutions' CSRs falsely tell insurance customers that repair in these circumstances either:  is not safe; is unlikely to hold; or, will compromise the structural integrity of the windshield.

103.    Further, unless an insurance customer specifically inquires about the possibility of using OEM glass or scheduling the replacement work with a non-network shop, the script automatically compels the CSR to process the insurance claim by having a Safelite shop install one of Safelite's non-OEM manufactured or distributed ARG windshields.  There is no disclosure that non-OEM windshields manufactured or distributed by Safelite are an inferior quality product as compared to OEM windshields, which would be material to any reasonable consumer's decision to consider repairing their windshield even if the crack is longer than six inches rather than replacing the windshield with a non-OEM windshield.  In fact, in the event that an insurance customer specifically inquires about any difference between Safelite's non-OEM ARG windshields and OEM windshields, Safelite Solutions' CSRs tell insurance customers that they are equivalent.

104.    By processing claims and scheduling appointments in this manner, Safelite is falsely telling consumers that cracks longer than six inches are not repairable as well as misleading consumers by omitting material information—namely, the industry-accepted option of safely (and less expensively) repairing windshields with Long Cracks. These material misrepresentations and omissions harm the public as well as Plaintiffs.

105.    Safelite cannot claim ignorance of the industry standards, inasmuch as it was one of the companies present during the deliberations that set the standards, and is one of the committee member companies "represented" on the 2007 ROLAG Standards. *See* Ex. D,

Foreword at p. iii (exhibit highlighted in relevant part).  Instead, Safelite has intentionally chosen to ignore the industry standard for its own financial gain.

106.    Indeed, Belron's Glass Medic America has even advertised equipment in a manner that shows it supported the viability of Long Crack repair.  *See* Exhibit F.

107.    Safelite's material misrepresentations and omissions about the viability of Long Crack repair (while it is acting in its capacity as a TPA providing the service of processing insurance claims for insurance policyholders) are made with knowledge intended to induce consumers to enter into a windshield replacement transaction.

108.    Safelite has clear motive to promote windshield replacement, and to induce insureds into entering windshield replacement transactions (as opposed to windshield repairs of Long Cracks), because by inducing a policyholder to enter into a windshield replacement, Safelite Solutions ends up benefiting other parts of Safelite's core businesses and making greater profits (as compared to increasing the percentage of its lower-priced repair revenues).

109.    Safelite Fulfillment benefits from the arbitrary "six inch rule" because the rule converts the majority of windshield crack repairs into windshield replacements, and Safelite charges (insureds) around three times as much for replacements around $300-$350, as opposed to Long Crack repairs which are generally around $100-150.

110.    Safelite Solutions persists in repeating the inaccurate "six inch rule" because it benefits by lowering its insurer clients' overall claims costs for fixing windshield damage since, as previously stated, insurers waive their policyholders' deductibles when there is a windshield repair, but do not waive their policyholders' deductibles when there is a windshield replacement. Accordingly, an insurer client of Safelite Solutions pays zero most of the time a policyholder has a windshield replacement since the average deductible is higher than the cost to purchase and

install an ARG windshield.  This savings to the insurer clients of Safelite Solutions translates into their continuing referral of windshield breakage business to this TPA which, in turn, serves to reinforce Safelite Fulfillment's and Safelite Solution's financial motivation for continuing to ignore the industry-accepted option of safely (and less expensively) repairing windshields with Long Cracks.

111.    Additionally, many of the non-OEM ARG windshields sold and installed at Safelite Fulfillment shops are either manufactured by Safelite Glass Corp. or purchased and sold through Safelite's Service Auto Glass thereby further padding Defendants' profits.

112.    The influence that Safelite has on policyholders and whether they choose to proceed with a windshield repair or a windshield replacement cannot be overstated.  The insurance companies themselves have an independent duty to deal fairly, honestly and in good faith with their policyholders when handling glass claims, and Safelite Solutions in its capacity as TPA serves as the insurers' trusted surrogate when discharging the insurers' obligations under this quasi-trust relationship.

113.    Most of the policyholders making FNOL claims to their insurers do not have any knowledge about windshield repairs or replacements—leaving them vulnerable to any and all recommendations made by Safelite.  In Safelite's own words: "[V]ehicle glass claims are not a frequent occurrence for most car owners, policyholders often rely on their insurance company or its representatives to assist with a recommendation of a vehicle glass repair shop and for assistance scheduling an appointment at the shop."[5]  Thus, policyholders are particularly susceptible to Safelite Solutions' representations regarding the "six inch rule" when offering

_____

[5]    *See Safelite Group Inc. v Jespen*, Case 3:13-cv-01068, Doc. 2-1, USDC, District of Connecticut, at pp. 7-8.

either inexpensive repair or costly replacement services, and its systematic practice and policy of never disclosing that there is a middle of the road cost alternative under the governing industry standards for safely repairing Long Cracks.

114.    Further, most policyholders are unaware of the conflicted economic relationship between Safelite Solutions (operating in a quasi-trust capacity as their insurer's TPA) and Safelite Solutions (operating as a conduit for higher-priced windshield replacement sales to benefit Safelite's affiliated retail, manufacturing and distribution businesses). Safelite Solutions does not disclose this material information about how it has a direct financial interest in the type of repair option chosen by the policyholder as part of its intake scripts for policyholders' FNOL claims.

115.    All of these false and/or misleading misrepresentations and nondisclosures by Safelite in regard to Long Crack repair significantly impact and deceive a large portion of the public.

116.    As previously alleged, Safelite Fulfillment serves more than 4.1 million customers each year (including both retail and insurance customers). Of those customers, only slightly over 1 million jobs result in repair of windshield chips and cracks shorter than six inches with the remainder being mostly windshield replacements. Safelite has created a promotional and/or advertising scheme based on deception related to the viability of Long Crack repair.

**b)      Safelite's Website Representations To Retail Customers And Policyholders Alike**

117.    Safelite does not limit its false statements about the viability of windshield repair to its false and misleading omissions during its TPA scripted communications with policyholders. Safelite's website, https://fixmyglass.safelite.com/External/GlassDamage.aspx,

also makes false and misleading material affirmative misrepresentations and omissions about the viability of repairing Long Cracks.

118.    Specifically, the Safelite website currently represents against the guidance of the ROLAG Standard, by falsely listing (seemingly as a criteria) under a heading entitled "Replace my windshield" -- "Damage larger than 6""; and likewise asking under a heading entitled "Repair my windshield" -- "Does the chip or crack fit under a dollar bill?" Both misrepresentations falsely convey the message that 6 inches is the absolute cut off line and that cracks over six inches are not repairable. Additionally, an accompanying video placed on the website entitled "Windshield repair" expressly states that: "If the damage spreads beyond the size of a dollar bill a replacement will be necessary".

119.    In addition, prior to this particular formulation, the Safelite website similarly represented against the guidance of the ROLAG Standard, by falsely stating "Your windshield helps keep you safe. **If the damage is larger than 6"**, it cannot be repaired. You need a replacement."  (Emphasis supplied in original on-line text.) Prior to that articulation the website falsely stated (to customers who indicated on-line in response to certain questions posed by Safelite that they had a crack larger than the size of a dollar bill) that:  "It sounds like we need to replace your windshield.  This is because if the damage is too big…the structural integrity of the glass is damaged beyond repair."

120. In    addition,    Safelite's    website    contains    another    video    at lwww.safelight.com/windshield-replacement/   which   falsely   implies   that   its   windshield replacement is as safe as a factory-installed OEM windshield.  Specifically, in that video, Safelite depicts an OEM factory robot installing a windshield on the vehicle assembly line with a Safelite model stating in the background "In the factory high tech robotics installed your original

windshield precisely.  That precision inspired us to create our exclusive True Seal Technology which consistently places the new glass in perfect position for a strong reliable bond.  That's just another reason to choose the Safelite advantage."

121.    As discussed at ¶39 above, nothing can duplicate the factory seal of an original installed windshield which is a material aspect of ensuring the safety features of an OEM windshield such as torsional rigidity, air bag crash pulse, installation stress, and roof support. Safelite makes these misrepresentations and omits material information concerning the safety disadvantage of non-OEM installed windshields versus OEM installed windshield to further its goal of convincing consumers that replacing the windshield has no safety implications – all to increase its profits by convincing consumers to replace a windshield as opposed to repairing it. Indeed, in its <u>internal</u> Training Reference Guide under the section entitled "Benefits of Repair" subsection "Safety", Safelite admits this fact stating that:  "While we provide the highest quality windshield replacements, nothing can duplicate the factory seal of the original windshield. On the assemble-line, the original windshield is put in by machine, in a controlled environment, before the vehicle has had any exposure to outside elements. By opting for a Safelite repair the original factory seal is preserved."

122.    These website misrepresentations are viewable to retail and insurance customers alike, who are interested in trying to decide what they need to do to fix the type of windshield damage they have suffered; and further, if they want to pay to fix the windshield damage independent of or in conjunction with their comprehensive insurance coverage.

   **c)**  **Safelite's Additional Misrepresentations To Policyholders Who Are Actually Aware of the Benefits of Long Crack Repair**

123.    Safelite also makes misrepresentations regarding pricing to policyholders (and glass shops) in order to further undercut the market for Long Crack windshield repairs.

30

124.    Specifically, when policyholders on their own initiative or in conjunction with an independent automobile glass repair shop contact Safelite Solutions (serving as the administrator for an insurance claim) about that shop doing a Long Crack repair, Safelite Solutions only offers to pay the repair shop the same reimbursement as for a chip repair (often at or below $65-75) and misrepresents to the insured (and to the shop) that such a rate is the "prevailing rate" for all repairs (*including* Long Crack repairs).

125.    This is false.  Long Cracks are more expensive to fix than chips due to the need to purchase specialized equipment and resins, and increased material and labor costs, but the cost to repair a Long Crack is still significantly less than the cost to purchase and install a windshield replacement.  However, the so-called "prevailing rate" that is quoted by Safelite Solutions to the insured (and to the shop) as the limit on what amount it will pay for performing windshield repair only reflects the labor time and material costs that Safelite Solutions compiles based on the types of repair that it has previously agreed to pay its shops to perform under its NPA: namely, chip windshield repairs only.  (Safelite Fulfillment shops do not perform, and are not authorized to perform, any Long Crack repairs.)  Accordingly, Safelite Solutions' represented "prevailing rate"—being based on an artificially circumscribed loop of pricing information of chip repairs -- significantly understates the necessary labor time and added material costs to perform Long Crack repairs in a professional and competent manner.

126.    Therefore, when policyholders on their own initiative select a VGRR shop and asks them to perform a Long Crack repair, the VGRR shop has a choice to either be under reimbursed for its more involved work or force the insureds to pay for part of that service (above their deductibles).  In this situation, most shops are unlikely to agree to being underpaid for their services and if the shop insists on the latter option, it is likely to deter the policyholder from

proceeding with repair of a Long Crack. In all events, Safelite's misrepresentations about the so-called "prevailing rate" contribute to its concerted suppression of the market for Long Crack repair.

### J.   Safelite Has Caused Ultra Bond Significant Damage Due To Its Misrepresentations and Nondisclosures Concerning Long Crack Repair

127.    Ultra Bond sells repair kits, resins, primers, additives and pre-treatment chemicals and tools necessary to complete Long Crack repair using the multi-viscosity method. Additionally, Ultra Bond sells refills of the resins that function best with its system of repair.

128.    Also, while the multi-viscosity method patent expired in 2012, Ultra Bond and Ultra Bond Licensing continues to "license" the "know how" required for properly utilizing the multi-viscosity method of repairing windshields, which requires instruction for proper performance.

129.    As previously alleged, the benefits of windshield repair of Long Cracks (as opposed to windshield replacement) are significant to the consuming public, both in terms of safety and cost.

130.    However, despite the early success of the Ultra Bond system for repairing Long Cracks when first introduced, Plaintiffs' subsequent sales and licenses to VGRR shops and related businesses in the United States have been significantly hampered.

131.    The cause of Plaintiffs' low sales and reduced licenses is not the performance of the Ultra Bond system; rather, it is the false and/or misleading material misrepresentations and nondisclosures made by Safelite to its retail and insurance customers about repair of Long Cracks. If retail and insurance customers were truthfully informed about the option of Long Crack repair, they would seek out  shops that perform this service and, in turn, VGRR shops and

related businesses would purchase or license Plaintiffs' products in order to be able to offer this service.

132. Safelite controls large swaths of the market for VGRR services via its role as the country's dominant TPA and retailer of windshields. As previously alleged, however, Safelite Solutions deliberately fails to inform insurance policyholders altogether about the availability of industry-standard Long Crack repair. Additionally, via its website, Safelite Group, Safelite Fulfillment and Safelite Solutions make false affirmative misrepresentations that are contrary to industry standards governing Long Crack repair and directly lead both insurance and retail consumers into believing that windshield replacement is the only option for a windshield with a Long Crack.

133. Upon information and belief, if Safelite truthfully informed its retail and insurance customers about the option of Long Crack repair, over 90% of consumers would choose to perform cheaper and safer Long Crack repair over more expensive and more dangerous windshield replacement that is almost always done with an undisclosed, inferior non-OEM ARG windshield. Nevertheless, despite clear industry guidelines in place since 2007, Safelite engages in misrepresentations and nondisclosures concerning Long Crack repair for its own benefit and to the detriment of the public.

134. Because informed consumers would choose Long Crack repair if Safelite did not engage in misrepresentations or omit material information, automotive shops and related businesses *would have to* purchase a system capable of performing satisfactory Long Crack repairs to meet increased consumer demand or risk losing out on increased windshield repair business. This increased customer demand for, and satisfaction with, Long Crack repair would have resulted in more sales (and profits) for Plaintiffs but for the deceptive conduct of Safelite.

135.    In addition to lost profits due to Ultra Bond's inability to sell its original Long Crack repair system, Plaintiffs have not been able to develop, market or license a more advanced system for Long Crack repair for which Richard Campfield obtained a patent in September of 2012 to which Ultra Bond has exclusive right to.

136.    The Ultra Bond repair system as originally patented utilized an acrylate-hybrid UV "radical" cure.  However, as described above, in September of 2012, Ultra Bond obtained the 2012 Patent, which is a method of using UV cationic epoxy to repair cracks and breaks in windshields.  The UV cationic epoxy method under the 2012 Patent is even easier to use by eliminating oxygen inhibition, shrinkage and dark cures after any exposure to UV.  In addition, once cured, UV cationic offers extreme clarity and greater temperature and moisture resistance. *See* Ex. B.  The 2012 Patent represents yet another breakthrough in the technology of Long Crack repairs.

137.    However, because of the lost profits and destruction of the Long Crack repair market via Safelite's material misrepresentations and omissions, Ultra Bond has been unable to bring this more advanced technology to market. This has again resulted in further lost profits.

138.    In sum, Safelite's material misrepresentations and omissions about the viability of Long Crack repair have directly caused Plaintiffs significant lost profits by severely weakening the market that would otherwise exist for Ultra Bond's products and services.

## V.    CLAIM FOR RELIEF

### Violations of Section 43(a) of the Lanham Act

139.    Plaintiffs repeat and re-allege all allegations contained in the preceding paragraphs, as though fully set forth herein.

140.    Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) prohibits, *inter alia*, any "false or misleading description of fact, or false or misleading representation of fact

which . . . in commercial advertising or promotion, misrepresents the nature characteristics, [or] qualities . . . of . . . goods, services, or commercial activities."

141.    As described above, Defendants advertise and/or promote their windshield repair and replacement services in interstate commerce: (i) on the worldwide web; (ii) through Defendant Safelite Solutions' three national call centers in Columbus, Ohio and Chandler, Arizona staffed 24/7 by Defendants' customer service representatives trained to handle the FNOL calls using the set script described at ¶¶ 93-113,  in connection with Defendants' TPA services for more than 175 insurance and fleet companies; and (iii) through Defendant Safelite Fulfillment which operates in all 50 states, and is available to more than 95% of all drivers.

142.    As described above, Defendants: (i)  knowingly falsely state and/or misleadingly omit material information regarding the viability of repairing cracks longer than six inches; (ii) knowingly falsely tell consumers that windshield cracks longer than six inches require that the windshield be replaced and cannot be repaired; (iii) knowingly make false and/or misleading representations as to the benefits of Long Crack repairs services; (iv) knowingly make false and/or misleading representations disparaging Plaintiffs' Long Crack repair goods, services and business; and, (v) knowingly  misrepresent to insurance customers and shops the "prevailing rate" for VGRR shops to perform Long Crack windshield repairs.

143.    Defendants made (and continue to make) these knowing omissions and misrepresentations with the intention of inducing policyholders to enter into a windshield replacement transaction rather than a repair using the Long Crack method. As such, Defendants have misrepresented the nature, characteristics and qualities of Plaintiffs' Long Crack repair services.

144.    The misrepresentations and omissions relating Long Crack repair are material because, *inter alia*, windshields repairs are both safer and cheaper for the consumer than a windshield replacement.

145.    Defendants have full knowledge of the ROLAG Standard for repair of Long Cracks, but instead of adhering to it—they knowingly choose to misrepresent it to, and/or conceal it from, the public for the ulterior purpose of deceptively steering unwitting consumers into higher priced, less safe windshield replacement transactions.   Defendants benefit from performing as many windshield replacements as possible due to their owning:  a VGRR business that services retail and insurance consumers alike, a manufacturing business that produces non-OEM ARG windshields, and a wholesale distributing business that sells ARG replacement windshields to its TPA-network shops to install.

146.    Defendants' misrepresentations and omissions are likely to deceive or to confuse a substantial segment of the buying public and, upon information and belief, in fact have actually deceived or confused a substantial segment of the buying public.   Defendants' misrepresentations and omissions have influenced and are likely to influence the buying public's purchasing decisions. As it relates to insurance consumers, Safelite's misrepresentations and omissions have harmed the public because *inter alia* a) Safelite is the largest TPA; b) if repair industry guidelines were followed (and not concealed), a large percentage of windshield replacements could and would be repaired instead; and c) besides increasing drivers' safety by affording insureds the opportunity of performing Long Crack repairs, their deductibles payments would either be significantly less or waived entirely.

147.    As it relates to retail consumers, Safelite's misrepresentations that cracks over six inches are not repairable harm the public because Safelite's VGRR business replaces

36

approximately 3 million windshields a year, and absent Safelite's misrepresentations many of these replacements would result in cheaper and safer repairs.

148.     Upon information and belief, many of the windshield replacements performed by Safelite could in fact have been repaired if Safelite had utilized (and had truthfully made known to its retail and insurance customers) the industry standard for Long Crack repair. Data tabulated by Ultra Bond, from its own business records, suggests that an artificial, bright-line six inch rule, as opposed to adopting ROLAG Standards (i.e. forcing replacements on all cracks over six inches) has resulted in a situation where 80-90% of total replacements could in fact have been repaired had the market for Long Crack repair not been suppressed and negatively impacted by Safelite's misrepresentations and nondisclosures. For example, Ultra Bond's repair and replacement business in Grand Junction, Colorado markets and advertises both crack repair and replacement and tells every consumer the truth on their options to repair or replace, resulting in an 80-90% crack repair versus replacement ratio.

149.     Section 35 of the Lanham Act entitles a plaintiff, "subject to the principles of equity," to recover (1) the defendant's profits from the false advertising, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  In addition, Section 35 permits a court to award up to three times the amount of actual damages, and to adjust an award of the defendant's profits as the court sees fit according to the circumstances of the case. 15 U.S.C.A. § 1117.

150.     Plaintiffs have suffered injury in the form of lost business opportunities directly caused by Safelite's omissions and misrepresentations, which have wiped out a large portion (if not most) of the market for Ultra Bond's products and services.

151.    Absent Safelite's omissions and misrepresentations, Ultra Bond, Inc. and Ultra Bond Licensing would have sold millions of dollars of tools, resins, licenses, and consulting services related to Long Crack repair.  In addition, Ultra Bond Windshield Repair and Replacement in Grand Junction, Colorado and throughout Northeastern Pennsylvania would have been able to repair many of the windshields with Long Cracks that Safelite unfairly and deceptively caused its customers to fix by purchasing and installing replacements instead.

152.    Defendants' misconduct has also caused Plaintiffs to delay marketing and selling the improved Long Crack repair method patented under the 2012 UV Epoxy Patent.  As a result, Plaintiffs have suffered and will continue to suffer substantial lost profits associated with the delay in marketing and selling Ultra Bond's products and services associated with that proprietary process.

153.    Plaintiffs demand the amount of actual damages they have sustained, together with (if successful), the costs of this action together with reasonable attorney fees as determined by the Court.

154.    In addition, because Safelite has wrongly benefited from its deceptive practices and knowing misrepresentations by, *inter alia*, unfairly inducing retail and insurance customers to unnecessarily pay for more expensive and less safe windshield replacements at its VGRR shops, Plaintiffs demand damages in the form disgorgement of these ill-gotten gains.

155.    Lastly, Plaintiffs request that the Court impose an injunction requiring Safelite to desist from continuing to make false representations and misleading statements and/or nondisclosures about Long Crack repair.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, respectfully request that judgment be entered in their favor and against Defendants as follows:

A.      Enter judgments against each of the Defendants and in favor of Plaintiffs predicated on Defendants' violations of the Lanham Act on all claims as alleged herein;

B.      Enter an Order:

a.   Permanently enjoining Defendants from disseminating or causing the dissemination of any oral or written statements, expressly or by implication, that windshield cracks longer than six inches require that the windshield be replaced rather than repaired.

b.   Requiring Defendants to disclose to consumers that Long Cracks (as defined herein) may be repairable and that the American National Standards Institute has approved the "Repair of Laminated Automotive Glass Standards" which were jointly developed by the National Glass Association and the National Windshield Repair Association, and which generally approve of the utilization of Long Crack Repair as an alternative to windshield replacement.

c.   Requiring Defendants to disclose to consumers that repairing a Long Crack can be safer and/or safer less expensive than replacing a windshield.

d.   Requiring Defendants to disclose to consumers that Safelite is in the business of manufacturing and/or supplying ARG windshields used to replace a windshield damaged by a Long Crack and that Safelite has a profit motive to sell a Safelite windshield in connection with a windshield replacement rather than repairing a windshield with a Long Crack.

      e.   Requiring Defendants to disseminate corrective advertising for the misrepresentations and omissions regarding the repair of Long Cracks that Defendants made since the ROLAG Standards were adopted in 2007, in a manner to be determined.

C.      Enter an Order awarding  Plaintiffs the ill-gotten profits Defendants derived from their wrongful acts as complained of herein, as allowed by the Lanham Act;

D.      Enter an Order awarding Plaintiffs all damages sustained by them, including Plaintiffs' lost profits, reasonable attorney's fees, other costs of this suit, and  prejudgment and post-judgment interest, as allowed by law; and

E.      Enter an Order awarding such further and additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves demand a trial by jury on all issues so triable.

Respectfully submitted,

s/ *Drew Legando*

Drew Legando (0084209)
Jack Landskroner (0059227)
**LANDSKRONER GRIECO MERRIMAN, LLC**
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
T. (216) 522-9000
F. (216) 522-9007
E. drew@lgmlegal.com, jack@lgmlegal.com

Peter R. Kahana, Esq.
Michael Kane, Esq.
Y. Michael Twersky, Esq.
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103

T. (215) 875-3000
F. (215) 875-4604
E. pkahan@bm.net, mkane@bm.net
   mitwerseky@bm.net

Kurt B. Olsen, Esq.
**KLAFTER OLSEN & LESSER, LLP**
1250 Connecticut Ave., NW, Suite 200
Washington DC 20036
T. (202) 261-3553
F. (202) 261-3553
E. ko@klafterolsen.com

Fran L. Rudich, Esq.
**KLAFTER OLSEN & LESSER, LLP**
Two International Drive, Suite 350
Rye Brook, New York 10573
T. (914) 934-9200
F. (914) 934-9220
E. fran@klafterolsen.com

*Counsel for Plaintiffs*