Tab 16

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

---------------------------

RICHARD CAMPFIELD, et al.,

       Plaintiff,

    vs.           Case No. 2:15-cv-2733

SAFELITE GROUP, INC., et al.,

       Defendant.

---------------------------

VIDEOTAPED DEPOSITION OF DOUG HERRON

Columbus, Ohio

February 23, 2018

9:08 a.m.

Reported by:
Rebecca Williams, RPR
Job No. 53721

2

```
1
2
3
4              February 23, 2018
5                 9:08 a.m.
6
7          Deposition of
8   DOUG HERRON, held at the offices of Jones Day,
9   325 John H. McConnell Boulevard, Suite 600,
10  pursuant to Notice, before Rebecca Williams,
11  RPR, a Notary Public of the State of Ohio.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1
2          IT IS HEREBY STIPULATED AND AGREED,
3   by and between the attorneys for the respective
4   parties herein, that filing and sealing be and
5   the same are hereby waived.
6          IT IS FURTHER STIPULATED AND AGREED
7   that the within deposition may be sworn to and
8   signed before any officer authorized to
9   administer an oath with the same force and
10  effect as if signed and sworn to before the
11  Court.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
1
2   A P P E A R A N C E S :
3
4   FOR THE PLAINTIFF:
5      KLAFTER OLSEN & LESSER
6      1250 Connecticut Avenue Northwest,
7      Suite 200
8      Washington, DC 20036-2643
9      BY:  KURT B. OLSEN, Esq.
10        KO@klafterolsen.com
11
12
13
14  FOR THE DEFENDANT:
15      JONES DAY
16      325 John H. McConnell Blvd., Suite 600
17      Columbus, OH  43215-2673
18      BY:  MATTHEW A. KAIRIS, ESQ.
19        makairis@jonesday.com
20
21
22
23
24
25
```

5

```
1          THE VIDEOGRAPHER:  This begins the
2   video deposition of Doug Herron in the matter
3   of Campfield, et al. versus Safelite Group,
4   Incorporated, et al.  This matter is in the
5   United States District Court Southern District
6   of Ohio, Matter No. 215-cv-2733.  This
7   deposition is being held at Jones Day in
8   Columbus, Ohio.  Today's date is February 23rd,
9   2018.  The time is 9:07.
10         My name is Kurt Henschel, on behalf
11  of David Feldman Worldwide.  The court reporter
12  is Rebecca Williams, in association with David
13  Feldman Worldwide.  Would counsel please
14  identify themselves for the record.
15         MR. OLSEN:  Kurt Olsen, Klafter,
16  Olsen & Lesser on behalf of the plaintiffs.
17         MR. KAIRIS:  Matt Kairis on behalf
18  of the defendants, along with Brian DiMasi,
19  counsel at Safelite.
20         THE VIDEOGRAPHER:  Court reporter
21  please swear in the witness.
22         DOUG HERRON, called as a witness,
23  having been duly sworn by a Notary Public, was
24  examined and testified as follows:
25  EXAMINATION BY
```

2  (Pages 2 to 5)

6

MR. OLSEN:

Q. Good morning, Mr. Herron.

A. Good morning.

Q. Again, as you heard, my name is Kurt Olsen, and I'm counsel for the plaintiffs in this action. And before we get started with the substantive questioning, I would like to ask you, have you been deposed before?

A. I have.

Q. Okay. When's the last time you were deposed?

A. Probably two or three years ago.

Q. And what type of matter was that?

A. It was a retirement claim matter.

Q. Was Safelite the defendant in that action?

A. Yes.

Q. So I'll just be very brief. You understand that you are testifying today under oath, just as you would be in a court of law?

A. I do.

Q. And just as you did, please give a verbal response to my questions as opposed to just nodding your head one way or the other, so the court reporter can accurately transcribe

7

the response.

A. Okay.

Q. And I will do my best not to interrupt you, as long as you do your best not to interrupt me, and that way the court reporter doesn't hit both of us.

A. Sounds fair.

Q. If at any time you need a break, please let me know. We'll take a break. I just ask if there's a question pending, that you answer the question first.

A. Okay.

Q. You will hear objections by your counsel. As long as your counsel does not instruct you not to answer the question, after he's done objecting, you may continue, as long as you understand the question.

A. Okay.

- - - - -

(Thereupon, Deposition Exhibit 1, Notice of Deposition, was marked for purposes of identification.)

- - - - -

Q. Mr. Herron, you've just been handed a document marked for identification as Herron

8

Exhibit 1. It's our Plaintiff's Rule 30(b)(6) notice of deposition of Defendant. And have you read this document before?

A. No; I don't believe I have read this document.

Q. Mr. Herron, you've been designated as a corporate representative in connection with this notice to testify on -- with respect to certain topics that are listed in this notice.

- - - - -

(Thereupon, Deposition Exhibit 2, E-mail from Grose to Olsen, 1-15-08, was marked for purposes of identification.)

- - - - -

Q. If you would pull out Exhibit 2, which is an e-mail from Ken Grose to me, dated January 15, 2018.

A. This?

Q. Yes.

A. Oh, okay.

Q. In which Mr. Grose identified topics that you would be testifying on as Safelite's corporate representative. And what

9

I would like to do is go through the topics that you've been identified, and I know that Mr. Kairis and I had a discussion that there was a mistake in terms of being designated as the corporate representative for Topic 29, which relates to Safelite's communications with insurance companies regarding long crack repair. We'll work that out amongst ourselves later, but I just note for the record that we understand that that was an error.

Do you have an understanding of what a Rule 33- -- Rule 30(b)(6) witness is?

A. No; I can't say that I do.

Q. Okay. Your answers -- you will be testifying and binding the company with your responses, to the extent that I'm questioning you about the topics that you've been designated to act as the corporate witness, that's distinct from in your individual capacity. Do you understand that?

A. I do understand that.

Q. Okay. And so let's start with the topics that you have been designated for. The first one is Topic 8, which is found at Page 6 of Exhibit 1. Topic 8 is --

3 (Pages 6 to 9)

10

1      MR. KAIRIS: There's no question.
2  I actually want to take a quick break. I
3  have something just with regard to the topics he's
4  designated for, okay?
5      MR. OLSEN: Okay.
6      THE VIDEOGRAPHER: Off the record.
7      (Recess is taken.)
8      THE VIDEOGRAPHER: On the record.
9      Q.  Mr. Herron, turning to Topic 8 in
10  Exhibit 1, on Page 6.
11      A.  Yes.
12      Q.  And Topic 8 is, quote, "The actual
13  or estimated financial impact on your VGRR
14  sales and profit margins of either adhering or
15  not adhering to the ROLAGS in regard to the
16  limits of long crack repair, including any
17  study, survey, report or analysis of such
18  financial impact."
19          Have you read that topic before
20  today?
21      A.  I have.
22      Q.  And did you read that topic in
23  preparation for your deposition?
24      A.  I did.
25      Q.  Tell me about what did you do to

11

1  prepare for this deposition?
2      A.  Over the last day and a half,
3  yesterday and the afternoon before, I met with
4  Matt and some of his colleagues, along with
5  Brian, and reviewed a number of documents.
6  Talked about the questions that -- the topics
7  that I would be questioned on; so that was it.
8      Q.  So what did you do to prepare to
9  testify as the corporate representative on
10  Topic 8?
11      A.  Well, I read the topic, and I
12  informed Matt and company that --
13      MR. KAIRIS: I actually instruct
14  you not to divulge your conversations with
15  counsel. You can -- I think you ought to just
16  stop there. Maybe there's a different way you
17  can ask that question, Kurt.
18      MR. OLSEN: Okay. Well, I just
19  asked him what he did to prepare to testify as
20  a corporate representative on this topic.
21      Q.  So without divulging your
22  communications with counsel, what did you do to
23  prepare yourself to testify as the corporate
24  representative on Item 8?
25      A.  Well, there are no financial

12

1  analyses. There were no studies that were ever
2  performed, no reports prepared. So it was
3  actually easy to prepare, because there was
4  nothing to look at.
5      Q.  So when you say that there were no
6  financial studies or reports that were
7  prepared, prepared with respect to what?
8      A.  Well, the item says, "Financial
9  impact on your VGRR sales profit margins of
10  either adhering or not adhering to ROLAGS.
11  There were never any analyses or studies
12  prepared in regard to Safelite's adherence or
13  not adherence to ROLAGS.
14      Q.  Let's turn to Topic 9. Topic 9 is
15  "The operation of guaranteed average invoice
16  (GAI). Pricing terms for insurance customers
17  of Safelite Solutions, including how adhering
18  or not adhering to the ROLAGS in regard to the
19  limits of long crack repair would or could
20  impact on the profitability of insurance
21  customer contracts containing GA pricing
22  terms."
23          Did you -- what did you do to
24  prepare yourself to testify with respect to
25  that topic?

13

1      A.  This is very similar to Topic No.
2  8, because here again, there were -- there were
3  no analyses prepared showing the possible
4  impact of adhering or not adhering to ROLAGS in
5  regards to GAI pricing terms.
6      Q.  With respect to Topic 10 -- and I'm
7  just going to go through each topic and ask the
8  same question, just so you know.
9          So Topic 10 states, "All
10  communications and/or meetings by Safelite's
11  board of directors concerning windshield repair
12  criteria by Safelite were contemplated to be
13  used by Safelite, (including the windshield
14  repair criteria in the ROLAGS), including any
15  discussions, presentations, and/or minutes
16  which relate to long crack repair or the
17  financial impact to Safelite of any adjustment
18  of its standards for U.S. technicians on the
19  limits of repairable automobile windshield
20  crack damage."
21          What did you do to prepare yourself
22  to testify on this topic?
23      A.  I reflected on the topic, and I can
24  recall no communications or discussions at any
25  Safelite board of directors meetings on the

4 (Pages 10 to 13)

14

1  topics of ROLAGS.
2      Q.  Do you understand Topic 10 to
3  include discussions regarding any adjustment to
4  the windshield repair criteria that Safelite
5  might undertake beyond just ROLAGS?
6      A.  So the latter part of the topic,
7  "Including any discussions, presentation,
8  and/or minutes, which relate to long crack
9  repair or the financial impact to Safelite of
10  any adjustment of its standards for U.S.
11  technicians on the limits of repairable," I do
12  understand that.  And, again, it's not a topic
13  that, to my knowledge, was ever communicated to
14  or discussed with Safelite's board of
15  directors.
16      Q.  Who sits on Safelite's board of
17  directors?
18      A.  Let's see, the current board of
19  directors:  Gary Lubner, Dave Miller, Gerard
20  Damski, Tom Feeney, and until I retired, I was
21  on the board.
22      Q.  And with respect to the individuals
23  other than Tom Feeney and yourself, who are
24  those other members?  Are they outside
25  directors, or do they have an officer position

15

1  at Safelite?
2      A.  They are Belron employees.
3      Q.  And Belron, the foreign
4  Belgium-based company or Belron U.S.?
5      A.  Belron SA, which is based in
6  London, England, and they are our parent
7  company.
8      Q.  Okay.  Are minutes kept of those
9  meetings?
10      A.  Actually, there have not been any
11  face-to-face meetings.  We have annual meetings
12  that are all done on paper.  So are there
13  minutes of those meetings?  That, I don't know
14  if our counsel keeps any minutes, but, again,
15  there's no discussion.  There's an annual
16  meeting that I think we're required to conduct
17  for statutory purposes.
18      Q.  Okay.  When you say there's no
19  discussion, there's no discussion at all?
20      A.  Correct.
21      Q.  How does that work?  You said it's
22  conducted by telephone?
23      A.  Not even telephone.  It's unanimous
24  written consent.
25      Q.  I see.  Do you recall in the 2010

16

1  timeframe an initiative instituted by Belron
2  for a global repair standard?
3      A.  I've heard of that.
4      Q.  Do you recall any discussion at any
5  board meeting regarding -- well, strike that.
6          What's your understanding of the
7  Belron global repair standard?
8      A.  That one was being contemplated.
9      Q.  Okay.  Was there any discussion of
10  the Belron global repair standing [sic] at any
11  board meeting that you attended?
12      A.  No.
13      Q.  Are you aware of any discussion of
14  the Belron global repair standing [sic] at a
15  board of directors meeting?
16      A.  Well, again, there were no formal
17  board of directors meetings where people had
18  discussions.  Everything was conducted by
19  unanimous written consent.
20      Q.  And you're talking -- Belron --
21  strike that.
22          Belron acquired Safelite in early
23  2007, correct?
24      A.  Yes.
25      Q.  Prior to that, did Safelite conduct

17

1  actual board meetings?
2      A.  Yes, we did.
3      Q.  And when did you join Safelite?
4      A.  June of 1992.
5      Q.  Okay.  Were you a member of
6  Safelite's board of directors prior to its
7  acquisition by Belron?
8      A.  I was.
9      Q.  And were minutes kept of those
10  meetings?
11      A.  They were.
12      Q.  And how often did the board meet?
13      A.  I don't recall specifically the
14  frequency of board meetings.  A few times per
15  year.
16      Q.  When did you become a member of
17  Safelite's board of directors?
18      A.  I don't recall specifically when
19  that was.
20      Q.  Do you have a general recollection?
21      A.  Most likely, shortly after I joined
22  the company in 1992.
23      Q.  At these board meetings, at any
24  time, was there ever any discussion of
25  Safelite's criteria for repairable crack length

5 (Pages 14 to 17)

18

1  in a windshield?
2      A.  Not that I recall.
3      - - - - -
4      (Thereupon, Deposition Exhibit 3,
5      E-mail from Brown to Many, 1-8-05,
6      was marked for purposes of
7      identification.)
8      - - - - -
9      Q.  Mr. Herron, you've just been handed
10 a document marked for identification as Herron
11 Exhibit 3.  It's an e-mail and attachment from
12 Steve Brown to a number of individuals,
13 including yourself.  The subject is Draft Board
14 Update, and then attached to it is a document
15 entitled Safelite Board of Directors' Business
16 Update January 8, 2005.
17      I would just like you to take a
18 moment and look at it, and tell me if this
19 appears to be a true and accurate copy of the
20 e-mail and attachment.
21      MR. OLSEN:  Go off the record for a
22 second.
23      THE VIDEOGRAPHER:  Off the record.
24      (Recess is taken.)
25      THE VIDEOGRAPHER:  On the record.

19

1      Q.  Does this appear to be a true and
2  accurate copy of the e-mail and attachment?
3      A.  It does.
4      Q.  Who is Steve Brown?
5      A.  Steve Brown was a member of the
6  finance team.  He worked out of Infield, North
7  Carolina, for the most -- most of his period
8  with the company.  He would support our
9  manufacturing operations from a financial
10 perspective.  And at this particular time, he
11 was also supporting our wholesale business
12 unit.
13      Q.  And who is Catherine Chewning?
14      A.  Catherine Chewning was the
15 executive assistant to our chief executive
16 officer.
17      Q.  And that's Mr. Feeney?
18      A.  At this point in time, it was a
19 gentleman named Dan Wilson.
20      Q.  Okay.  Do you know whether or not
21 Safelite maintains a file with minutes, in
22 addition to the ones that are represented by
23 Exhibit 3?
24      A.  I don't know for certain.
25      Q.  Do you know if Safelite did, who

20

1  would maintain that file?
2      A.  It would be our general counsel.
3      Q.  And although this set of minutes
4  does not discuss anything about windshield
5  repair criteria, does this refresh your
6  recollection as to whether or not windshield
7  repair criteria were ever discussed at any
8  board meeting that you attended?
9      A.  No, it doesn't.
10      Q.  And so after Safelite was acquired
11 by Belron in early 2007, Safelite stopped
12 having actual meetings of its board of
13 directors?
14      A.  Yes.  We stopped having actual
15 board of directors meetings.
16      Q.  Do you know why?
17      A.  I don't.
18      Q.  Mr. Herron, the next topic that you
19 have been designated to testify as the
20 corporate representative is Topic 20.  Topic 20
21 states, "Your annual nationwide and regional
22 insurance and consumer windshield repair
23 ratios, including targeted ratio goals."
24      What did you do prepare to give
25 testimony on this topic?

21

1      A.  I didn't do anything specific to
2  prepare for that.
3      Q.  What qualifies you to give
4  testimony on this topic as Safelite's corporate
5  representative?
6      A.  As the financial leader for the
7  company, I always had access to and would
8  monitor our windshield repair ratios.
9      Q.  And when you say your -- as the
10 financial leader, what's the financial leader
11 of the company?  The chief financial officer?
12      A.  Correct.
13      Q.  And how long have you been chief
14 financial officer?
15      A.  I was chief financial officer from
16 the day I joined the company, in June 1992,
17 through the end of 2016.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



22

24

1  are six inches or less, does Safelite have a
2  hard cut-off at six inches, or are there some
3  cracks over six inches that it would repair?
4       A.   It's a hard cut-off.
5       Q.   And how long has that been in
6  existence?
7       A.   For as long as I can recall.  I've
8  been around since, you know, '92.

16       Q.   The next topic that you have been
17  designated to give testimony on is Topic 29,
18  and this is the topic that we understand that
19  it was an error.  But just for the record, I
20  just wanted to note.
21       Topic 29 is, "All communications
22  with insurance company clients of Safelite
23  Solutions, LLC, in regard to the limits of long
24  crack repair."
25       Did you have any communications

25

1  with insurance company clients regarding long
2  crack repair, which is defined as a windshield
3  crack longer than six inches?
4       A.   I don't recall ever having
5  communications on that subject.
6       Q.   The next topics that you have been
7  identified to give testimony on as the
8  corporate representative are 38 through 43.
9       Topic 38 is, "The person or persons
10  responsible for preparation and circulation of
11  the daily sales report."  There's an example.
12  "Including explanation of each category of
13  information contained therein and how that
14  information was determined."
15       What did you do to prepare to give
16  testimony on this topic?
17       A.   Other than understanding that I
18  would be asked questions about this, there
19  really was nothing for me to do to repair --
20  prepare, as I know this one backwards and
21  forward.  I look at it every day.

20       Q.   If -- what standard does Safelite
21  apply with respect to repairable crack length
22  in windshields?
23       A.   Most cracks that are six inches or
24  less can be repaired.
25       Q.   And when you say most cracks that

7  (Pages 22 to 25)

26



18  Q.  Okay.  We will.
19  A.  Okay.
20  Q.  Topic 39 -- well, strike that.
21      Did you review any documents in
22  preparation for Topic 38?
23  A.  I did not.
24  Q.  Okay.  Topic 39 states,
25  "Information contained in," and then there's a

27

1  document that was prepared by counsel that
2  summarized some financial data.  Now, the Bates
3  number here is inaccurate.  We have been
4  provided another document by Safelite, which
5  we'll look at, but did you look at a summary
6  financial presentation in preparation for --
7  A.  This is what I'm going to call the
8  big sheet.
9  Q.  I hope you have the big sheet,
10  because we have one that's -- that's why I
11  brought a magnifying glass.
12  A.  If that's what you're asking me
13  about, yes, I did look at the big sheet.
14  Q.  Okay.  And did you have any
15  responsibility to prepare what we've been
16  calling the big sheet, that document?
17  A.  I did not.
18  Q.  When is the first time that you saw
19  that document?
20  A.  It would have been Wednesday
21  afternoon.
22  Q.  Topic 40 is "The total annual
23  volume average price, revenue and profits for
24  windshield replacements and repairs by you."
25  And, again, "you" is a defined term.  That's

28

1  Safelite.  "That had been scheduled for service
2  by retail customers and/or policyholders making
3  FNOL insurance claims via the Safelite website,
4  telephone, walk-in, or any other purchase
5  channel for which Safelite records its
6  information, including the manner of tracking."
7      Have you read that topic before?
8  A.  I have.
9  Q.  And what did you do prepare for
10  that -- to give testimony about that topic?
11  A.  Looked at the big sheet.
12  Q.  And the big sheet was the exhibit
13  that we discussed earlier with respect to Topic
14  39?
15  A.  Yes.
16  Q.  Did you review any other documents?
17  A.  I did not.
18  Q.  Topic 41 is, "The total annual
19  revenue and gross profit margins to Safelite
20  and each Safelite Group, Inc. Each" -- excuse
21  me.  Strike that.
22      Topic 41 reads, "The total annual
23  revenue and gross profit margins to Safelite
24  and each of Safelite Group, Inc., Safelite
25  Solutions, LLC, Safelite Fulfillment, Inc. for

29

1  windshield repairs and for windshield
2  replacements, including the manner of tracking
3  such revenues -- revenue and margins."
4      What did you do to prepare to give
5  testimony on that topic?
6  A.  I didn't do anything specific to
7  prepare for that topic.
8  Q.  Did you read that topic before
9  today's deposition?
10  A.  I did.
11  Q.  Topic 42 reads, "The preparation of
12  Safelite's budgets and/or financial forecast as
13  they relate to windshield repair or
14  replacement."
15      Did you read that topic prior to
16  today's deposition?
17  A.  I did.
18  Q.  What did you do to prepare to give
19  testimony on that topic?
20  A.  I didn't do anything specific.
21  Q.  Did you review any documents?
22  A.  I did not.  Oh, wait a minute.
23  There were documents in the stack that I
24  reviewed over the last day and a half.  I think
25  there were some documents in there that, to the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

30

1   best of my recollection, did talk about budgets
2   and forecasts of replacements and repairs.
3       Q.   Topic 43 reads, "Safelite Groups,
4   Safelite Fulfillment, and Safelite Solutions
5   corporate hierarchy and corporate organization,
6   including information on the financial
7   relationship between these entities and how
8   each entity separately and in combination
9   accounts for financial information, such as
10  revenue, margins, and profits."
11          Did you read that topic before
12  today's deposition?
13      A.   I did.
14      Q.   And what did you do to prepare to
15  give testimony on that topic?
16      A.   I did nothing specific.
17      Q.   Did you review any documents in
18  connection with your preparation?
19      A.   I did not.
20      Q.   Can you just give me a brief
21  description of your employment history at
22  Safelite?
23      A.   I joined the company in June of
24  1992 as the chief financial officer. Always
25  based in Columbus. I've always had

9   Q.   Do you recognize the name Daniel
10  Herron?
11      A.   I think there might be a Daniel
12  Herron at Safelite.
13      Q.   Is there? Because there was a
14  document. Is he any relation to you?
15      A.   No.
16      Q.   Okay.
17      A.   That's what happens when you hit
18  the wrong key.
19      Q.   Have you ever heard of an entity
20  within Safelite called the senior leadership
21  team?
22      A.   Yes.
23      Q.   Or SLT?
24      A.   Yes.
25      Q.   Okay. And what was that or is

31

1   responsibility for the financial matters of the
2   business. Other areas of responsibility that
3   I've had from time to time include information
4   technology, real estate, our vehicle fleet
5   operation. At one time, I had responsibility
6   for the wholesale sales force, risk management.
7   I think that's -- I think that's a good
8   summary. Is that what you're looking for?
9       Q.   Yes, sir. So what is the wholesale
10  sales force?
11      A.   It's a small group of people, 15 or
12  so individuals, who call on third-party
13  independent glass companies.
14      Q.   When you say they call on
15  third-party independent glass companies, what
16  do you mean?
17      A.   They make sales calls.
18      Q.   To sell what?
19      A.   Vehicle glass.
20      Q.   And you also mentioned risk
21  management. What does that mean in connection
22  with Safelite?
23      A.   Some might say it's a flowery term
24  for our insurance coverage.

33

1   that?
2       A.   It's the senior leadership team of
3   which I was a member when I was the CFO.
4       Q.   And when did first become a member
5   of the SLT?
6       A.   From day one.
7       Q.   1992?
8       A.   Well, the term senior leadership
9   team, it hasn't always been called that. At
10  one time, it was called the operating
11  committee. I think we had a different term,
12  you know, prior to that, but the essence of the
13  group of leaders is the same. It's the
14  senior-most -- senior-most body of leaders in
15  the business.
16      Q.   How long was it -- about when did
17  it start being called the senior leadership
18  team? Do you know?
19      A.   I don't know for certain. As long
20  as our current CEO has been in the role, Tom
21  Feeney, I'm pretty sure it's been called the
22  senior leadership team. So that would make it
23  eight, nine years.
24      Q.   So back to like 2009 or something?
25      A.   Yeah.

9  (Pages 30 to 33)

34

1    Q.   And then prior to that, it was
2    called what?
3    A.   It was the operating committee
4    prior to that.
5    Q.   And who were the members of the
6    senior leadership team other than yourself?
7    A.   Tom Feeney, Steve Migo, Dino Lano,
8    Renee Cacchillo, Natalie Crede, Cindy Elliott.
9    Q.   Steve Migo just recently joined the
10   company like two years ago, correct?
11   A.   It's more than two.
12   Q.   But fairly recently, in the past
13   three years maybe?
14   A.   More than that.
15   Q.   Do you know when he joined the
16   company?
17   A.   Off the top of my head, I don't.
18   Q.   Who is Cindy Elliott?
19   A.   Cindy Elliott is our general
20   counsel.
21   Q.   Do you know how long she's been
22   general counsel?
23   A.   While she's been with the company
24   for a number of years, carrying the official
25   title of general counsel, I believe is within

35

1    just the last couple of years.
2    Q.   And Natalie Crede?
3    A.   Natalie Crede leads our people
4    organization.
5    Q.   What is the people organization?
6    A.   Many businesses would refer to it
7    as human resources.  At Safelite, we call it
8    people on leadership development.
9    Q.   How long has Ms. Crede been with
10   the company?
11   A.   Again, I don't know specifically,
12   but I'm going to -- I just don't know
13   specifically.  It's been a while.
14   Q.   And then another gentleman you
15   mentioned is Lano Dino?
16   A.   Dino Lano.
17   Q.   Dino Lano?
18   A.   Yes.
19   Q.   Excuse me.  And who is Mr. Lano?
20   A.   Dino's current responsibilities are
21   those leadership of the Safelite Solutions
22   business unit.
23   Q.   And what does Safelite Solutions
24   do?
25   A.   That is our claims management

36

1    business.  Some people refer to it as a
2    third-party administrator or TPA.
3    Q.   So we have Mr. Migo, Ms. Crede,
4    Ms. Elliott, Mr. Lano, yourself, Mr. Feeney.
5    Am I missing anybody?
6    A.   You are.
7    Q.   Who am I missing?
8    A.   Renee Cacchillo.
9    Q.   Renee Cacchillo.  And is that Mr.
10   Cacchillo or Ms.?
11   A.   Mrs.
12   Q.   Mrs.  And what position does she
13   have at Safelite?
14   A.   Renee's title is senior vice
15   president customer brand and technology.  We
16   believe it's kind of a unique assembly to
17   responsibility.  She's responsible for
18   information technology, marketing, and what we
19   call our customer organization.
20   Q.   How long has Mrs. Cacchillo been
21   with the company?
22   A.   Again, I don't know specifically,
23   but it's several years.
24   Q.   Was marketing -- strike that.
25        Were there -- did the senior

37

1    leadership team ever have meetings together?
2    A.   Yes.
3    Q.   And how often?  Were they periodic
4    meetings or just ad hoc?
5    A.   They were regularly scheduled
6    meetings.
7    Q.   And how often would those meetings
8    occur?
9    A.   Monthly.
10   Q.   And were they in person or by phone
11   or both?
12   A.   The requirement was that you had to
13   be there in person.  As you can expect, there
14   would be times when somebody would have a
15   conflict and not be able to be there.  If
16   possible, they would call in by phone.  The
17   majority of meetings, everybody was there.  And
18   if everybody couldn't be there, we would
19   reschedule it.
20   Q.   Were there minutes kept of these
21   meetings?
22   A.   No.
23   Q.   Were there notes kept of these
24   meetings?
25   A.   You would have to ask individuals

10  (Pages 34 to 37)



38

1    if they -- if they kept notes.
2        Q.   Did you --
3        A.   They may have.
4        Q.   Did you keep any notes of those
5    meetings?
6        A.   Every once in a while, I would.

16        Q.   Were there presentations, written
17   presentations or visual presentations made at
18   these meetings?
19        A.   Sometimes, yes.
20        Q.   Do you know what happened to the
21   presentations after the meetings?  Are they
22   stored somewhere at Safelite?
23        A.   That would be up to each
24   individual, whether they kept it or not.  There
25   was not a requirement to maintain or archive

39

1    the presentations.
2        Q.   What was -- and you may have
3    answered this, but what was the role of the
4    senior leadership team?
5        A.   Strategy setting, resource
6    allocation, leadership, policies.  Did I say
7    policies?
8        Q.   Not yet.
9        A.   Okay.  All right.  Now I have.
10   Strategy setting, policies, governance, making
11   sure that we're doing the right things.
12        Q.   At the senior leadership team
13   meetings, was the repair criteria for
14   windshield cracks ever discussed?
15        A.   Not that I recall.
16        Q.   Do you recall any discussions at
17   the SLT meetings regarding what we called
18   earlier the Belron global repair standard?
19        A.   I don't.
20        Q.   Do you recall any discussion at the
21   -- any of these SLT meetings regarding the
22   ROLAGS?
23        A.   I don't.
24        Q.   Let me back up for a second.  Do
25   you know what ROLAGS means?

40

1        A.   I don't.  Until two days ago, I did
2    not know what the acronym stood for.
3        Q.   Okay.  Which -- and it stands for
4    the repair of laminated glass standards.
5             And did -- prior to your
6    preparation for this deposition, did you have
7    -- did you say you hadn't even heard of ROLAGS?
8        A.   Right.
9        Q.   You mentioned that Ms. --
10   Mrs. Cacchillo --
11        A.   Yes.
12        Q.   -- was a member of the SLT and also
13   responsible for marketing at Safelite?
14        A.   Yes.

11  (Pages 38 to 41)



42

25   Q.   Do you recall windshield repair ads

43

1   for -- being emphasized in order to maintain a
2   certain windshield repair ratio?
3       A.   I do not.
4       MR. OLSEN:  Take a break.
5       MR. KAIRIS:  Sure.
6       THE VIDEOGRAPHER:  Off the record.
7       (Recess is taken.)
8       THE VIDEOGRAPHER:  On the record,
9   10:14.
10       - - - - -
11       (Thereupon, Deposition Exhibit 4,
12       E-mail String, July 2015, was marked
13       for purposes of identification.)
14       - - - - -
15       Q.   Mr. Herron, you've just been handed
16   a document marked for identification as Herron
17   Exhibit 4.  It's an e-mail string from the July
18   2016 timeframe, the most recent one was from
19   you.
20       A.   Uh-huh.
21       Q.   And take a moment.  Just let me
22   know if it appears to be a true and accurate
23   copy of the e-mail you sent on or about July 9,
24   2016.
25       A.   Okay.

44

1       Q.   And I just have a couple of
2   questions.  Do you see in Mr. Goodman's to
3   line, there's "ZZ senior leadership team" and
4   "ZZ corporate director/VPs"?
5       A.   I do.
6       Q.   What is the corporate directors?
7   What does that stand for?
8       A.   In our, say, organization
9   structure, we have vice presidents.  We have
10   assistant vice presidents, and we have
11   directors.  Then we have managers.
12       Q.   So these are not directors from the
13   perspective of a board level position?
14       A.   They are not.  No, they are not.

5       (Thereupon, Deposition Exhibit 5,
6       E-mail from Metzger to Senior
7       Leadership Team, was marked for
8       purposes of identification.)
9       - - - - -
10       Q.   Mr. Herron, you've just been handed
11   a document marked for identification as Herron
12   Exhibit 5.  It's an e-mail and attachment from
13   Malina Metzger to the senior leadership team
14   and others, subject "Media training message
15   triangles," with some attachments.
16       If you could just take a moment to
17   review it, and let me know if this appears to
18   be a true and accurate copy of the document.
19       A.   It does appear to be true and
20   accurate.
21       Q.   And as we discussed earlier, you
22   were a member of the senior leadership team, so
23   you would have received this document?
24       A.   That's correct.
25       Q.   Okay.  And do you know, did -- is

12  (Pages 42 to 45)



46

1 it okay if I call it the SLT, abbreviate it for
2 senior leadership team?
3    A.  Yes.
4    **Q.  It's easier.**

11    **Q.  Did the SLT ever review any studies**
12 **concerning the safety of windshield crack**
13 **repair in general?**
14    A.  Not that I recall.  A review of a
15 study, no; I don't recall that.
16    **Q.  And I believe you testified that**
17 **you don't recall the SLT ever discussing the**
18 **ROLAGS; is that correct?**
19    A.  That's correct.
20    **Q.  Did the SLT ever have any -- strike**
21 **that.**
22      Have you ever heard of the name
23 **Paul Syfko?**
24    A.  I have.
25    **Q.  And did -- who is Mr. Syfko?**

48

1    A.  Paul Syfko is a Belron employee, a
2 Belron associate, and he's responsible for the
3 Glass Medic operation, which is the windshield
4 repair component of Belron.
5    **Q.  Did the SLT ever participate in any**
6 **discussions with Mr. Syfko about repairable**
7 **crack lengths of windshields?**
8    A.  Whether it happened in a formal way
9 of Paul coming and making a presentation to the
10 SLT, I don't have a recollection of a formal
11 presentation.  But interaction with Paul
12 discussing with him, which I've, you know, done
13 myself about windshield repair, I'm sure that
14 there were -- well, I suspect that there were
15 communication with Paul, yeah.

2    **Q.  And Mr. Syfko didn't mention ROLAGS**
3 **to you to your -- best of your recollection?**
4    A.  Not that I recall.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



50

52

1    Q.    Exhibit 5, which is the messaging
2    triangle sent by Malina Metzger, who's the PR
3    manager for Safelite, or at least who was at
4    this time?
5        A.    Correct.

25

Q.    Do you know who Dave Erwin is?

14  (Pages 50 to 53)



54

1    A.  I do.
2    Q.  And who is Mr. Erwin?
3    A.  Dave was with our business several
4  years ago.  His responsibility was to lead our
5  repair division.  At the time David was with
6  the company, we had a separate organization,
7  focused on windshield repair.
8    Q.  And did the SLT ever have any
9  discussions with Mr. Erwin about repairable
10  crack length for windshields?
11    A.  I don't recall any SLT meeting
12  where Dave made a presentation or we had a
13  specific SLT conversation with David.
14    Q.  Do you recall any general
15  discussions with Mr. Erwin regarding the
16  proposed Belron global repair standard as part
17  of an SLT meeting?
18    A.  I don't.
19      - - - - -
20    (Thereupon, Deposition Exhibit 6,
21    E-mail String, July 2008, was marked
22    for purposes of identification.)
23      - - - - -
24    Q.  Mr. Herron, you've just been handed
25  a document marked as Herron Exhibit 6.  It's

55

1  not a document that you received, but I want to
2  -- it's an e-mail string, and I want to direct
3  your attention to the one at the top between
4  Matthew Johnson and Mark Placenti, and it's
5  dated July 2nd, 2008.  And do you see where it

56

6    Q.  Do you know whether Safelite
7  performed any studies regarding customer
8  satisfaction in connection with cracks --
9  windshield cracks longer than six inches?
10    MR. KAIRIS:  Objection; outside the
11  scope of the 30(b)(6).  Foundation.
12    A.  I don't recall any Safelite studies
13  or Belron studies, for that matter, that were
14  conducted for that.
15    Q.  Do you recall any studies at all?
16    A.  I do not.
17      - - - - -
18    (Thereupon, Deposition Exhibit 7,
19    E-mail to Herron from Perchak,
20    3-17-14, was marked for purposes of
21    identification.)
22      - - - - -
23    Q.  Mr. Herron, you've just been handed
24  a document marked for identification as Exhibit
25  7, I believe.  It's an e-mail in which you are

57

1  a recipient from Matthew Perchak, dated March
2  17, 2014.  If you could just take a moment and
3  let me know if it appears to be a true and
4  accurate copy.
5    A.  It does appear to be a true and
6  accurate copy.
7    Q.  Do you have an understanding of
8  what this e-mail is discussing?
9    A.  I do.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



58

13        - - - - -
14       **(Thereupon, Deposition Exhibit 8,**
15       **E-mail String, was marked for**
16       **purposes of identification.)**
17       - - - - -
18       **Q.**   Mr. Herron, you've just been handed
19  a document marked for identification as Exhibit
20  8. It's not -- it's a Safelite document. It
21  was not sent to you, but I would just like to
22  -- like to ask you a couple questions about it.
23       The e-mail, it's concerning
24  qualified repairs, and I'm referring you down
25  to the bottom of the first page where the

16 (Pages 58 to 61)



62

1    e-mail is from Rick Skeen.  Do you know who
2    Rick Skeen is?
3        A.   I do.
4        Q.   And who is he?
5        A.   Rick was one of our regional repair
6    managers back in the day when we had the
7    separate repair organization.
8        Q.   Separate from the replacement
9    organization or --
10       A.   Yeah.
11       Q.   So Mr. Skeen writes to -- do you
12   know who he's writing to here?
13       A.   Let's see.  These look to be what
14   in today's nomenclature I would say is district
15   managers.  They appear to be that.  I didn't --
16   many, many of these names, I do not recognize.
17       Q.   Understood.
18       A.   So maybe they're not district
19   managers.  I'm going to correct that.

5        A.   I've read it.
6        Q.   Okay.  And before I ask you any
7    questions, was there anything in this memo that
8    jumped out at you as not being accurate?
9        A.   Absolutely.

17  (Pages 62 to 65)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



66

10          - - - - -
11          (Thereupon, Deposition Exhibit 9,
12          E-mail String, 3-22-10, was marked
13          for purposes of identification.)
14          - - - - -
15      **Q.   Mr. Herron, you've just been handed**
16  **a document marked for identification as Exhibit**
17  **9.  The -- it's an e-mail string dated March**
18  **22nd, 2010.  You're a recipient of the initial**
19  **e-mail.  The subject is Daily Sales?**
20      A.   Oh, yes.
21      **Q.   And you're in the middle there**
22  **towards the left.  So does this appear to be a**
23  **true and accurate copy of the e-mail that you**
24  **received on March 22nd, 2010?**
25      A.   It does.  It would be the cover

67

1   note for the daily sales report.

13      **Q.   And what is curved tempered**
14  **replacement?**
15      A.   Side and back glass.
16      **Q.   Okay.  Putting aside curved**
17  **tempered replacement --**
18      A.   Yes.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



70

24      Q.   Okay.
25      A.   It's what's the cart and what's the

71

1   horse, is what I'm trying to get across to you
2   here.
3      **Q.   Well, when you say what's the cart**
4   **and the horse, what are you referring to?**
5      A.   I knew I shouldn't said that.
6      **Q.   Metaphors can be dangerous.**
7      A.   Yes, they can be. They can, can't

19  (Pages 70 to 73)



74

18    MR. KAIRIS: Take a break?
19    MR. OLSEN: Sure. Now's a good
20 time.
21    THE VIDEOGRAPHER: Off the record,
22 11:00.
23    (Recess is taken.)
24    THE VIDEOGRAPHER: On the record,
25 11:15.

75

1    Q.   Mr. Herron, during the break, did
2 you discuss any of your testimony with counsel?
3    MR. KAIRIS: Objection. That calls
4 for privileged information. I instruct the
5 witness not to answer.
6    MR. OLSEN: Counsel, did the -- if
7 you can say, did the communications -- any
8 communications at -- strike that.
9    Was there any discussion about
10 whether the subject of Mr. Herron's testimony
11 itself was privileged?
12    MR. KAIRIS: I'm not being deposed.
13 I'm instructing the witness not to answer.
14    MR. OLSEN: Okay.
15    - - - - -
16    (Thereupon, Deposition Exhibit 10,
17    E-mail String, was marked for
18    purposes of identification.)
19    - - - - -
20    Q.   Mr. Herron, you've just been handed
21 a document marked for identification as Exhibit
22 10. It's an e-mail string that's not to you,
23 but it references an SLT meeting. The subject
24 is 2011 advertising 9:00 a m. SLT meeting, and
25 then it has an attachment, Belron Feedback.

76

1        Do you know who Matthew Johnson is?
2    A.   I do.
3    Q.   And who is Mr. Johnson?
4    A.   Matt is part of our marketing
5 organization, and he's the gentleman that's
6 responsible for advertising.
7    Q.   And did he make presentations to
8 the SLT?
9    A.   Yes.
10    Q.   And if you turn to the attachment,
11 which is entitled 2011 Advertising Plan Update
12 September 24th, 2010 --
13    A.   Uh-huh.
14    Q.   -- these are never supposed to be a
15 memory test, but I'll just ask it. Do you
16 recall receiving this document or anything like
17 it?
18    A.   I don't.

20  (Pages 74 to 77)



78

- - - - -

(Thereupon, Deposition Exhibit 11,
E-mail String, April 2012, was
marked for purposes of
identification.)

- - - - -

Q.   Mr. Herron, you've been handed a
document marked for identification as Exhibit
11.  It's an e-mail string that is from and to
you with an attachment, dated April of 2012,
subject Q1 Review Market Update.

A.   Uh-huh.

Q.   Just take a moment and review it,
and let me know if it appears to be a true and
accurate copy.

A.   Okay.  I've read it.

Q.   And did you also look at the
attachments?

A.   I did.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



82

22    Q.    And if the crack length for —
23  strike that.
24          If the repair criteria for crack
25  length in windshields was increased over six

85

1   inches to, say, 14 inches, that would result in
2   more repairs, correct?
3       A.    You're asking me to speculate on
4   that, and that's -- that's not something I
5   think I'm prepared to do.
6       Q.    Can you -- if you look at the last
7   attachment under Repair versus Replacements,
8   strategic question --
9       A.    Okay.
10      Q.    Is this a document that you created
11  or Mr. Miller created?  Miller?
12      A.    This appears to be one I created.

22  (Pages 82 to 85)



86

4        - - - - -
5        (Thereupon, Deposition Exhibit 12,
6        E-mail String, was marked for
7        purposes of identification.)
8        - - - - -
9        Q.    Mr. Herron, you have just been
10   handed a document marked for identification as
11   Exhibit 12.  It's an e-mail string of which you
12   are a recipient of the -- the one that begins
13   at the bottom of the first page?
14        A.    Uh-huh.
15        Q.    Here in the middle on the
16   right-hand side?
17        A.    Yep.
18        Q.    And the subject is Daily Sales
19   Report.  Does this appear to be a true and
20   accurate copy of the e-mail that you at least
21   received on that portion?
22        A.    It does.
23        Q.    Okay.  And do you see, although
24   you're not a recipient of the subsequent
25   e-mails, if you look at the first one from Adam

87

1        Houk to Ken Savage --
2        A.    Uh-huh.
3        Q.    -- and who is Mr. Houk?
4        A.    Adam is a financial analyst in our
5    financial planning and analysis team.
6        Q.    And Mr. Savage?
7        A.    Ken's one of our regional people
8    business partners.
9        Q.    And Mr. Lyons?
10       A.    Mike Lyons is Adam Houk's
11   supervisor.
12       Q.    Mr. Houk states, "Ken, below is our

21        Q.    Okay.
22        - - - - -
23        (Thereupon, Deposition Exhibit 13,
24        E-mail String, was marked for
25        purposes of identification.)

89

1        - - - - -
2        Q.    Mr. Herron, you've just been handed
3    a document marked for identification as Exhibit
4    13.  It's an e-mail string that includes you as
5    a sender, in the bottom two e-mails, kind of
6    small print.
7        MR. KAIRIS:  Can we go off the
8    record for a minute.
9        MR. OLSEN:  Yeah, sure.
10       THE VIDEOGRAPHER:  Off the record.
11   (Discussion held off record.)
12       THE VIDEOGRAPHER:  On the record,
13   11:35.
14       Q.    Mr. Herron, does Exhibit 13, at
15   least the e-mails that you sent, appear to be
16   true and accurate copies?
17       A.    They do.
18       Q.    And do you see at the bottom of the
19   first page, one of the recipients in the cc
20   line is a group e-mail, ZZS Solutions
21   leadership team?
22       A.    I do.
23       Q.    What is the Solutions leadership
24   team?
25       A.    Well, it's -- I don't know who all

23  (Pages 86 to 89)



90

1    is on that distribution list, but it's the
2    leadership team for Safelite Solutions, which
3    is our claims management business unit,
4    third-party administration, TPA.
5    **Q. Okay. But you are not a member of**
6    **that?**
7    A. I am not.
8    **Q. Okay. At the top of the e-mail,**
9    **the portion of the e-mail that's not sent to**
10    **you, it's sent from Matthew Johnson to Renee**
11    **Cacchillo.**
12    A. Uh-huh.

6    - - - - -
7    (Thereupon, Deposition Exhibit 14,
8    Daily Sales Report, was marked for
9    purposes of identification.)
10    - - - - -
11    **Q. Mr. Herron, you've just been handed**
12    **a document marked for identification as Exhibit**
13    **14. It's actually the last one, which is the**
14    **large paper is an attachment that was produced**
15    **in native format. That's why it doesn't have a**
16    **Bates number.**
17    A. Uh-huh.
18    **Q. But if you would just review it for**
19    **a moment and let me know if this appears to be**
20    **a true and accurate copy.**
21    A. Yes; it appears to be a true and
22    accurate copy.
23    **Q. So can you just walk -- because**
24    **this is a complete copy with the attachments of**
25    **the daily sales report. Is this typically**

92

1    **representative of the type of information you**
2    **would see -- receive in the daily --**
3    A. It is. It is.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

94



```
14    - - - - -
15        (Thereupon, Deposition Exhibit 15,
16        E-mail from Adams to Lyons, 9-16-16,
17        was marked for purposes of
18        identification.)
19    - - - - -
20        Q.   Mr. Herron, you've just been handed
21    a document marked Exhibit 15 for
22    identification.  It's an e-mail and an
23    attachment, dated September 16, 2016, from
24    Patty Adams to Mike Lyons, and the subject is,
25    Doug, 2015 Financial Overview PowerPoint, which
```

25  (Pages 94 to 97)



98

1    is also attached.
2        Have you seen this presentation
3    before?
4        A.   Yes.
5        Q.   Does this appear to be a true and
6    accurate copy?
7        A.   It does.
8        Q.   What was the purpose of this
9    presentation?
10       A.   That's what I'm trying to ascertain
11   for myself.  Who was my audience here?  Because
12   I would have written this presentation.  I just
13   don't recall in September of 2016 who our
14   audience would have been.
15       The very last page leads me to
16   conclude -- I'm talking to a subset of Safelite
17   leadership.  I can't recall in September of '16
18   what the -- what the group would have been, who
19   my audience would have been.  I'm sorry, but I
20   can't -- I can't recall.
21       Q.   Understood.
22       A.   In that time period, I can't
23   recall.

100

1        MR. OLSEN:  No.  No.  No.  Just --
2    I was going to -- I said, "Our parent company
3    Safelite's role within Belron."
4        MR. KAIRIS:  If you don't mind.
5        MR. OLSEN:  We'll go through each
6    one.  That's fine.

18       MR. KAIRIS:  I'm going to object.
19   I'm going to object to the form and scope.  You
20   can't do this.  If you want to take him to a
21   page and ask him -- you're asking him to
22   testify --
23       MR. OLSEN:  Okay.
24       MR. KAIRIS:  As to the accuracy of
25   everything in this exhibit?

26  (Pages 98 to 101)

102



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

110



9      THE REPORTER: Our corporate what?
10  A.  Overhead.
11      - - - - -
12      (Thereupon, Deposition Exhibit 16,
13      Business Overview for Robert Tyler,
14      was marked for purposes of
15      identification.)
16      - - - - -
17    **Q.  Mr. Herron, you've just been handed**
18  **a document marked for identification as Exhibit**
19  **16. It's an e-mail and an attachment, which**
20  **you're not a recipient of. It's a business**
21  **overview for Richard Tyler. Did you ever**
22  **receive this document, or do you have an**
23  **understanding about what it's about?**
24    A.  No, I don't -- I'm not recognizing
25  this.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

114

1    Q.   Do you know who Richard Tyler is?
2    A.   I do.
3    Q.   Who is he?
4    A.   He's a senior level executive at
5  Belron.
6    Q.   Just ask you a few questions about
7  some of the information in here.
8    A.   Okay.
9    Q.   You were the chief financial
10 officer obviously at this time, correct?
11   A.   Yes, I was.



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



118

120

1    MR. KAIRIS:  Objection; calls for
2  privileged information.  Instruct the witness
3  not to answer.
4          - - - - -
5      (Thereupon, Deposition Exhibit 17,
6      E-mail from Spencer to Senior
7      Leadership Team, was marked for
8      purposes of identification.)
9          - - - - -
10    Q.   You've just been handed a document
11  marked for identification as Exhibit 17.  It's
12  an e-mail from Tim Spencer to the senior
13  leadership team, attaching a 2017 performance
14  road map.  Just take a moment and review it for
15  me and let me know if it appears to be a true
16  and accurate copy.
17    A.   It does.
18    Q.   Who is Mr. Spencer?
19    A.   Tim Spencer is the gentleman who
20  took my place as the chief financial officer
21  for Safelite.
22    Q.   If you turn to Slide 2, Financial
23  Overview.  It's Bates stamped last number 033.
24    A.   Uh-huh.
25    Q.   Do you see on the first bullet

121

1  point, it says, "We will continue the
2  trajectory subscribed by Doug yesterday with
3  the sales and profit group in 2017"?
4    A.   Uh-huh.
5    Q.   Is Doug referring to you?
6    A.   Yes.
7    Q.   Okay.  What was the purpose of this
8  presentation?
9    A.   As I recall, the context for this
10  was a relatively small group of our national
11  leadership team, which we brought together here
12  in Columbus in January of 2017, because every
13  other year, we kind of have a big national
14  leadership meeting and then we have a small
15  leadership meeting and another big one.  And so
16  this one was a small one that we actually held
17  in that hotel I was telling you about, The
18  Joseph, just down the street.  And by small, I
19  mean I would say we had maybe 80 people in
20  attendance there.
21          And on the first day, I covered --
22  my role in the agenda was to cover 2016 actual
23  results.  And then the following day, Tim
24  covered the budget.
25    Q.   Mr. Herron, if you would turn to

10    Q.   Just keep it to the side because
11  we're eventually going to cross-reference a few
12  things.
13          MR. KAIRIS:  Is okay to break for
14  lunch now, or do you need to --
15          MR. OLSEN:  Yeah, let's do that.
16  That's perfect.
17          THE VIDEOGRAPHER:  Off the record,
18  12:17.
19      (Recess is taken.)
20          THE VIDEOGRAPHER:  On the record,
21  1:08.
22    Q.   Good afternoon, Mr. Herron.
23    A.   Good afternoon.
24    Q.   Did you discuss your testimony with
25  counsel during the break?

31  (Pages 118 to 121)



122

```
1    Slide 6.
2        A.    Okay.
3        Q.    The last Bates -- three Bates 037.
4        A.    Uh-huh.
```

32  (Pages 122 to 125)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



126

14     **Q.  Would one of the reasons why**
15 **somebody typically might do that, not do that**
16 **is because of the cost of replacement?**
17     MR. KAIRIS: Objection; foundation.
18 Outside the scope of the 30(b)(6).
19     A.  Typically, it's not going to be
20 just the cost. The example I was going to give
21 you was, you know, you've got the family, and
22 you have two, maybe even three cars in your
23 family, and one of those cars is a 1962
24 Pontiac, and, yeah, you've got problem on the
25 windshield, but, hey, look, I don't -- it's my

129

1 '62 Pontiac. I really don't need to do
2 something about that. So it's not that big of
3 a deal for me. I'm just going to continue to
4 drive it.
5     Q.  Okay.
6     A.  If that helps.

33 (Pages 126 to 129)



130

14   Q.   Have you ever heard of Ultrabond
15   before?
16   A.   I had.  I have.
17   Q.   When is the first time you heard
18   about Ultrabond?
19   A.   I can't pinpoint it.
20   Q.   Was it before this current
21   litigation?
22   A.   Yes.
23   Q.   Okay.  And did you know who
24   Mr. Campfield was -- or is?
25   A.   I've heard the name, but no, I was

133

1    not that familiar with all the ins and outs of
2    that business.
3    Q.   To your knowledge, did anyone at
4    Safelite ever study any repairs made of cracks
5    in windshields longer than six inches using
6    Mr. Campfield's products?
7    MR. KAIRIS:  Objection to form;
8    foundation; outside the scope of the 30(b)(6).
9    A.   I am not aware of that.
10   Q.   Do you know whether anyone at
11   Safelite ever even looked at any repairs of a
12   windshield crack longer than six inches using
13   Mr. Campfield's products?
14   MR. KAIRIS:  Objection to form and
15   foundation and outside the scope of the
16   30(b)(6).
17   A.   I don't know specifically.  I mean,
18   I could hazard -- I could hazard a guess or
19   whatever to Paul Syfko, perhaps.
20   THE COURT REPORTER:  The what?
21   A.   Paul Syfko, perhaps, would have
22   been involved in something like that, but I
23   don't know that for a fact.
24   Q.   And you didn't -- did you ever have
25   any discussions with Mr. Syfko about

34  (Pages 130 to 133)

134

1    Mr. Campfield's products?
2        A.   No.
3             - - - - -
4             (Thereupon, Deposition Exhibit 18,
5             E-mail from Herron to Goodman and
6             Lyons, was marked for purposes of
7             identification.)
8             - - - - -
9        Q.   Okay.  Mr. Herron, you've just been
10   handed a document marked for identification as
11   Exhibit 18.  It's an e-mail and attachment from
12   you to Kurt Goodman and Mike Lyons.
13       A.   Yes.
14       Q.   Does this appear to be a true and
15   accurate copy of the e-mail and attachment you
16   sent on or about November 18th, 2012?
17       A.   Yeah, it does.
18       Q.   Do you know what the purpose of
19   this attachment was?
20       A.   I do.
21       Q.   And what was that?
22       A.   So this would have been a few days
23   before the presentation to Belron senior execs,
24   Gary Lubner or Dave Miller, most notably, and
25   probably Richard Tyler as well, as to our 2013

135

1    budget, the budget for the ensuing year.
2             Each member of the senior
3    leadership team would prepare their own
4    presentation decks for inclusion in those
5    business reviews with the Belron guys, and part
6    of my responsibility was to incorporate all of
7    those individual decks into a combined
8    presentation and make sure that they were --
9    that they were consistent.
10            And so I had received Steve's
11   presentation, and so I wanted to give it to
12   members of my team for their eyes to look at
13   and make sure that it lines up with what I
14   would be presenting as the financial
15   expectation for the 2013 budget.
16       Q.   And this is 2012, so obviously,
17   Mr. Migo was there at Safelite at this time?
18       A.   Uh-huh.
19       Q.   Does this refresh your recollection
20   as to when Mr. Migo approximately joined the
21   company?
22       A.   I mean, he's been there for a
23   number of years, but, no, I don't know what
24   year it was.
25       Q.   Was Mr. Migo -- he was not a member

136

1    of the senior leadership team, was he?
2        A.   Yes, from the very beginning.
3        Q.   Okay.  Would it surprise you that
4    Mr. Migo stated in an e-mail after
5    Mr. Campfield's lawsuit came to the attention
6    of Safelite that he had never even heard of
7    ROLAGS?
8        A.   Would it surprise me?
9        Q.   Yes.
10       A.   That Steve Migos said that?
11       Q.   Uh-huh.
12       A.   No; I don't think so, because
13   neither had I.
14       Q.   If you could turn to the page Bates
15   stamped last three digits 318.  It has 2013
16   field sales?
17       A.   Uh-huh.
18       Q.   And do you see where it says,
19   "Getting back to selling"?
20       A.   Yes, I do.  Yes.
21       Q.   And the third bullet point,
22   "Continue focus on continuing education" -- or
23   "CE"?  Excuse me.
24       A.   CE.
25       Q.   Do you understand CE to mean

137

1    continuing education?
2        A.   I do.
3        Q.   And what's your understanding of --
4    this is continuing education that Safelite
5    provides?
6             MR. KAIRIS:  Objection; foundation,
7    outside the scope of the 30(b)(6).
8        A.   It is continuing education that our
9    salespeople provide to insurance agents.
10       Q.   And is this a topic that would be
11   discussed at the SLT meetings?
12            MR. KAIRIS:  Objection; foundation;
13   outside the scope of the 30(b)(6).  We've
14   noticed somebody on that topic that you deposed
15   the company on that topic.  You've not noticed
16   Mr. Herron for his personal deposition.  You've
17   noticed him for specific topics.  Doesn't
18   matter that he was on the senior leadership
19   team.  You didn't notice him in his personal
20   capacity.  You're asking him about continuing
21   education with insurance agents.  That was the
22   subject of the 30(b)(6) deposition of
23   Mr. Pierce and Mr. Miller.
24            MR. OLSEN:  So you're going to
25   instruct him not to answer questions that are

35 (Pages 134 to 137)

138

1  simply outside the scope of the 30(b)(6)?
2       MR. KAIRIS: I'm making the
3  objection, and I think the questions are
4  inappropriate. I'm not instructing him not
5  answer. At some point, I'll cut him off,
6  though.
7       MR. OLSEN: We're not going to
8  belabor it. Okay. I just wanted to know if
9  you were going to instruct him not to answer.
10      Q.  Was the continuing education that
11  Safelite provided to agents a topic that was
12  discussed at the -- amongst the senior
13  leadership team?
14      A.  Certainly not at any length. I
15  mean, the senior leadership team was aware that
16  we provide continuing education classes, but
17  that's about -- that's about it.
18      Q.  And do you know what the purpose of
19  providing the continuing education classes was?
20      MR. KAIRIS: Objection; foundation;
21  outside the scope of the 30(b)(6).
22      A.  Well, from Safelite's standpoint,
23  it's -- it's an opportunity to build the
24  relationship between our salespeople and the
25  insurance agents on a topic that is helpful and

139

1  meaningful to them, that of continuing
2  education.
3       - - - - -
4       (Thereupon, Deposition Exhibit 19,
5       Financial Information, was marked
6       for purposes of identification.)
7       - - - - -
8       Q.  The moment we've all been waiting
9  for.
10      A.  I know I've been on the edge of my
11  seat.
12      MR. OLSEN: And then can we mark
13  this as the next exhibit.
14      - - - - -
15      (Thereupon, Deposition Exhibit 20,
16      Financial Information, was marked
17      for purposes of identification.)
18      - - - - -
19      Q.  Mr. Herron, you've just been handed
20  two documents. Exhibit 19 is the financial
21  information prepared in connection with this
22  litigation. It's a two-page document.
23      And then Exhibit 20 is a larger and
24  more legible version of the first page of
25  Exhibit 19.

140

1       A.  Thank you. Thank you.
2       Q.  It is not Bates stamped, but
3  counsel has provided it graciously for this
4  deposition so I don't have to use this
5  magnifying glass that I brought with me, just
6  in case.
7       Do you have an understanding of
8  what Exhibits 19 and 20 are?
9       A.  Did you ask me a question?
10      Q.  Yes. Do you have an understanding
11  of what they are?
12      A.  I do.
13      Q.  And what is that?
14      A.  This is the document that I
15  reviewed Wednesday afternoon and yesterday with
16  two members of our Safelite finance team, as
17  well as counsel. It was prepared in response
18  to a question that we got from counsel.
19      Q.  Did you have any role in preparing
20  this document?
21      A.  I did not. I didn't prepare it.
22      Q.  Did you -- is the first time you've
23  seen this document yesterday?
24      A.  Wednesday afternoon.
25      Q.  Wednesday?

141

1       A.  Uh-huh.
2       Q.  Do you know who prepared this
3  document?
4       A.  I do.
5       Q.  Who is that?
6       A.  That would have been our financial
7  planning and analysis team and largely, that
8  means Mike Lyons would be the fellow who
9  prepared it.



36  (Pages 138 to 141)



142

6    strike that.
7            Do you know if the backup used in
8    preparation of this document is maintained in a
9    file?
10       A.   It's electronically maintained,
11   yeah.
12       Q.   What type of accounting system does
13   Safelite use?
14       A.   Oracle.
15       Q.   Have you ever heard of Cognos?
16       A.   I have.
17       Q.   What is that?
18       A.   Cognos is -- it's an IBM product.
19   It's a database, and it's the database and --
20   well, not necessarily just a database. It's a
21   reporting tool that inquires on a database to
22   prepare reports. They can either be canned
23   reports or ad hoc reports, and we use Cognos.
24       Q.   Did you do anything to verify the
25   accuracy of the figures that are presented in

143

1    Exhibits 19 and 20?
2        A.   Yeah. We tied out a couple of the
3    -- I did personally a couple of the totals.
4        Q.   And when you say you tied out a
5    couple, what did you tie them to?
6        A.   To other annual reports, windshield
7    replacements and repairs.

146



1   phone.
2       **Q.   Is Safelite able to track for each**
3   **category via the web or phone, what advertising**
4   **materials -- strike that.**
5       **Is Safelite able to track what**
6   **Safelite advertising materials a consumer has**
7   **seen in connection with tracking via the web or**
8   **the phone?**
9       MR. KAIRIS:  Objection; outside the
10  scope --
11      MR. OLSEN:  That's just a butchered
12  question, so let me rephrase that, because --
13  let me --

3       **Q.   If you could pull out Exhibit 11-**
4   **-- 16, which had the 2011 P&L statement?**
5       A.   Yeah, uh-huh.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

154



23      A.   There can be, yeah.
24           MR. OLSEN:  If you give me just a
25      couple minutes, I think I may be done.  I just

40  (Pages 154 to 157)



158

1    want to look at something.
2        MR. KAIRIS:  Sure.
3        THE VIDEOGRAPHER:  Off the record.
4        (Recess is taken.)
5        THE VIDEOGRAPHER:  On the record,
6    2:06.
7      **Q.   Mr. Herron, during your break, did**
8  **you discuss any of your testimony with counsel?**
9        MR. KAIRIS:  Objection; calls for
10  privileged information.  Instruct the witness
11  not to answer.
12     **Q.  Looking at Exhibit 20 and the**

2     **Q.  On Exhibit 19, with respect to the**
3  **network affiliates --**
4    A.  Yes.
5     **Q.  -- does Safelite receive any fee**
6  **from the network affiliates?  I mean, is there**
7  **a reason why -- because the only thing that's**
8  **provided is the volume?**
9    A.  Yeah.  At one time, there was a
10  paper processing fee that if network affiliates
11  weren't connected with us electronically and
12  they had to send in their paper, they paid us a
13  paper processing fee, but I think almost all
14  the world is electronic now, so that would
15  really get rid of that.  There's no membership
16  fee or anything like that, if that's what
17  you're asking --
18     **Q.  And no per unit fee or anything**
19  **like that?**
20    A.  No.
21     **Q.  Okay.  Thank you.**
22       MR. KAIRIS:  Thank you.  He'll read
23  and sign.
24       THE VIDEOGRAPHER:  Off the record.
25       (Time noted:  5:23 p.m.)

161

1
2  STATE OF _____ )
3             ) :ss
4  COUNTY OF _____)
5
6
7     I, DOUG HERRON, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15        _____
16        DOUG HERRON
17
18
19
20  Sworn and subscribed to before me,
21  this _____ day of _____, 2018.
22
23  _____
24     Notary Public
25

41  (Pages 158 to 161)

162

```
 1          C E R T I F I C A T E
 2   The State of Ohio,  )
 3                SS:
 4   County of Franklin.  )
 5
 6        I, REBECCA WILLIAMS, a Notary
 7   Public within and for the State of Ohio, do
 8   hereby certify:
 9        That DOUG HERRON, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13        I further certify that I am not
14   related to any of the parties to this action by
15   blood or marriage, and that I am in no way
16   interested in the outcome of this matter.
17        IN WITNESS WHEREOF, I have hereunto
18   set my hand this 26th day of February, 2018.
19
20
21
22        Rebecca Williams, Notary Public
23        within and for the State of Ohio
24        My commission expires June 7, 2022.
25
```

164

```
 1   Exhibit 16, Business Overview          118
 2   Exhibit 17, E-mail from Spencer to     125
 3   Senior Leadership Team
 4   Exhibit 18, E-mail from Herron to      139
 5   Goodman and Lyons
 6   Exhibit 19, Financial Information      144
 7   Exhibit 20, Financial Information      144
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

163

```
 1   -----------------I N D E X--------------------
 2   WITNESS          EXAMINATION BY      PAGE
 3   D. Herron       Mr. Olsen          6
 4
 5   ------------------E X I B I T S---------------
 6   Exhibit 1, Notice of Deposition        12
 7   Exhibit 2, E-mail from Grose to Olsen, 13
 8   1-15-08
 9   Exhibit 3, E-mail from Brown to Many,  23
10   1-8-05
11   Exhibit 4, E-mail String, July 2015      48
12   Exhibit 5, E-mail from Metzger to Senior 50
13   Leadership Team
14   Exhibit 6, E-mail String, July 2008     59
15   Exhibit 7, E-mail to Herron from Perchak, 61
16   3-17-14
17   Exhibit 8, E-mail String                66
18   Exhibit 9, E-mail String, 3-22-10       71
19   Exhibit 10, E-mail String              80
20   Exhibit 11, E-mail String, April 2012    85
21   Exhibit 12, E-mail String              91
22   Exhibit 13, E-mail String              93
23   Exhibit 14, Daily Sales Report         96
24   Exhibit 15, E-mail from Adams to Lyons, 102
25   9-16-16
```

165

```
 1        INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition over carefully
 4   and make any necessary corrections. You should state
 5   the reason in the appropriate space on the errata
 6   sheet for any corrections that are made.
 7        After doing so, please sign the errata sheet
 8   and date it.
 9        You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12        It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

42  (Pages 162 to 165)

```
                                                  166
 1              E R R A T A
 2

 3

 4
 5       I wish to make the following changes,
 6    for the following reasons:
 7
 8    PAGE LINE
 9    ___  ___ CHANGE:_____
10    REASON:_____
11    ___  ___ CHANGE:_____
12    REASON:_____
13    ___ ___ CHANGE:_____
14    REASON:_____
15    ___  ___ CHANGE:_____
16    REASON:_____
17    ___ ___ CHANGE:_____
18    REASON:_____
19    ___ ___ CHANGE:_____
20    REASON:_____
21
22    _____  _____
23     WITNESS' SIGNATURE     DATE
24
25
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

**A**

abbreviate 46:1
able 37:15 52:16,20 55:16 60:4 145:8,9 146:2,5,14 149:20 151:8,11
Absolutely 63:9 153:17
ac 111:19
acc 116:19
accelerate 126:21
accept 156:23
access 21:7
account 78:2
accounting 142:12
accounts 30:9
accuracy 99:24 142:25
accurate 18:19 19:2 43:22 45:18 45:20 49:11 49:14 51:1 51:4 57:4,6 60:8 63:8 63:11,17,21 64:1 66:23 80:16 84:4 86:20 89:16 91:20,22 98:6 99:5 99:17 100:9 100:12,18 105:19 116:20 117:7 120:16 134:15 151:1 165:16
accurately

6:25
achieve 70:21 109:3
achieving 69:15
acquired 16:22 20:10
acquisition 17:7
acronym 40:2 60:15 60:17 61:7
acronyms 61:1
act 9:18
action 6:6,16 68:10 69:19 162:14
actions 68:19
actual 10:12 17:1 20:12 20:14 26:6 68:16 69:9 81:11 94:13 106:13 121:22
ad 37:4 41:15 41:17,18,22 41:23,23 42:16 67:9 71:21 72:4 77:18 78:16 142:23
Adam 86:25 87:4,10
Adams 97:16 97:24 163:24
add 22:9 102:17 112:10 147:11
added/high 101:13
addition 19:22
additional 72:13 91:1

91:1
addressing 82:20
adherence 12:12,13
adhering 10:14,15 12:10,10,17 12:18 13:4 13:4 155:5
adjustment 13:17 14:3 14:10
administer 4:9 109:11
administra... 90:4
administra... 36:2
ads 41:12,14 42:11,25 49:22 68:24 71:22 130:22 146:22
advantageo... 60:2
advertisem... 40:25 68:11 129:16 130:3
advertising 41:5,8,12 49:7 51:19 67:3,7,25 68:22 69:21 70:2,18 71:11 72:1 75:24 76:6 76:11,23,24 77:11,12,14 77:15,17,25 78:5,9 79:25 90:15 90:20 91:2 91:3 112:20 127:6,9,13 127:18,22

127:25 130:1,5,6 146:3,6
affiliate 149:13,13 149:22 150:2,10
affiliates 150:4 160:3 160:6,10
afternoon 11:3 27:21 119:22,23 140:15,24
agency 109:13
agenda 77:23 121:22
agents 137:9 137:21 138:11,25
aggregate 116:14
aggregated 141:18
ago 6:12 23:2 26:8 34:10 40:1 54:4 64:22,22 72:25 155:20,21 157:8
agreed 4:2,6 22:19
agreeing 46:10
agreements 59:23
agrees 63:15
ahead 70:17 81:11 90:25
air 72:2,6
al 1:5,8 5:3,4
aligned 52:16 52:25
alleviate 76:22
allocation

39:6
alluded 73:7
amount 64:20 79:20
analyses 12:1 12:11 13:3 51:3,6
analysis 10:17 87:5 141:7
analyst 87:4
and/or 13:10 13:15 14:8 28:2 29:12
annual 15:11 15:15 20:21 27:22 28:18 28:22 41:11 68:20 141:18 143:6
answer 7:11 7:15 75:5 75:13 120:3 127:14 137:25 138:5,9 155:4 158:11
answered 39:3
answers 9:14
anybody 36:5 55:23 95:16 132:11 155:8
appealing 47:8 131:22 155:14
appear 19:1 45:19 57:5 62:15 66:22 86:19 89:15 98:5 117:6 124:18 134:14
appears 18:19 43:22

45:17 57:3 80:15 85:12 91:19,21 120:15 148:23
apples 124:7 124:7 125:14,15 125:16,16 148:10,10
applied 23:17 24:12 86:1
applies 132:11 155:7
apply 23:21
approach 58:21 59:17 68:22 73:17 73:20 74:3 83:19
approaches 58:25 59:15 74:17
approaching 146:23
appropriate 46:22,25 47:2 48:21 48:21 50:3 154:23 165:5
approve 150:14,16
approxima... 88:7 114:19 116:20,23 135:20 147:15
April 80:4,11 81:1 124:21 163:20
archive 38:25
area 156:19
areas 31:2 38:14 108:10 159:5

argue 83:9
154:2,2
arm 101:13
101:17
102:10
arrangeme...
58:1
arrogant
156:17
ascertain
98:10
aside 67:16
asked 11:19
25:18
144:19
157:7
asking 27:12
85:3 99:21
137:20
160:17
aspect 78:15
assembly
36:16
assessment
81:6
assistant
19:15 44:10
associate
48:2
associates
150:11
association
5:12
assume 78:22
146:18
attached
18:14 62:21
97:3 98:1
161:12
165:11
attaches 63:1
attaching
120:13
attachment
18:11,20
19:2 45:12
57:15 75:25
76:10 80:11

82:20 85:7
91:14 95:23
97:23
113:19
134:11,15
134:19
attachments
45:15 80:19
91:24
attendance
121:20
attended
16:11 20:8
attention
55:3 57:22
79:22 136:5
attorney
165:13
attorneys 4:3
attractive
58:23 59:17
73:19
125:25
attributable
148:3
audience
98:11,14,19
authorized
4:8
auto 112:18
AutoGlass
100:23
101:9 105:6
105:10
106:1,20
111:14
118:15
143:20,25
144:4,24
automobile
13:19
Avenue 3:6
average
12:15 27:23
58:5,6,10
58:14 64:3
64:6,12
65:3 70:5

83:18 87:13
87:18,22,23
aware 16:13
49:9 99:9
130:4,13
133:9
138:15
153:5
awareness
42:6 73:4
77:15
a.m 2:5 75:24
_____
B
B 3:9 152:2
163:5
back 33:24
39:24 62:6
67:15 71:8
81:15
104:18
123:20,23
124:23
125:20
136:19
142:5 149:9
153:8
backup 142:7
backwards
25:20
bar 118:2
based 15:5
30:25
basic 131:10
basis 68:6
84:1 93:6
94:9
Bates 27:2
50:17 91:16
95:25 97:5
114:13
115:6
120:23
122:3,3
136:14
140:2
battle 152:20
becoming

122:22
beginning
57:23 58:15
136:2
begins 5:1
86:12
behalf 5:10
5:16,17
59:7
belabor
138:8
Belgium-ba...
15:4
belief 117:16
132:9
believe 8:4
22:22 34:25
36:16 47:16
56:25 63:20
63:25 82:4
84:15 147:2
148:8
155:18,23
belong 150:7
Belron 15:2,3
15:4,5 16:1
16:7,10,14
16:20,22
17:7 20:11
39:18 48:1
48:2,4
54:16 56:13
75:25 80:25
81:3 99:7
99:16 100:3
100:12,16
114:5
134:23
135:5
Belron's
104:6
bench 111:4
benefit 65:14
benefits
73:16
109:25
best 7:3,4
30:1 49:3

65:22,23
99:17 100:9
100:12
105:19
116:17
127:14
bet 91:3,4
bets 90:16,21
better 69:6
69:11,14,16
81:14 82:9
beyond 14:5
91:2
big 27:8,9,13
27:16 28:11
28:12 92:8
101:7
121:13,15
125:4 129:2
145:2
159:16
bigger 123:13
biggest 109:6
bill 50:13,20
51:21 53:19
66:7
billion 110:23
111:17
112:2 118:6
118:21
binding 9:15
bit 31:25
57:13 58:12
58:12 69:23
79:16 115:3
131:1
blended
96:24 97:8
blood 162:15
Blvd 3:16
board 13:11
13:25 14:14
14:16,18,21
16:5,11,15
16:17 17:1
17:6,12,14
17:17,23
18:13,15

20:8,12,15
44:13 88:17
150:25
body 33:14
bolded 101:2
bottom 50:11
61:25 86:13
89:5,18
94:2 95:14
111:24
117:13
119:7 122:8
Boulevard
2:9
box 111:23
112:5
brand 36:15
breadth
53:24
break 7:8,9
10:2 43:4
74:18 75:1
95:17 97:2
105:3
119:13,25
158:7
breakdown
26:8 105:17
105:22
107:16,18
110:10
112:11
breakout
97:4
breaks 106:1
Brian 5:18
11:5
brief 6:18
30:20
bring 68:11
70:7 71:11
bringing 67:3
brochures
112:22
broken
106:15
141:19
brought

27:11
121:11
140:5
**Brown** 18:5
18:12 19:4
19:5 88:18
163:9
**bubble**
105:25
112:9
**budget** 26:7
67:19,20
68:9,12,20
69:9 93:10
93:17 94:10
121:24
135:1,1,15
**budgeted**
68:1,17
69:7,15
**budgeting**
122:10
**budgets**
29:12 30:1
**build** 138:23
**bullet** 50:18
53:14 55:10
78:6 81:20
114:17
116:3
117:14
120:25
124:3 126:8
126:18
128:6
136:21
**business**
18:15 19:11
22:2,10,12
23:3,5 31:2
32:3 33:15
35:22 36:1
38:10,12
52:22 53:3
54:3 70:20
78:2,3 81:3
81:5 83:14
83:16 87:8

88:19 90:3
91:4 93:4,8
95:11
100:20
101:13,19
101:24,24
102:1,2
105:3
106:11
107:18
111:10
113:13,20
116:12,17
125:24
126:5,6
127:1 133:2
135:5
145:19
149:16,23
150:7
151:17,19
164:1
**businesses**
35:6 44:22
44:23
**butchered**
146:11
**buy** 152:15

———————
**C**
**C** 3:2 152:2
162:1,1
**Cacchillo**
34:8 36:8,9
36:10,20
40:10 90:11
**calculation**
21:20
**calculations**
125:6
**call** 27:7
31:12,14
35:7 36:19
37:16 44:22
46:1 95:9
112:6
**called** 5:22
32:20 33:9

33:10,17,21
34:2 39:17
**calling** 27:16
109:15
**calls** 31:17
75:3 103:2
109:13,24
120:1 158:9
**campaign**
41:9,11,22
70:18
**campaigns**
41:5,12
72:1
**Campfield**
1:5 5:3
132:24
**Campfield's**
133:6,13
134:1 136:5
**canned**
142:22
**capacity** 9:20
137:20
**caps** 101:2
**car** 47:8
**care** 132:6
154:6,13
**careful** 73:22
**carefully**
165:3
**Carolina**
19:7
**carriers**
22:21
**carrying**
34:24
**cars** 42:3
128:22,23
**cart** 70:25
71:3,9
**case** 1:7 53:8
58:21 74:13
81:11 83:8
116:15
140:6
141:20
**cases** 72:18

153:20
**categories**
87:13
112:11
123:7
**category**
25:12 95:1
95:2,6
143:16
146:3
152:17
**Catherine**
19:13,14
**cc** 89:19
**CE** 136:23,24
136:25
**CEO** 33:20
80:24
**certain** 8:9
19:24 33:19
43:2 58:8
69:8 149:21
151:25
**Certainly**
138:14
**certainty**
73:21
**certify**
161:10
162:8,13
**CFO** 33:3
117:7
152:14
**chair** 130:16
**change** 50:2
74:2 117:17
127:6,12,22
128:2
131:17
153:5,10,23
166:9,11,13
166:15,17
166:19
**changed**
72:19
**changes**
130:4 165:9
166:5

**changing**
74:14,14
85:25
117:21
130:21
**channel** 28:5
**characterizes**
103:5
**charge**
148:18,21
151:9,11
**chart** 97:4
104:18
110:17,21
117:4,6
118:2,16
122:5
123:23
124:14,19
124:22
127:19
**charts** 144:9
144:14
149:12
**check** 64:14
**Chewning**
19:13,14
154:3,4,16
**chief** 19:15
21:11,13,15
30:24 114:9
120:20
130:15
**chimney**
110:24
112:4
**chimneys**
111:4,25
**chip** 50:12,19
51:21
**choice** 149:18
150:1
**choose**
106:25
**chose** 150:6
**chosen** 144:6
**Cindy** 34:8
34:18,19
**circulated**

81:17
**circulation**
25:10
**claim** 6:14
47:7 64:7
77:20 103:3
107:1 144:6
151:22,23
155:15
**claims** 28:3
35:25 77:15
77:18,21
90:3 101:19
116:4,8,11
118:7
144:19
**clarify**
126:15
**classes**
138:16,19
**clause** 63:15
65:9
**clear** 114:15
**client** 58:1
59:18 70:13
76:22 77:10
154:3,4,16
**clientele**
73:20
**clients** 22:16
22:17 24:22
25:1 58:8
77:16 78:1
101:21,22
103:1
107:13,14
108:13,15
151:17
153:18
**Cognos**
142:15,18
142:23
**colleagues**
11:4 81:17
155:4
**color** 110:22
110:22
118:3

1:17 3:17
5:8 30:25
92:22,23
121:12
**column** 94:5
97:1
**columns**
96:10,21
111:5
**combination**
30:8 90:15
90:20 95:7
**combined**
58:25 60:2
73:16 93:25
135:7
**come** 42:23
145:16,16
145:17,17
145:19
**comes** 25:24
69:20 101:8
145:25,25
**coming** 48:9
**comment**
105:15
**commercial**
94:19
101:21
107:2,14
108:19
114:20
141:24
142:1,3
148:3
**commission**
162:24
**commitment**
60:4 64:11
**committed**
23:11
**committee**
33:11 34:3
**communica...**
52:16,20
**communica...**
14:13
**communica...**

48:15
**communica...**
9:6 11:22
13:10,24
24:21,25
25:5 48:17
75:7,8
**companies**
9:7 31:13
31:15 58:18
58:19 72:17
74:12 83:11
103:3
108:16
112:23
114:21
116:14
117:4
144:18
153:10
**company**
9:15 11:12
15:4,7
17:22 19:8
21:7,11,16
22:16 24:14
24:22 25:1
30:23 34:10
34:16,23
35:10 36:21
52:14 54:6
59:8,16
64:15 68:19
70:22 71:13
72:16 73:12
83:9,20,22
93:15 99:4
99:6 100:2
101:23
102:1
109:21
135:21
137:15
143:21
144:1,24
145:13
151:24
152:1,2,2

152:12
153:24
154:7,17,20
156:19
**company's**
60:1 68:15
69:22 70:1
70:10 71:14
72:9 151:20
**compare** 26:7
26:7 93:16
94:10 147:6
**compared**
157:4
**comparison**
83:5,6 93:9
93:19,20
124:8
**compensati...**
32:4
**competition**
58:16
**competitor**
109:10
**competitors**
42:9
**complete**
91:24
**completed**
59:10,11
143:20,25
144:5,24
**completely**
122:20
**completing**
63:2 65:18
145:21
**component**
48:4
**components**
152:6
**comprised**
104:1
**concern** 84:6
**concerning**
13:11 47:12
61:23
**conclude**

98:16
**condition**
72:14
**conditions**
122:15
**conduct**
15:16 16:25
**conducted**
15:22 16:18
56:14
**conference**
52:13
**conflict** 37:15
**confusing**
111:23
**connected**
160:11
**Connecticut**
3:6
**connection**
8:7 30:18
31:21 56:8
139:21
146:7
**consent** 15:24
16:19
**consider** 51:7
129:7
**considerati...**
71:20 85:18
**consistency**
52:23
**consistent**
52:16,20,24
135:9
**constant**
151:13
**constantly**
152:17
**consumer**
20:22 94:16
94:18
106:21
141:19
144:2 146:6
148:19,22
149:1
157:18

158:18,21
158:25
159:6,14,20
**consumers**
51:23
143:22
144:5
146:22
148:17
**contacted**
52:11
**contacts**
109:24
**contained**
25:13 26:25
**containing**
12:21
**contemplat...**
13:12 16:8
**context** 65:13
83:18 85:15
85:23
108:20
121:9 126:6
154:19
**continue** 7:16
70:17 121:1
129:3
136:22
**continues**
46:22 50:22
82:16
**continuing**
136:22
137:1,4,8
137:20
138:10,16
138:19
139:1
**contract**
22:19,21
23:11 63:14
65:9 109:10
145:6
**contracts**
12:21 58:8
72:17 83:10
83:22

101:23
107:3
152:12
**contractual**
22:15 64:11
64:16
114:18
**contrasted**
110:5
**control** 46:5
46:7,7,11
107:21
**conversation**
49:19 54:13
**conversatio...**
11:14 51:9
51:25 56:4
**conversion**
145:14,14
145:24
**copies** 89:16
**copy** 18:19
19:2 43:23
45:18 57:4
57:6 66:23
80:16 81:12
86:20 91:20
91:22,24
98:6 120:16
134:15
**corner** 50:11
**corporate** 8:7
8:25 9:5,18
11:9,20,23
20:20 21:4
25:8 30:5,5
44:4,6
108:1,5
109:16
113:8,9
**correct** 15:20
16:23 21:12
34:10 45:24
47:18,19
52:5 62:19
67:21 78:23
79:7 83:4
84:5,20,21

88:12,13
93:5 96:2
101:10
104:3,10,11
104:14,25
105:8 107:5
114:10
115:13
118:14
129:14
132:5 145:7
151:2,6
157:19
161:11
**corrections**
161:12
165:4,6
**corrective**
69:18
**correspond...**
93:10
**cost** 41:14
68:25 87:23
111:7 112:3
112:8 126:3
126:9
128:16,20
151:9,23
159:3,4,10
159:12
**costs** 112:10
**counsel** 5:13
5:19 6:5
7:14,14
11:15,22
15:14 20:2
27:1 34:20
34:22,25
75:2,6
119:25
140:3,17,18
158:8
**country**
109:14
**County** 161:4
162:4
**couple** 35:1
44:1 61:22

100:19
117:1
141:17
143:2,3,5
155:21
157:8,25
**course** 23:10
64:8 66:8
74:11 82:14
132:7
**court** 1:1
4:11 5:5,11
5:20 6:20
6:25 7:5
83:24
133:20
165:16
**cover** 66:25
121:22
**coverage**
31:24 32:2
32:3,6,7
149:24
**covered**
40:23
121:21,24
144:25
**covering**
111:24
151:9
**crack** 9:7
10:16 12:19
13:16,20
14:8 17:25
23:16,21
24:10,24
25:2,3
46:18 47:12
48:7,24
49:8,13
50:12 53:18
53:19 54:10
55:6,15,23
78:11 84:19
84:22,24
85:25 129:8
129:18
130:7,23

131:4
133:12
154:25
156:1,6
**cracks** 23:23
23:25 24:3
39:14 46:6
46:15 56:8
56:9 133:4
**create** 42:6
77:19
141:11
**created** 85:10
85:11,12
**Crede** 34:8
35:2,3,9
36:3
**credit** 64:16
**criteria** 13:12
13:14 14:4
17:25 20:5
20:7 39:13
46:5,7,9,10
46:14,15,21
46:22,25
47:2 53:2
53:17 66:4
78:10 84:18
84:24
**cross-refer...**
119:11
**CSRs** 62:23
**current** 14:18
33:20 35:20
124:3
125:21
126:3
132:20
**currently**
58:3
**curve** 41:23
88:2,3,8,12
94:23 96:15
125:12
142:4
**curved** 67:11
67:13,16
96:23

123:11
**customarily**
123:15
**customer**
12:21 23:15
36:15,19
47:5 48:22
53:5,6 56:5
56:7 93:7
93:25 95:3
95:4 105:17
105:22
106:8,16
123:7
131:19
132:2
154:15
155:12
159:19,20
**customers**
12:16 28:2
69:4 93:7
93:11,14
96:8 97:7
146:15
153:4
154:12
**cut** 138:5
**cutoff** 155:11
**cut-off** 24:2,4
24:10
**C/T** 96:17,22

_____

**D**

**D** 163:1,3
**daily** 25:11
25:22,23
26:1 57:11
57:17 66:19
67:1 68:6
86:18 91:8
91:25 92:2
93:6 94:9
141:16
163:23
**damage**
13:20 65:19
66:6 73:13

128:12
155:10
**Damski**
14:20
**Dan** 19:19
**dangerous**
71:6
**Daniel** 32:9
32:11
**data** 27:2
141:10
145:22
**database**
142:19,19
142:20,21
**date** 5:8
165:8
166:23
**dated** 8:18
55:5 57:1
66:17 80:11
97:23
124:21
**Dave** 14:19
53:25 54:3
54:12 80:24
81:4,11
134:24
**David** 5:11
5:12 54:5
54:13 55:6
**day** 2:8 3:15
5:7 11:2
21:16 25:21
26:3 29:24
33:6 57:17
62:6 93:16
93:17
121:21,23
161:21
162:18
**days** 40:1
42:4 134:22
155:21
165:14
**DC** 3:8
**deal** 129:3
**decided**

128:12
**decision**
90:25
156:13
**decisions**
91:4
**decks** 135:4,7
**decline** 56:5
**declined**
122:9
**declining**
122:13
**decrease**
79:10,12
**deemed**
165:16
**Deepen** 128:6
**defendant**
1:9 3:14
6:15 8:2
**defendants**
5:18
**defined** 25:2
27:25 87:20
107:25
143:22
**defining**
104:15
**definitely**
82:11
**definition**
23:19 96:5
132:12,13
143:14
**definitions**
143:9
**deliver** 53:7
**delivering**
47:4 108:9
**demand**
103:11
**denominator**
21:23
104:20
123:13
**denominat...**
125:13
**depending**

57:25
deposed 6:8
6:11 75:12
137:14
deposing
165:13
deposition
1:16 2:7 4:7
5:2,7 7:20
7:21 8:2,12
10:23 11:1
18:4 29:9
29:16 30:12
40:6 43:11
45:5 54:20
56:18 61:14
66:11 75:16
80:3 86:5
88:23 91:7
97:15
113:12
120:5 134:4
137:16,22
139:4,15
140:4 161:9
162:10,11
163:6 165:3
165:11,14
165:15
describe 77:7
80:21
description
30:21 65:6
92:6 99:4,6
designated
8:6 9:4,18
9:23 10:4
20:19 24:17
desired 70:15
128:3 154:8
despite
109:21
detailed
40:22
determined
25:14
developing
123:12

development
35:8 108:3
difference
147:25
157:15
158:13,17
different
11:16 33:11
46:11 51:9
51:13,14
100:20
125:6,19
148:16
159:10,13
differentiate
73:17
differentiat...
58:16
differentiat...
83:19
differentiat...
42:7,8
126:21
differently
85:22
digital 112:19
113:2,2
digits 50:10
96:1 97:6
114:13
115:6
136:15
diligence
51:12
Dilitaron
99:14,15
DiMasi 5:18
Dino 34:7
35:15,16,17
14:3,7
Dino's 35:20
direct 55:2
57:22
directed
41:24,25
42:1
director
88:17
directors

13:11,25
14:15,17,19
14:25 16:15
16:17 17:6
17:17 18:15
20:13,15
44:6,11,12
director/VPs
44:4
discolor
131:20
discuss 20:4
48:18 75:2
119:24
158:8
discussed
14:14 20:7
28:13 38:7
39:14 40:21
45:21 49:17
137:11
138:12
discussing
47:17 48:12
57:8 65:4
85:14
105:18
discussion
9:3 15:15
15:19,19
16:4,9,13
17:24 39:20
65:2 75:9
81:15 85:19
89:11 99:1
153:5
discussions
13:15,24
16:18 39:16
40:15,24
41:16,21
48:6 51:16
51:17 54:9
54:15 55:14
55:18,20,22
85:24 86:2
130:20

133:25
disparity
125:5
disposal
148:14
distinct 9:19
distribution
90:1 111:8
district 1:1,2
5:5,5 62:14
62:18 92:22
92:24
districts
92:20,21,23
division 1:3
54:5
divulge 11:14
divulging
11:21
document
7:25 8:3,5
18:10,14
27:1,4,16
27:19 32:14
43:16 44:16
45:11,18,23
52:6 54:25
55:1 56:24
61:19,20
66:16 75:21
76:16 80:9
85:10 86:10
89:3 91:12
97:21
113:18,22
119:7
120:10
124:20
134:10
139:22
140:14,20
140:23
141:3,11
142:2,4,8
documents
11:5 26:21
28:16 29:21
29:23,25

30:17 61:2
92:5 139:20
141:16
doing 39:11
66:4 69:16
70:12 83:12
83:13,20
85:20,21,22
165:7
dollar 50:13
50:19 51:21
53:19 60:9
60:10 66:7
103:16
152:6 159:5
dollars 63:19
64:21 69:4
93:12 95:8
95:8,9
101:3,5
105:1 111:6
Doug 1:16
2:8 5:2,22
97:25 121:2
121:5 161:7
161:16
162:9
draft 18:13
81:12
dramatically
56:2
drive 71:13
71:14,18
129:4
dropping
56:2
drove 77:14
due 51:11
79:11
duly 5:23
162:10
durable
48:23 53:11
131:19
155:13
156:14
dynamics
109:9

E

E 3:2,2 162:1
162:1 163:1
163:5 166:1
earlier 28:13
39:18 45:21
57:18 73:7
88:16 92:12
104:18
129:24
130:15
144:14
155:6
early 16:22
20:11 41:25
42:4
earnings
44:24
101:14
102:12,13
easier 46:4
143:12
147:12
157:1
east 92:14
eastern 1:3
92:15
easy 12:3
EBIT 44:24
45:2,3
107:22
158:15
edge 139:10
education
136:22
137:1,4,8
137:21
138:10,16
138:19
139:2
effect 4:10
153:13
eight 33:23
either 10:14
12:10 64:13
67:10 69:6
69:10 95:16
142:22

144:6
146:16,23
**elaborate**
32:1 57:12
72:21 79:16
85:13
**electronic**
160:14
**electronica...**
142:10
160:11
**element** 23:3
**eliminate**
58:22
**Elliott** 34:8
34:18,19
36:4
**emphasize**
73:6
**emphasized**
43:1
**employee**
48:1 154:15
**employees**
15:2 154:11
**employment**
30:21
**encouraging**
65:11
**engaged**
154:15
**engaging**
101:20
**England** 15:6
**enhance**
102:11
**enhances**
101:14
**enlighten**
131:1
**ensuing**
64:16 135:1
**ensure** 47:1
49:12
**enterprise**
100:16
**entities** 30:7
58:19

**entitled** 18:15
44:16 63:2
76:11 104:4
105:3
118:17
**entity** 30:8
32:19
**entrusted**
156:20
**environment**
74:15 103:6
103:9
**equals** 147:15
**errata** 165:5
165:7,10,13
**error** 9:10
24:19
**errors** 32:6
**Erwin** 53:25
54:2,9,15
55:23
155:24
**Esq** 3:9,18
**essence** 33:12
111:3
**essentially**
109:8
**estate** 31:4
**estimate**
103:19,20
103:25
104:3
**estimated**
10:13
115:11
116:18
**evaluating**
69:13 72:8
**eventually**
119:11
**everybody**
37:17,18
56:24 60:12
**evolved** 74:8
**exactly** 73:23
94:6 129:23
131:15
150:21

**EXAMINA...**
5:25 163:2
**examined**
5:24
**example**
25:11 68:8
78:5 92:22
103:2
112:21
113:3
128:20
145:5
148:16
157:16
**examples**
57:20
159:12
**exclusion**
71:16,19
**exclusive**
145:6
**exclusively**
128:3
**excuse** 28:20
35:19 49:1
94:7 102:20
136:23
144:1
**execs** 81:3
134:23
**executive**
19:15,15
114:4
**exhibit** 7:20
8:1,12,17
9:25 10:10
18:4,11
19:23 28:12
43:11,17
45:5,12
52:1 54:20
54:25 56:18
56:24 60:12
61:14,19
66:11,16
75:16,21
80:3,9 86:5
86:11 88:23

89:3,14
91:7,12
95:21 97:15
97:21 99:25
113:12,18
115:19
120:5,11
123:20
124:8,20,22
125:20
134:4,11
139:4,13,15
139:20,23
139:25
143:11,11
147:3,19
149:9,10
155:24
156:25
158:12
160:2 163:6
163:7,9,11
163:12,14
163:15,17
163:18,19
163:20,21
163:22,23
163:24
164:1,2,4,6
164:7
**Exhibits**
140:8 143:1
148:1
**exist** 83:7
**existence**
24:6
**exists** 103:11
**expand** 58:11
**expect** 37:13
41:14
**expectation**
135:15
**expense**
111:8
**expenses**
112:6
**experience**
51:10

**experiencing**
157:5
**experts**
127:18
156:18
**expires**
162:24
**explain** 62:24
64:9 83:15
107:6
110:16
123:4 125:7
**explained**
74:11
**explaining**
92:11
**explanation**
25:12
**expression**
68:18 69:3
**extends** 102:2
**Extensive**
117:15
**extent** 9:16
**external**
103:6,8,10
**extreme**
65:25
**eye** 53:10
**eyes** 135:12
**e-mail** 8:13
8:18 18:5
18:11,20
19:2 43:12
43:17,23
45:6,12
54:21 55:2
56:19,25
57:8,16
61:15,23
62:1,21
66:12,17,19
66:23 75:17
75:22 80:4
80:10 81:22
86:6,11,20
88:24 89:4
89:20 90:8

90:9 97:4
97:16,22
113:19
120:6,12
134:5,11,15
136:4 163:7
163:9,11,12
163:14,15
163:17,18
163:19,20
163:21,22
163:24
164:2,4
**e-mails** 86:25
89:5,15

**F**

**F** 162:1
**face-to-face**
15:11
**fact** 59:14
71:8 109:21
133:23
156:3
**factor** 71:20
158:22
**factors**
158:23
159:2,9
**Facts** 50:18
53:14
**fail** 47:7
165:15
**failed** 64:6
**fair** 7:7 82:23
84:11,14
**fairly** 34:12
92:25
**familiar**
133:1
**family** 128:21
128:23
**fan** 110:22
**far** 105:13,18
110:19,22
156:21
**Farm** 109:4,5
109:13,19

145:3,4
**Farm's**
109:16
**February**
1:18 2:4 5:8
162:18
**fee** 160:5,10
160:13,16
160:18
**feedback**
75:25 81:13
81:18
**feel** 63:10
**feels** 115:24
115:25
**Feeney** 14:20
14:23 19:17
33:21 34:7
36:4
**fees** 106:12
148:8,8,11
148:13,14
148:14
**Feldman**
5:11,13
**fell** 68:8
**fellow** 141:8
**field** 109:12
112:9
136:16
**figure** 103:15
116:20,23
**figures**
105:18
124:22
142:25
145:10
158:19
**file** 19:21
20:1 106:25
142:9 144:6
**filing** 4:4
**finance** 19:6
108:2
140:16
**financial**
10:13,18
11:25 12:6

12:8 13:17
14:9 19:9
21:6,10,10
21:11,14,15
27:2,6
29:12 30:6
30:9,24
31:1 38:11
63:14 64:25
65:8 68:15
68:16,18
69:3,22
70:1,6 71:8
87:4,5
97:25
100:17
114:9
120:20,22
130:16
135:14
139:5,16,20
141:6
147:20
164:6,7
**financially**
65:24
**find** 58:22,23
**fine** 70:16,19
100:6
**first** 7:11
9:24 25:25
27:18 33:4
59:22 61:25
63:12 69:1
72:1,23
73:1,11
77:9 78:17
81:20 82:25
86:13,25
89:19 90:14
94:2 103:1
108:12
120:25
121:21
132:17
139:24
140:22
143:10

146:19
154:11
158:13
**fiscal** 26:1
63:25 90:24
**fit** 66:6
**five** 74:17
**flavor** 59:14
**fleet** 31:4
32:5 101:21
101:24
102:1
108:19
114:20
**fleets** 107:4
**flow** 102:3
**flowery** 31:23
**FNOL** 28:3
106:11
146:19
**FNOLs**
159:24,25
**focus** 41:8
69:13 70:8
71:15
108:10
128:2
136:22
152:22
153:2
**focused** 41:18
41:18 49:19
54:7 65:18
67:10
102:16
127:10
152:17
**following**
68:22 76:25
81:2 121:23
166:5,6
**follows** 5:24
**force** 4:9 31:6
31:10
**forced** 63:19
**forecast**
29:12
**forecasts**

30:2
**foregoing**
161:8
**foreign** 15:3
**foremost**
73:11
**forgive** 157:9
**forgot** 155:21
**form** 99:19
102:6
112:25
126:14
129:21
130:10
131:12
133:7,14
156:8,15
**formal** 16:16
48:8,10
**format** 91:15
**forth** 162:10
**forward**
25:21
**found** 9:24
**foundation**
52:8 56:11
78:14 113:1
117:22
128:17
130:11
131:13
133:8,15
137:6,12
138:20
147:1
**four** 77:1
96:10
**fourth** 50:18
53:14
**fragmented**
115:10
**Franklin**
162:4
**frankly** 95:15
**frequency**
17:14 77:22
**front** 61:10
**fulfillment**

28:25 30:4
106:19
115:9,12
**full** 60:16
**functions**
108:2,5
**further** 4:6
58:12
162:13

――――――
**G**
**GA** 12:21
**GAI** 12:16
13:5 58:4
58:24 59:1
59:5,9,12
59:13,15,20
59:22 60:2
60:4 65:1
65:13 70:9
70:14,23
73:16,16
74:2,4,7,9
74:10,16
**GAIs** 58:2
60:13 72:17
72:23 73:19
**game** 117:17
117:21
**Garrison**
62:22
**Gary** 14:19
81:4 134:24
**geared** 42:12
42:16,17
**general** 17:20
20:2 34:19
34:22,25
41:3 47:13
53:20,22
54:14 55:19
72:14 77:4
122:15
**generalize**
61:4
**generally**
38:7 61:5
80:22 88:9

92:5 99:13
99:16 116:1
117:7
**generate**
72:13
151:12
**gentleman**
19:19 35:14
76:5 120:19
**geographic**
92:19
**Gerard** 14:19
**getting**
136:19
151:16
**gist** 77:23
**give** 6:22
20:24 21:3
24:17 25:7
25:15 28:10
29:4,18
30:15,20
73:21 92:5
128:20
135:11
155:4 156:4
156:11
157:24
159:12
**given** 23:11
67:9,9
117:7
162:12
**gives** 82:8
99:3
**giving** 59:14
**glass** 27:11
31:13,15,19
40:4 42:3
42:24 48:3
67:15 77:19
81:8 88:12
88:19,19
95:18 97:9
103:4,12
105:11
109:8,9
110:5

112:18
114:15
116:4,8,13
116:16
128:13
140:5
144:17
148:4
151:15,23
159:25
**global** 16:2,7
16:10,14
39:18 54:16
80:24
**GM** 62:22
**go** 9:1 13:7
18:21 38:13
70:17 89:7
90:25 94:5
95:23 96:9
96:20 100:5
101:11
102:4
115:22
123:23
126:18
158:23
**goals** 20:23
**goes** 76:25
149:17
159:18
**going** 13:7
27:7 35:12
41:9,10,11
41:13,13
47:5,6,7,8
47:10 48:22
48:23,24,24
48:25 53:9
53:10,10,11
61:2 62:19
64:14,15
68:21,25
69:9,10,12
70:19,19,20
72:2,3,4
74:4,6,9,10
80:23 81:6

81:21 83:17
91:5 99:18
99:19 100:2
102:3
104:17
106:12
110:19
112:13,17
112:17,20
115:18
119:11
122:25
123:3
124:22
126:2,4
128:19,20
129:3
131:20,21
131:21,22
137:24
138:7,9
141:14
153:22,22
154:3,5,13
154:25
155:12,13
155:13,14
155:15,16
159:6,16
**good** 6:2,3
31:7 65:10
69:7,11
74:19
119:22,23
145:12
**Goodman**
134:5,12
164:5
**Goodman's**
44:2
**governance**
39:10
**graciously**
140:3
**great** 22:9
**green** 110:25
111:2
**Grose** 8:13

8:18,23
163:7
**gross** 28:19
28:23 87:21
118:23
119:4
**group** 1:8 5:3
28:20,24
31:11 33:13
89:20 98:18
108:2 121:3
121:10
**grouping**
92:19 93:23
**Groups** 30:3
**grow** 82:7
126:22
127:6,23
**growing**
82:13
109:22
126:23,25
127:10
**growth**
108:10
117:10
**guaranteed**
12:15 58:5
58:6,9,14
63:20 64:3
64:6,12
65:3 70:5
83:18
**guess** 42:18
71:9 107:7
115:24
133:18
145:5
**guys** 135:5

———————
**H**
———————
**H** 2:9 3:16
**half** 11:2
29:24 92:16
**hand** 94:2
162:18
**handed** 7:24
18:9 43:15

45:10 54:24
56:23 61:18
66:15 75:20
80:8 86:10
89:2 91:11
97:20
113:17
120:10
134:10
139:19
**happen** 49:23
69:10
**happened**
26:2 38:20
48:8 82:6
104:5 149:5
**happenings**
38:14
**happens**
32:17
**happy** 82:7
**hard** 24:2,4
40:19
**hate** 61:4
**hazard**
133:18,18
**head** 6:24
34:17
123:19
**hear** 7:13
**heard** 6:4
16:3 32:19
40:7 47:22
129:23
132:14,17
132:25
136:6
142:15
153:9
155:18
**heck** 112:16
**hefty** 64:23
**held** 2:8 5:7
89:11
121:16
**help** 68:14
72:13
**helped** 73:21

**helpful** 23:4
69:24
138:25
**helping** 42:1
42:6
**helps** 22:2,11
44:25 58:21
62:24 83:14
83:16
102:19
129:6
**Henschel**
5:10
**hereinbefore**
162:10
**hereunto**
162:17
**Herron** 1:16
2:8 5:2,22
6:2 7:24,25
8:6 10:9
18:9,10
20:18 32:10
32:12 43:15
43:16 45:10
45:11 54:24
54:25 56:19
56:23 61:18
66:15 75:1
75:20 80:8
86:9 89:2
89:14 91:11
97:20
113:17
119:22
121:25
134:5,9
137:16
139:19
158:7 161:7
161:16
162:9 163:3
163:15
164:4
**Herron's**
75:10
**hey** 128:25
**He'll** 160:22

**hierarchy**
30:5 92:20
92:25
**high** 101:13
**higher**
148:18,21
151:12
159:5,6
**highest**
102:18
109:19
**Highlights**
44:17
**highly** 47:5
48:22 53:5
53:6 131:19
132:1
154:14,15
155:12
**hire** 90:5
**historical**
99:3
**history** 30:21
152:7
**hit** 7:6 32:17
72:10,15
**hoc** 37:4
142:23
**hold** 122:10
**honestly**
26:15 73:5
**hope** 27:9
**hopefully**
59:13 69:24
**horse** 71:1,4
**hot** 38:14
**hotel** 121:17
**Houk** 87:1,3
87:12,17
**Houk's** 87:10
**huge** 64:25
64:25
**human** 35:7
**hundred**
107:15
114:19
115:3,3

**I**

**IBM** 142:18
**idea** 70:7
116:22
127:16
**identification**
7:22,25
8:15 18:7
18:10 43:13
43:16 45:8
45:11 54:22
56:21,24
61:16,19
66:13,16
75:18,21
80:6,9 86:7
86:10 88:25
89:3 91:9
91:12 97:18
97:22
113:15,18
120:8,11
134:7,10
139:6,17
**identified**
8:23 9:2
25:7 70:3
118:11
**identifies**
53:17
**identify** 5:14
**Illinois**
109:17
**immediately**
128:6
**impact** 10:13
10:18 12:9
12:20 13:4
13:17 14:9
23:17 58:2
60:14 69:21
72:5
**impacted**
79:19
**impacts**
77:24 78:2
78:3
**imperative**

165:12
**implication**
84:13
**implications**
82:14 84:11
**important**
22:23 23:6
23:7,9,12
52:18,25
62:25 63:13
82:18
109:23
151:25
154:14
**improve**
68:14 69:17
102:19
117:16
153:11,25
**improved**
91:5
**improving**
153:15
**inaccurate**
27:3 65:5
**inappropri...**
138:4
156:21
**inches** 23:23
24:1,2,3
25:3 50:12
53:2 55:15
55:24 56:3
56:9 78:12
84:19 85:1
85:1 86:1
129:19
130:8,24
131:5,18
133:5,12
154:25
155:9,23,25
156:4,4
**include** 14:3
31:3 38:10
76:23 81:6
97:8 108:18
109:2

112:21
113:5
148:11
**included**
26:13 91:2
142:2,3
148:6,8
**includes** 59:1
59:9 89:4
**including**
10:16 12:17
13:13,14
14:7 18:13
20:23 25:12
28:6 29:2
30:6 106:16
118:7
**inclusion**
135:4
**income** 44:23
**incorporate**
135:6
**Incorporated**
5:4
**increase**
77:12,21
78:19 79:3
108:12,21
126:11
129:9
**increased**
77:14 84:25
110:2 149:7
**increasing**
77:18 78:18
79:1 84:7
129:8
**incur** 70:6
**incurred**
111:6
**incurring**
70:23
**independent**
31:13,15
59:11 88:19
149:17
**individual**
9:19 22:8

38:24 84:1
92:21 135:7
144:5
**individuals**
14:22 18:12
31:12 37:25
**industry**
52:13 59:24
73:3,5 74:1
74:13
115:10
122:19
123:9
128:10
155:8
**Infield** 19:6
**influenced**
122:17
**information**
25:13,14
26:3,9,25
28:6 30:6,9
31:3 36:18
57:13 75:4
92:1,6
114:7 120:2
139:5,16,21
150:24
158:10
164:6,7
**informed**
11:12
**infrastruct...**
124:4
125:22
126:7,9
**initial** 66:18
**initiative**
16:1
**initiatives**
68:18 70:18
**inquires**
142:21
**ins** 133:1
**inside** 60:2
**insight** 128:6
**insignificant**
79:20

**instituted**
16:1
**instruct** 7:15
11:13 75:4
120:2
137:25
138:9
158:10
**instructing**
75:13 138:4
**INSTRUC...**
165:1
**insurance** 9:7
12:16,20
20:22 22:16
22:21 24:22
25:1 28:3
31:24 32:2
32:4,5,6,7
58:8,18,19
59:8,16,18
60:1 63:24
64:7,14
70:13,22
72:17 73:12
73:20 74:12
77:16 83:8
83:11,22
94:18
101:21,23
101:25
102:16
103:1,3
105:23
106:8,25
107:9,13
108:16
109:20
112:22
114:20
116:14
117:4 137:9
137:21
138:25
141:19
143:15,20
144:1,6,7
144:10,18

144:24
148:17
149:24
151:4,5,15
151:17,20
151:23
152:1,2,2
152:12,18
152:19
153:4,10,18
153:24
154:17,20
156:19
158:18,21
159:4,14,19
**insured**
106:23,25
**insureds**
106:10
**insurer** 109:6
**intend** 127:21
**interaction**
48:11
**interest** 44:24
65:22,24
**interested**
162:16
**interrupt** 7:4
7:5
**Inventory**
117:15
**investment**
79:19,23,24
159:18
**invisible** 47:9
**invoice** 12:15
58:5,7,10
58:14 64:4
64:7,13
70:5 83:18
**invoices** 65:3
**involved**
133:22
145:23
**issue** 82:18
**issues** 69:18
132:2

**item** 11:24
12:8
**items** 159:13
**i.e** 90:15,21

**J**

**January** 8:19
18:16
121:12
**Job** 1:22
**John** 2:9 3:16
**Johnson** 55:4
76:1,3 77:5
79:1,9
90:10
155:25
**join** 17:3
150:2
**joined** 17:21
21:16 24:14
30:23 34:9
34:15
135:20
**Jones** 2:8
3:15 5:7
**Joseph**
121:18
**journey**
77:11 152:4
**July** 43:12,17
43:23 54:21
55:5 163:11
163:14
**jumped** 63:8
149:4
**June** 17:4
21:16 30:23
90:17
162:24

**K**

**Kairis** 3:18
5:17,17 9:3
10:1 11:13
40:18 43:5
52:8 56:10
71:23 74:18
75:3,12

78:13 89:7
99:8,10,18
99:24 100:4
102:6
112:25
117:22
119:13
120:1
126:14
128:17
129:20
130:10
131:12
133:7,14
137:6,12
138:2,20
146:9,25
150:19
156:8,15
157:17
158:2,9
160:22
**keep** 38:4
119:7,10
122:21
152:22
**keeps** 15:14
**Ken** 8:18
87:1,12
**Ken's** 87:7
**kept** 15:8
17:9 37:20
37:23 38:1
38:24 60:3
**key** 32:18
38:14
100:17
**kind** 36:16
58:11 68:23
72:3 89:5
99:3 121:13
122:19
152:12
**Klafter** 3:5
5:15
**knew** 71:5
**know** 7:9 9:2
13:8 15:13

19:20,24,25
20:16 24:8
24:9 25:20
33:12,18,19
34:15,21
35:11,12
36:22 38:20
39:25 40:2
40:22 42:19
42:20 43:22
45:17,25
46:19 48:12
51:11 52:9
52:13,22
53:12,25
56:6 57:3
62:1,12
69:22 71:12
72:4 74:10
74:12,13,16
76:1 77:19
78:5,25
79:7 80:15
82:21 88:7
89:25 91:19
92:11 113:6
114:1
120:15
122:12,14
122:16
127:15
128:21
129:15
132:23
133:10,17
133:23
134:18
135:23
138:8,18
139:10
141:2,10
142:5,7
145:24
150:21,21
152:21
159:7
**knowing**
146:22

**knowledge**
14:13 23:4
99:17 100:9
100:13
105:19
133:3
**KO@klafte...**
3:10
**Kurt** 3:9 5:10
5:15 6:5
11:17
134:12

**L**

**label** 112:2
**labeled**
124:11
**labels** 111:24
**laminated**
40:4
**language**
49:15,22,24
49:25 50:5
50:6
**Lano** 34:7
35:15,16,17
35:19 36:4
**large** 91:14
**largely** 83:17
141:7
151:15
**larger** 129:18
139:23
147:12
150:24
**largest** 109:5
109:22
**laser** 71:15
**lasting** 47:6
131:20
**launched**
108:10
**law** 6:20
**lawsuit** 136:5
**lead** 47:10
48:22,25
53:4,11
54:4 81:14

91:5 126:8
131:23
154:3
**leader** 21:6
21:10,10
114:15
152:13,15
**leaders** 22:2
33:13,14
109:15
**leadership**
32:20 33:2
33:8,17,22
34:6 35:8
35:21 37:1
38:12 39:4
39:6,12
41:7 44:3
45:7,13,22
46:2,8
89:21,23
90:2 98:17
108:3 120:7
120:13
121:11,14
121:15
129:25
130:17,21
135:3 136:1
137:18
138:13,15
163:13
164:3
**leads** 35:3
53:5 78:19
79:2 98:15
**leasing**
114:20
**led** 90:16
**left** 66:22
93:12
110:23
144:22
**left-hand**
50:11 92:12
**legal** 108:4
**legible**
139:24

**length** 17:25
23:16,21
24:10 49:8
49:14 54:10
84:20,22,25
129:8
138:14
156:7
**lengths** 48:7
**Lesser** 3:5
5:16
**lessor** 101:22
**let's** 9:22
12:14 14:18
62:13
114:24
115:17
119:15
143:8
**level** 44:13
114:4
152:18,23
**levels** 93:24
152:9
**levers** 68:13
117:10
**liability** 32:3
**limited**
122:22,23
**limits** 10:16
12:19 13:19
14:11 24:23
53:23
**line** 44:3
89:20 100:7
166:8
**lines** 51:25
135:13
147:11
159:13
**link** 126:22
**Links** 109:10
**list** 90:1
**listed** 8:9
104:9
**lists** 57:17
77:1
**literal** 122:20

literally
127:8
litigation
132:21
139:22
little 31:25
46:11 57:13
58:12,12
65:25 69:23
95:1 111:23
131:1
LLC 24:23
28:25
London 15:6
long 7:4,14
7:16 9:7
10:16 12:19
13:16 14:8
21:13 24:5
24:7,13,15
24:23 25:1
33:16,19
34:21 35:9
36:20 46:19
46:20 49:25
51:2,5
72:25
155:20
longer 25:3
55:15,24
56:9 78:11
78:19 79:2
130:7,24
131:5 133:5
133:12
look 12:4
18:18 25:21
26:16 27:5
27:5,13
49:25 50:16
62:13 80:18
82:2,7,21
85:6 86:25
95:15 111:9
111:19
115:19
128:25
135:12

147:18
148:9
151:21
156:25
158:1
looked 28:11
133:11
141:17
144:15
looking 31:8
72:5 124:21
143:10,18
151:3
156:24
158:12
losing 154:3
loss 103:1
146:19
148:25
149:1 151:4
152:12,15
157:3,3,5
lot 22:7 79:21
94:23
145:22
152:8
158:23
159:8,17
lower 152:5
159:7,8
Lubner 14:19
81:4 134:24
lump 26:11
lunch 119:14
Lyons 87:9
87:10 97:16
97:24 134:6
134:12
141:8
163:24
164:5
_____
M
magnifying
27:11 140:5
magnitude
65:7 82:13
maintain

20:1 23:8
38:25 41:19
43:11 67:19
70:4 126:5
maintained
142:8,10
maintaining
41:24
maintains
19:21
majority
37:17
105:13
makairis@...
3:19
making 28:2
39:10 46:21
46:24 48:9
138:2
156:13
Malina 45:13
52:2
management
31:6,21
35:25 90:3
101:19
116:4,8,11
118:8
manager
52:3
managers
44:11 62:6
62:15,19,23
manages
116:13
manner 28:6
29:2
manufactu...
19:9
map 120:14
March 57:1
66:17,24
margin 87:13
87:18,21
101:13
148:24
150:24
158:18

marginally
122:9
margins
10:14 12:9
28:19,23
29:3 30:10
148:15
mark 55:4,6
139:12
marked 7:21
7:25 8:14
18:6,10
43:12,16
45:7,11
54:21,25
56:20,24
61:15,19
66:12,16
75:17,21
80:5,9 86:6
86:10 88:24
89:3 91:8
91:12 97:17
97:21
113:14,18
120:7,11
134:6,10
139:5,16
147:19
market 80:12
81:12 82:1
82:1,3,6,9
103:14
104:5,15,17
109:22
115:9 122:5
127:2,4
marketing
36:18,24
40:13,16
42:20 49:6
51:19 67:23
68:1,10
70:2 76:4
108:4
marketplace
73:18 81:7
102:17

103:10
128:11
marriage
162:15
materials
49:7 51:19
132:8 146:4
146:6
mathemati...
21:20
Matt 5:17
11:4,12
57:16 76:4
matter 5:2,4
5:6 6:13,14
51:10 56:13
137:18
156:18
162:16
matters 31:1
59:16
Matthew
3:18 55:4
57:1 76:1
90:10
maxed
122:19
maximize
154:10
maximizing
153:3
McConnell
2:9 3:16
mean 31:16
31:21 44:21
49:22 51:14
90:23 99:10
101:3,16
103:8 106:4
109:3
121:19
122:19
125:25
127:5,16,22
133:17
135:22
136:25
138:15

143:15
157:15,20
160:6
meaningful
139:1
means 39:25
71:17 84:12
128:9 141:8
143:17
146:19
measureme...
100:17
measures
145:15
mechanism
58:9
Media 45:14
Medic 48:3
meet 17:12
63:16 64:6
64:12
meeting
15:16 16:5
16:11,15
20:8 41:8
54:11,17
65:1 75:23
75:24 81:11
121:14,15
meetings
13:10,25
15:9,11,11
15:13 16:17
17:1,10,14
17:23 20:12
20:15 37:1
37:4,6,7,17
37:21,24
38:5,8,18
38:21 39:13
39:17,21
40:17,23
41:7 49:17
130:17
137:11
member 17:5
17:16 19:5
33:3,4

38:12 40:12
45:22 90:5
135:2,25
**members**
14:24 34:5
52:7,11,19
135:12
140:16
**membership**
160:15
**memo** 62:21
63:1,4,7
65:6 66:6
**memory**
76:15
**mention** 49:2
109:19
**mentioned**
31:20 35:15
40:9 50:7
76:21 96:6
130:14
132:3
150:10
**message**
45:14 52:20
52:25 65:10
65:24 72:3
72:7 127:13
131:3,10
**messages**
52:17 127:6
127:23
**messaging**
52:1 68:24
128:2,3
**met** 11:3
**Metaphors**
71:6
**metric** 22:8
70:8 93:9
94:15 95:3
145:12,23
145:24
**metrics** 22:7
22:10
**Metzger** 45:6
45:13 52:2

163:12
**middle** 66:21
86:15
**Migo** 34:7,9
36:3 135:17
135:20,25
136:4
**Migos** 136:10
**migrate**
152:5
**migrating**
152:9
**Mike** 62:22
87:10 97:24
134:12
141:8
**Miller** 14:19
80:24 81:4
81:12,21,24
85:11,11
134:24
137:23
**million** 63:24
103:15
104:19
111:1,6
112:19
113:8
118:24
**millions**
63:19 64:21
**mind** 46:12
53:4 64:18
100:4
**minus** 87:22
**minute** 29:22
89:8
**minutes**
13:15 14:8
15:8,13,14
17:9 19:21
20:3 37:20
157:25
**mislead**
51:23
**missed** 107:7
**missing** 36:5
36:7

**misstates**
129:21
130:11
156:9
**mistake** 9:4
**mix** 71:21
76:24 123:1
123:4,6
124:5,11,13
124:17,18
125:5,10,18
125:23
126:3 153:6
**mixed** 88:4
**Mobile**
148:14
**model** 53:3
125:24
126:6
**modification**
51:8
**modified**
126:4
**modify**
125:24
**moment**
18:18 23:2
43:21 45:16
57:2 63:4
77:1 80:14
91:19
120:14
139:8
**moments**
157:8
**money** 73:8
102:3
110:12
155:1
**monitor** 21:8
**monitored**
68:5
**monitors**
141:22
145:15
**month** 26:1,3
41:9 95:14
**monthly** 37:9

38:8 49:17
**months** 41:10
68:23
149:23
**month-to-d...**
93:20
**morning** 6:2
6:3 25:25
57:19 88:16
**move** 154:1
**moving**
122:21
152:17,23
**MPs** 62:24
**multiple**
111:16
**multi-year**
101:22
114:18

_____
**N**
**N** 3:2 163:1
**name** 5:10
6:4 32:9
47:22 60:16
132:25
**named** 19:19
**names** 62:16
**Natalie** 34:8
35:2,3
**national**
109:14
121:10,13
**nationwide**
20:21 63:24
**native** 91:15
**necessarily**
22:8 142:20
**necessary**
165:4
**need** 7:8
69:18 72:10
72:12 76:22
77:24
119:14
129:1
**negative** 58:2
60:13 84:12

148:25
**negotiable**
158:20
**negotiation**
157:14,21
**neither**
136:13
**net** 56:1
145:13,14
145:24
157:3
**network**
149:13,19
149:20,22
150:2,3,7,9
150:11,15
160:3,6,10
**never** 12:11
51:6,24
76:14 136:6
152:14
**nine** 33:23
108:10
**nod** 110:9
**nodding** 6:24
**Nods** 123:19
**nomenclat...**
60:25 62:14
**non-network**
149:13
150:5
**non-progra...**
144:12
145:2
**non-progra...**
145:2
**normally**
61:10
**North** 19:6
**Northwest**
3:6
**notably**
134:24
**Notary** 2:11
5:23 161:24
162:6,22
**note** 9:9
24:20 57:23

57:25 67:1
**noted** 160:25
165:10
**notes** 37:23
38:1,4
**nothing's**
128:7
**notice** 2:10
7:21 8:2,8
8:10 103:1
137:19
146:19
163:6
**noticed**
137:14,15
137:17
**November**
134:16
**Now's** 74:19
**number** 11:5
18:12 21:21
21:23 26:11
27:3 34:24
78:19 91:16
94:24 95:25
104:21
111:1,17
115:9 116:4
120:23
126:13
129:9
135:23
155:1
**numbers**
26:6 63:16
65:7 101:7
125:5
**numerator**
21:21
104:20
125:9,11

_____
**O**
**oath** 4:9 6:20
**object** 99:18
99:19
**objecting**
7:16

objection
40:18 52:8
56:10 71:23
71:24 75:3
78:13 99:8
102:6
112:25
117:22
120:1
126:14
128:17
129:20,21
130:10
131:12
133:7,14
137:6,12
138:3,20
146:9,25
150:19
156:8,15
158:9
objections
7:13
objectives
69:15
obscured
112:5
obstruct
131:21
obvious
42:21 113:3
obviously
114:10
135:16
occur 37:8
offer 81:14
154:23
office 109:16
officer 4:8
14:25 19:16
21:11,14,15
30:24
114:10
120:20
130:16
offices 2:8
109:13
official 34:24

oh 3:17 8:22
29:22 52:21
66:20
106:18
144:1
Ohio 1:2,17
2:11 5:6,8
92:24 162:2
162:7,23
okay 6:10 7:2
7:12,18
8:22 9:14
9:22 10:4,5
11:18 15:8
15:18 16:9
17:5 19:20
26:18,19,24
27:14 32:16
32:25 39:9
40:3 43:25
45:25 46:1
55:9 57:20
60:22 61:9
61:12 62:20
63:6 66:2
67:16 70:24
71:9,10
72:2,16,21
75:14 77:3
77:24 79:5
80:17,21
85:9 86:23
88:21 90:5
90:8 92:8
93:22 94:21
95:22,24
96:3,8,14
96:19 97:11
99:23
101:11
102:11
103:18
106:21
107:25
110:21
111:9 112:1
112:7 114:8
115:5

116:22
119:9,13
121:7 122:2
123:22
124:15
125:7,10,14
125:17
127:5 128:1
129:5
130:19
131:7
132:23
134:9 136:3
138:8 142:1
145:8
147:22
148:15
150:23
156:2,24
160:21
Olsen 3:5,9
5:15,15,16
6:1,5 8:13
10:5 11:18
18:21 43:4
74:19 75:6
75:14 89:9
99:23 100:1
100:5
119:15
137:24
138:7
139:12
146:11
157:19,24
163:3,7
omissions
32:6
once 38:6
64:24
ones 19:22
59:10
101:20
132:7 145:1
one-off 83:5
onward
157:4
operate 70:20

operating
33:10 34:3
44:22 84:17
operation
12:15 31:5
48:3
operations
19:9 32:8
opining 46:10
46:14
opportuniti...
67:3 69:17
145:15,19
opportunity
122:21
138:23
opposed 6:23
42:12 123:2
123:14
157:3
158:21
Oracle
142:14
order 43:1
129:9
146:15
organization
30:5 35:4,5
36:19 44:8
54:6 62:7,9
76:5 92:20
102:9 108:4
112:9
organizatio...
92:25
original
165:12
originating
101:23,25
origination
101:12,17
102:7
ought 11:15
outcome
68:17 70:10
70:16 71:10
128:4
162:16

outcomes
47:4
outlined
82:19
outs 133:1
outside 14:24
56:10 78:13
113:1
128:18
130:11
131:13
133:8,15
137:7,13
138:1,21
146:9,25
150:19
156:9,16
overall 44:17
72:5 103:23
103:24
105:7 127:2
127:3
128:10
overhead
107:21,24
107:25
108:1,6
113:8,10
oversee
129:25
overseeing
46:9,13
oversight
49:5
overview
97:25 99:4
113:13,21
120:23
164:1
owner 47:9
ownership
104:6

_____
P
_____
P 3:2,2
page 9:24
10:10 50:8
50:10,16

52:15 61:25
63:12,23
81:20,22
86:13 89:19
94:3 97:12
97:13 98:15
98:25,25
99:11,21
100:7 119:8
123:24
136:14
139:24
143:10
149:9,10
161:13
163:2 166:8
pages 161:9
paid 156:22
160:12
paper 15:12
91:14
160:10,12
160:13
paragraph
44:18 57:23
63:13 90:14
parent 15:6
99:6 100:2
part 14:6
22:18 54:16
64:12 74:6
76:4 78:17
81:5 92:24
93:21 95:21
129:24
135:5
141:15
151:18
participants
73:6
participate
48:5
participating
149:19
particular
19:10 23:8
41:17,19
42:11 52:19

59:18 64:7
70:3,13
71:18 80:25
81:10 90:24
93:16
144:16
**particularly**
157:2
**parties** 4:4
162:14
**partners** 87:8
**Patty** 97:24
**Paul** 47:23
48:1,9,11
48:15 51:9
56:4 133:19
133:21
**pause** 156:5
156:11
**pay** 63:15
79:21
**paying** 63:23
**payment**
70:14
**pays** 94:16
109:19
**penalties**
63:20 64:20
70:6
**penalty** 63:14
64:5 65:1,9
70:23
**pending** 7:10
**people** 16:17
31:11 35:3
35:5,8 36:1
42:1 51:9
51:13,14
52:13 65:11
87:7 108:3
121:19
128:10
150:6,22
**percent** 79:11
88:10
103:25
104:2,9,13
105:7,23

106:2,4,7
106:21
107:3,9,10
107:11,12
107:13,15
107:20
109:3
111:13,16
115:10,11
115:23
116:5,16
117:2
122:11
123:14
124:5,17
125:1,3,23
126:3
144:18,20
**percentage**
22:3 62:25
63:16 88:8
102:15
123:1,4
126:12,25
127:1,3
145:20
159:5
**percentages**
124:18
**Perchak**
56:19 57:1
163:15
**perfect**
119:16
**perform**
132:5
**performance**
22:11 23:3
23:5 38:10
38:11 41:15
68:15,16
69:6,13,22
70:1,11
71:9 72:9
91:5 120:13
**performed**
12:2 56:7
59:7

**performs**
106:19,20
**period** 19:7
64:17 72:6
93:11 98:22
114:24
**periodic** 37:3
**periods**
141:18
**person** 25:9
37:10,13
**personal**
137:16,19
**personality**
151:24
**personally**
79:21 143:3
155:3
**persons** 25:9
**perspective**
19:10 44:13
112:10
**pertains** 59:6
106:7
**Peter** 100:8
**phenomenal**
67:4
**philosophy**
117:16
**phone** 37:10
37:16 103:2
145:11,17
146:1,3,8
146:16,18
146:24
157:5,13,21
**physical**
93:21 95:11
103:19,20
104:19,25
123:7
**Pierce** 137:23
**pinpoint**
132:19
**place** 40:16
40:20 46:19
59:23
101:22

120:20
146:15
**Placenti** 55:4
64:17 72:6
93:11 98:22
114:24
**plaintiffs**
5:16 6:5
**Plaintiff's** 8:1
**plan** 76:11,23
**planning**
87:5 141:7
**plateau**
122:18
**please** 5:13
5:21 6:22
7:9 57:23
57:25 72:22
77:8 79:17
82:21 165:3
165:7
**pleasing**
53:10
**plus** 21:24
22:25 63:24
79:11,11
95:5 104:21
106:1 115:9
125:9
**point** 19:18
26:4 50:18
53:14 55:18
55:20 56:1
77:10 78:6
79:6 80:25
81:20 83:21
84:18
114:17
116:3,15
117:14
121:1
122:25
124:3
126:18
136:21
138:5
144:16
159:8
**pointing**

124:12
**points** 55:10
102:18
117:1
**policies** 39:6
39:7,10
**policy** 50:3
**policyholder**
60:1 65:23
154:18,23
155:1
156:13
**policyholde...**
28:2 73:12
83:13
143:21
144:25
153:20
156:6
**Pontiac**
128:24
129:1
**portion** 82:17
86:21 90:9
95:18
**Portland**
62:22
**poses** 82:18
**posing** 85:17
**position**
14:25 36:12
44:13 117:7
**positive** 58:2
60:13
**possibility**
154:24
**possible** 13:3
37:16 47:9
66:3
**possibly**
65:19 73:1
**posts** 111:5
**PowerPoint**
97:25 98:25
**PR** 52:2
**Precisely**
82:12
**preference**

42:6
**preparation**
10:23 25:10
26:22 27:6
29:11 30:18
40:6 142:8
**prepare** 11:1
11:8,19,23
12:3,24
13:21 20:24
21:2 25:15
25:20 27:15
28:9 29:4,7
29:18 30:14
135:3
140:21
142:22
**prepared**
12:2,7,7,12
13:3 27:1
85:5 88:18
139:21
140:17
141:2,9
**preparing**
140:19
**prescription**
154:1
**presentation**
14:7 27:6
48:9,11
54:12 81:12
98:2,9,12
121:8
134:23
135:4,8,11
**presentatio...**
13:15 38:16
38:17,17,21
39:1 76:7
**presented**
50:1 57:14
142:25
**presenting**
135:14
**president**
36:15 92:15
**presidents**

44:9,10
**press** 52:11
**pressures**
76:22 77:10
**pretty** 33:21
64:23
**prevalent**
73:2 74:1
77:13
**prevent**
70:22
**pre-Belron**
104:9
**price** 26:10
27:23 60:5
60:18,20,20
78:19 79:2
87:22,23
93:24 94:13
94:14,15,16
96:22,23
97:1 102:18
109:20
148:18,21
151:12
152:5,9,18
152:23
157:10,14
157:21
159:8,9
**prices** 149:7
**pricing** 12:16
12:21 13:5
58:1,9,15
58:20,25
59:1,2,15
60:15 73:16
74:3,16
83:19 124:4
124:16
125:22
149:6 151:8
151:21
157:11
158:20
**primarily**
38:11
**print** 89:6

112:22
**prior** 16:25
17:6 29:15
33:12 34:1
34:4 40:5
93:11,17
146:23
**privileged**
75:4,11
120:2
158:10
**privy** 51:7
**probably**
6:12 69:8
74:17 81:2
115:18
134:25
**problem**
128:24
**processing**
160:10,13
**produced**
91:14
**product**
111:7,7
142:18
**products**
132:4 133:6
133:13
134:1
**profile**
114:14
**profit** 10:14
12:9 28:19
28:23 44:21
44:25 45:2
45:3 60:9
73:8 82:14
84:2,10,13
101:3,5
102:15
107:22,23
111:1
118:23
119:1,4,4,6
121:3
145:10
148:15,24

150:24
151:12
157:3
158:13,15
158:17,24
**profitability**
12:20 60:10
71:14 126:5
153:11,15
153:25
**profitable**
60:7 83:1,3
149:5
**profits** 27:23
30:10 44:18
69:5 107:18
107:21
153:3
**program**
109:8,11
144:10,21
144:25
151:15,18
**programs**
116:13
144:17
**projected**
79:9
**projection**
79:10 95:14
**prominent**
59:24
**promote**
73:10,18
**promoter**
56:2
**promoting**
109:25
**proposed**
54:16
**proven** 152:7
**provide**
137:9
138:16
152:7
**provided**
27:4 52:6
138:11

140:3 160:8
**provider**
109:7
**provides**
57:17 101:1
102:4,25
105:6 137:5
**providing**
100:24
106:10
138:19
151:9
**Public** 2:11
5:23 161:24
162:7,22
**published**
50:1
**pull** 8:17
68:14
123:21
147:3
**pulled** 129:15
**pulling**
115:20
**purchase**
28:4
**purchases**
106:23
**purpose**
42:15,18
98:8 121:7
126:11
134:18
138:18
**purposes**
7:22 8:14
15:17 18:6
43:13 45:8
54:22 56:20
61:16 66:13
75:18 80:5
86:7 88:25
91:9 97:17
113:14
120:8 134:6
139:6,17
**pursuant**
2:10

**push** 68:14
**put** 74:10
101:22
152:16
**putting** 59:22
67:16
159:25
**P&L** 110:14
118:17
147:4 154:5
154:8,10,12
**p.m** 160:25
_____
**Q**
**qualified**
61:24 63:2
65:18
**qualifier**
61:10
**qualifies** 21:3
**qualify** 62:25
**quality**
101:14
102:12,13
102:21
**quantificat...**
66:1
**quantity**
59:21 101:2
101:4
102:20
105:15
**question** 7:10
7:11,15,17
10:1 11:17
13:8 44:15
85:8 123:3
126:16
129:22
131:15
140:9,18
145:12
146:12
151:13
153:9 157:8
**questioned**
11:7
**questioning**

6:7 9:16
**questions**
6:23 11:6
25:18 44:2
61:22 63:7
76:20 81:16
82:19 85:15
85:18,24
100:19
114:6
123:25
137:25
138:3
**quick** 10:2
**quickly** 50:14
**quite** 73:5
115:3
**quote** 10:12
**quoting**
123:1
**Q1** 80:12
_____
**R**
**R** 3:2 162:1
166:1,1
**radio** 113:5,7
**raise** 60:4
**rally** 65:16
**rambled**
69:23
**ran** 67:6
**rates** 122:8
122:12
**ratio** 20:23
21:19 22:1
22:5,14,18
22:20,24
23:8,10,12
23:18 41:20
41:24 43:2
59:19 70:4
70:9,21
71:15,18
72:11,15
78:18,21,22
79:2 123:2
123:12
125:8,18

153:7,11
**ratios** 20:23
21:8 123:16
123:17
**reached**
122:18
**reaching**
156:21
**reacting**
115:17
**read** 8:3,4
10:19,22
11:11 28:7
29:8,15
30:11 63:5
77:3 80:17
146:23
147:12
160:22
161:8 165:3
**reads** 28:22
29:11 30:3
90:13
**real** 31:4
76:22
**realize** 60:10
**really** 24:11
25:19
122:15
129:1
160:15
**reason** 50:2
73:7,10
128:12
130:14
131:24
160:7 165:5
166:10,12
166:14,16
166:18,20
**reasons** 76:25
77:1 128:14
155:2 166:6
**Rebecca** 1:21
2:10 5:12
162:6,22
**recall** 13:24
15:25 16:4

17:13,18
18:2 24:7
25:4 26:15
39:15,16,20
40:24 42:25
47:14,15,17
49:4,18,20
54:11,14
55:14,17,19
55:22 56:3
56:12,15
60:17 67:6
76:16 78:15
85:24 86:2
98:13,17,20
98:23 121:9
130:19
131:16
**receipt**
165:14
**receive** 58:20
83:22 92:2
106:13
113:22
160:5
**received**
45:23 55:1
66:24 86:21
135:10
**receiving**
76:16 92:6
**Recess** 10:7
18:24 43:7
74:23
119:19
158:4
**recipient**
57:1 66:18
86:12,24
113:20
**recipients**
89:19
**recognize**
32:9 62:16
125:3
151:14
**recognizing**
113:24

**recollection**
17:20 20:6
30:1 40:22
41:4 48:10
49:3 135:19
**recommen...**
72:8
**record** 5:14
9:9 10:6,8
18:21,23,25
24:19 43:6
43:8 74:21
74:24 89:8
89:10,11,12
90:16
119:17,20
129:21
130:11
156:10
158:3,5
160:24
162:12
**records** 28:5
141:15
**red** 111:5
**refer** 35:6
36:1 44:23
61:2 81:25
107:10
113:2
118:13
128:8
144:13
145:13
**reference**
65:8
**references**
75:23
**referred**
77:22 78:9
88:15
100:21
158:14
**referring**
50:6,9,15
50:23 61:24
71:4 77:5
78:21 79:1

79:9,24
83:10 87:17
90:21 92:18
93:2 94:1
97:5 102:14
102:22
108:16,22
121:5 126:7
126:23
154:17,19
159:21
**refers** 103:18
116:8,12
117:21
118:7
**reflected**
13:23
**reflective**
50:3
**reflects** 151:4
**refresh** 20:5
135:19
**refund** 63:19
**refunds**
63:25
**regard** 10:3
10:15 12:12
12:18 24:23
**regarding** 9:7
14:3 16:5
25:1 39:17
39:21 40:25
49:7,13
51:18,20
54:15 55:15
55:23 56:7
85:25
**regards** 13:5
**region** 92:17
92:24
**regional**
20:21 62:5
87:7
**regions** 26:8
92:13,23
93:6
**regular** 41:7
**regularly**

37:5
**reinforcing**
46:21
**relate** 13:16
14:8 29:13
59:20
**related**
162:14
**relates** 9:6
**relation**
32:14
**relationship**
23:14 30:7
138:24
**relationships**
83:11
114:19
**relative**
126:12
**relatively**
121:10
**relevancy**
85:19
**relevant**
85:21
**remember**
24:15 46:20
**Ren** 100:8
**Renee** 34:8
36:8,9
40:23 42:19
90:10
**Renee's**
36:14
**repair** 9:8
10:16 12:19
13:11,14,16
14:4,9 16:2
16:7,10,14
20:5,7,22
21:8,18
22:1,5,14
22:18,20
23:8,18
24:3,24
25:2,19
29:13 39:13
39:18 40:4

41:1,18,20
41:22,24
42:17,25
43:2 46:6
46:14,14,18
47:6,10,13
48:4,13,19
48:23 49:1
53:2,9,12
54:5,7,16
55:7,11,24
59:13,19
60:11,19,21
61:7,8 62:5
62:7 63:16
63:20 65:14
67:11 70:4
70:9,21
71:15,21
72:11,15
73:4,6,9,10
73:18 76:24
78:18,21,22
79:2,12
81:9 82:1
82:17 83:3
84:13,18,24
85:7,20,25
87:14 88:11
88:11 93:3
93:8 95:3,5
95:8 96:25
97:1 100:24
102:22,24
103:4,12
105:10
106:14
110:6
116:17
122:8,12,18
122:24
123:1,2,4,6
123:16,17
123:24
124:5,8,11
124:12,17
124:18
125:5,8,8

125:10,11
125:18,18
125:23
126:3
131:20,23
132:3,12
146:15
148:1
151:10
152:3,24
153:7,11,21
153:23
155:5,8,9
155:12,23
156:1,4,14
158:19
**repairable**
13:19 14:11
17:25 23:16
23:21 24:10
48:6 49:7
49:13 54:9
65:12 129:8
156:6
**repaired**
21:22 23:14
23:24 42:2
42:23 50:14
50:20 51:22
55:16 73:14
155:11
**repairing**
22:4 23:13
53:18 65:12
65:19 84:3
154:24
**repairs** 21:24
22:24,25
26:13,15
27:24 29:1
30:2 42:12
59:4,7,10
59:21,23,25
60:3,7
61:24 63:3
65:13,18
66:3,4 67:8
67:21 68:5

72:13 73:2
73:19 74:1
74:5,10
82:4,7,11
83:13,20,23
84:7 85:2
103:15,21
104:1,21,23
122:17
123:10,12
125:9,11,13
126:12,13
129:10
132:5 133:4
133:11
141:23
143:7,16,19
143:25
144:3 147:9
148:16,19
148:22
150:25
151:3,5
152:10,11
152:19
153:6,16
**repeat** 129:22
153:8
**rephrase**
146:12
**replaced**
42:22 78:12
128:13
129:19
130:9,23
131:6
**replacement**
26:9,10
29:14 41:19
41:22 42:12
42:16,24
59:12 60:11
60:18,20,24
61:3 62:8
67:10,12,14
67:17 71:21
73:9 74:9
76:24 78:5

78:8,16
81:9 82:1
82:18 83:14
83:16 87:14
87:25 88:1
90:16 93:3
93:8,14,24
94:8,12
95:4,8,18
96:11,16,24
97:7 100:24
102:23,24
103:4,12
105:10
106:14
108:13,22
108:23
110:3,4
116:17
126:22,24
126:25
127:7,10,23
128:7,16
146:16
148:1
152:21,25
153:16,24
158:19
**replacements**
21:24 23:1
27:24 29:2
30:2 59:2,3
59:6,9 60:5
60:6 61:6
67:7,20
68:5,8,11
82:5,12,25
83:2,23,25
84:8,14
85:7 88:9
93:15
103:14,21
104:2,21,24
109:20
123:10,11
123:24
125:10,12
125:13

126:13
141:23
143:7,16,19
143:24
144:4,23
147:7
148:24
149:2
150:25
152:10
153:6
156:25
157:6
**replaces** 74:5
**replacing**
22:4 50:21
51:22 84:2
**report** 10:17
25:11,22,23
25:24 26:2
57:11,18
67:1 86:19
91:8,25
93:21
163:23
**reported** 1:21
58:3
**reporter** 5:11
5:20 6:25
7:6 83:24
113:9
133:20
148:20
**reporting**
142:21
**reports** 12:2
12:6 26:14
141:16
142:22,23
142:23
143:6,18
**represent**
116:15
149:15
**representat...**
8:7,25 9:5
11:9,20,24
20:20 21:5

25:8 92:1
**represented**
19:22 51:11
88:8
**representing**
144:18
**required**
15:16
131:18
132:11
**requirement**
37:12 38:25
**requireme...**
149:21
**reschedule**
37:19
**resins** 132:9
**resource** 39:5
**resources**
35:7
**respect** 8:8
12:7,24
13:6 14:22
23:21 28:13
40:16 42:9
44:15 68:10
85:14 88:9
141:22
143:15
144:8 150:9
151:5
152:11,24
153:3 160:2
**respective**
4:3
**responded**
81:16
**response** 6:23
7:1 140:17
**responses**
9:16
**responsibil...**
35:20
**responsibil...**
27:15 31:1
31:2,5
36:17 38:15
46:9 49:10

54:4 109:15
135:6
153:18
156:23
**responsible**
25:10 36:17
40:13 48:2
76:6 92:15
**rest** 150:6
**result** 47:7
71:12 85:1
154:8
155:15
**results** 90:17
117:25
118:17
121:23
147:21
**retail** 28:2
92:13,17
93:2,12
94:13 95:7
95:10 96:5
112:9 118:4
118:10
**retaining**
145:21
**retired** 14:20
**retirement**
6:14
**return** 79:18
79:23,24
102:14,19
165:12
**revenue**
27:23 28:19
28:23 29:3
30:10 106:7
107:12
145:10
147:11
**revenues**
29:3 105:7
105:14
**review** 26:21
28:16 29:21
30:17 38:9
45:17 47:11

47:14 63:4
77:2 80:12
80:14 81:3
81:5,13
91:18
120:14
**reviewed**
11:5 29:24
140:15
**reviewing**
49:15,21
**reviews** 135:5
**Richard** 1:5
113:21
114:1
134:25
**Rick** 62:1,2,5
**rid** 160:15
**right** 39:9,11
40:8 65:22
65:24 67:22
73:11 93:13
93:18 94:2
110:25
111:19
114:23
115:15
117:14
125:2
127:19
153:19,20
154:4,11,12
160:1
**rights** 83:12
**right-hand**
86:16
**risk** 31:6,20
58:18,22
73:22
**risk-averse**
58:19
**road** 120:14
**Robert**
113:13
**ROI** 79:9,10
**ROLAGS**
10:15 12:10
12:13,18

13:4,14
14:1,5
39:22,25
40:7 47:18
49:2 136:7
155:17,18
155:23
156:3
**role** 33:20
39:3 99:7
100:3,16
121:22
140:19
**roll** 92:21,23
**row** 94:7
**RPR** 1:21
2:11
**RPU** 58:3
60:14,14,21
61:1,8
93:24 94:9
94:9,12
95:12 96:21
96:22,24
**Rule** 8:1 9:12
9:12
**rules** 117:17
117:21
**run** 41:9,10
41:13,22
72:4 91:1
109:9 154:7
**running**
41:17 77:18

——————
S
——————

**S** 3:2 163:5
**SA** 15:5
**safe** 47:10
49:1 53:12
55:11,24
131:23
155:16,25
**Safelite** 1:8
5:3,19 6:15
12:17 13:12
13:13,17,25
14:4,9 15:1

16:22,25
17:3 18:15
19:21,25
20:10,11
22:6,15,23
23:7,17,20
24:1,13,22
26:11 27:4
28:1,3,5,19
28:20,23,24
28:24,25
30:3,4,4,22
31:22 32:12
32:20 35:7
36:13 38:22
40:13,25
42:2,2,7,7,8
42:23 44:21
46:6,25
48:25 52:3
52:19 53:20
56:6,12
58:16 59:5
60:7 61:1
61:20 63:15
63:18 64:4
64:5 66:5
67:6,19,23
67:25 68:4
68:5,9 70:5
74:4,5,5
83:1,3 84:2
84:17 86:1
90:2 95:17
98:16
100:23
101:8,11
102:4,5,16
102:25
103:22
105:6,7,9
106:1,1,6
106:19,19
106:23
107:8,11,15
110:1
111:13

112:13
114:14
116:12,13
118:15
120:21
127:12
129:7,15
133:4,11
135:17
136:6 137:4
138:11
140:16
141:22
142:13
143:8,20,25
144:4,23
145:5,8,9
146:2,5,6
146:14,21
146:22,24
149:7
150:12,14
151:5,11
153:3 156:5
156:12
157:5 160:5
**Safelite's**
8:25 9:6
12:12 13:10
14:14,16
17:6,17,25
21:4 29:12
32:7 49:6
51:19 53:3
93:4 99:6
100:3,15
101:18
102:12
105:14
127:1 130:3
130:4,21
132:4,4
138:22
149:19
**Safelite-ma...**
144:17
**safely** 55:16
**safety** 47:12

**sale** 111:10
111:18
**sales** 10:14
12:9 25:11
25:22,23
26:5,6,10
26:11,12
31:6,10,17
57:11,18
66:19 67:1
67:4 69:4
69:20 71:13
86:18 87:22
87:23 88:19
91:8,25
93:11 95:7
95:9,13
101:2,4,12
101:16
102:8,9,9
102:14,15
102:20
105:3,16,22
107:16
108:9
109:12,14
109:24
110:24
112:3,3
118:4,7,21
121:3
136:16
141:15,16
147:19
148:3
158:23
163:23
**salespeople**
137:9
138:24
**satisfaction**
56:5,8
**satisfied** 47:5
48:22 53:5
53:6 131:19
132:2
154:14
155:12

**Saturday**
81:1
**Savage** 87:1
87:6
**save** 154:25
**saw** 27:18
155:24
**saying** 78:10
79:18 81:25
**says** 12:8
50:11 55:6
55:10 57:25
60:13 62:21
87:17
100:19
114:14,18
115:8,8
117:15
118:3,10
121:1 122:8
124:2,25
127:8
136:18
144:10
**scheduled**
28:1 37:5
**scope** 40:18
56:11 78:14
99:19 113:1
128:18
130:12
131:13
133:8,15
137:7,13
138:1,21
146:10
147:1
150:20
156:9,16
**score** 56:2
**se** 123:7
**sealing** 4:4
**seat** 139:11
**second** 18:22
39:24 44:17
50:8 69:2
81:21 98:25
124:3

149:10
**section** 44:16
**see** 14:18
  15:25 44:2
  44:17 53:23
  55:5,8,12
  61:1 62:13
  67:2,5
  73:15 78:4
  78:17,20
  82:8,10
  86:23 89:18
  92:2 93:6,9
  93:14,19
  95:20 97:2
  103:6 104:8
  105:22
  107:17
  111:22
  112:4
  114:24
  115:17
  117:11,17
  118:20
  120:25
  124:2,25
  128:5
  136:18
**seeing** 123:15
**seen** 98:2
  140:23
  146:7
**segment**
  94:19 95:17
  102:17
  105:17,22
  106:8,16
  142:2,3
  148:22
  158:21
**segments**
  93:25 94:17
  94:20
  141:21,25
**segregation**
  149:16
**sell** 31:18
**selling** 109:24

136:19
**send** 57:16
  150:8
  160:12
**sender** 89:5
**senior** 32:20
  33:2,8,17
  33:22 34:6
  36:14,25
  38:12 39:4
  39:12 41:7
  44:3 45:6
  45:13,22
  46:2,8
  114:4 120:6
  120:12
  129:25
  130:17,20
  134:23
  135:2 136:1
  137:18
  138:12,15
  163:12
  164:3
**senior-most**
  33:14,14
**sense** 106:9
  122:20
**sent** 43:23
  52:2 61:21
  62:23 81:11
  89:15 90:9
  90:10
  112:22
  134:16
**sentence** 77:9
  90:14
**separate** 54:6
  60:21 62:7
  62:8 67:20
  82:2 92:14
**separately**
  30:8
**September**
  76:12 97:23
  98:13,17
**series** 41:11
**serve** 103:22

159:10
**served** 23:15
  69:4 93:7,7
  95:4 96:9
**service** 28:1
  53:7 95:3
  106:13
  109:7
  112:18
  151:10
  153:23
  159:4,18,19
**serviced**
  104:22
**services**
  100:24
  102:4,23,25
  106:10,17
  106:18,23
  114:15
  115:13
  118:14
  152:6
**set** 20:3 69:9
  162:10,18
**setting** 39:5
  39:10 68:20
**severity**
  151:22
**share** 104:5
  104:16
  109:3,22
  115:9 116:4
  126:22,24
  126:25
**sheet** 27:8,9
  27:13,16
  28:11,12
  165:6,7,10
  165:13
**shift** 73:21
**shifted** 42:5
**shifts** 58:17
**shops** 59:11
  74:6 88:20
  149:17,18
  150:2
**shortly** 17:21

**short-term**
  154:1
**shot** 82:10
**showed**
  144:16
**showing** 13:3
  150:3
**shown** 161:12
**shows** 26:2,5
  26:6,8,9
**sic** 16:10,14
  100:8
**side** 42:3,24
  67:15 86:16
  92:12 93:3
  108:19
  119:10
  122:18
  151:4
  152:21
**sign** 103:17
  149:20
  160:23
  165:7
**SIGNATU...**
  166:23
**signed** 4:8,10
**significance**
  21:25 53:1
**significant**
  82:15 84:11
  92:7 114:18
**signing** 165:9
**similar** 13:1
**simply** 40:21
  41:8 46:20
  68:17
  118:13
  138:1 150:5
**singularly**
  127:10
**sir** 31:9 96:7
  117:3
**sits** 14:16
**six** 23:23 24:1
  24:2,3 25:3
  50:12 53:2
  55:9,15,24

56:2,9
  78:11 84:19
  84:25 86:1
  111:4
  129:18
  130:8,24
  131:5,17
  133:5,12
  154:25
  155:9
**six-inch** 24:9
  46:18
  129:13
**size** 50:13
  66:6 103:14
  104:17
  122:5
  155:10
**Skeen** 62:1,2
  62:11,20
  64:2 65:6
**slide** 99:16
  100:11,15
  103:5 104:4
  105:2,16,21
  107:17
  108:7
  110:11
  111:9
  114:12,14
  115:5,22
  117:3,10,24
  118:16
  120:22
  122:1
  147:20,22
**slow** 152:4
**SLT** 32:23
  33:5 38:8
  39:17,21
  40:12,16,23
  46:1,5,16
  47:1,11,17
  47:20 48:5
  48:10 49:5
  49:12 50:25
  51:14,17
  52:7,11,19

54:8,11,13
  54:17 75:23
  75:24 76:8
  137:11
**small** 31:11
  89:6 121:10
  121:14,16
  121:18
**smaller** 50:13
  50:19 51:21
  53:18,19
**solidify** 83:21
**solution**
  153:21
**Solutions**
  12:17 24:23
  26:12 28:25
  30:4 35:21
  35:23 89:20
  89:23 90:2
  101:12,18
  102:16,25
  106:2,6
  107:8,12,16
  112:14
  116:12,13
**somebody**
  37:14 42:20
  106:22,24
  128:15
  137:14
  155:2
**son** 52:24
**sorry** 98:19
  110:9
  122:24
  129:20
  148:20
  152:16
  157:17
**sort** 41:12
  42:5 122:17
  131:14
**sound** 154:8
  156:17
**Sounds** 7:7
**source**
  141:16

**Southern** 1:2
5:5
**space** 165:5
**spaces** 115:22
**speaking**
52:12 61:5
**specific** 21:1
23:10 29:6
29:20 30:16
49:19 50:6
54:13 55:17
63:14 68:9
71:12 72:7
72:24
137:17
**specifically**
17:13,18
35:11,13
36:22 40:20
49:18 65:5
74:16
133:17
**specificity**
122:14
**specifics** 58:1
**speculate**
85:3
**Spencer**
120:6,12,18
120:19
164:2
**spoke** 55:6
**spreadsheet**
92:9
**ss** 161:3
162:3
**stack** 29:23
**staff** 108:5
**stage** 41:25
**stamped**
50:17
114:13
115:6
120:23
136:15
140:2
**stand** 44:7
58:4 60:14

**standard**
16:2,7
23:20 39:18
46:18 48:20
48:20,21
51:8 53:20
54:16 66:9
86:1 129:12
129:13
131:17,24
131:25
132:6,10
155:5,22
156:3
**standards**
13:18 14:10
40:4 50:4
**standing**
16:10,14
**standpoint**
138:22
151:21
155:7
**stands** 40:3
81:8
**start** 9:22
33:17 68:21
92:8 143:9
**started** 6:6
59:22 72:23
73:2,15
74:2
**starting**
81:19 93:13
**starts** 76:21
81:24,25
**state** 2:11
101:1,12
108:21
109:4,5,13
109:16,19
125:21
126:20
145:3,4
161:2 162:2
162:7,23
165:4
**stated** 70:17

129:16
136:4
**statement**
50:10,22
51:4 53:13
53:17,21,22
55:9 117:13
118:18
122:7 147:4
**statements**
49:6,10,13
51:1,18,20
99:12
**states** 1:1 5:5
13:9 20:21
26:24 66:5
67:2 79:10
82:17 87:12
92:16
103:13,23
103:24
**stating** 50:19
130:22
**statistic**
87:22
115:18
**statistics**
144:15
**statutory**
15:17
**stay** 68:1
70:2,3
**steadily**
122:9
**step** 69:1,2
72:1
**stepped**
130:15
**stepping**
73:24
**Steve** 18:12
19:4,5 34:7
34:9 88:18
136:10
**Steve's**
135:10
**STIPULA...**
4:2,6

**stood** 40:2
**stop** 11:16
**stopped**
20:11,14
130:5
**store** 112:6
**stored** 38:22
**stores** 92:21
**strange** 154:9
**strategic**
82:19 85:8
85:15,17,23
123:25
**strategy** 39:5
39:10 77:25
85:20
126:21,23
**street** 121:18
**strictly**
123:18
**strike** 16:5,21
26:20 28:21
36:24 47:20
64:4,19
67:24 75:8
82:24 83:1
84:23
126:17
142:6 144:2
146:4
**string** 43:12
43:17 54:21
55:2 61:15
66:12,17
75:17,22
80:4,10
86:6,11
88:24 89:4
163:11,14
163:17,18
163:19,20
163:21,22
**structure**
44:9 74:2
112:8
124:16
126:4,10
159:3,4

**structures**
58:14
**studies** 12:1,6
12:11 47:11
51:6 56:7
56:12,13,15
**study** 10:17
47:15 133:4
**subject** 18:13
25:5 45:14
66:19 75:10
75:23 80:12
80:22 86:18
97:24
137:22
156:18
161:11
165:9
**submitted**
144:19
**subscribed**
121:2
161:20
**subsequent**
51:3 86:24
**subset** 98:16
**substance**
51:20 78:10
129:17
130:6,22
131:1
**substantive**
6:7
**substituting**
82:4,11
84:8,13
**subtotals**
92:13
**success**
152:20
**successful**
152:8
**sudden** 77:20
149:4
**sufficiently**
65:17
**suggest** 84:9
**suggested**

84:16
**suggests**
82:10
**suitable**
155:10
**Suite** 2:9 3:7
3:16
**summarized**
27:2
**summary**
27:5 31:8
**supervisor**
87:11
**support** 19:8
108:2
**supporting**
19:11 50:17
53:14
**supposed**
76:14
**sure** 32:2
33:21 39:11
43:5 46:21
46:24 47:3
48:13 49:9
49:11 51:1
52:10,15
59:22 65:11
65:17 72:12
74:19 79:4
82:13 89:9
92:10 127:9
129:22
135:8,13
150:17
158:2
**surprise**
136:3,8
**survey** 10:17
**suspect** 48:14
51:8
**swear** 5:21
**sworn** 4:7,10
5:23 161:20
162:11
**Syfko** 47:23
47:25 48:1
48:6,17

49:2 51:10
56:4 133:19
133:21,25
**synonymous**
102:8
**system**
142:12
**Systems**
159:23

---

**T**

**T** 162:1,1
163:5 166:1
**table** 38:13
**tables** 144:9
**take** 7:9 10:2
18:17 43:4
43:21 45:16
57:2 63:3
68:9 69:18
74:18 77:1
78:1 80:14
82:9,21
99:20 103:2
120:14
123:6 154:5
154:13
**taken** 10:7
18:24 43:7
71:20 74:23
119:19
158:4
**talk** 30:1
38:13 41:6
72:12 99:13
126:17
132:1
157:20
**talked** 11:6
57:18 110:4
155:17
**talking** 16:20
53:8 60:23
66:3 71:25
77:10 87:24
87:25 98:16
102:1
115:12

126:9,24
157:18
**talks** 44:18
78:4,18
84:10 126:8
**target** 67:20
67:21
**targeted**
20:23 67:7
70:21
**targets** 68:2
**taxes** 44:24
**team** 19:6
32:21 33:2
33:9,18,22
34:6 37:1
38:12 39:4
39:12 41:7
44:3 45:7
45:13,22
46:2,8 87:5
89:21,24
90:2 109:12
120:7,13
121:11
127:25
129:25
130:17,21
135:3,12
136:1
137:19
138:13,15
140:16
141:7
163:13
164:3
**technicians**
13:18 14:11
91:1 132:4
132:8
149:25
150:1
**technology**
31:4 36:15
36:18
159:17,18
159:21
**techs** 62:23

90:15,20
**telephone**
15:22,23
28:4
**tell** 10:25
18:18 63:10
72:24
**telling** 121:17
156:5
**tempered**
41:23 67:11
67:13,17
88:2,3,8,12
94:23 95:18
96:15,23
97:8 105:11
108:25
110:5
123:11
125:12
142:4 148:4
**term** 22:15
27:25 31:23
33:8,11
60:25 64:3
91:3 102:7
102:8 128:9
156:22
**terms** 9:4
12:16,22
13:5 46:13
60:9 69:4
69:25 71:20
123:15
153:2 156:5
159:11
**test** 76:15
**testified** 5:24
47:16
129:24
**testify** 8:8
11:9,19,23
12:24 13:22
20:19 99:22
**testifying**
6:19 8:24
9:15
**testimony**

20:25 21:4
24:17 25:7
25:16 28:10
29:5,19
30:15 75:2
75:10
119:24
158:8 161:9
162:12
**Thank**
125:17
140:1,1
143:13
160:21,22
**thing** 25:25
53:4 69:8
73:11 97:11
109:18
143:17
148:7 154:9
160:7
**things** 39:11
71:13 76:20
85:21 107:4
112:23
119:12
151:25,25
**think** 11:15
15:16 29:24
31:7,7
32:11 33:11
50:7 52:21
53:22 68:23
68:24 73:5
85:5,22
95:16
115:20
122:17,21
122:25
124:10
136:12
138:3 145:4
149:22
153:9
154:22
155:3,6,20
156:12,20
156:22

157:7,25
160:13
**third** 63:12
78:6 95:2
114:17
136:21
**third-party**
31:12,15
36:2 59:11
74:6 88:20
90:4 149:17
149:18
150:1
**thirty** 165:13
**thoughts**
82:22
**three** 6:12
34:13 41:9
87:13 96:1
96:10 97:6
112:16
114:13
115:6,11
122:3
128:22
136:15
**thrust** 65:9
**tie** 143:5
**tied** 143:2,4
**Tim** 120:12
120:19
121:23
123:1
**time** 5:9 6:10
7:8 17:24
19:10,18
27:18 31:3
31:3,5
33:10 49:25
51:3,5 52:4
54:5 64:24
71:24 72:6
72:19,25
73:3,25
74:20 77:14
79:6 80:25
83:21 84:18
98:22

114:10,24
116:16,20
132:17
135:17
140:22
141:18
144:17
151:14
160:9,25
**timeframe**
16:1 43:18
115:16
117:8
**times** 17:14
23:5,6
37:14
141:17
**Tim's** 124:19
**title** 34:25
36:14
**today** 6:19
10:20 92:12
116:23
144:20
**today's** 5:8
29:9,16
30:12 62:14
74:15
108:13,15
**told** 155:24
**Tom** 14:20
14:23 33:20
34:7
**tool** 58:15
142:21
**tools** 69:21
**top** 34:17
55:3 63:22
81:21 90:8
93:14 94:4
117:4
**topic** 9:5,24
9:25 10:9
10:12,19,22
11:10,11,20
12:14,14,25
13:1,6,7,9
13:22,23

14:2,6,12
20:18,20,20
20:25 21:4
24:16,17,18
24:21 25:9
25:16 26:20
26:22,24
27:22 28:7
28:10,13,18
28:22 29:5
29:7,8,11
29:15,19
30:3,11,15
137:10,14
137:15
138:11,25
**topics** 8:9,24
9:1,17,23
10:3 11:6
14:1 25:6
38:14 98:25
137:17
**total** 22:24
23:15 26:10
27:22 28:18
28:22 82:3
82:8 93:8
95:4,6,13
106:2,5
107:9,12
110:14,24
112:5 118:7
118:20
126:12
145:13,14
145:24
147:18,25
151:21,23
**totality** 22:9
72:9
**totals** 143:3
**tough** 152:20
**TPA** 36:2
90:4 101:19
106:11,12
146:19
**track** 22:24
145:9,23

146:2,5,14
**tracked** 22:6
**tracking** 28:6
29:2 146:7
**tracks** 22:10
**trading** 44:18
44:20,21,25
107:22,23
111:1 119:1
119:3,6
158:15
**traditional**
109:8
**train** 149:25
150:22
**trained** 132:8
150:11
**training** 45:2
45:3,14
150:10,13
150:14,18
**trajectory**
121:2
**transcends**
132:10
**transcribe**
6:25
**transcript**
161:11
165:14,15
**trending**
63:22,23
70:14
**triangle** 52:2
**triangles**
45:15
**tried** 153:9
**troops** 65:17
**true** 18:19
19:1 43:22
45:18,19
52:21 57:3
57:5 66:23
80:15 86:19
89:16 91:20
91:21 98:5
120:15
134:14

161:10
162:11
**try** 68:1
153:23
**trying** 65:16
71:1 98:10
154:10
**turn** 12:14
76:10 81:19
98:24 100:7
104:4 105:2
110:11
114:12
117:3
118:16
120:22
121:25
123:20
127:24
136:14
**turning** 10:9
100:11
108:7 115:5
125:20
**TV** 67:2
112:19
113:2,3
**Twenty** 88:10
**twice** 64:24
**two** 6:12
34:10,11
40:1 89:5
96:9 111:4
125:5
128:22
139:20
140:16
144:9
149:12
**two-page**
139:22
**Tyler** 113:13
113:21
114:1
134:25
**type** 6:13
41:17,21
71:22 92:1

108:5
142:12
150:18
153:23
**types** 103:3
**typical** 92:25
108:4
**typically**
25:25 91:25
128:15,19

——————
**U**
——————
**uh-huh** 43:20
57:24 76:13
78:7,20
80:13 81:23
86:14 87:2
88:5 90:12
91:17 94:25
95:20
100:22
104:7 105:5
107:19
108:11,14
110:7,15,18
111:12
113:4
114:22
117:5 118:1
119:5
120:24
121:4 122:4
122:6 124:1
124:6,24
126:19
135:18
136:11,17
141:1
144:11
147:5,8,10
147:14,17
147:24
149:3,11
**ultimately**
102:2
**Ultrabond**
132:14,18
**unanimous**

15:23 16:19
**unattractive**
124:5,17
125:23
**underestim...**
82:5
**underneath**
117:14
**understand**
6:19 7:17
9:10,20,21
14:2,12
22:3,11
23:13 24:18
42:1 44:25
69:8 73:23
77:24 82:3
136:25
**understand...**
9:11 16:6
25:17 57:7
77:4 79:8
79:13 82:9
87:16 90:19
113:23
116:7
117:20
137:3 140:7
140:10
**Understood**
62:17 97:3
98:21
**undertake**
14:5
**undertaking**
68:19
**unfolded**
73:25
**unfolds** 69:5
**unfortunat...**
118:3
**unique** 36:16
151:24
**unit** 19:12
35:22 60:18
60:20 88:19
90:3 94:13
95:11

101:20
105:4
107:18
111:11
116:12
160:18
**United** 1:1
5:5 92:16
103:12,23
103:24
**units** 79:12
95:12 96:11
96:16,25
100:20
104:19
**universally**
152:3
**Update** 18:14
18:16 76:11
80:12
**updates**
88:17
**upset** 77:16
**use** 64:3
67:23,25
70:1 72:16
102:7 140:4
142:13,23
143:11
145:4
152:14
**user** 102:3
**usually** 50:12
50:20 51:22
128:9
**utilization**
90:17
108:13,22
110:3
**U.S** 13:18
14:10 15:4
81:7 109:6
114:15

——————
**V**
——————
**Valley** 92:24
**value** 22:9
101:13

102:18
**variety** 58:13
58:24 59:15
81:15
**various** 93:6
109:24
**vary** 42:21
**vast** 105:13
**vehicle** 31:4
31:19 32:5
77:19 81:8
103:11
114:15
115:12
116:16
128:13
**verbal** 6:23
**verify** 142:24
**version**
111:22
139:24
**versus** 5:3
22:4 42:16
82:17 85:7
123:24
148:2 153:6
157:15
159:14
**VGRR** 10:13
12:9 81:7,8
106:10,17
106:18
109:7
115:13
118:13
122:5 123:8
127:1
147:20
**viable** 55:11
55:25
126:22
156:1
**vice** 36:14
44:9,10
92:14
**video** 5:2
**VIDEOGR...**
5:1,20 10:6

10:8 18:23
18:25 43:6
43:8 74:21
74:24 89:10
89:12
119:17,20
158:3,5
160:24
**videos** 130:6
**VIDEOTA...**
1:16
**viewed**
146:23
**visible** 48:25
**vision** 131:21
**visual** 38:17
**visually** 47:8
131:22
155:14
**voiced** 84:7
**volume** 26:9
27:23 77:21
93:9,21
95:2,12
101:4
103:19,20
104:19,25
123:8 127:7
127:11,23
145:10
159:10
160:8
**vs** 1:7

_____
**W**
W 96:21
**wait** 29:22
**waiting** 139:8
**waived** 4:5
**walk** 91:23
92:4 93:18
106:22
**walk-in** 28:4
**want** 10:2
47:4 52:22
52:24 55:1
55:2 65:14
66:8 99:20

155:2 158:1
**wanted** 24:20
52:10,14
73:10
135:11
138:8
**warranty**
47:7 155:15
**Washington**
3:8
**wasn't** 73:3
130:17
**way** 6:24 7:5
11:16 48:8
58:17 59:20
69:10,16
93:18
105:17
110:25
111:19
119:6
122:16
127:25
145:20
146:21
152:9
162:15
**weather**
122:16
**web** 113:3
145:11,11
145:18,25
146:3,7,16
146:24
157:15
**website** 28:3
**wedded**
129:11
**Wednesday**
27:20
140:15,24
140:25
**week** 81:2
**week-to-date**
93:19
**weren't**
160:11
**west** 92:14

we'll 7:9 9:8
27:5 57:20
68:23,24
82:9 100:5
**we're** 15:16
22:4 39:11
53:8 64:13
64:15 65:11
65:19 69:12
70:12,20
71:10 74:8
74:9 82:7
82:12,20
85:17,19
109:6
115:12
119:11
126:9 138:7
150:3
151:16
152:8
153:17,22
153:22
154:9
156:18
**we've** 27:15
64:25 65:3
94:8 96:5
105:18
129:11
137:13
139:8
141:17
143:18
152:20
155:17
**When's** 6:10
**WHEREOF**
162:17
**wholesale**
19:11 26:11
31:6,9
87:15 88:14
88:18 95:11
95:12,13
112:17
**wide** 58:13
59:15

**wife** 52:23
**Williams**
1:21 2:10
5:12 162:6
162:22
**Wilmington**
109:16
**Wilson** 19:19
**wind** 145:20
**windshield**
13:11,13,19
14:4 18:1
20:4,6,22
21:8,18,23
21:24 22:1
22:5,14,18
22:20,24,25
22:25 23:8
23:15,18
25:2 27:24
29:1,1,13
39:14 40:25
41:20 42:22
42:23,25
43:2 46:6
46:15 47:12
48:3,13,18
50:21 51:23
53:9,12,18
54:7 55:16
56:9 59:1,4
59:19 67:10
67:11 70:4
70:9,21
71:15 72:10
73:4,10,13
78:11,22
83:2,3 84:3
85:25 88:1
88:6 90:16
93:3 96:11
96:22 123:9
123:10,12
125:9,10,11
125:12
128:25
129:9,17,18
129:19

130:7,8,23
131:4,4,5
132:12
133:12
143:6 144:3
144:23
147:6,9
151:3 152:3
153:21
154:24
155:8,9
156:24
**windshields**
21:22 22:3
22:13 23:17
23:22 42:2
48:7 49:8
54:10 59:3
65:15 82:2
82:8 84:19
84:25 94:22
105:11
108:23
110:4
123:18
129:10
133:5
**wise** 159:5,5
**wish** 166:5
**witness** 5:21
5:22 9:12
9:18 75:5
75:13 120:2
158:10
161:7 162:9
162:12,17
163:2 165:1
166:23
**worded**
131:11
**words** 51:20
78:10 123:8
129:17
130:6,22,25
**work** 9:8
15:21 65:13
153:10
**worked** 19:6

64:10
working 109:25
workman's 32:4
world 160:14
Worldwide 5:11,13
wouldn't 23:9 70:6 119:3 130:14
Wow 112:16
write 64:14
writes 62:11
writing 62:12
written 15:24 16:19 38:16 98:12
wrong 32:18
wrote 127:19
W/S 96:12

**X**
X 70:22 72:11 163:1 163:5

**Y**
yeah 33:25 48:15 53:15 62:10 79:15 89:9 94:8 106:18 110:10 115:7,19,21 115:25 118:5 119:15 122:22 128:24 131:9,14 134:17 142:11 143:2 147:5 149:14 157:23 159:25

year 17:15 26:8 63:18 63:25 68:22 69:5,12 70:11 72:24 90:24 93:11 93:17 94:11 121:13 135:1,24
years 6:12 33:23 34:10 34:13,24 35:1 36:23 54:4 64:22 64:22 122:10,13 135:23 157:1,6
Yep 86:17
yesterday 11:3 26:2 96:4 121:2 140:15,23

**Z**
zero 110:19 110:20
zeroing 131:15
ZZ 44:3,4 89:20

**$**
$129,009 79:11
$135 111:1
$16.5 103:15
$211.52 87:14
$34.78 87:15
$4 63:24
$53.58 87:14
$532 111:6

**0**
033 120:23
037 122:3

**1**
1 7:20 8:1 9:25 10:10 163:6
1-15-08 8:13 163:8
1-8-05 18:5 163:10
1.11.4 118:6
1.114 118:21
1.506 111:17
1:08 119:21
10 13:6,9 14:2 75:16 75:22 104:4 115:22 163:19
10:14 43:9
100 107:15
102 163:24
11 80:3,10 123:21 124:20 125:20 147:3 163:20
11:00 74:22
11:15 74:25
11:35 89:13
118 164:1
12 86:5,11 149:23 163:6,21
12.9 104:9
12:17 119:18
125 164:2
1250 3:6
13 88:23 89:4 89:14 163:7 163:22
139 164:4
14 85:1 91:7 91:13 114:12 155:23 156:3,4 163:23
144 164:6,7

15 8:19 31:11 97:15,21 105:2 107:2 111:10 115:20 163:24
15.5 115:23
16 97:23 98:17 105:16 113:12,19 115:5 124:21 147:4,19 164:1
16.5 104:18
168 113:8
17 57:2 107:17 120:5,11 124:8,22 130:18 164:2
18 107:9,10 107:11,13 134:4,11 164:4
18th 134:16
19 108:7 123:14 139:4,20,25 140:8 143:1 143:11 148:1 149:10 160:2 164:6
19.6 122:11
1962 128:23
1992 17:4,22 21:16 24:14 30:24 33:7

**2**
2 8:12,17 115:10 120:22 163:7
2nd 55:5

2:06 158:6
2:15-cv-2733 1:7
20 20:20,20 103:25 139:15,23 140:8 143:1 143:11 148:1 156:25 158:12 164:7
200 3:7 104:8
2000 115:8
20036-2643 3:8
2005 18:16
2007 16:23 20:11 115:23
2008 54:21 55:5 163:14
2009 33:24
2010 15:25 66:18,24 76:12 149:1 157:2,6
2011 75:24 76:11,23 115:1,18 117:24 118:17 147:4,7,20 148:2,10,25
2012 80:4,11 81:1 114:25 124:21,23 125:1,4 134:16 135:16 163:20
2013 108:10 134:25 135:15 136:15 149:1 157:2 157:6
2014 57:2

157:4
2015 43:12 90:18,25 97:25 103:21 104:12 110:14,24 111:6 115:23 163:11
2016 21:17 43:18,24 97:23 98:13 121:22 130:16
2017 120:13 121:3,12 122:11 129:16 130:5
2018 1:18 2:4 5:9 8:19 161:21 162:18
2022 162:24
21 110:11 117:3
215-cv-2733 5:6
22nd 66:18 66:24
22.2 124:25
23 1:18 2:4 163:9
23rd 5:8
24 106:21 155:25
24th 76:12
24-inch 55:11
26th 162:18
260 114:13
262 115:6
27 115:9 117:10
29 9:5 24:17 24:21

**3**

**3** 18:4,11
19:23 100:7
112:16
163:9
**3-17-14** 56:20
163:16
**3-22-10** 66:12
163:18
**30** 109:3
117:4
165:14
**30s** 123:16,18
**30(b)(6)** 8:1
9:12 56:11
78:14 113:1
128:18
130:12
131:13
133:8,16
137:7,13,22
138:1,21
147:1
150:20
156:9,16
**318** 136:15
**32.5** 104:13
115:23
**325** 2:9 3:16
**33** 9:12
117:24
147:20,22
**38** 25:8,9
26:22
**39** 26:20,24
28:14
118:16

**4**

**4** 43:11,17
79:11
100:11
147:15
163:11
**40** 27:22
124:4,14,16
125:3,22
126:2
**41** 28:18,22

112:19,20
**42** 29:11
**43** 25:8 30:3
**43215-2673**
3:17
**444.8** 118:24
**448** 118:23
**48** 163:11

**5**

**5** 45:5,12
52:1 100:15
163:12
**5:23** 160:25
**50** 124:4,14
124:17
125:3,22
126:3
163:12
**506** 110:23
112:2
**52** 112:12
**532** 112:3
**53721** 1:22
**549.4** 147:12
**59** 163:14

**6**

**6** 9:24 10:10
54:20,25
103:5 122:1
163:3,14
**600** 2:9 3:16
**61** 105:23
116:4,16
144:18
163:15
**62** 129:1
**623.8** 147:16
148:2
**63** 117:2
144:20
**66** 163:17
**686** 97:6
**687** 96:1

**7**

**7** 56:18,25
60:12

162:24
163:15
**71** 163:18
**74** 147:13
**77** 50:10
**78** 50:17

**8**

**8** 9:24,25
10:9,12
11:10,24
13:2 18:16
61:14,20
163:17
**80** 104:1
121:19
163:19
**82** 106:2,4,7
107:12
**85** 163:20
**86** 107:20
**88** 105:6
111:13,16

**9**

**9** 12:14,14
43:23 66:11
66:17
163:18
**9-16-16** 97:16
163:25
**9:00** 75:24
**9:07** 5:9
**9:08** 2:5
**9:08 a.m** 1:19
**90s** 73:1
**91** 163:21
**92** 24:8
**93** 163:22
**96** 163:23
**963** 148:2,10
**963.6** 118:11
147:23

Tab 17

DOCUMENT FILED UNDER SEAL

Tab 18

DOCUMENT FILED UNDER SEAL

Tab 19

DOCUMENT FILED UNDER SEAL

Tab 20

**From:** Strain, Gary
**Sent:** Monday, March 08, 2010 6:18 PM
**To:** McMillan, Jim; Blystone, John
**Subject:** RE: Repair Standard - Important questions to be answered

███████████████████████████████████

Gary Strain
Vice President Strategic Clients
856-489-8603 (office)
215-888-4425 (cell)

**From:** McMillan, Jim
**Sent:** Monday, March 08, 2010 1:07 PM
**To:** Strain, Gary; Blystone, John
**Subject:** FW: Repair Standard - Important questions to be answered

FYI below...

Jim

**From:** McMillan, Jim
**Sent:** Monday, March 08, 2010 1:04 PM
**To:** Pearson, Pete
**Subject:** RE: Repair Standard - Important questions to be answered

We cannot do this Pete...

██████████████████████████████

████████████████████████████████████████████
██████████

██████████████████████████████

Jim

**From:** Pearson, Pete
**Sent:** Saturday, March 06, 2010 10:40 AM
**To:** Chris Davies; Andrew Shorter; craigw@belron.com; Jim Leydon; Johan Mortier; Katherine Marshell; Marc Lafferty; Paul Syfko; Peter Rohrs; Stephen Powner ; Willem Mes
**Cc:** O'Mara, Brian; zz#All SAMs
**Subject:** RE: Repair Standard - Important questions to be answered

Chris,

███████████████████████████████████████████
█████████████████████████████████

███████████████████████████████████████████████
███████████


DEPOSITION
EXHIBIT
McMillan 9
2/8/18    KLR

SL0000120

Pete

**From:** Chris Davies [mailto:chrisd@belron.com]
**Sent:** Monday, March 01, 2010 10:34 AM
**To:** Andrew Shorter; craigw@belron.com; Jim Leydon; Johan Mortier; Katherine Marshell; Marc Lafferty; Paul Syfko; Pearson, Pete; Peter Rohrs; Stephen Powner ; Willem Mes
**Subject:** FW: Repair Standard - Important questions to be answered
**Importance:** High

Hi Everyone,

Thanks to everyone who has given me feedback already. Can those who haven't yet done so can you respond soon as possible please? I would appreciate if people can come back to me by end of play Wednesday at the latest. After reviewing everyone's feedback I would like to set up a conference call to discuss what is returned and any points of contention. Once I have the feedback I will generate a table of points for discussion (based on challenges to the original questions I posed) and set up a conference call.

I look forward to receiving the remaining feedback. Thanks for your help everyone.

Regards,

Chris

**From:** Chris Davies
**Sent:** 23 February 2010 12:39
**To:** Andrew Shorter; craigw@belron.com; Jim Leydon; Johan Mortier; Katherine Marshell; Marc Lafferty; Paul Syfko; Pete Pearson ; Peter Rohrs; Stephen Powner ; Willem Mes
**Subject:** Repair Standard - Important questions to be answered
**Importance:** High

Hi Everyone,

I want to just give an overview of where we are currently with drafting the repair standard and also ask you for your thoughts and guidance on the next steps.

Chip repair

Most countries repair damages that are up to 2cm (or 2 euro coin) in size anywhere on a windscreen (with possible exceptions at the edges) apart from the driver's vision area (we know that some countries don't repair in the vision area and those that do restrict the size to circa 1cm).

Crack repair – Specials

Crack repair – cars

However Paul Syfko is still convinced that long crack repairs are not durable ███████████████
████████████) - which means that crack repairs don't meet our definition of repairable damage. The
scientific testing that is being undertaken is taken longer than expected but I am told that results are imminent. ████████
████████████

Please can you all give some thought to the above questions and let me have your responses by the end of the week of
possible. The next step will then for Paul and I to generate the next draft of the repair standard for circulation and
potential team sign off – providing we are all aligned.

Regards,

Chris

Chris Davies
Head of Technical Research & Innovation
Mobile: +44 7730 435145

Tab 21

DOCUMENT FILED UNDER SEAL

Tab 22

DOCUMENT FILED UNDER SEAL

Tab 23

CONFIDENTIAL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

RICHARD CAMPFIELD AND ULTRABOND, INC.,

                                        Plaintiffs,                    Case No. 2:15-cv-2733

        v.

SAFELITE GROUP, INC., SAFELITE SOLUTIONS LLC,
and SAFELITE FULFILLMENT, INC.,

                                        Defendants.

**EXPERT REPORT OF JUSTIN MCLEAN**
**June 11, 2018**

CONFIDENTIAL

# TABLE OF CONTENTS

I.    Introduction ................................................................................................. 2

    A.    Qualifications ................................................................................. 2

    B.    Assignment ..................................................................................... 2

    C.    Compensation ................................................................................ 3

    D.    Documents and Information Considered ........................................ 3

II.    Summary of Opinions ................................................................................. 3

III.    Background ................................................................................................. 5

    A.    Parties in Suit ................................................................................. 5

        1.    Plaintiffs Ultra Bond and Richard Campfield .................... 5

        2.    Defendant Safelite Group ................................................... 7

    B.    Windshield Repair and Replacement .............................................. 8

        1.    Background ......................................................................... 8

        2.    Marketplace Participants ................................................... 11

        3.    Customers ........................................................................ 13

    C.    Safelite's Alleged False Advertising ............................................ 14

IV.    Framework For Analysis ........................................................................... 17

V.    Analysis .................................................................................................... 17

    A.    Safelite Revenue From Use Of False Messages ........................... 17

        1.    Overview .......................................................................... 17

        2.    Safelite's Actual Windshield Replacement Sales .............. 18

        3.    Safelite Windshield Replacement Sales that Were Performed on Cracks between 6 and 14 Inches .............. 18

        4.    Portion of Safelite Customers for Whom Long Crack Repair Would Have Been An Acceptable Alternative to Replacement ................................... 20

    B.    Safelite Profits from Incremental Revenue ................................... 24

    C.    Harm to Ultra Bond ...................................................................... 26

VI.    CONCLUSION ......................................................................................... 30

CONFIDENTIAL

## I.    INTRODUCTION

### A.    Qualifications

1. I am a Managing Principal in the Washington, D.C. office of Analysis Group, Inc. Analysis Group is a consulting firm specializing in microeconomic, financial, and accounting analysis. I have roughly twenty years of experience in the field of economic and financial consulting, in which I have provided consulting advice and other services in both litigation and non-litigation settings. My primary areas of expertise include intellectual property damages, applied finance theory, and valuation.

2. I have a Master of Science degree in Industrial Administration with a concentration in finance, entrepreneurship, and accounting from Carnegie Mellon University. I also hold a Bachelor of Arts degree in Economics from Swarthmore College.

3. A copy of my curriculum vitae, which includes testimony I have given in the past four years, is attached as Appendix A.

### B.    Assignment

4. I have been retained by attorneys representing the Plaintiffs, Richard Campfield ("Campfield") and Ultra Bond, Inc. (collectively, "Plaintiffs"), in the above-captioned case. I understand that Safelite Group, Inc., Safelite Solutions LLC, and Safelite Fulfillment, Inc. (collectively "Safelite") have been accused of violation of Section 35 of the Lanham Act by promoting vehicle glass repair and replacement ("VGRR") services by means of an organized campaign to influence purchasers' decisions about choosing between windshield repair or replacement services by engaging in false or misleading statements of facts about the repairability of cracks greater than six inches in length. I have been asked to provide expert analysis and testimony regarding (1) Safelite's revenues and profits from the allegedly false or misleading statements of fact in its commercial advertising, and (2) but-for the allegedly false or misleading statements of fact in

2

CONFIDENTIAL

its commercial advertising, whether Ultra Bond would have generated more revenues and profits.

### C.    Compensation

5.  Plaintiffs have been billed on a time-and-materials basis for my work and the work of those under my direction and supervision. My hourly rate for the analysis I have conducted and any testimony I may give is currently $725. My compensation is not affected by the nature of the opinions that I form or the outcome of this case.

### D.    Documents and Information Considered

6.  In the course of my analysis, I have reviewed and considered various internal documents and data, legal filings, and other information of a type reasonably relied upon in a matter like this by experts in my field.

7.  The information considered includes, but is not limited to, financial statements, internal Safelite and Ultra Bond documents, deposition testimony and research of publicly available information. Appendix B provides a list of the materials that I have relied upon in the course of preparing this report and its supporting exhibits.

8.  In addition to the information listed in Appendix B, I also have spoken to Richard Campfield, founder and owner of Ultra Bond, Inc. and Rene Befurt, an Expert for Ultra Bond on this matter.

9.  I also have relied on my training and my applied professional experience. I reserve the right to update my opinions if new relevant information becomes available.

## II.    SUMMARY OF OPINIONS

10. My opinions in this matter as of the report date are summarized below. The sections that follow provide more detailed discussion and support for these opinions.

CONFIDENTIAL

- From 2010 to 2016, Safelite generated ██████ in revenue from windshield replacements.[1]
- From 2010 to 2016, Safelite generated as much as ██████ in revenue from windshield replacements on cars with windshields that were candidates for Long Crack repairs.[2]
- From 2010 to 2016, Safelite generated as much as ██████ in incremental revenues from windshield replacements that were a result of Safelite's allegedly false or misleading statements of fact in its commercial advertising.[3]
- From 2010 to 2016, Safelite generated as much as ██████ in incremental profits from windshield replacements that were a result of Safelite's alleged wrongdoing.[4]
- Ultra Bond competes in the vehicle glass repair and replacement business and is a leading supplier of Long Crack repair supplies. In the absence of Safelite's promotions, Long Crack windshield repairs would have been viewed as a viable alternative to windshield replacement by end-customers. Ultra Bond's customers have indicated that they would have purchased more Ultra Bond Long Crack repair supplies had customer demand been higher for these repairs. As a result, Ultra Bond lost sales and the corresponding profits from the alleged wrongdoing.

11. I understand that Safelite may subsequently present its own analysis regarding the revenues, costs, and profit effects stemming from the alleged bad acts. I plan to respond to any such analysis if allowed by the Court.

---

[1] Exhibit 9.

[2] Exhibit 13.

[3] Exhibits 11 and 13.

[4] Exhibits 12 and 13.

CONFIDENTIAL

### III.   BACKGROUND

#### A.   Parties in Suit

##### 1.  Plaintiffs Ultra Bond and Richard Campfield

12. Established in 1989, Ultra Bond Inc.'s business primarily involves selling automotive windshield repair products to automotive glass shops and related businesses across the United States and around the world as well as offering automotive glass repair and replacement services to end customers.[5] Ultra Bond Inc.'s products include repair kits comprised of specialized tools, resins, primers, additives, and chemicals used for repairing windshields.[6] Ultra Bond, Inc. generated between roughly ████████████████ in annual sales over its fiscal years commencing in May 2010 through April 2017.[7]

13. Richard Campfield is an inventor who has actively participated in the vehicle glass repair and replacement ("VGRR") industry since 1986,[8] and is a past president of the National Windshield Repair Association ("NWRA").[9] I understand that Mr. Campfield is the founder and owner of Ultra Bond, Inc., along with two other firms, Ultra Bond Windshield Repair and Replacement and Ultra Bond Licensing.[10] I understand that Ultra Bond Windshield Repair and Replacement is Mr. Campfield's repair and replacement shop in Grand Junction, Colorado.[11] I also understand that Ultra Bond Licensing has in the past entered agreements with Ultra Bond's windshield repair business clients.[12] Mr. Campfield

---

[5] http://ultrabond.com/about-ultra-bond (viewed 05/31/2018).

[6] *See, e.g.*, http://ultrabond.com/windshield-repair/ (viewed 05/31/2018).

[7] Exhibit 1.

[8] http://ultrabond.com/about-ultra-bond/ (viewed 5/31/2018).

[9] *See, e.g.*, https://nwrassn.org/cool-advice-for-hot-glass/ (viewed 5/8/2018).

[10] Amended Complaint, at 11.  *See also* https://nwrassn.org/cool-advice-for-hot-glass/ (viewed 5/8/2018).

[11] http://ultrabond.com/dont-replace-it-windshield-crack-repair-over-1-foot-long/ (viewed 5/31/2018).

[12] ████████████████████████ and "licensing" fees now go to Ultra Bond, Inc. Conversation with Richard Campfield, June 7, 2018; Deposition of Richard Campfield, Volume 1, May 30, 2018 ("Campfield Deposition Vol. 1"), at 78. ████████████

CONFIDENTIAL

also owns a retail repair business in Northeastern Pennsylvania.[13] I refer to Ultra Bond, Inc., Ultra Bond Windshield Repair and Replacement and Ultra Bond Licensing collectively as "Ultra Bond."

14. Ultra Bond's supply products include car windshield crack repair kits (consisting of tools, resins, primers, additives, and pre-treatment chemicals) as well as stand-alone resins that are able to be used to repair cracks longer than six inches.[14] The NWRA classifies these cracks as "long cracks" ("Long Cracks").[15] I understand that Mr. Campfield also provides training for repair technicians on Long Crack windshield repair, and that Ultra Bond posts on its website for potential customers a video which shows what the results of a Long Crack repair will look like when such work is completed.[16]

15. Mr. Campfield and/or Ultra Bond hold and/or have held several patents related to the repair of Long Cracks.[17] One of those patents is U.S. Patent 8,268,104 ("the '104 Patent"), which I understand relates to enabling the repair of Long Cracks with a UV Cure Epoxy, instead of the currently used UV Cure Acrylate, and which allows for quicker and easier Long Crack repair.[18]

16. I understand that Ultra Bond is one of the few firms that supplies Long Crack repair products in the U.S.[19] According to Mr. Campfield, Ultra Bond accounts

---

. Deposition of Richard Campfield, Volume 3, June 1, 2018, ("Campfield Deposition Vol. 3") at 675-76.

[13] http://ultrabond.com/northeastern-pa-crackmaster-windshield-repair (viewed 5/31/2018); Campfield Deposition, at 82-83. Conversation with Richard Campfield, June 7, 2018.

[14] *See, e.g.*, http://ultrabond.com/windshield-repair/ (viewed 5/31/2018).

[15] https://www.rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018).

[16] http://ultrabond.com/long-crack-holds-up-in-rollover-crash/ (viewed 06/11/2018). *See also* UB092148. Additionally, Ultra Bond website displays photographs showing that how Long Crack repair holds up even in a rollover crash. *See* http://ultrabond.com/long-crack-holds-up-in-rollover-crash/ (viewed 6/11/2018). Ultra Bond also shows a sample piece of windshield glass that was cracked and repaired to Long Crack customers in advance of performing this type of repair, so the customer can see a physical exemplar of how a Long Crack repaired windshield will look. Conversation with Richard Campfield, June 8, 2018.

[17] http://ultrabond.com/about-ultra-bond/ (viewed 5/31/2018); http://ultrabond.com/patents (viewed 5/31/2018).

[18] Conversation with Richard Campfield.

[19] Campfield Deposition, at 53; Conversation with Richard Campfield, June 7, 2018.

CONFIDENTIAL

for over 50 percent of U.S. Long Crack repair product sales.[20] Ultra Bond also sells Long Crack repair supply products outside of the U.S.[21]

### 2. Defendant Safelite Group

17. Defendant Safelite Group ("Safelite") is based in Columbus, Ohio, that has been owned by London-based Belron S.A. since early 2007.[22] It is comprised of three major business operations: 1) Safelite Fulfillment, Inc. ("Safelite Fulfillment"), 2) Safelite Solutions LLC ("Safelite Solutions"), and 3) Service AutoGlass®.[23] ▉

▉[24]

18. Safelite Fulfillment offers windshield repair and replacement services to retail consumers under the trade name Safelite AutoGlass. The entity is the largest auto glass repair and replacement organization in the U.S. with 6,000 technicians who serve 6 million customers each year.[25] According to Safelite's website, the company's replacement services are available to 97 percent of drivers in all 50 states.[26]

19. Safelite Solutions manages and processes claims for fleet and insurance companies. The company currently serves as a third-party administrator of auto glass claims for more than 175 insurance and fleet companies, including 19 of the top 30 property and casualty insurance companies.[27] Safelite Solutions manages approximately 9,000 affiliate providers and operates national contact centers in

---

[20] Conversation with Richard Campfield, June 7, 2018.

[21] *See, e.g.,* http://ultrabond.com/distributors (viewed 5/16/2018). I understand that Ultra Bond uses distributors to market Ultra Bond products internationally.

[22] https://www.insurancejournal.com/news/national/2007/03/05/77424 htm (viewed 05/31/2018). https://www.belron.com/aboutus/ (viewed 5/31/2018); Deposition of Doug Herron ("Herron Deposition"), at 15-16.

[23] https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018); Amended Complaint, at 1.

[24] ▉▉

[25] https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018). *See also* SL0000076-82, at 77.

[26] https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018).

[27] https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018).

CONFIDENTIAL

Ohio, Iowa, and Arizona.[28] Safelite Solutions is the largest glass claims management company in the U.S. According to one internal Safelite document, the company had a ▆ percent share of the glass claims management market as of March 2012.[29]

20. Service AutoGlass is a national provider of wholesale vehicle glass products and installation and repair materials and tools. The company provides services to vehicle glass companies through a network of 91 warehouses throughout the United States.[30]

**B.  Windshield Repair and Replacement**

**1.  Background**

21. The retail VGRR market provides auto glass repair and replacement services to a variety of consumers. Windshield damage is the most common form of vehicle glass damage,[31] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  .[32]

22. I understand that windshield damage can occur as a result of a variety of factors and that, overall, windshield damage is related to factors such as weather and number of miles driven.[33]  Common types of windshield damage include "bullseyes", "star breaks", "cracks", and "combination breaks".[34] Bullseye damage is marked by a separated cone in the outer layer of glass that results in a dark circle with an impact point. Star breaks are damage that exhibits a series of legs that emanate from the break. Cracks are single lines of separation that

---

[28] https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018).

[29] SL0063247-89, at 62.

[30] https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018).

[31] *See e.g.,* Herron Deposition, at 67, 88. Side and back glass ("curved tempered" glass) make up roughly twenty percent of Safelite's glass replacements and zero percent of Safelite's glass repairs.

[32] Exhibit 5.

[33] *See, e.g.,* SL0082418-36, at 22; SL0069031-048, at 035.

[34] https://www.rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018).

CONFIDENTIAL

sometime emanate from an impact point. Combination breaks consist of damage with multiple characteristics such as a star break within a bullseye or a crack emanating from a break.[35]

23. Windshield cracks can be classified as either "Short Cracks" (cracks shorter than 6 inches, or about the length of a dollar bill[36]) and Long Cracks (cracks longer than 6 inches).[37] Windshield cracks can also be classified by their location. For example, "edge" cracks are cracks that occur at the edge of the windshield, while "floater" cracks occur away from the edge of the windshield.[38]

24. Generally, I understand that windshield cracks can be addressed via windshield repair or windshield replacement. The repair of windshield cracks generally involves removing the air in the damaged area of a windshield and replacing it with a resin.[39] I also understand that the appropriate resin and repair technique may depend on the damage.[40] Windshield replacement entails removing an entire damaged windshield from a vehicle and replacing it with a new windshield. I understand that according to the VGRR industry standard, which was set by two leading industry associations and approved by the American National Standards Institute ("ANSI"), windshield cracks up to 14 inches are repairable.[41] This standard is part of the "Repair of Laminated Automotive Glass Standards"

---

[35] https://www rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018).

[36] *See, e.g.*, https://www.moneyfactory.gov/images/FactSheet_FederalReserveNotes_20130502.pdf (viewed 6/10/2018).

[37] https://www.rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018).

[38] https://www.rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018).

[39] *See, e.g.*, SL0005375-415, at 395; https://nwrassn.org/history-of-auto-glass-repair/ (viewed 4/18/2018); https://rolags.com/pdf/FinalANSI+NGA+R1_1-2007_by_ANSI.pdf (viewed 4/20/2018).

[40] *See also* SL0005375-415, at 396. Conversation with Richard Campfield, June 7, 2018.

[41] https://www rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018).

CONFIDENTIAL

("ROLAGS").[42] I understand that this standard has been in place since June 2007.[43]

25. The costs of windshield repair and windshield replacement depend on a number of factors including, among others, the type of glass and features of the windshield (for a replacement),[44] and the length[45] of the crack (for repair). For example, it is more costly and/or complicated to replace a windshield that has a rain sensor, a heads up display, and/or other Advanced Driver Assistance Systems.[46] As well, longer cracks may be more costly to repair because they require more resin.[47] Windshield repair typically is less costly than windshield replacement.



26. I understand that windshield repair success rates are high[50] and that, in general, customer satisfaction with windshield repair is high, including for Long Crack

---

[42] https://www.rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018). I understand that cracks longer than 14 inches also can be repaired. For example, Mr. Campfield's repair shop records show that he has repaired cracks longer than 18 inches in length. Further, Safelite's internal documents show that Safelite knew, as of 2008, that windshield crack repairs of up to 24 inches can be safely repaired. Exhibit 2; SL0009620-23, at 20, 22.

[43] https://rolags.com/pdf/FinalANSI+NGA+R1_1-2007_by_ANSI.pdf (viewed 5/8/2018). I also understand that the ability to successfully repair a windshield crack depends on factors such as whether the damage penetrates the inside layer of laminate glass and whether it intersects more than one edge.

[44] *See e.g.,* SL0005375-415, at 81-85.

[45] *See e.g.,* Statement by ██████, Pursuant to 28 U.S.C. §1746, February 28, 2018, at pp. 3-4. Conversation with Richard Campfield, June 7, 2018.

[46] SL0005375-415, at 82. *See also,* http://motorburn.com/2018/04/future-auto-glass-repair-replace/ (6/6/2018).

[47] Conversation with Richard Campfield, June 7, 2018.

[48] SL0008415-36, at 19. *See also*, SL0005375-415, at 382-384, 411.

[49] ████████████████████████████

[50] *See, e.g,* Statement by ██████, Pursuant to 28 U.S.C. §1746, April 10, 2018, at p. 2; Statement by ██████ Pursuant to 28 U.S.C. §1746, February 28, 2018, at p. 1; Statement by ██████ Pursuant to 28 U.S.C. §1746, March 28, 2018, at p. 2.

CONFIDENTIAL



repair. ███████████████████████████████

████████████████████████████████████████

█████████████.[51] As well, various windshield repair shops that use Ultra Bond products indicate that their customers have been satisfied with their companies' repair work, including Long Crack repair work.[52] Mr. Campfield also has reported that in his repair business he rarely encounters a customer that is not satisfied with a Long Crack repair.[53]

### 2. Marketplace Participants

27. Participants in the U.S. VGRR marketplace include automotive glass shops, suppliers of replacement glass and repair supplies and automotive insurance companies.

28. Safelite is the largest participant in the U.S. VGRR marketplace.[54] In 2012, Safelite estimated that it commanded over ██████ of the United States auto glass fulfillment market, while the next largest competitor commanded 3 percent of the market.[55] A more recent Safelite document indicated that, in 2016, the company held █████████ of the VGRR market.[56] Safelite's competitors in the VGRR space include TechnaGlass, Gerber Collision & Glass, JN Phillips Auto Glass, and ABRA Auto Body & Glass.[57] VGRR services in the U.S. are also

---

[51] SL0005375-415, at 407.

[52] *See, e.g.,* Statement by ██████, Pursuant to 28 U.S.C. §1746, April 19, 2018, at p. 2.; Statement by ████ ██████ Pursuant to 28 U.S.C. §1746, April 10, 2018, at p. 2. Statement by ██████, Pursuant to 28 U.S.C. §1746, May 2, 2018, at p. 2. Statement by ████████, Pursuant to 28 U.S.C. §1746, March 5, 2018, at p. 3. *See also,* http://ultrabond.com/ultra-bond-windshield-repair-reviews/ (viewed 5/17/2018).

[53] Conversation with Richard Campfield, June 7, 2018.

[54] *See, e.g.,* SL0000077-78, at 77.

[55] SL0063247-89, at 62.

[56] SL0069032-48, at 33.

[57] SL0069032-48, at 39; http://www.technaglass.com/ (viewed 4/20/2018); https://www.gerbercollision.com/ (viewed 4/20/2018); https://www.jnphillips.com/ (viewed 4/23/2018); https://www.abraauto.com/ (viewed 4/23/2018).

CONFIDENTIAL

provided by a variety of small shops.[58] Some of those are part of Safelite's network.[59]

29. Safelite's windshield business is focused on the repair of chips and Short Cracks and the replacement of windshields with other damage. Safelite does not offer Long Crack repair.[60] I understand that some other market participants also focus on those services, whereas some shops provide other services, such as Long Crack repair.

30. The VGRR market also includes suppliers of replacement glass and repair supplies. As noted above, Safelite provides wholesale vehicle glass products as well as repair materials and tools under its Service AutoGlass company.[61] I understand that Service AutoGlass does not sell supplies that address the repair of Long Cracks. As described above, Ultra Bond sells repair supplies to a variety of VGRR customers, including those directed toward repairing Long Cracks. Other firms that sell repair supplies that are used in the repair of Long Cracks may include Crack Eraser, U.S. Windshield Repair, Glass Mechanix, Glass-Weld, Novus, and Liquid Resins, although, according to Richard Campfield, the products of several of these firms are not recommended for Long Crack repair.[62]

31. Auto insurance providers also play a role in the VGRR market. Some vehicle insurance policies cover glass damage that may cover some or all of the costs associated with repairing or replacing damaged windshields, depending on the individual policy and extent of the damage.[63]

---

[58] *See e.g.,* Herron Deposition, at 31, 88, 139, 149-150; SL0084639-40, at 40.

[59] SL0063247-89, at 62; SL0084639-40, at 40.

[60] Herron Deposition, at 23-24.

[61] https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018).

[62] https://crackeraser.com/ (viewed 5/15/2018); Campfield Deposition, at 53; Conversation with Richard Campfield, June 7, 2018.

[63] *See e.g.,* https://www.progressive.com/claims/claim-glass/ (viewed 5/8/2018); https://www.statefarm.com/claims/claims-help/auto/windshield-repair (viewed 5/8/2018).

CONFIDENTIAL

32. Auto insurance companies often use outside firms to manage windshield glass repair claims.[64] As noted above, Safelite Solutions is the largest player in the auto glass claims segment, holding an estimated ▮▮▮▮ share of the glass claims management market as of March 2012.[65] Safelite's competitors in the automobile glass claims management market include Lynx Services and HSG.[66]

### 3. Customers

33. Customers of windshield repair and/or replacement services include individual car owners, as well as commercial fleets and government entities.[67] Individual car owners who experience a damaged windshield typically either 1) directly contact a VGRR company or shop or 2) contact their auto insurance policy provider.[68]

34. VGRR shop technicians provide customers with advice on whether the customer should have their windshield damage repaired or replaced.[69] Once the customer decides how to address the damage, they can pay for the service through making a claim on their automotive insurance policy, or without making a claim.[70] For those calling their insurance company, I understand that often the call is redirected to the insurance companies' auto glass administrator.[71]

---

[64] For example, according to Safelite, 19 out of the top 30 property and casualty insurance companies use Safelite Solutions to manage windshield glass repair claims. https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018); Herron Deposition, at 109; State Farm, the largest insurer in the U.S., uses Lynx to manage auto glass claims. https://www.statefarm.com/claims/claims-help/auto/windshield-repair (viewed 5/8/2018).

[65] SL0063247-89, at 62.

[66] SL0069032-48, at 39; https://www.lynxservices.com/LYNXWeb/AutoGlassClaims (viewed 4/23/2018); http://hsgclaims.com/ (viewed 4/23/2018).

[67] See e.g., SL0077314-21, at 15.

[68] See e.g., Herron Deposition, at 143-145; SL0084639-40, at 39.

[69] Conversation with Richard Campfield, June 7, 2018. See also, SL0000077-78, at 77; SL0084636.

[70] ▮▮▮▮

[71] For example, 19 out of the top 30 property and casualty insurance companies use Safelite Solutions to manage windshield glass repair claims. And State Farm, the largest insurer in the U.S., uses Lynx to manage auto glass claims. https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018); Herron Deposition, at 109; https://www.statefarm.com/claims/claims-help/auto/windshield-repair (viewed 5/8/2018).

CONFIDENTIAL

35. I understand that in addition to advice, cost, and the type of damage, other factors that may influence whether potential consumers replace or repair a cracked windshield include the time it takes to repair and/or replace a windshield, safety concerns associated with repair and/or replacement and/or environmental concerns. For example, Safelite documents[72] identify repair as a preferred alternative to replacement for a number of reasons, including:

- Repair is safer than replacement because it does not require breaking the original windshield factory seal;
- Repair is more environmentally friendly; and
- Repair is more convenient for the consumer because it takes less time.

### C.    Safelite's Alleged False Advertising

36. I understand that this matter involves the contention that Safelite promotes and has promoted VGRR services in a false or deceptive way as part of an organized advertising campaign to influence VGRR purchasers' decisions about the non-repairability of certain types of windshield damages beyond an alleged cutoff of precise measurable width and length.[73] In particular, Safelite promotes and has promoted through a variety of means and media formats that windshield cracks longer than six inches cannot be repaired, as a matter of objective fact. I understand that these alleged false messages fall into at least two categories:[74] 1) messages that state or imply a windshield always requires a replacement when a crack is longer than six inches;[75] and 2) messages that state or imply that that only windshield cracks up to six inches long can be repaired.[76]

---

[72] SL0005375-415, at 380, 412; SL0008022-23, at 22; SL0008415-36, at 17-20; SL0009104-05, at 05.

[73] Complaint, at 22-32; Amended Complaint, at 24-48.

[74] *See, e.g.*, Amended Complaint, at para 4-5.

[75] *See, e.g.*, SL0084636; SL0084637; SL0085552.

[76] *See, e.g.*, SL0008022-23, at 22. Some of the accused promotional materials arguably fall somewhere in between. *See, e.g.*, SL0084917-18.

CONFIDENTIAL

37. In these promotional materials, Safelite often describes the purported 6 inch repair cut off by suggesting that customers compare the length of the crack to that of a dollar bill. This is the so called "dollar bill" rule.[77] Although Safelite's advertisements indicate otherwise, I understand that VGRR repair technicians can successfully repair windshield cracks that are substantially longer than six inches (or about the length of a dollar bill). As noted above, the industry standard approved by ANSI since June of 2007 establishes that windshield cracks up to 14 inches long are repairable.[78] I understand that Safelite has been falsely promoting a 6 inch repair cut-off at least since the current 14-inch standard was adopted in June 2007.[79]

38. The 6 inch repair cutoff has been a consistent part of Safelite's promotional efforts over the years.[80] For example, Safelite Advertising Director, Matthew Johnson testified that the dollar bill rule has been used as a marketing tool by Safelite for over 10 years.[81] Safelite has promoted the "dollar bill" and/or six inch rule to both consumers and insurance companies,[82] and Safelite has used a variety of means and media formats to promote the purported 6 inch cutoff, including online videos, websites pages, brochures, and press releases.[83] Safelite also has promoted the "dollar bill" and/or six inch rule through content it provides to third parties to distribute to consumers. These third parties include insurance

---

[77] Amended Complaint, at 2. *See e.g.,* SL0009104-05, at 04; SL0008022-23, at 22; SL0084917-18, at 18; SL0009721-24, at 22; SL0006352-53, at 52; SL0006327-28, at 27; SL0006364; SL0001451-52, at 51; SL0084636; SL0084637.

[78] https://www.rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018).

[79] https://rolags.com/pdf/FinalANSI+NGA+R1_1-2007_by_ANSI.pdf (viewed 5/8/2018).

[80] *See, e.g.,* SL0083720-30, at 720.

[81] Deposition of Matthew Johnson, at 15, 30-31.

[82] *See e.g.,* SL0005255-93, at 55, 70, 76; SL0008022-23; SL0005375-10, at 392, 399.

[83] *See e.g.,* SL0084636; SL0084637; SL0085552; UB052368-69, at 68; SL0008022-23; SL0006364; SL0009721-31; SL0006033; SL0005829.

CONFIDENTIAL

companies and commercial vehicle fleet operators.[84] Often the content is provided to third parties without attribution to Safelite.[85]

39. Safelite that has successfully used promotional activity to increase sales in the past. For example, former Safelite CFO Doug Herron testified that "when it comes to sales, advertising is one of those tools to impact the company's financial performance."[86] Bruce Millard, Safelite Vice President of digital and customer innovation, testified that digital advertising is "very important" to Safelite's "repair or replacement" business.[87] As well, a July 2015 internal Safelite email discussing recent results noted:



[88]

40. The evidence also reveals that Safelite has successfully been able to influence customers choices of which services to purchase (i.e., repairing vs. replacing a windshield), including encouraging customers with windshield cracks smaller than 6 inches to repair their windshields, and encouraging customers to repair cracks when it is in Safelite's best interest.[89] As well, Safelite has generally helped the insurance industry define what can be repaired vs. not repaired.[90]

---

[84] SL0084917-18; SL0081019-20, at 20; SL0080650-59, at 59; SL0009104-05; SL0000227; SL0008035; SL0080962; SL0000340.

[85] SL0084917-18; SL0081019-20, at 20; SL0000340.

[86] Herron Deposition, at 69. *See also* Herron Deposition, at 68, 77, 89-90, 130; SL0079610-11; SL0082418-36; SL0079712-13; SL0063246-90, at 275.

[87] Millard Deposition, at 26.

[88] SL0069587-88. Herron Deposition, at 90-91.

[89] Safelite has been incentivized by its contracts with insurance providers to repair chips and Short Cracks, and has been successful in encouraging customers to do so. *See, e.g.*, Herron Deposition at 58-60, 68-72.

[90] *See, e.g.*, SL0080494-99, at 94.

CONFIDENTIAL

## IV.     FRAMEWORK FOR ANALYSIS

41. I understand that according to U.S. law, a successful plaintiff in a false advertising case is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."[91] I also understand that a plaintiff may need to show that, among other things, it has been or is likely to be injured as a result of a false or misleading statement of fact.

42. For the purposes of my analysis, I have assumed that Safelite will be found liable for making false or deceptive claims with regard to windshield repair. I have been asked to analyze the revenue and profit earned by Safelite stemming from these alleged bad acts and to assess whether or not Plaintiffs were injured by these alleged bad acts. I have not been asked to quantify the amount by which Plaintiffs have been injured by their lost profits, however, I have been asked to comment on the likelihood of such injuries.

## V.      ANALYSIS

### A.      Safelite Revenue From Use Of False Messages

### 1.  Overview

43. In order to estimate Safelite's revenues from its false advertising, I start with Safelite's revenues from windshield replacement sales. I then evaluate those revenues in order to estimate the Safelite revenue related to customers that purchased a windshield replacement but instead could have received a Long Crack repair. I then identify the portion of customers for whom Long Crack repair would have been an acceptable alternative. This involves several steps, including identifying:

- Safelite revenue from windshield replacements;
- the portion of Safelite replacement sales related to windshield cracks between 6 and 14 inches long; and

---

[91] U.S. Trademark Act 15 U.S.C. §1117(a).

CONFIDENTIAL

- the portion of customers for whom Long Crack repair would have been an acceptable alternative.

44. I describe this analysis below.

### 2. Safelite's Actual Windshield Replacement Sales

45. Safelite windshield replacement sales to non-commercial and non-governmental customers over the period 2010 through 2016 are shown in Exhibit 5.[92] As described by Safelite's former Chief Financial Officer, Doug Herron, these revenues include sales to customers who made a claim on their auto insurance and those who did not.[93]



.[95]

### 3. Safelite Windshield Replacement Sales that Were Performed on Cracks between 6 and 14 Inches

46. As discussed above, the evidence shows that Safelite promoted the repair of windshield damage for cracks no longer that 6 inches, and that it promoted the need to replace a windshield for cracks longer than 6 inches, and that, contrary to what Safelite promoted, it is safe, effective, and consistent with ROLAGS recommendations to repair cracks of up to 14 inches.[96] In addition, as discussed

---

[92] *See also* SL0084639-40, at 39. My calculations focus on the 2010 to 2016 period, which I understand is the period for which Safelite revenue data has been produced. I understand that the accused conduct began prior to 2010 and has continued subsequent to 2016, and note that my calculations can be adjusted to reflect different time periods.

[93] Herron Deposition, at 21, 139-144.

[94] Exhibit 5.

[95] These revenue figures exclude sales made to commercial customers, such as rental car firms and taxi fleets. While I understand that Safelite has promoted its windshield replacement services to commercial customers using similar messages to those at issue here, I have been asked to exclude those sales from my analysis. *See e.g.,* SL0009104-05.

[96] https://www.rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018). It is known that longer cracks can be repaired as well. Mr. Campfield's repair shop records show that he has repaired cracks longer than 18

CONFIDENTIAL

above, the vast majority of customers who choose to repair windshield cracks, are satisfied with those repairs.[97]

47. I understand that Safelite claims that it does not track how many of its windshield replacements were performed where the original damage involved cracks between 6 and 14 inches long.[98] To the extent that Safelite produces this information, I plan to review it. For the purposes of this report, because Safelite has not provided this information, I use data provided by the Plaintiff to inform this analysis.

48. Based on my review of the evidence and discussion with Richard Campfield, I understand that, excluding chips, a majority of repairable windshield damage consists of cracks between 6 and 14 inches.[99] The evidence also suggests that Safelite influences customers with windshield cracks smaller than 6 inches to repair their windshields.[100] As such, a majority of Safelite's replacements should relate to vehicles where the windshield damage consisted of cracks between 6 and 14 inches.

49. I use data on the length of windshield cracks repaired from 2012 to 2014 at the Ultra Bond Windshield Repair and Replacement shop to project the portion of Safelite replacement sales related to 6 to 14 inch cracks. I understand that Ultra Bond Windshield Repair has periodically kept track of the types of windshield damage among cars serviced at their shop, including the length of cracks. According to Mr. Campfield, based on his over 30 years of experience in the industry, the distribution of windshield damages of customers at his shop would be fairly representative of that encountered by Safelite stores around the U.S.[101]

---

inches in length. Further, Safelite's internal documents show that Safelite knew, as of 2008, that windshield crack repairs of up to 24 inches can be safe and viable. Exhibit 2; SL0009620-23, at 20, 22.

[97] SL0005375-415, at 407.

[98] Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendants, February 23, 2018, at 10.

[99] Conversation with Richard Campfield, June 7, 2018.

[100] *See, e.g.,* SL0005375-415, at 410; SL0008415-36, at 17, 19, 29, 32, 34; SL0082418-36, at 29, 32.

[101] Conversation with Richard Campfield, June 7, 2018. Mr. Campfield started working in windshield repair in 1986. http://ultrabond.com/about-ultra-bond/ (viewed 5/31/2018). In addition, I understand that Richard Campfield and

CONFIDENTIAL

50. As shown in Exhibits 2 and 3, Ultra Bond's 2012 to 2014 data shows that Long Crack repairs have been more numerous than windshield replacements. For every hundred customers that obtain one of these services, between 59.1 percent and 66.5 percent were for 6 to 14 inch crack repairs. Over the entire period, 62.1 percent of these customers received 6 to 14 inch Long Crack repairs.[102]

51. Exhibit 6 shows that applying the 62.1 percentage to Safelite's windshield replacement units results in estimates of windshields replaced that could have been repaired that varies ███████████████████████. In total, for 2010 through 2016, it appears that Safelite replaced an estimated ████ windshields with cracks of between 6 to 14 inches.[103]

52. Alternatively, using Ultra Bond's Long Crack experience relative to shorter cracks and chips results in a lower estimate of the Long Cracks Safelite has repaired. Exhibit 7 shows calculations of estimates of Safelite windshields replaced that could have been repaired using this alternative methodology.[104] According to this methodology, between 2010 and 2016, Safelite replaced an estimated 3.0 million windshields that had cracks of between 6 to 14 inches.[105]

**4. Portion of Safelite Customers for Whom Long Crack Repair Would Have Been An Acceptable Alternative to Replacement**

53. As discussed above, Safelite has consistently promoted its services using the dollar bill rule through a number of means and media formats and often has

---

others on behalf of Richard Campfield have conducted a number of "parking lot surveys" which assess the distribution of windshield damage in public parking lots. I understand that these surveys are generally corroborative of the notion that the damage addressed in Mr. Campfield's shop is representative of what is addressed in automotive glass shops in the U.S. *See, e.g.*, UB088653-55 and UB067200-01. I also note that Ultra Bond's data is generally consistent with the fraction of Safelite's repairs that are Short Cracks. SL0006939-940.

[102] Exhibit 3; UB088619; UB088617; UB088644.

[103] Exhibit 6.

[104] The alternative methodology estimates the number of windshields replaced by Safelite where the damage involved a crack of between 6 and 14 inches by applying Ultra Bond's ratio of Long Cracks to stone breaks and Short Cracks to the reported number of Safelite repairs. This results in a more conservative estimate, but may understate profits given the evidence that Safelite generally influences potential customers into high profit replacements (which in turn would lower its repair numbers). *See* Exhibit 7.

[105] Exhibits 7 and 14.

CONFIDENTIAL

presented to customers and insurance companies promotional messages that state or imply that windshield cracks longer than 6 inches cannot be repaired.[106] I also understand from Dr. Rene Befurt, who is an expert for Ultra Bond in this matter, that from a marketing perspective, Safelite's dollar bill rule-related promotional activity likely has been critical in both (1) influencing Safelite customers seeking to address windshield damage to purchase a replacement rather than repair their windshield, and (2) (falsely) educating potential windshield damage customers generally, including non-Safelite customers, as to the limits of windshield crack repair.[107]

54. As well, I understand that customers, whether they contacted Safelite via the Internet or by calling, were likely to encounter Safelite's promotion of the 6 inch rule (in other words, it is an objective fact that it is not feasible for any repair technician to repair cracks greater than the size of a dollar bill). This is consistent with a Belron US (an entity that includes Safelite)[108] February 2009 presentation which indicated that the dollar bill rule was "[t]he Most Important Aspect" of their repair messaging and the message must be consistently delivered to customers, including by call center operators and repair technicians.[109] As well, on a page that appears to provide customers with various options to fix car glass, Safelite's website has emphasized: "Your windshield helps keep you safe. **[i]f the damages is larger than 6"**, it cannot be repaired. You need a replacement."[110] Also, a video linked to the Safelite website informed the viewer:

> How do you know if your windshield can be repaired? The easiest way to tell is to hold a dollar bill against the chip or crack…If the

---

[106] *See e.g.,* SL0084636; SL0084637; SL0085552; SL0009104-05, at 04; SL0008022-23, at 22; SL0084917-18, at 18; SL0009721-24, at 22; SL0006352-53, at 52; SL0006327-28, at 27; SL0006364; SL0001451-52, at 51.

[107] Expert Report of Dr. Rene Befurt, June 4, 2018 ("Befurt Report"), at pp. 23-26.

[108] https://www.insurancejournal.com/news/national/2007/03/05/77424 htm (viewed 05/31/2018).

[109] SL0007254-78, at 73.

[110] UB042433-34, at 33. [Emphasis in original.] *See also* SL0085552 and SL0085553. Documents that I recently received appear to show that ▮▮▮▮▮ of potential Safelite customers visited Safelite webpages with messages related to the six inch rule from mid-2014 through 2017. SL0085556; SL0085559.

CONFIDENTIAL

damages spreads beyond the size of a dollar bill, a replacement will be necessary.[111]

55. Historically, Safelite has successfully used advertising to increase sales,[112] and has successfully influenced customers' choices of which services to purchase (e.g., repairing vs. replacing a windshield).[113] I understand that Safelite does not comprehensively track what fraction of its replacement customers with cracks between 6 and 14 inches long were exposed to the allegedly false messages.[114] However, the alleged false promotional materials here, if effective, would generate additional revenues (and profits) to Safelite by, among other things, influencing the customer to choose windshield replacement rather than a repair.[115]

56. In order to quantitatively adjust for the effectiveness of Safelite's accused promotional materials, I use results from a survey performed by Dr. Befurt. I understand that Dr. Befurt surveyed a set of respondents using three examples of promotional materials that contain what I understand are representative false messages or statements from the challenged advertising at issue in this case.[116] In particular, he employed a test and control survey methodology to assess whether one set of respondents who saw Safelite promotional material containing allegedly false messages responded differently from another set of respondents

---

[111] SL0084636.

[112] Herron Deposition, at 68. ("[Advertising] could be one of the levers that we would push or pull to help improve the company's financial performance.") *See also*, Herron Deposition, at 77, 90-91; SL0082418-36, at 35.

[113] Safelite has been incentivized by its contracts with insurance providers to repair Short Cracks, and has been successful in encouraging customers to do so. *See, e.g.*, Herron Deposition at 58-60, 68-72.

[114] *See, for example,* Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendants, February 23, 2018, at 10. I recently received documents which may provide additional information as to (1) how many visitors to Safelite's website visited certain webpages with accused promotional material and (2) the propensity of those customers to make service appointments. Exhibits 22 to 25 show alternative revenue and profit calculations that utilize that recently produced data. These calculations may be conservative because I understand that the data may not always be able to track when someone sees a video or website referencing the dollar bill rule and then make a service appointment. Millard Deposition, at 59, 60, 70, 72.

[115] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████.

[116] Befurt Report, at p. 35. In fact, I understand that the messages in the surveyed material are less direct and/or strong than some of the accused messages that Dr. Befurt did not directly test. Befurt Report, at p. 35.

CONFIDENTIAL

who saw corrected messages. The survey assessed how these different groups differed in terms of (1) interpretations of the tested advertisements, and (2) purchase intentions.

57. Among other things, Dr. Befurt's survey revealed that the two sets of respondents interpreted the ability to repair a 10 inch (i.e., Long Crack) crack differently, and respondents who were exposed to Safelite's false messages were substantially less likely to indicate they would attempt to repair a 10 inch crack as compared to respondents who were exposed to corrected promotional material.[117] In particular, Dr. Befurt found that between 56.3 and 58.0 percent of consumers with Long Cracks would replace their windshield after viewing the promotional materials with the allegedly false statements, whereas between 27.4 and 31.8 percent of consumers with Long Cracks would replace their windshield after viewing the promotional materials with the corrected messages. That is, as shown in Exhibit 19, between 24.5 percent and 30.6 percent of consumers replaced, rather than repaired, their windshields with a Long Crack because of the allegedly false statements.

58. I use Dr. Befurt's survey results to apportion the revenues.[118] As shown in Exhibit 19, between 43.5 and 52.7 percent of Safelite *replacement* customers with Long Cracks would not have replaced their windshield in the presence of messages which were not allegedly false.[119]

59. Exhibits 13 and 14 summarize the results of this apportionment analysis and show that revenues attributable to the accused wrongdoing amount to up to ▮▮▮▮▮▮ over the 2010 to 2016 period.[120]

---

[117] Befurt Report, at Exhibits 2, 3 and 4.

[118] Befurt Report, at pp. 50-51 and Exhibit 5.

[119] For example, results of one of Dr. Befurt's surveys indicates that for every 56.3 windshield replacements, approximately 31.8 replacements would have occurred independent of the allegedly false messages and 24.5 (or 43.5 percent) replacements would not have been replaced but for the allegedly false messages. Exhibit 19.

[120] Exhibits 13 and 14. I have addressed here incremental revenues and profit from that revenue over the period from 2010 through 2016, which I understand is the period for which Safelite revenue data has been produced. I understand that the accused conduct began prior to 2010 and has continued subsequent to 2016, and note that my calculations can be adjusted to reflect different time periods.

CONFIDENTIAL

60. I was also asked to calculate these figures for Internet sales only. 

61. I was also asked to report the gains to Safelite based on the number of views of certain at-issue online videos from 2014 to 2016, as reported by Safelite in its production.[121]

62. In Exhibit 11, I illustrate the range of incremental revenues (annually and over the 2010 to 2016 time period) that result from alternative assumptions, including as to the fraction of Safelite replacements that are repairable Long Cracks.

**B.      Safelite Profits from Incremental Revenue**

63. I understand that in an analysis of unjust enrichment in these types of matters, the defendant may bear the burden of identifying the costs of generating the revenues associated with the alleged wrongdoing. I plan to evaluate Safelite's expert analysis of these deductible expenses. I also may respond to any analysis put forth by Safelite's expert to further apportion revenues attributable to the wrongdoing.

64. To date, I have not seen detailed cost data associated with Safelite's sales of the products at issue. Based on a financial report that I understand was generated for the purpose of this litigation, from 2010 to 2016 Safelite generated an average per unit trade profit or, equivalently, earnings before interest and taxes (EBIT), for

---

[121] SL0085173. I understand that the data on video views provided by Plaintiffs do not include views of all video ads at issue in this matter and for not all time periods, and therefore provide a conservative measure of total video views. November 22, 2017 email from David Boylan to Peter Kahana et. al.; Millard Deposition, at 52-52, 62-63, 72; Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendants, February 23, 2018, at 6-7.

CONFIDENTIAL

replacement windshields ███████████████████████████ [122]
That is shown in Exhibit 5. However, no cost detail has been provided which
identifies the nature and quantum of the costs included.

65. Trade profit / EBIT takes into account both variable and fixed costs, including, in
particular, costs that would not vary with incremental increases or decreases in
revenue.[123] As such, these profits understate the per unit profit that Safelite
generated on incremental windshield replacements.

66. Incremental profits are often estimated by "contribution margin" or "gross
margin," in situations where most corporate operating expenses are fixed. While I
have not seen comprehensive data on Safelite's contribution margin from
windshield repair, data from an internal Safelite presentation on the 2014
profitability of its business segments suggests that, excluding overhead, the
Safelite AutoGlass segment (which performs replacements and repairs) has a
profit rate of roughly ████████████ [124] As shown in Exhibit 13, using that
percentage on replacements implies per unit incremental profits on the order of
██████████████

67. These estimates (derived from the entire Safelite AutoGlass segment) would be
conservative for replacements alone, as the evidence generally suggests that
replacements are more profitable than repairs.[125] In addition, a 2012 internal
Safelite email noted that replacement sales of windshields and curved tempered
glass generated a per unit gross profit margin of roughly ███████████
██████████████████████████. [126]

68. In Exhibit 12, I illustrate the range of profits implied by the estimated incremental
profit rate when applied to the various measures of revenues at issue. From 2010

---

[122] Exhibit 5. *See also* SL0084639. Mr. Herron testified that the "profit" listed on SL0084639 is EBIT. Herron Deposition, at 158.

[123] *See, e.g.*, https://www.investopedia.com/terms/e/ebit.asp ["EBIT = Net Sales - COGS - SGA Expense + Non-Operating Income + Interest Income"] (viewed 06/01/2018).

[124] SL0077314-21, at 16. ████████████████████████.

[125] *See, e.g.,* Herron Deposition, at 87-88; SL0011508-09.

[126] Herron Deposition, at 87-88; SL0011508-09.

CONFIDENTIAL

to 2016, Safelite generated as much as ███████ in incremental profits from windshield replacements that were a result of Safelite's allegedly false or deceptive promotions. I may update these calculations if sufficient cost data is provided by Safelite.

### C.  Harm to Ultra Bond

69. I was asked to address whether Safelite's wrongdoing harmed Ultra Bond. In summary, Safelite's false advertising harmed Ultra Bond via Ultra Bond and Safelite's competition in the automotive glass market for VGRR services. In particular, the evidence shows that Safelite's false advertising led to substantially fewer Long Crack repairs in the marketplace and impacted Ultra Bond's market opportunities in that area. In addition, evidence shows that faced with higher demand for Long Crack repairs, Ultra Bond's windshield repair supplies customers would purchase more windshield crack supplies, such as resins, from Ultra Bond. As a result, Ultra Bond lost sales and associated profits from the alleged wrongdoing.

70. Safelite and Ultra Bond both compete in the VGRR (or automotive glass) sector. As discussed above, Safelite is the largest player in the repair and replacement industry, while Ultra Bond's business includes the manufacture, supply and sale of windshield repair products (including repair kits comprised of specialized tools, resins, primers, additives, and chemicals used for repairing windshields and Long Cracks), as well as windshield replacements and repairs.

71. As discussed above, Safelite's alleged wrongdoing encouraged end-customers to replace repairable Long Cracks by making end-customers believe that repairing Long Cracks was not possible. As well, the evidence, including from Dr. Befurt's survey, shows that the repair of Long Cracks was an acceptable alternative for many customers who used Safelite to replace windshields with Long Cracks, and that with accurate information, many customers would have considered Long Crack repair instead of replacement. As such, Safelite's alleged wrongdoing

CONFIDENTIAL

decreased the market demand for Long Crack repair,[127] which is an area that Ultra Bond particularly focuses on. As such, Safelite's actions reduced Ultra Bond's market opportunities.

72. As Safelite does not repair Long Cracks,[128] and in fact appears to hold that repairing Long Cracks is not in the best interest of customers,[129] any increase in Long Crack demand would likely be serviced by other automotive glass providers. A portion of any increase in Long Crack repairs could have been serviced directly by Ultra Bond.[130] However, increases in crack repairs likely would impact Ultra Bond to a greater extent through increases in Ultra Bond supply sales to current and potential auto glass shop customers, as a result of increased demand for crack repair services at those auto glass shops.

73. The fact that, Safelite notwithstanding, the crack repair industry is "highly fragmented"[131] and that the competition between Safelite and Ultra Bond is multi-faceted makes assessing the particular impact of Safelite's actions to Ultra Bond difficult. For example, if a customer in Florida elects to replace, instead of repair, a car windshield with a Long Crack that is unlikely to directly displace an Ultra Bond sale to a car owner. However, it may displace a sale of repair services by an automotive glass shop in Florida. With enough lost Long Crack sales, however, the third party shop will, in turn, purchase fewer Long Crack repair supplies. While Ultra Bond's position as a leading seller of Long Crack repair supplies

---

[127] Both case documents and the surveys conducted by Dr. Befurt suggest that repair and replacement are substitutes for some potential consumers. For example, an April 2012 email from Belron CEO Dave Mellor to Safelite CFO Doug Herron remarked: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ SL0080105-06, at 05-06. Safelite promotional materials also acknowledge the substitutability of windshield repair and replacement (at least for Short Cracks), and often discuss the benefits of repair vs. replacement. SL0008022-23; SL0009104-05. *See also*, SL0005375-415, at 386.

[128] Herron Deposition, at 23-24.

[129] *See, e.g.*, Millard Deposition, at 29.

[130] For example, I understand that there is both an Ultra Bond location and a Safelite location in Grand Junction, CO.

[131] SL0063247-289, at 252.

CONFIDENTIAL

suggests that Safelite's gains result in lost market opportunities for Ultra Bond, estimating Ultra Bond's losses is difficult because not every lost repair would trigger a purchase of supplies, and not every forgone purchase of supplies would have been from Ultra Bond. The exercise is made more difficult because, but for Safelite's actions, it is likely that some automotive glass shops not currently in the business of Long Crack Repair would enter that business.[132] As well, Ultra Bond would likely attract new customers, who may purchase supplies from Ultra Bond to do other work in addition to Long Crack repairs.

74. Another reason that harm is difficult to quantify here is that but-for the alleged wrongdoing, Ultra Bond may have developed new Long Crack repair supplies enhancing their sales. In particular, I understand that the '104 patent enables repairing Long Cracks with a UV Cure Epoxy (instead of the currently used UV Cure Acrylate) which allows for quicker and easier Long Crack repair. According to Mr. Campfield, this was not pursued because of the state of the Long Crack repair market. Under these circumstances, identifying with sufficient precision the difference between how Ultra Bond "would have" performed and how it "actually" performed becomes more difficult.

75. Notwithstanding that it would be difficult to precisely estimate the amount of revenue and profit that Ultra Bond would gain from a general increase in Long Crack repairs in the market, there is clear evidence that incremental Long Crack repairs would impact Ultra Bonds sales and corresponding profits. For example, the statements of multiple owners and or presidents of windshield repair businesses, who have been long time Ultra Bond customers, show that higher demand for Long Crack repairs would result in materially higher Ultra Bond sales. These individuals, state among other things:

- Their businesses have been affected by Safelite's advertising about the 6 inch rule.[133]

---

[132] *See, e.g.*, Statement by ▮▮▮▮▮▮▮▮, Pursuant to 28 U.S.C. §1746, March 9, 2018, at p. 2.

[133] *See, e.g.*, Statement by ▮▮▮▮▮▮▮▮, Pursuant to 28 U.S.C. §1746, February 28, 2018, at p. 4; Statement by ▮▮▮▮▮▮, Pursuant to 28 U.S.C. §1746, April 19, 2018, at p. 3; Statement by ▮▮▮▮▮▮, Pursuant to 28 U.S.C.

CONFIDENTIAL

- They use Ultra Bond products for repairing Long Cracks and, in some cases, other Ultra Bond products as well.[134]
- If customer demand for Long Crack repair were to increase, they would purchase more Ultra Bond, Inc. products.[135]

76. This is consistent with Ultra Bond's experience in New Zealand around the time in which misleading ads were removed from that marketplace.[136] There, in May 2009, the New Zealand Advertising Standards Authority Complaints Board ordered Smith & Smith, a subsidiary of Belron[137] to cease promoting that windshield cracks were not repairable.[138] After these types of promotions stopped, Ultra Bond's average annual direct sales to the marketplace more than doubled.[139] Ultra Bond's total average annual sales, which include sales through a Canadian distributor, to the New Zealand marketplace also doubled.[140]

---

§1746, April 10, 2018, at p. 3; Statement by ███████, Pursuant to 28 U.S.C. §1746, March 28, 2018, at p. 3; Statement by ███████, Pursuant to 28 U.S.C. §1746, May 2, 2018, at p. 2; Statement by ███████, Pursuant to 28 U.S.C. §1746, March 5, 2018, at p. 3.

[134] Statement by ███████, Pursuant to 28 U.S.C. §1746, April 19, 2018, at p. 2; Statement by ███████ Pursuant to 28 U.S.C. §1746, March 28, 2018, at p. 1; Statement by ███████, Pursuant to 28 U.S.C. §1746, March 9, 2018, at p. 1; Statement by ███████, Pursuant to 28 U.S.C. §1746, May 2, 2018, at p. 1; Statement by ███████, Pursuant to 28 U.S.C. §1746, April 30, 2018, at p. 2.

[135] Statement by ███████ Pursuant to 28 U.S.C. §1746, February 28, 2018, at p. 4; Statement by ███████, Pursuant to 28 U.S.C. §1746, April 19, 2018, at p. 4; Statement by ███████, Pursuant to 28 U.S.C. §1746, April 10, 2018, at p. 3; Statement by ███████, Pursuant to 28 U.S.C. §1746, March 28, 2018, at pp. 3-4; Statement by ███████, Pursuant to 28 U.S.C. §1746, May 2, 2018, at p. 3; Statement by ███████, Pursuant to 28 U.S.C. §1746, March 5, 2018, at p. 3.

[136] Conversation with Richard Campfield, June 8, 2018.

[137] UB076142-47, at 42-43, 46; https://www.belron.com/aboutus/wherewecamefrom/ (viewed 6/11/2018). Conversation with Richard Campfield, June 8, 2018.

[138] I understand that on May 12, 2009, the New Zealand Advertising Standards Authority Complaints Board found local advertising claiming that windshield cracks were not repairable (even though the relevant standard was that cracks up to 350 millimeters or roughly 14 inches were repairable) to be misleading. UB076142-47.

[139] Exhibits 26 and 27.

[140] Exhibits 26 and 27. I note also that is consistent with the pattern of sales that Ultra Bond experienced over the past 30 years. I understand from Mr. Campfield that prior to the ROLAGS change and Safelite's commencement of these types of promotions, his sales fell from roughly ███████ ███████.
Conversation with Richard Campfield, June 8, 2018. *See also* Exhibit 1; UB020580-85; UB023418-19; UB026526-27; UB022832-33; UB061763-64.

CONFIDENTIAL

77. Because Ultra Bond profits from its Long Crack supply sales,[141] Safelite's actions have also led to Ultra Bond foregone profits from these existing customers. This type of increased sales in the U.S. marketplace in fact would reduce the cost of goods sold through larger purchases of raw materials, therefore increasing Ultra Bond's gross profit. It also would have enabled higher operating margins as many of the companies expenses other that payroll and advertising, would not need to have increased.[142] ██████████████████████████

████████████████████████████████,[143] Ultra Bond lost sales and profits from many other customers due to Safelite's wrongdoing.

## VI. CONCLUSION

78. As described in the sections above, my opinions in this matter are:

- From 2010 to 2016, Safelite generated ████████ in revenue from windshield replacements.[144]
- From 2010 to 2016, Safelite generated as much as ████████ in revenue from windshield replacements on cars with windshields that were candidates for Long Crack repairs.[145]
- From 2010 to 2016, Safelite generated as much as ████████ in incremental revenues from windshield replacements that were a result of Safelite's allegedly false or misleading statements of fact in its commercial advertising.[146]

---

[141] ████████████████████████████████████████████
████████████████████████████████████████
████████████████████

[142] Conversation with Richard Campfield, June 7, 2018.

[143] *See, e.g.,* UB066625-647. Conversation with Richard Campfield, June 7, 2018.

[144] Exhibit 9.

[145] Exhibit 13.

[146] Exhibits 11 and 13.

CONFIDENTIAL

- From 2010 to 2016, Safelite generated as much as ████████ in incremental profits from windshield replacements that were a result of Safelite's alleged wrongdoing.[147]

- Ultra Bond competes in the vehicle glass repair and replacement business and is a leading supplier of Long Crack repair supplies. In the absence of Safelite's promotions, Long Crack windshield repairs would have been viewed as a viable alternative to windshield replacement by end-customers. Ultra Bond's customers have indicated that they would have purchased more Ultra Bond Long Crack repair supplies had customer demand been higher for these repairs. As a result, Ultra Bond lost sales and the corresponding profits from the alleged wrongdoing.

79. I understand that Safelite may subsequently present its own analysis regarding the revenues, costs, and profit effects stemming from the alleged bad acts. I plan to respond to any such analysis if allowed by the Court.


Justin McLean                                   DATED: June 11, 2018

---

[147] Exhibits 12 and 13.

**Appendix A**

**JUSTIN N. McLEAN**
**Managing Principal**

Phone: 202 530 2591                                                    800 17th Street, N.W.
Fax: 202 530 0436                                                                   Suite 400
justin.mclean@analysisgroup.com                           Washington, D.C., 20006

Mr. McLean specializes in applying finance and economics to problems in complex business litigation, including securities, valuation, tax, and intellectual property matters. His experience spans several industries, from banking, insurance, and high technology to telecommunications and health care. He has served as an expert witness, and has provided assistance in many phases of litigation, including development, presentation, and review of pretrial discovery; preparation of testimony; and critique of analyses of opposing experts.

Mr. McLean's case work has included general damages analyses, lost profit and reasonable royalty calculations related to intellectual property misappropriation, and assessments of fiduciary duties and investment management. In addition, he has evaluated the economic characteristics and risk transfer of a range of financial instruments, such as private mortgage insurance, subprime loans, and preferred equity in a new venture. He has led large case teams in a number of high-profile matters, including consulting to the U.S. Department of Justice regarding the financial issues involved in tribal trust fund disputes, and supporting counsel for a large electronics manufacturer in litigation associated with features on smartphones and tablets.

In addition, Mr. McLean has presented on topics related to damages assessment and patents. He has also worked with entrepreneurial companies, helping to develop financial projections, business plans, and marketing strategies.

**EDUCATION**

| | |
|---|---|
| 2000 | M.S., industrial administration (University Honors, *Beta Gamma Sigma*), Tepper School of Business at Carnegie Mellon University<br>*Concentrations: finance, accounting, and entrepreneurship* |
| 1995 | B.A., economics, Swarthmore College |

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 2000–Present | Analysis Group, Inc. |
| 1999 | Deloitte & Touche Consulting Group |
| 1996–1998 | Analysis Group, Inc. |
| 1995–1996 | Putnam, Hayes & Bartlett |

**SELECTED EXPERT CASEWORK**

**Litigation Engagements with Testimony**

- ***Bloostein, et al. v. Morrison Cohen LLP, et al.***
  *Supreme Court of the State of New York, County of New York*
  Deposition and Expert Report: Calculated damages associated with alleged breach of
  fiduciary duties related to a tax deferral strategy.

- ***Western Shoshone Identifiable Group v. United States of America***
  *U.S. Court of Federal Claims*
  Testimony, Deposition, and Expert Report: Calculation of damages associated with alleged
  bad acts related to trust fund management.

- ***Taylor Precision Products, Inc. v. The Larimer Group, Inc., et al.***
  *U.S. District Court, Southern District of New York*
  Deposition and Expert Report: Calculated diminution in value to assets related to undisclosed
  changes in customer activities.

- ***SNMP Research International, Inc., et al. v. Nortel Networks, Inc., et al.***
  *U.S. Bankruptcy Court, District of Delaware*
  Deposition and Expert Report: Calculated reasonable royalty and profit damages related to copyright,
  trade secret, and breach of contract claims associated with protocol software.

- ***Computer Sciences Corporation v. Federal Home Loan Mortgage Corp.***
  *U.S. District Court, Eastern District of Virginia*
  Deposition and Expert Report: Addressed damages related to master service agreement for
  information technology solutions.

- ***PerdiemCo LLC v. Industrack LLC, et al.***
  *U.S. District Court, Eastern District of Texas*
  Deposition and Expert Report: Calculated reasonable royalty damages related to patent directed to
  fleet management systems and software.

- ***Nancy Thompson, et al. v. Gordon Witherspoon and UBS Financial Services, Inc.***
  *Circuit Court, Baltimore City*
  Testimony, Deposition, and Expert Report: Addressed calculation of damages associated with breach
  of duties regarding a life insurance policy.

- ***Markem-Imaje, Corp. v. VideoJet Technologies Ltd., et al.***
  *U.S. District Court, District of New Hampshire*
  Deposition and Expert Report: Calculated lost profits and reasonable royalty for patent directed to a
  tape drive and controller used in a printing apparatus.

*Justin N. McLean, Page 3 of 11*

- ***NorthmobileTech, LLC v. Simon Property Group, Inc.***
  *U.S. District Court, Western District of Wisconsin*
  Deposition and Expert Report: Calculated reasonable royalty for patent directed to a marketing method involving the location of the customer.

- ***William Black, Jr. v. Gramercy Advisors, LLC, et al.***
  *American Arbitration Association*
  Testimony and Expert Report: Addressed net out-of-pocket damages calculations associated with misrepresentations and breach of fiduciary duties regarding an investment transaction.

- ***LG Electronics, USA, Inc., et al. v. Whirlpool Corporation***
  *U.S. District Court, District of New Jersey*
  Depositions and Expert Reports: Calculated reasonable royalty damages for patents directed to ice and water dispensing in bottomfreezer refrigerators. Performed analysis of the commercial success of products due to the patented invention.

- ***Charity Funding, Inc., et al. v. Military Order of the Purple Heart Service Foundation, Inc.***
  *U.S. District Court, Eastern District of Virginia, Alexandria Division*
  Deposition and Expert Report: Calculated damages and unjust enrichment related to charitable vehicle donation program.

- ***United States of America, ex rel. Jon H. Oberg v. Nelnet, Inc., et al.***
  *U.S. District Court, Eastern District of Virginia, Alexandria Division*
  Deposition and Expert Report: Addressed economic damages related to improper submission of claims for student loan subsidy payments.

- ***Edward D. Jones & Co., L.P. v. Jason L. Williams and Wells Fargo Advisors, LLC***
  *Financial Industry Regulatory Authority, Department of Arbitration*
  Testimony: Addressed lost profits and unjust enrichment related to improper solicitation of customers and misappropriation of proprietary customer information.

- ***FutureLogic, Inc. v. TransAct Technologies, Inc.***
  *U.S. District Court, Central District of California*
  Deposition and Expert Report: Calculated lost profit damages related to patent directed to coupon printing by slot machine printers.

- ***Auction Management Solutions, Inc. v. Adesa, Inc., et al.***
  *U.S. District Court, Northern District of Georgia, Atlanta Division*
  Deposition and Expert Report: Calculated reasonable royalty for patent directed to remote bidding system and software for live auctions.

- ***CareFirst Blue Cross Blue Shield v. Merck-Medco Managed Care, L.L.P, et al.***
  *Superior Court of New Jersey, Law Division-Camden County*
  Deposition and Expert Report: Calculated unpaid manufacturer rebates related to prescription drug benefit plan agreements.

- **Bright House Networks and Suddenlink Merger Analysis**
  *Federal Trade Commission*
  Expert Presentation: Performed price analysis of service combinations offered by the two cable providers.

- **BCBS Minnesota, et al. v. Mylan Laboratories, Inc., et al.**
  *U.S. District Court, District of Columbia*
  Deposition and Declarations: Performed analysis of various claims data for calculation of antitrust damages stemming from exclusive supply agreements for raw materials.

- **Rodski v. Rodski**
  *Court of Common Pleas, Luzerne County, Pennsylvania*
  Testimony and Expert Report: Performed valuation of privately-held amateur radio equipment business.

- **The Apollo Theatre Foundation, Inc. v. Western International Syndication, et al.**
  *U.S. District Court, Southern District of New York*
  Deposition and Expert Report: Calculated damages related to trademark infringement and breach of duties regarding variety show.

**Other Litigation Engagements as Testifying Expert**

- **In the Matter of: Certain Potassium Chloride Powder Products**
  *U.S. International Trade Commission*
  Analysis of harm to domestic industry from alleged unfair competition.

- **PerdiemCo LLC v. GPS N.A., et al.**
  *U.S. District Court, Eastern District of Texas*
  Calculated reasonable royalty damages related to patent directed to fleet management systems and software.

- **Beijing UniSpreadtrum Technology Ltd. v. Sasken Communications Technologies Limited**
  *American Arbitration Association, International Centre for Dispute Resolution*
  Calculated damages stemming from alleged breach of joint venture technology agreement and royalty for alleged infringement.

- **Pavonix, Inc., et al. v. Alexander, Aronson, Finning & Company, P.C.**
  *American Arbitration Association*
  Calculated damages stemming from alleged incorrect financial statements used in sale of business.

- **Edward D. Jones & Co., L.P. v. Betty Schutte-Box and Wells Fargo Advisors, LLC**
  *Financial Industry Regulatory Authority, Department of Arbitration*
  Addressed lost profits and unjust enrichment related to improper solicitation of customers and misappropriation of proprietary customer information.

- ***MaxLinear, Inc. v. Silicon Laboratories, Inc.***
  *U.S. District Court, Southern District of California, San Diego Division*
  Calculated reasonable royalty for patents directed to fine tuning control for synthesizing high frequency signals for wireless communications.

- ***NorthmobileTech, LLC. v. General Growth Properties, Inc.***
  *U.S. District Court, Western District of Wisconsin*
  Calculated reasonable royalty for patent directed to a marketing method involving the location of the customer.

- ***MicroSpherix, LLC v. Biocompatibles, Inc.***
  *U.S. District Court, Southern District of Florida*
  Calculated reasonable royalty for patent directed to brachytherapy seed coating technology.

- ***Confidential Analysis of Financial Condition***
  *Federal Trade Commission*
  Analyzed the financial condition of a multinational company and two of its subsidiaries.

- ***East Side Entrees, Inc. v. Acosta, Inc. and Matchpoint Marketing, LLC***
  *U.S. District Court, Eastern District of New York*
  Analyzed economic damages from breach of contract for marketing and advertising plan related to new food product launch.

- ***Ubisoft v. Optical Experts Manufacturing***
  *U.S. District Court, Western District of North Carolina*
  Analyzed damages stemming from copyright infringement and breach of contract related to early leak of PC version of Assassin's Creed video game.

- ***Samuel Washington v. Citizens Bank***
  *State of South Carolina, Court of Common Pleas, County of Beaufort*
  Calculated economic benefit from credit report trade-line deletions related to automobile repossessions.

- ***BB&T Investment Services, Inc. v. Michael Neal***
  *National Association of Securities Dealers Arbitration*
  Calculated lost profits and unjust enrichment related to misappropriation of proprietary customer information.

- ***R.H. Murphy, Co. v. ITW, Inc.***
  *U.S. District Court, District of Massachusetts*
  Calculated reasonable royalty for patent directed to BGA integrated circuit trays. Addressed lost profit, reasonable royalty and price erosion claims.

*Justin N. McLean, Page 6 of 11*

**SELECTED CONSULTING EXPERIENCE**

**Finance, Valuation, and Tax**

- **Various valuations of privately-held companies**
  *Including:*
  Valuations of privately-held rolling steel door business, exotic sports cars business, government contracting software business, and genetic testing company.

- ***Quapaw Tribe of Oklahoma; G. Goodeagle; T. Bear v. United States of America***
  *U.S. Court of Federal Claims*
  Evaluation of activities of the trustee and calculation of the economic harm associated with alleged bad acts related to fund and asset management.

- ***Chickasaw Nation and Choctaw Nations v. United States of America***
  *U.S. District Court, Western District of Oklahoma*
  Evaluation of the adequacy of the accounting regarding various trust assets.

- ***FINRA Department of Enforcement v. David Lerner Associates, et al.***
  *Financial Industry Regulatory Authority, Office of Hearing Officers*
  Evaluation of REITS, non-traded REITS, and the practices of specific non-traded REITs.

- ***Jicarilla Apache Nation, et al. v. United States of America***
  *U.S. Court of Federal Claims*
  Evaluation of the fiduciary duties of investment fund trustee and calculation of the economic harm associated with alleged bad acts related to fund management.

- ***Quechan Tribe of the Fort Yuma Indian Reservation v. United States of America***
  *U.S. Court of Federal Claims*
  Evaluation of the fiduciary duties of investment fund trustee and calculation of the economic harm associated with alleged bad acts related to fund management.

- ***Santa Clara Valley Housing Group, Inc., et al. v. United States of America***
  *U.S. District Court, Northern District of California*
  Analysis of the economic characteristics of a transaction and its business purpose related to a tax dispute, including the valuation of certain real estate projects.

- ***Chemtech Royalty Associates, et al. v. United States of America***
  *U.S. District Court, Middle District of Louisiana*
  Analysis of the economic characteristics of a transaction and its business purpose related to a tax dispute.

- ***Herschel Blumberg, et al. v. Arent Fox, LLP***
  *U.S. District Court, Eastern District of Pennsylvania*
  Review and evaluation of both real estate development activities and fiduciary duties.

- **Donna Moore, et al. v. GMAC Mortgage, LLC, et al.**
  *U.S. District Court, Eastern District of Pennsylvania*
  Evaluation of the economic characteristics and risk transfer associated with private mortgage insurance.

- **Delhaize America Inc., et al. v. Secretary of the Revenue of North Carolina**
  *Superior Court, North Carolina, Wake County*
  Analysis of corporate restructuring and formation of particular subsidiaries associated with tax dispute.

- **Hillsborough Holdings Corporation, et al. v. United States of America**
  *U.S. Bankruptcy Court, Middle District of Florida, Tampa Division*
  Analysis of the subprime mortgage industry. Addressed economic characteristics and accounting of particular loans.

- **Amana I, et al. v. Cairnwood Group, et al.**
  *Superior Court, State of Georgia*
  Analysis of the venture capital industry and evaluation of the economic returns of comparable funds. Calculated damages associated with alleged misrepresentations for a particular investment fund.

- **The Boston Company Asset Management, LLC. v. Munder Capital, et al.**
  *Superior Court, Commonwealth of Massachusetts*
  Analysis of breach of fiduciary duty and breach of non-solicitation agreements associated with investment management. Calculated lost profits related to misappropriation of proprietary customer information and other alleged bad acts.

- **In Re: WCI Steel, Inc.**
  *U.S. Bankruptcy Court, Northern District of Ohio, Eastern Division*
  Valuation related to bankrupt steel firm, including an analysis of various restructuring proposals.

- **NRG Power Marketing Company v. Federal Energy Regulatory Commission**
  *U.S. Court of Appeals, District of Columbia Circuit*
  Analysis of the financial status of a bankrupt entity seeking to reject a power contract.

- **MKP Hedge Fund v. Salomon Smith Barney**
  *U.S. District Court, Southern District of New York*
  Analysis of margin calls related to mortgage-backed security hedge fund.

- **Southeast Land Development Associates, L.P. v. The District of Columbia, et al.**
  *U.S. District Court, District of Columbia*
  Valuation related to land values for the proposed baseball stadium in Washington, D.C.

- **Trustees of the Mafco Litigation Trust, et al. v. Ronald Perelman, et al.**
  *U.S. District Court, District of Delaware*
  Analysis of debt issuance and the impact of certain restrictive covenants.

- **_Maymin, et al. v. Fuji Bank_**
  *U.S. District Court, Southern District of New York*
  Analysis of hedge fund performance and determination of lost profits related to the management of the fund.

- **Various confidential engagements**
  *Including:*
  Analysis of competitive position of private lender and its portfolio of securitized loan products, analysis of allocations and performance of initial public offerings, analysis of the conformance to representations and warranties for a pool of mortgages, and analysis of a right-of-first refusal encumbrance in a real estate lease related to a merger.

**General Damages**

- **_In Re: JPMorgan Chase Mortgage Modification Litigation_**
  *U.S. District Court, District of Massachusetts*
  Analysis of mortgage modification programs and evaluation of identification of class members and damages from various alleged failures by JPMC.

- **_Flycell, Inc. v. Shlossberg LLC, et al._**
  *U.S. District Court, Southern District of New York*
  Analysis of damages from alleged breaches of duties associated with overpayment for affiliate marketing services.

- **_Adam Jernow, et al. v. Wendy's International, Inc._**
  *U.S. District Court, Southern District of New York*
  Analysis of damages from alleged price premium associated with inaccurate representations regarding trans fat content in French fries.

- **_BCBS Michigan, et al. v. Hoechst A.G., et al._**
  *U.S. District Court, Eastern District of Michigan, Southern Division*
  Calculated antitrust damages stemming from delayed entry of generic alternative pharmaceuticals.

- **_Marathon Enterprises, Inc. v. Schroter GMBH & Co._**
  *U.S. District Court, Southern District of New York*
  Calculated damages from breach of a contract regarding the delivery of skinless frank production machinery.

- **_Independent Media Services, Inc. v. Aegis Group PLC, et al._**
  *Supreme Court, State of New York*
  Calculated damages from the breach of a non-solicitation clause in a non-disclosure agreement.

- **_Pearson PLC v. Hicks, Muse, Tate & Furst, Inc._**
  *U.S. District Court, Southern District of New York*
  Calculated damages from breach of contract involving the acquisition and valuation of publishing companies.

- **PBM Products, Inc. v. Mead Johnson & Company**
  *U.S. District Court, Eastern District of Virginia*
  Calculated damages stemming from a false advertising campaign. Performed marketing analysis and evaluated financial projections for companies within the infant formula industry.

**Intellectual Property**

- **Wisconsin Alumni Research Foundation v. Apple, Inc.**
  *U.S. District Court, Western District of Wisconsin*
  Evaluated smartphone pricing, processor speed, and reasonable royalty damages for patents directed to smartphones and tablets.

- **Apple, Inc. v. Samsung Electronics Co., Ltd., et al.**
  *U.S. District Court, Northern District of California, San Jose Division*
  Addressed conjoint study results, claims for lost profits, and reasonable royalty damages for patents directed to smartphones and tablets.

- **MacDermid, Inc. v. Cookson Group, PLC, et al.**
  *U.S. Superior Court, Judicial District of Waterbury*
  Calculated damages related to misappropriation of trade secrets in context with bidding process and acquisition of company.

- **Abbott Biotechnology Ltd. and Abbvie Inc. v. Centocor Ortho Biotech, Inc.**
  *U.S. District Court, District of Massachusetts*
  Calculated lost profits and reasonable royalty damages for patents directed to methods for treating rheumatoid arthritis by co-administering methotrexate and human antibodies.

- **Wi-LAN Inc. v. Alcatel-Lucent, et al.**
  *U.S. District Court, Eastern District of Texas, Marshall Division*
  Calculated reasonable royalty damages for patents directed to High Speed Packet Access (HSPA) transmission in cell phones and base stations.

- **Novozymes A/S, et al. v. Danisco A/S, et al.**
  *U.S. District Court, Western District of Wisconsin*
  Addressed lost profit, reasonable royalty, and convoyed sales damages for patent directed to an Alpha Amylase used in the production of fuel ethonol.

- **Northeastern University, et al. v. Google, Inc.**
  *U.S. District Court, Eastern District of Texas, Marshall Division*
  Calculated reasonable royalty damages for patent directed to indexing data and performing queries.

- **Medtronic Inc., et al. v. Abbott Laboratories and Abbott Vascular, Inc.**
  *U.S. District Court, Northern District of California, San Francisco Division*
  Addressed lost profits and reasonable royalty damages for patent directed to coronary and peripheral stents.

*Justin N. McLean, Page 10 of 11*

- ***Medtronic USA Inc., et al. v. ACS and Guidant Corp.***
  *U.S. District Court, District of Delaware*
  Calculated lost profits and reasonable royalty damages for patents directed to coronary and peripheral stents.

- ***In the Matter of: Certain 3G Mobile Handsets and Components Thereof***
  *U.S. International Trade Commission*
  Analyzed royalty license proposals to assess if the economic terms were fair, reasonable and non-discriminatory.

- ***Johnson & Johnson, et al. v. Actavis Group hf and Actavis, Inc.***
  *U.S. District Court, Southern District of New York*
  Calculated disgorgement of profit remedies for trademark and trade dress infringement related to antibiotic ointments and creams.

- ***Guidant Corp. v. St. Jude Medical, Inc.***
  *U.S. District Court, District of Delaware*
  Calculated lost profits and reasonable royalty damages for patent directed to cardiac resynchronization therapy technology. Addressed intervening rights claims, and calculation of research and development expenses.

- ***True Position, Inc. v. Andrew Corp.***
  *U.S. District Court, District of Delaware*
  Calculated lost profits and prejudgment interest for patent directed to cellular telephone location hardware and software.

- ***Water Fun Products Corp. v. ProSlide Technology Inc.***
  *U.S. District Court, Central District of California, Western Division*
  Calculated reasonable royalty and prejudgment interest for patent directed to manufacture of water slide rides.

- ***The Topps Company, Inc. v. Cadbury Stani and Cadbury Schweppes***
  *U.S. District Court, Southern District of New York*
  Calculated disgorgement of profit remedies for trade secret infringement of proprietary formula for bubble gum.

- ***Texas Instruments Inc. v. Tessera, Inc.***
  *U.S. District Court, Northern District of California, Oakland Division*
  Calculated damages from breach of contract and patent infringement damages for patent directed to semiconductor packaging technology.

- ***Atofina v. Great Lakes Chemical Corp.***
  *U.S. District Court, District of Delaware*
  Calculated reasonable royalty and prejudgment interest for patent directed to manufacturing of difluoromethane.

- **Bennetton Sportsystem USA, Inc. (Prince Sports Group) v. Wilson Sporting Goods Co.**
  *U.S. District Court, District of New Jersey*
  Addressed lost profit, reasonable royalty, price erosion, and prejudgment interest claims for patent directed to tennis racquets.

- **Bauer Inc. v. Rollerblade, Inc.**
  *U.S. District Court, Eastern District of Virginia*
  Calculated lost profits, reasonable royalty, and prejudgment interest for patent directed to a skate boot design.

## SELECTED PRESENTATIONS AND PUBLICATIONS

"Effective Lost Profits and Damages Calculation: Your Guide in 2018," with Ken Metcalfe, David Bones, James McGovern, and Stephanie Demperio, webcast hosted by The Knowledge Group (April 18, 2018)

"Lost Profits and Damages Calculation: Everything You Need to Know in 2018," with Caryln Irwin, Alexis Lavko, and Alex Bardon, webcast hosted by The Knowledge Group (January 17, 2018)

"Estimating the Cost of Capital," with R. Jeffrey Malinak, Chapter 10 in *Litigation Services Handbook: Sixth Edition* (2017)

"Patent Valuation for Software Inventions: What You Need to Know in 2016," with Brian Dies, webcast hosted by The Knowledge Group (June 6, 2016)

"Litigation Strategies, Tactics and Techniques: Experts - Strategies and Best Practices," with Alexandra Cunningham and Sona Rewari (October 5, 2015)

"How to Prove Damages in Patent, Trademark and Copyright Cases," with John Augustyn, Brian Nolan, Christine Meyer, Carmen Bremer, and Kris Boushie, webcast hosted by The Knowledge Group (September 2, 2015)

"Working with Experts," with Ajay Jyoti (May 27, 2015)

"Presenting an Effective Damages Case in Light of Recent Federal Circuit Precedent," with Brian Kacedon and Lauren Stiroh (October 19, 2011)

"Economic Approach to Damages," with Ran Harel and Maureen Chakraborty (April 21, 2009)

"Economic Analysis in Patent Litigation: The Law & Economics of Permanent Injunctions," with Carla Mulhern (July 25, 2007)

"Terms and Structures for Software Technology Transfer," with Laura Stamm and Josh Lerner (October 27, 2004)

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| JM000004 | – | JM000005 |
| NGA00000203 | – | NGA00000212 |
| NGA00000256 | – | NGA00000260 |
| NGA00003927 | – | NGA00003942 |
| SL0000025 | – | SL0000030 |
| SL0000067 | – | SL0000069 |
| SL0000076 | – | SL0000082 |
| SL0000109 | – | SL0000113 |
| SL0000120 | – | SL0000122 |
| SL0000132 | – | SL0000137 |
| SL0000157 | – | SL0000158 |
| SL0000162 | – | SL0000163 |
| SL0000166 | – | SL0000168 |
| SL0000172 | – | SL0000189 |
| SL0000225 | – | SL0000227 |
| SL0000256 | | |
| SL0000292 | – | SL0000296 |
| SL0000340 | | |
| SL0000405 | – | SL0000422 |
| SL0001131 | – | SL0001169 |
| SL0001184 | – | SL0001185 |
| SL0001288 | | |
| SL0001442 | – | SL0001454 |
| SL0001617 | – | SL0001656 |
| SL0001763 | – | SL0001799 |
| SL0003526 | – | SL0003528 |
| SL0003582 | – | SL0003593 |
| SL0003599 | – | SL0003602 |
| SL0003751 | – | SL0003759 |
| SL0003862 | | |
| SL0003985 | | |
| SL0004189 | – | SL0004196 |
| SL0004251 | – | SL0004372 |
| SL0004541 | – | SL0004586 |
| SL0004678 | – | SL0004680 |
| SL0004696 | – | SL0004708 |
| SL0004751 | – | SL0004753 |

CONFIDENTIAL

## APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| SL0004757 | | |
| SL0004886 | – | SL0004891 |
| SL0004946 | – | SL0004949 |
| SL0004972 | – | SL0004976 |
| SL0004978 | – | SL0004980 |
| SL0004991 | – | SL0004993 |
| SL0005083 | – | SL0005084 |
| SL0005114 | – | SL0005115 |
| SL0005141 | – | SL0005142 |
| SL0005238 | – | SL0005241 |
| SL0005250 | – | SL0005333 |
| SL0005374 | – | SL0005415 |
| SL0005426 | – | SL0005433 |
| SL0005451 | – | SL0005456 |
| SL0005464 | | |
| SL0005646 | – | SL0005647 |
| SL0005765 | – | SL0005804 |
| SL0005817 | – | SL0005819 |
| SL0005824 | – | SL0005829 |
| SL0005910 | – | SL0005914 |
| SL0005962 | – | SL0005976 |
| SL0006021 | – | SL0006023 |
| SL0006033 | – | SL0006039 |
| SL0006058 | – | SL0006059 |
| SL0006139 | – | SL0006146 |
| SL0006153 | – | SL0006175 |
| SL0006234 | – | SL0006238 |
| SL0006248 | – | SL0006262 |
| SL0006323 | – | SL0006324 |
| SL0006327 | – | SL0006328 |
| SL0006352 | – | SL0006353 |
| SL0006358 | – | SL0006366 |
| SL0006464 | – | SL0006478 |
| SL0006523 | – | SL0006539 |
| SL0006545 | – | SL0006547 |
| SL0006567 | – | SL0006569 |
| SL0006703 | – | SL0006704 |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| SL0006706 | – | SL0006710 |
| SL0006935 | – | SL0006936 |
| SL0006939 | – | SL0006940 |
| SL0006972 | – | SL0006973 |
| SL0006976 | – | SL0006978 |
| SL0007026 | – | SL0007028 |
| SL0007034 | – | SL0007036 |
| SL0007252 | – | SL0007278 |
| SL0007376 | – | SL0007378 |
| SL0007552 | – | SL0007571 |
| SL0007583 | – | SL0007589 |
| SL0007645 | – | SL0007684 |
| SL0007687 | – | SL0007811 |
| SL0007854 | – | SL0007858 |
| SL0007935 | – | SL0007978 |
| SL0008003 | – | SL0008007 |
| SL0008011 | – | SL0008025 |
| SL0008030 | – | SL0008035 |
| SL0008069 | – | SL0008071 |
| SL0008139 | – | SL0008203 |
| SL0008288 | – | SL0008353 |
| SL0008415 | – | SL0008436 |
| SL0008478 | – | SL0008491 |
| SL0008512 | – | SL0008513 |
| SL0009101 | – | SL0009107 |
| SL0009173 | – | SL0009183 |
| SL0009450 | – | SL0009471 |
| SL0009615 | – | SL0009616 |
| SL0009618 | – | SL0009623 |
| SL0009644 | – | SL0009653 |
| SL0009664 | – | SL0009666 |
| SL0009716 | – | SL0009735 |
| SL0009745 | – | SL0009748 |
| SL0009763 | | |
| SL0009893 | – | SL0009902 |
| SL0009911 | – | SL0009913 |
| SL0009917 | – | SL0009920 |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
| --- | --- | --- |
| SL0009936 | – | SL0009938 |
| SL0009954 | | |
| SL0010044 | – | SL0010053 |
| SL0010116 | – | SL0010117 |
| SL0010197 | | |
| SL0011508 | – | SL0011509 |
| SL0013685 | – | SL0013692 |
| SL0013970 | – | SL0013979 |
| SL0014094 | – | SL0014097 |
| SL0015098 | – | SL0015100 |
| SL0016886 | – | SL0016887 |
| SL0016975 | – | SL0016976 |
| SL0017222 | – | SL0017242 |
| SL0017656 | – | SL0017658 |
| SL0043181 | – | SL0043186 |
| SL0043319 | – | SL0043323 |
| SL0043334 | – | SL0043335 |
| SL0043901 | – | SL0043903 |
| SL0045805 | – | SL0045809 |
| SL0050151 | – | SL0050153 |
| SL0051390 | – | SL0051391 |
| SL0051555 | – | SL0051561 |
| SL0054808 | – | SL0054811 |
| SL0055657 | – | SL0055658 |
| SL0055670 | – | SL0055693 |
| SL0055709 | – | SL0055710 |
| SL0055725 | – | SL0055726 |
| SL0055743 | – | SL0055748 |
| SL0055879 | – | SL0055906 |
| SL0055966 | – | SL0055968 |
| SL0057136 | – | SL0057140 |
| SL0057163 | | |
| SL0058368 | – | SL0058370 |
| SL0059473 | – | SL0059482 |
| SL0059793 | – | SL0059794 |
| SL0062491 | – | SL0062500 |
| SL0063246 | – | SL0063289 |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| SL0064273 | – | SL0064333 |
| SL0065747 | – | SL0065771 |
| SL0065940 | – | SL0065942 |
| SL0065955 | – | SL0065956 |
| SL0066288 | – | SL0066297 |
| SL0067588 | – | SL0067632 |
| SL0068243 | – | SL0068247 |
| SL0069031 | – | SL0069048 |
| SL0069587 | – | SL0069590 |
| SL0071049 | – | SL0071050 |
| SL0071196 | – | SL0071215 |
| SL0071455 | | |
| SL0074566 | | |
| SL0077312 | – | SL0077322 |
| SL0078353 | – | SL0078355 |
| SL0078372 | – | SL0078468 |
| SL0079279 | – | SL0079280 |
| SL0079460 | | |
| SL0079470 | – | SL0079477 |
| SL0079513 | – | SL0079531 |
| SL0079538 | | |
| SL0079610 | – | SL0079611 |
| SL0079620 | – | SL0079621 |
| SL0079629 | – | SL0079630 |
| SL0079693 | – | SL0079696 |
| SL0079699 | – | SL0079705 |
| SL0079712 | – | SL0079713 |
| SL0079851 | – | SL0079852 |
| SL0080071 | – | SL0080072 |
| SL0080105 | – | SL0080109 |
| SL0080235 | – | SL0080236 |
| SL0080347 | | |
| SL0080356 | – | SL0080357 |
| SL0080391 | – | SL0080396 |
| SL0080412 | – | SL0080430 |
| SL0080494 | – | SL0080499 |
| SL0080649 | – | SL0080659 |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| SL0080669 | – | SL0080674 |
| SL0080736 | – | SL0080759 |
| SL0080784 | – | SL0080785 |
| SL0080836 | – | SL0080837 |
| SL0080843 | – | SL0080850 |
| SL0080960 | – | SL0080962 |
| SL0080970 | – | SL0080972 |
| SL0080977 | – | SL0080979 |
| SL0080991 | – | SL0080993 |
| SL0081017 | – | SL0081020 |
| SL0081028 | – | SL0081030 |
| SL0081044 | – | SL0081046 |
| SL0081062 | – | SL0081067 |
| SL0081078 | – | SL0081080 |
| SL0081116 | – | SL0081118 |
| SL0081161 | – | SL0081162 |
| SL0081266 | – | SL0081268 |
| SL0081415 | – | SL0081435 |
| SL0081885 | – | SL0081889 |
| SL0082318 | – | SL0082320 |
| SL0082336 | – | SL0082340 |
| SL0082405 | – | SL0082408 |
| SL0082417 | – | SL0082436 |
| SL0082623 | – | SL0082628 |
| SL0082646 | – | SL0082648 |
| SL0082970 | – | SL0082972 |
| SL0082979 | – | SL0082997 |
| SL0083037 | – | SL0083038 |
| SL0083158 | – | SL0083167 |
| SL0083354 | – | SL0083358 |
| SL0083373 | – | SL0083382 |
| SL0083388 | – | SL0083389 |
| SL0083417 | – | SL0083421 |
| SL0083467 | – | SL0083485 |
| SL0083515 | – | SL0083552 |
| SL0083570 | – | SL0083582 |
| SL0083637 | – | SL0083647 |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| SL0083661 | – | SL0083664 |
| SL0083677 | – | SL0083678 |
| SL0083720 | – | SL0083730 |
| SL0083732 | – | SL0083787 |
| SL0083832 | – | SL0083840 |
| SL0083856 | – | SL0083875 |
| SL0083926 | – | SL0084012 |
| SL0084021 | – | SL0084023 |
| SL0084029 | – | SL0084031 |
| SL0084087 | – | SL0084127 |
| SL0084201 | | |
| SL0084204 | – | SL0084263 |
| SL0084291 | – | SL0084299 |
| SL0084636 | – | SL0084640 |
| SL0084671 | – | SL0084673 |
| SL0084701 | – | SL0084705 |
| SL0084728 | – | SL0084730 |
| SL0084747 | – | SL0084749 |
| SL0084757 | – | SL0084760 |
| SL0084830 | – | SL0084832 |
| SL0084857 | – | SL0084859 |
| SL0084916 | – | SL0084919 |
| SL0084935 | – | SL0084938 |
| SL0085133 | – | SL0085134 |
| SL0085173 | | |
| SL0085510 | – | SL0087778 |
| UB000001 | | |
| UB001296 | | |
| UB011669 | – | UB011670 |
| UB012309 | | |
| UB012933 | | |
| UB015398 | – | UB015426 |
| UB015707 | – | UB015735 |
| UB016242 | – | UB016408 |
| UB017050 | – | UB017078 |
| UB017252 | – | UB017280 |
| UB017348 | – | UB017376 |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| UB017435 | – | UB017666 |
| UB017690 | – | UB017712 |
| UB017722 | – | UB017793 |
| UB017940 | – | UB017941 |
| UB019203 | – | UB019206 |
| UB019230 | – | UB019231 |
| UB019291 | – | UB019292 |
| UB019700 | – | UB019703 |
| UB019727 | – | UB019728 |
| UB019800 | – | UB019828 |
| UB019837 | – | UB019865 |
| UB020383 | – | UB020390 |
| UB020431 | – | UB020432 |
| UB020580 | – | UB020585 |
| UB020787 | – | UB020789 |
| UB021066 | – | UB021067 |
| UB022832 | – | UB022833 |
| UB023418 | – | UB023419 |
| UB025432 | – | UB025433 |
| UB025736 | – | UB025742 |
| UB026526 | – | UB026527 |
| UB026529 | | |
| UB028655 | – | UB028975 |
| UB031572 | – | UB031575 |
| UB035277 | – | UB035299 |
| UB038164 | – | UB038200 |
| UB039274 | – | UB039275 |
| UB040410 | – | UB040411 |
| UB041899 | – | UB041900 |
| UB042433 | – | UB042748 |
| UB043203 | – | UB043204 |
| UB043304 | – | UB043305 |
| UB043812 | – | UB043834 |
| UB045010 | – | UB045112 |
| UB048476 | – | UB048578 |
| UB049930 | – | UB050083 |
| UB050404 | | |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| UB051677 | – | UB051699 |
| UB052368 | – | UB052369 |
| UB052915 | – | UB053125 |
| UB053375 | – | UB053477 |
| UB055359 | | |
| UB055537 | – | UB055798 |
| UB057166 | – | UB057188 |
| UB057712 | – | UB057713 |
| UB059332 | – | UB059354 |
| UB059398 | – | UB059401 |
| UB061046 | – | UB061047 |
| UB061088 | – | UB061190 |
| UB061763 | – | UB061764 |
| UB062004 | – | UB062005 |
| UB062075 | – | UB062395 |
| UB062418 | – | UB062421 |
| UB063025 | – | UB063127 |
| UB063573 | | |
| UB063597 | – | UB063699 |
| UB063705 | | |
| UB063846 | – | UB063849 |
| UB064018 | – | UB064019 |
| UB065331 | – | UB065336 |
| UB066001 | | |
| UB066459 | – | UB066777 |
| UB067200 | – | UB067201 |
| UB070145 | – | UB070146 |
| UB070305 | – | UB070407 |
| UB072561 | – | UB072583 |
| UB074409 | | |
| UB075082 | – | UB075083 |
| UB075635 | – | UB075636 |
| UB076142 | – | UB076147 |
| UB078258 | – | UB078262 |
| UB078544 | – | UB078545 |
| UB079128 | – | UB079294 |
| UB079361 | | |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| UB080014 | – | UB080018 |
| UB081940 | – | UB081941 |
| UB082083 | – | UB082120 |
| UB082561 | – | UB082562 |
| UB082579 | – | UB082681 |
| UB083140 | – | UB083151 |
| UB084331 | – | UB084338 |
| UB084344 | – | UB084366 |
| UB085282 | – | UB085283 |
| UB085811 | – | UB085812 |
| UB085835 | – | UB085836 |
| UB086289 | – | UB086296 |
| UB087394 | – | UB087420 |
| UB087535 | – | UB087878 |
| UB088424 | – | UB088526 |
| UB088614 | | |
| UB088617 | – | UB089168 |
| UB090026 | – | UB090073 |
| UB090472 | – | UB090491 |
| UB090659 | – | UB090668 |
| UB090674 | – | UB090690 |
| UB091192 | – | UB091193 |
| UB091396 | – | UB091510 |
| UB092138 | – | UB092144 |
| UB092148 | | |
| UB092174 | – | UB092252 |
| UB093169 | – | UB093170 |
| UB094430 | | |
| UB094637 | | |
| UB095005 | – | UB095006 |
| UB095618 | | |
| UB096133 | – | UB096134 |
| UB096404 | – | UB096405 |
| UB096792 | – | UB096793 |
| UB097192 | – | UB097193 |
| UB098142 | | |
| UB099781 | – | UB099782 |

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| UB099992 | – | UB100117 |
| UB101115 | – | UB101319 |

<u>Expert Reports</u>:
Expert Report of Dr. Rene Befurt, June 11, 2018.

<u>Legal Documents</u>:
Amended Complaint with Jury Demand, January 8, 2018.
Complaint with Jury Demand, August 18, 2015.
Confidential Settlement Statement of Plaintiffs Richard Campfield and Ultra Bond, Inc. Pursuant to Federal Rule of
    Evidence 408, Undated.
Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendants, February 23, 2018.



<u>Depositions</u>:
Deposition of Bruce Millard, January 24, 2018.
Deposition of Doug Herron, February 23, 2018, with Exhibits.
Deposition of Jack Russell, March 2, 2018, with Exhibits.
Deposition of Mark Placenti, January 25, 2018.
Deposition of Matthew Johnson, Volume I, January 24, 2018.
Deposition of Matthew Johnson, Volume II, January 25, 2018.
Deposition of Peter Pearson, February 13, 2018.
Deposition of Richard Campfield, Volume 1, May 30, 2018, with Exhibits.
Deposition of Richard Campfield, Volume 2, May 31, 2018, with Exhibits.
Deposition of Richard Campfield, Volume 3, June 1, 2018, with Exhibits.

<u>Websites</u>:
http://hsgclaims.com/ (viewed 4/23/2018).
http://motorburn.com/2018/04/future-auto-glass-repair-replace/ (6/6/2018).
http://ultrabond.com/about-ultra-bond (viewed 5/31/2018).
http://ultrabond.com/distributors (viewed 5/16/2018).
http://ultrabond.com/dont-replace-it-windshield-crack-repair-over-1-foot-long/ (viewed 5/31/2018).
http://ultrabond.com/long-crack-holds-up-in-rollover-crash/ (viewed 6/11/2018).
http://ultrabond.com/northeastern-pa-crackmaster-windshield-repair (viewed 5/31/2018).
http://ultrabond.com/patents (viewed 5/31/2018).
http://ultrabond.com/ultra-bond-windshield-repair-reviews/ (viewed 5/17/2018).
http://ultrabond.com/windshield-repair/ (viewed 5/31/2018).
http://www.technaglass.com/ (viewed 4/20/2018).
https://crackeraser.com/ (viewed 5/15/2018).
https://nwrassn.org/cool-advice-for-hot-glass/ (viewed 5/8/2018).

CONFIDENTIAL

# APPENDIX B

## DOCUMENTS REVIEWED AND/OR RELIED UPON

<u>Websites (cont'd)</u>:
https://nwrassn.org/history-of-auto-glass-repair/ (viewed 4/18/2018).
https://rolags.com/pdf/FinalANSI+NGA+R1_1-2007_by_ANSI.pdf (viewed 5/8/2018).
https://www.abraauto.com/ (viewed 4/23/2018).
https://www.belron.com/aboutus/ (viewed 5/31/2018).
https://www.belron.com/aboutus/wherewecamefrom/ (viewed 6/9/2018).
https://www.gerbercollision.com/ (viewed 4/20/2018).
https://www.insurancejournal.com/news/national/2007/03/05/77424 htm (viewed 5/31/2018).
https://www.investopedia.com/terms/e/ebit.asp (viewed 6/1/2018).
https://www.jnphillips.com/ (viewed 4/23/2018).
https://www.lynxservices.com/LYNXWeb/AutoGlassClaims (viewed 4/23/2018).
https://www.moneyfactory.gov/images/FactSheet_FederalReserveNotes_20130502.pdf (viewed 6/10/2018).
https://www.progressive.com/claims/claim-glass/ (viewed 5/8/2018).
https://www.rolags.com/pdf/ANSI+NWRA+ROLAGS+001-2014.pdf (viewed 4/20/2018).
https://www.safelite.com/about-safelite/safelite-autoglass-companies (viewed 4/18/2018).
https://www.statefarm.com/claims/claims-help/auto/windshield-repair (viewed 5/8/2018).

<u>Other</u>:
Bloomberg.
Email from David Boylan to Peter Kahana et. al., November 22, 2017.
U.S. Trademark Act 15 U.S.C. § 1117(a).

CONFIDENTIAL



**EXHIBIT 2**

**ULTRA BOND, INC.**
**WINDSHIELD REPAIR AND REPLACEMENT DATA**
**2012 - 2014**

|  |  | 2012 | | 2013 | | 2014 | |
|---|---|---|---|---|---|---|---|
|  |  | # | % | # | % | # | % |
|  | Replacements | [A] | [B] | [C] | [D] | [E] | [F] |
| [1] | Edge Crack | N/A | N/A | 20 | 62.5% | 36 | 62.1% |
| [2] | Floater Crack | N/A | N/A | 6 | 18.8% | 11 | 19.0% |
| [3] | Stone Break | N/A | N/A | - | - | - | - |
| [4] | Miscellaneous | N/A | N/A | 6 | 18.8% | 11 | 19.0% |
| [5] | Total | 46 | 100.0% | 32 | 100.0% | 58 | 100.0% |
|  | Repairs | | | | | | |
| [6] | Edge Crack | 205 | 31.7% | 177 | 32.9% | 149 | 30.9% |
| [7] | Floater Crack | 23 | 3.6% | 9 | 1.7% | 7 | 1.5% |
| [8] | Stone Break | 419 | 64.8% | 352 | 65.4% | 326 | 67.6% |
| [9] | Total | 647 | 100.0% | 538 | 100.0% | 482 | 100.0% |
|  | Length of Crack Repairs | | | | | | |
| [10] | Less than 6" | 10 | 4.5% | 10 | 5.3% | 10 | 6.3% |
| [11] | 6" to 14" | 156 | 70.9% | 139 | 74.3% | 123 | 76.9% |
| [12] | 14" to 18" | 27 | 12.3% | 17 | 9.1% | 17 | 10.6% |
| [13] | Greater than 18" | 27 | 12.3% | 21 | 11.2% | 10 | 6.3% |
| [14] | Total | 220 | 100.0% | 187 | 100.0% | 160 | 100.0% |

Notes & Sources:
"N/A" represents data that is not reported.
Analysis assumes that the "7 - 14 inches" category represents cracks that are between 6" and 14" in length.
Analysis assumes that the "15 - 18 inches" category represents cracks that are between 14" and 18" in length.
[A][8] = [A][9] - [A][6] - [A][7].
[A], [B] From UB088619. See also UB092174-202.
[C], [D] From UB088617. See also UB015711-33.
[E], [F] From UB088644. See also UB092226-50.

**EXHIBIT 3**

**ULTRA BOND, INC.**
**6" TO 14"CRACK REPAIRS**
**AS A PORTION OF TOTAL REPLACEMENTS AND 6" OR GREATER CRACK REPAIRS**
**2012 - 2014**

|  | 2012 | | 2013 | | 2014 | | Total | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
|  | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] |
| [1] 6" to 14" Crack Repairs | 156 | 60.9% | 139 | 66.5% | 123 | 59.1% | 418 | 62.1% |
| [2] Greater than 14" Crack Repairs | 54 | 21.1% | 38 | 18.2% | 27 | 13.0% | 119 | 17.7% |
| [3] All Replacements | 46 | 18.0% | 32 | 15.3% | 58 | 27.9% | 136 | 20.2% |
| [4] Total | 256 | 100.0% | 209 | 100.0% | 208 | 100.0% | 673 | 100.0% |

Notes & Sources:
From Exhibit 2.

**EXHIBIT 4**

**ULTRA BOND, INC.**
**RATIO OF 6 TO 14 INCH CRACK REPAIRS**
**TO STONE BREAK REPAIRS AND LESS THAN 6" CRACK REPAIRS**
**2012 – 2014**

|  | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|
| [1] Stone Break Repairs | 419 | 352 | 326 | 1,097 |
| [2] Less than 6" Crack Repairs | 10 | 10 | 10 | 30 |
| [3] Total | 429 | 362 | 336 | 1,127 |
| [4] 6 to 14" Crack Repairs | 156 | 139 | 123 | 418 |
| [5] Ratio | .364 | .384 | .366 | .371 |

Notes & Sources:
[1]-[4] From Exhibit 2.
[5] = [4] / [3].



CONFIDENTIAL





CONFIDENTIAL

CONFIDENTIAL



CONFIDENTIAL









CONFIDENTIAL



[9] = [5] * [8].

CONFIDENTIAL



CONFIDENTIAL



[11] = [7] * [10].

CONFIDENTIAL



CONFIDENTIAL



[11] = [7] * [10].

CONFIDENTIAL

# EXHIBIT 18



[11] = [7] * [10].

**EXHIBIT 19**

**PORTION OF LONG CRACK REPLACEMENT CUSTOMERS
FOR WHOM LONG CRACK REPAIR WOULD HAVE BEEN AN ACCEPTABLE ALTERNATIVE
BY SURVEY**

| | Survey | | |
|---|---|---|---|
| | ███ Insurance Flyer | Safelite Brochure | ███ Ruler Brochure |
| Likelihood Respondent Will Replace a 10 Inch Crack | | | |
| [1] 6" Advertisement | 58.0% | 58.0% | 56.3% |
| [2] 14" or 12" Advertisement | 30.9% | 27.4% | 31.8% |
| [3] Consumers who Replaced but Would Have Repaired But-for the Alleged False Messages | 27.1% | 30.6% | 24.5% |
| [4] Of the Consumers Who Replaced a Long Crack, the Percentage of Consumers Who Would Have Not Replaced But-for the Alleged False Messages | 46.8% | 52.7% | 43.5% |

Notes & Sources:

[1]-[2] Respondents who answered "No" to "Would you consider repairing 10 inch damage?" are counted as zeroes.
 Analysis excludes those who answered "Don't know" to Would you consider repairing 10 inch damage?

[1]-[3] From Expert Report of Rene Befurt, at Exhibit 5.

 [4] = [3] / [1].



**EXHIBIT 21**



CONFIDENTIAL

**EXHIBIT 22**



CONFIDENTIAL



CONFIDENTIAL



[11] = [7] * [10].

CONFIDENTIAL



[11] = [7] * [10].





Tab 24

## DATA - Windshield Repair and Replacement - Ultra Bond 2012

Total Repairs Jobs - 647
Total Replacements Jobs - 46
Total Job s= 693                    Repair Ratio = 93% (misleading)

Total Cracks Repaired - 238
Total Replacements – 46
Total Stone Breaks – 570 (multiple breaks on many invoices)
Total Crack Repair v Replacement = **REAL Repair Ratio - 84% - *The Real Deal***


Edge Crack Data:                    Floater Crack Data:
6 inches and less - 7              6-inches and less - 3
7 -14 inches - 139                 7-14 inches - 17
15-18 inches – 25                  15-18 inches - 2
over 18 inches - 26                over 18 inches -1


Repaired Cracks:
Edge Cracks 205
Floater Cracks 23
Total Cracks = 238                 **Edge Cracks are 90% of Repairable Crack Market**

Length of Repairable Crack Market:
6-Inches and Less - 10 or 4% of Repairable Crack Market
7-14 inches - 156 or 66% of Repairable Crack Market
15-18 inches - 27 or 15% of Repairable Crack Market
Over 18 inches - 27 or 15% of Repairable Crack Market
**Conclusion - 96% of the Repairable Crack Market is over 6 inches**

**ROLAGS** – Repairable Crack Market per ROLAGS - 166 or **70%**
6-inches and under represents 6% of the repairable crack market.

**Conclusion: 94%** of repairable the crack market per the ROLAGS is being converted into
replacements by TPAs with 6-inch /length of a dollar bill criterion.

Replacement Data: Not kept by one employee January- July
Cause of Replacements:
Edge Crack

Combined Repair and Replacement Data: Not kept by one employee Jan- July
Edge Cracks
Floater Cracks
Miscellaneous


Frit and manufacturer data not kept by one employee January - July

**<u>Campfield/Ultra Bond DAMAGES</u>**

**Per Consumers request to repair cracks instead of a replacement would be 84% of replacements - this is the Real Repair Ratio (crack repair versus replacement).**

**Per the ROLAGS - 70% of replacements. This is what the insurers/TPAs would have for a Real Repair Ratio if adjusted per the ROLAGS and not the 6-inch size of a dollar bill criterion.**

UB088620

Tab 25

## DATA - Windshield Repair and Replacement - Ultra Bond 2013

Total Repairs - 538 (186 cracks + 352 Stone-Breaks)
Total Replacements - 32
Total = 570                                       Repair Ratio = 94% (misleading)

Total Cracks Repaired - 186
Total Replacements - 32
Total Crack Repair v Replacement = 218 **REAL Repair Ratio = 85% - *The Real Deal***

Repaired Cracks:
Edge Cracks 177
Floater Cracks - 9
Total Cracks = 186          **Edge Cracks = 95% of Repairable Crack Market**

Length of Repairable Crack Market:
6-Inches and Less = 10 - 5% of Repairable Crack Market
7-14 inches = 139 - 75% of Repairable Crack Market
15-18 inches = 17 - 9% of Repairable Crack Market
Over 18 inches = 21 - 11% of Repairable Crack Market
**Conclusion - 95% of Repairable Crack Market is over 6 inches**

**ROLAGS** - Repairable Crack Market per ROLAGS = 148
6-inches and under represents 6.75% of repairable crack market
**Conclusion: 93.25%** of repairable crack market per the ROLAGS is being converted into
replacements by TPAs with 6-inch /length of a dollar bill criterion.

Edge Crack Data:
6 inches and less - 10 = 5.6%
7 -14 inches - 129 - 70%
15-18 inches - 17 = 9%
over 18 inches - 21= 11%

Floater Crack Data:
6 inches and less = 0
7 -14 inches = 9
over 14 inches = 0

Replacement Data:
Cause of Replacements:
Edge Crack - 20 = 63% (16 with impacts in the Frit / 5 impacts Non-Frit)
Floater Cracks - 6 = 19%
Miscellaneous - 6 = 19%

Combined Repair and Replacement Data:
Edge Cracks - 197
Floater Cracks - 15
Miscellaneous  - 6

Frit Data:
Edge Cracks with impact in the Frit area - 168 = **85%**
Edge Cracks with impacts beyond Frit area - 32
**85% of Edge Cracks had an impact in the Frit area**

## Conclusion:
## 85% - of Edge Cracks are preventable by an outerlite Edgeguard Frit

**Campfield/Ultra Bond DAMAGES**

**Per Consumers request to repair cracks instead of a replacement would be 85% of replacements - this is the Real Repair Ratio (crack repair versus replacement).**

**Per the ROLAGS - 68% of replacements. This is what the insurers/TPAs would have for a Real Repair Ratio if adjusted per the ROLAGS and not the 6-inch size of a dollar bill criterion.**

UB088618

Tab 26

**Auto Glass DATA**

**Ultra Bond Windshield Repair and Replacement 2014**

## Windshield Repair Data
**Crack Repair Data**:
Edge Cracks - 149 = 95.5%          Impact location: Frit - 122 = 82%; Non-Frit - 27 = 18%
Floater Cracks -7 = 4.5%
Long Cracks - 146 = 94%
Short Cracks -10 = 6%

## Length of Cracks Repaired:
2-6 inches 10=6.25%
7-14 inches 123=77.8%
15-18 inches 17=10.6%
19+ inches 10=6.25%

Edge cracks less than 6-inches  7 = 4.6%

**Stone-Breaks**: Jobs - 269; Repairs - 326

Totals Repairs - 482; Total Jobs - 425

Repair Jobs: Edge-Cracks 149=35%; Floater-Cracks 7=1.6%; Stone-Breaks 269=63.3%

## Windshield Replacement Data
Total Replacements 56
Edge Cracked 36= 64%          Frit Impact 28=78% ; Non-Frit 8=22%
Floater Cracked 11=19.5%
Miscellaneous 11=19.5%

**Total Repair Ratio - Stone-Breaks + Cracks v Replacements- 88%**

**Real Repair Ratio - Crack Repair v Replacement - 74%**

## OE v ARG
Total Repairs: OE Windshields 251;  ARG Windshields  166
Edge Crack Repairs: OE 96 = 65%; ARG 52 = 35%
Replacements: OE 28 = 50%; ARGs 28 = 50%
Replaced from an Edge Crack: OE -18=53%; ARGs 16 = 47%
Total Market:  OE- 279 = 59%; ARG 194 = 41%

UB088644

**Combined Crack Repair and Replacement Data**:
Edge Cracks  185 = 86%
Floater Cracks 18 = 8%
Miscellaneous 11= 5%

**Conclusions**
86% of the current market could be eliminated by Edgeguard.
8% of current market could be eliminated by Stone-Chip Repair
5% of the market cannot be eliminated by any current preventative technology
In Colorado, the number one state per capita for windshield claims, 59% of consumers
calling in a claim have an OE windshield.

**Criterion - ROLAGS v Six-inch:**
**ROLAGS 14-inch Criterion would eliminate 70% of Replacements;**
**Six-Inch Criterion- is costing consumers over $2 Billion per year;**
**Six-Inch Criterion - is costing the Repair industry over $700 Million per year.**


**NOTES:**

**Campfields Crack Repair Patents could eliminate 74% of Replacements**

**Sum total of Campfield's Patents (Edge Crack Repair, Floater Crack Repair and
Edgeguard) could eliminate 95% of windshield replacements.**

CONFIDENTIAL

Tab 27

CONFIDENTIAL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| RICHARD CAMPFIELD AND ULTRABOND, INC., | |
| Plaintiffs, | Case No. 2:15-cv-2733 |
| v. | |
| SAFELITE GROUP, INC., SAFELITE SOLUTIONS LLC, and SAFELITE FULFILLMENT, INC., | |
| Defendants. | |

**SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JUSTIN MCLEAN**

**September 25, 2018**

# TABLE OF CONTENTS

I. Introduction ........................................................................................................... 2

  A. Qualifications ............................................................................................ 2

  B. Assignment ................................................................................................ 2

  C. Documents and Information Considered .............................................. 3

II. Summary of Opinions ........................................................................................ 3

III. Summary of Crawford Analysis ....................................................................... 7

IV. Critique of Crawford Analysis .......................................................................... 9

  A. Mr. Crawford's Use of One Day Safelite Sample ................................. 9

  B. Mr. Crawford's Analysis of Causation ................................................ 12

  C. Mr. Crawford's Profit Analysis ........................................................... 17

V. Safelite Revenue and Profit from Use of False Messages ............................... 22

VI. Harm to Ultra Bond ........................................................................................ 24

# I. INTRODUCTION

## A. Qualifications

1. I am a Managing Principal in the Washington, D.C. office of Analysis Group, Inc. Analysis Group is a consulting firm specializing in microeconomic, financial, and accounting analysis. I have roughly twenty years of experience in the field of economic and financial consulting, in which I have provided consulting advice and other services in both litigation and non-litigation settings. My primary areas of expertise include intellectual property damages, applied finance theory, and valuation.

2. I have a Master of Science degree in Industrial Administration with a concentration in finance, entrepreneurship, and accounting from Carnegie Mellon University. I also hold a Bachelor of Arts degree in Economics from Swarthmore College.

3. A copy of my curriculum vitae, which includes testimony I have given in the past four years, is attached as Appendix A.

4. On June 11, 2018, I submitted an expert report regarding (1) Safelite's revenues and profits from the allegedly false or misleading statements of fact in its commercial advertising, and (2) but-for the allegedly false or misleading statements of fact in its commercial advertising, whether Ultra Bond would have generated more revenues and profits ("McLean Report").[1]  In that report, among other things, I quantified Safelite's revenues and profits from the allegedly false or misleading statements of fact in its commercial advertising, using information that was available to me as of that time.

## B. Assignment

5. I have been asked by attorneys representing the Plaintiffs, Richard Campfield ("Campfield") and Ultra Bond, Inc. (collectively, "Plaintiffs") to provide

---

[1] Expert Report of Justin McLean, June 11, 2018 ("McLean Report").

economic analysis and testimony, if necessary, regarding the opinions contained in the August 14, 2018 Expert Rebuttal Report of Rodney L. Crawford (the "Crawford Report"), and to supplement the opinions that I provided in the McLean Report, if necessary.

### C.   Documents and Information Considered

6.   In the course of my analysis, I have considered various internal documents and data, legal filings, and other information of a type reasonably relied upon in a matter like this by experts in my field. A number of these sources are listed in Appendix B to the McLean Report.

7.   Additional materials that I have considered since the filing of that report are listed in Appendix B attached hereto. Included in that list are materials that I understand were produced by Safelite subsequent to the filing of the McLean Report, such as data generated by Safelite summarizing expenses associated with its businesses,[2] and a sample generated by Safelite technicians related to characteristics of windshield damage that Safelite encounters.[3]

8.   In addition, since I submitted my original report, I or people working under my direction have had further conversations with Dr. Rene Befurt and Richard Campfield.

9.   I also have relied on my training and my applied professional experience. I may update my opinions if new information becomes available to me.

## II.   SUMMARY OF OPINIONS

10.  My opinions in this matter as of the report date are summarized below. The sections that follow provide more detailed discussion and support for these opinions.

11.  In his August 14, 2018 Report, Mr. Crawford, among other things, presented an analysis regarding the revenue, cost, and profit effects stemming from Safelite's

---

[2] *See, e.g.*, SL0087855-859 and SL0087863-864.

[3] *See* Crawford Report, at pp. 40-42; and Syfko Report, at p. 12 and Exhibits 3 and 4.

alleged wrongdoing. Based on my review of Mr. Crawford's opinions and analyses and the underlying source materials, I observe that Mr. Crawford's analyses suffer from a number of flaws. These render his conclusions unreliable for purposes of determining Safelite's profits from the allegedly false or misleading statements of fact in its commercial advertising. At a minimum, Mr. Crawford has substantially understated Safelite's profits attributable to its allegedly false or misleading statements of fact in its commercial advertising.

12. Several of the flaws in Mr. Crawford's analysis bias downward his estimate of the portion of Safelite's profits attributable to Safelite's alleged wrongdoing. Included among the flaws are:

- Mr. Crawford's attempt to identify the portion of Safelite's profits that involve repairable 6 to 14 inch cracks is entirely based on what I understand to be a flawed and/or undocumented survey design that appears to result in a downward-biased estimate of the fraction of repairable to 6 to 14 inch cracks.

- While Mr. Crawford critiques my analysis as not sufficiently addressing causation, he himself made no adjustments for causation beyond adopting results from a survey conducted by another Safelite expert. That survey suffers from a number of flaws that appear to cause confusion among survey respondents, making the survey unreliable and biased, and thereby biasing Mr. Crawford's profit calculations.

- Mr. Crawford has substantially overstated the extent of expenses directly attributable to Safelite's wrongful acts, thereby understating Safelite's profit from its wrongful acts. For example, Mr. Crawford's analysis implies that a reduction in Safelite windshield replacement sales of just 859 units over a seven year period (or under 0.01 percent of Safelite's actual sales[4]) would trigger a proportional decrease in all expenses, including corporate overhead expenses. This does not make economic sense. Mr. Crawford has not sufficiently proven that these expenses are properly deductible here, and my

---

[4] Safelite sold ■ million units of replacement windshields in 2015 alone and ■ million units of replacement windshields from 2010-2016. Supplemental Exhibit 19.

analysis of the data relied upon by Mr. Crawford shows that, historically, all Safelite expense categories do not adjust commensurate with changes in sales, even for much larger units changes than contemplated by Mr. Crawford.

- Mr. Crawford's analysis of Safelite profitability also relies on the unsupported assumption that Safelite's profit rate from windshield replacement is equal to its profit rate from windshield repair. Mr. Crawford presents no evidence that this is the case. In fact, this assumption is inconsistent with the testimony of Safelite executives and documents produced by Safelite.

- Mr. Crawford incorrectly suggests that Safelite insurance-related replacement sales and telephone-initiated replacement sales should be omitted from the incremental profit calculation because such sales would not be influenced by Safelite's accused wrongdoing. However, a Safelite at-issue video promotion specifically, and other Safelite materials more generally, make it clear that Safelite expects insurance holders and telephone customers to encounter their online content.

13. In addition, Mr. Crawford's opinion that Safelite's wrongdoing has not led to actual harm to Ultra Bond appears to rely on the argument that Ultra Bond is too small to be harmed by a large firm. It also ignores the evidence from actual Ultra Bond customers that their businesses have been affected by Safelite's advertising and that if customer demand for Long Crack repair were to increase, Ultra Bond's customers would purchase more Ultra Bond, Inc. products.

14. Supplemental Exhibit 1 summarizes various Safelite revenue and profit calculations. In the event that conduct described in the Amended Complaint is found to be actionable in this matter, I understand that Safelite promotional activity in many forms, including online videos, website pages, brochures, press releases, and point of sale communications may be relevant and the damages period may span from at least 2010 to 2016.[5] Over that period, as described in the McLean Report, I determined that Safelite generated as much as ▮▮▮▮▮▮▮ in

---

[5] Amended Complaint, at pp. 27-51. Conversations with counsel. *See also* McLean Report, at pp. 15-16.

incremental revenues from as many as ▇▇▇▇▇▇ windshield replacements.[6] These amounts would be reduced if the finder of fact were to determine that certain sales are not sufficiently connected to Safelite's alleged conduct in this matter.

15. Since I submitted the McLean Report, Safelite has produced financial data relevant for calculating the profitability of its windshield replacement business. I use this recently-produced data in incremental Safelite profit scenarios shown in Supplemental Exhibit 1, scenarios 6 through 10.[7] Because Safelite has not proven the elements of its profit attributable to factors other than the wrongdoing and Mr. Crawford has not performed a reasonable approximation thereof, I have calculated Safelite's profits from its sales of replacement windshields by assuming deducted expenses should be limited to only those that appear to be reasonably related to Safelite's sales of windshield replacements. That results in Safelite estimated profits of as much as ▇▇▇▇▇▇ from windshield replacements.[8] Should less conduct be found actionable, lower incremental revenues and profits would result. That is reflected in other scenarios presented in Supplemental Exhibit 1.[9]

16. In the event that the additional wrongdoing described in the Amended Complaint is not determined to be actionable, Safelite incremental revenue and profit would be lower. Such scenarios are also presented in Supplemental Exhibit 1.

---

[6] McLean Report, Exhibit 13.

[7] Supplemental Exhibit 1, Scenarios 1 through 5, presents the calculations from the McLean Report. I note that the profit rates used to calculate the incremental profits in these scenarios are quite similar to the profit rate that I used in calculating profits in the Mclean Report.

[8] Supplemental Exhibit 1. In Supplemental Exhibit 23, I show profit calculations that rely on net profits. These may be relevant in the event that the finder of fact determines that fully loaded profits, as opposed to incremental profits, are the relevant metric of profits here.

[9] In general, the methodologies and calculations used to generate the scenarios in Supplemental Exhibit 1, which are shown in more detail in Supplemental Exhibits 2 to 16, can be adapted to calculate other scenarios that the finder of fact may find relevant, including by adjusting the time period of interest, the profit rate, and the incremental revenue.

### III.    SUMMARY OF CRAWFORD ANALYSIS

17. Mr. Crawford presented certain calculations "of Safelite profits that may be relevant to a damages award …[related to] disgorgement should liability be found."[10]

18. Starting with Safelite's total windshield replacement sales over the period August 2014 to December 2016, Mr. Crawford attempted to identify the subset of those windshield replacement sales over that period[11] related to the allegedly wrongful acts by:

- using the results of a recent one-day sample of Safelite's business to estimate the fraction of windshields replaced by Safelite that had repairable 6 to 14 inch long cracks;[12] and

- applying certain data obtained from the Van Liere Report to estimate the subset of the replaced windshields with repairable 6 to 14 inch long cracks that were replaced because of the wrongful conduct.[13]

19. Mr. Crawford estimated Safelite's profits generated on the resulting subset of incremental sales by applying a net pre-tax profit rate to his estimate of ill-gotten revenues. That net profit rate explicitly deducts from incremental revenue "all costs down to the pre-tax net income line in the Safelite income statement,"[14] including both direct and indirect costs, the latter category which includes allocated corporate overhead expenses that Mr. Crawford asserts "would appropriately be considered variable costs properly allocable as deductions from any claim for disgorgement of profits."[15]

20. Based on this analysis, Mr. Crawford presented resulting incremental profits separately for windshield replacements that were "self pay" consumer-purchased

---

[10] Crawford Report, at para 7. *See also*, Crawford Report, at para 103.

[11] Mr. Crawford also provided a scenario that goes from 2010 to 2016. *See* Crawford Report, at para 119.

[12] Crawford Report, at para 108, and Exhibits F and G.

[13] Crawford Report, at para 109, and Exhibits F and G.

[14] Crawford Report, at para 111.

[15] Crawford Report, at para 93.

and windshield replacements that were covered by insurance, and, within those groups, he presented profit calculations separately for "Internet customers" and for "all consumers," a category that includes both consumers who made reservations to replace a windshield via the Internet and via phone. Mr. Crawford appears to focus on the self-pay Internet consumers as the correct subset of customers. According to him, "'Insurance Replacement' business… is not driven by the alleged website content," and telephone-originated orders should be eliminated.[16] According to Mr. Crawford, that scenario resulted in Safelite generating 530 incremental units, ███████ in incremental revenues and ████ in incremental profits over the period August 2014 through 2016.[17]

21. Mr. Crawford also critiqued the calculations contained in the McLean Report. Among other things, Mr. Crawford opined that the McLean Report profit calculations were flawed because they rely on:

- estimates of 6 to 14 inch cracks that are derived from Ultra Bond's historical experience and not Safelite's historical experience;[18]

- estimates regarding the influence of the allegedly wrongful advertising on Safelite customers from the Befurt Report, which he claims are invalid;[19]

- a "profit" rate obtained from an internal Safelite presentation that, according to Mr. Crawford, may not be representative of the entire damages period, did not focus on the windshield replacement business and ignores significant operational overhead costs of the Safelite business that reduce actual profits to significantly lower amounts;[20]

- Safelite sales and profit data related to Insurance Replacement customers in addition to self-pay Consumer Replacement customers;[21]

---

[16] Crawford Report, at paras 9, 67, 105. *See also* Crawford Report, para 82.

[17] Crawford Report, at Exhibit F-2, and p. 63.

[18] Crawford Report, at para 5 and p. 52.

[19] Crawford Report, at para 5 and p. 52.

[20] Crawford Report, at para 5 and pp. 52-53.

[21] Crawford Report, at para 5 and pp. 52-53.

- insufficient evidence of a causal link between alleged false advertising and the Safelite sales and profits; [22] and

- an assumption that every Safelite web video viewer was unique and had Safelite replace a windshield;[23]

22. Mr. Crawford also "prepared a re-calculation" of one of the scenarios presented in the McLean Report. Specifically, those calculations modified the calculation presented as Exhibit 25 of the McLean report, making a modification "to account for [replacement] appointments that ultimately did not result in a sale."[24] According to Mr. Crawford, that calculation "is presented for information purposes only."[25]

## IV. CRITIQUE OF CRAWFORD ANALYSIS

23. Mr. Crawford's analysis suffers from a number of flaws, several of which bias downward his estimate of the portion of Safelite's profits attributable to Safelite's alleged wrongdoing. The sections that follow discuss these flaws.

### A. Mr. Crawford's Use of One Day Safelite Sample

24. As part of his analysis, Mr. Crawford critiqued my use of data on crack length and repairability obtained from Mr. Campfield.[26] As discussed in the McLean Report, I used data collected by Ultra Bond between 2012 and 2014 on the types of windshield damage among cars actually serviced at the shop.[27] In order to identify that fraction of Safelite's replacements that were performed on repairable 6 to 14 inch cracks, Mr. Crawford instead used the results of a survey created by Safelite for the purposes of this litigation. According to the results of that survey, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[22] Crawford Report, at para 5 and pp. 52-53.

[23] Crawford Report, at para 5 and p. 53.

[24] Crawford Report, at para 10, 119, 122-123.

[25] Crawford Report, at para 10, 122-123.

[26] Crawford Report, at para 62.

[27] McLean Report, at para 49-50.

██████████████████████████.[28] ██████████████████

███████████████████████████████████

███████████████████████████████████ ██ ███

██████████████████████████████████████

██████████████████████████████████.[30]

25. Based on my review of the Safelite one-day survey used to create a sample relied upon by Mr. Crawford and my conversation with Dr. Rene Befurt, it appears that there are several problems with the Safelite sample that call into question the reliability of the sample and of any analysis that relies upon it. Among other things:[31]

- Because there is little or no discussion in any of Safelite's reports as to the development of the survey, it is unclear whether the resulting data can reliably be used to estimate the fraction of repairable 6 to 14 inch cracks replaced by Safelite over the period of interest.

- It is unclear what quality control measures were used to insure that Safelite technicians understood the questions and answered them in an unbiased way.

- There is no discussion as to how responses from technicians who were aware of the current litigation - or who generally suspected that their responses may have related to some litigation - were dealt with.

- There is no discussion as to how Safelite technicians judged whether windshields required replacement for reasons other than crack length, and given that Safelite technicians presumably are not experienced with repairing 6 to 14 inch cracks, it is unclear how they would do so. This resulted in 45 percent of otherwise repairable windshields being judged as non-repairable.[32]

---

[28] Crawford Report, at para 74.

[29] Crawford Report, at para 74.

[30] Crawford Report, at para 77.

[31] Conversation with Dr. Rene Befurt.

[32] Calculated as 283 divided by 625. *See* Crawford Report, at p. 41.

- Survey responses with "no data" appear to be incorrectly treated as windshields without repairable 6 to 14 inch cracks (as opposed to being omitted from the analysis).
- While internal Safelite documents make it clear that the type of windshield damage experienced can vary day by day,[33] there is no discussion as to the representativeness of data from a one-day survey conducted after the period of interest. In contrast, the Campfield data span several years over a relevant time period.
- While Mr. Crawford described the results on the one-day survey as "robust"[34] and described the estimates of repairable long cracks obtained from Mr. Campfield's data as "impossibly high,"[35] he apparently has not justified either opinion.

26. At the very least, there appears to be downward bias in the estimate of repairable cracks used by Mr. Crawford. While it may not be possible to fix all of the potential problems with the Safelite sample, Mr. Crawford's analysis should be adjusted in at least two ways in order to make the results more reasonable.  In particular:

- The observations for which it is indicated there were "no data" should be omitted from both the numerator and denominator of the calculation. That adjustment alone increases the fraction of repairable 6 to 14 inch cracks from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[36]
- Based on my review of the survey questionnaire and conversations with Richard Campfield, it does not appear reasonable that ▮▮▮▮▮ of windshields that would be otherwise judged to have repairable 6 to 14 inch cracks would be excluded for "other" reasons such as "Original windshield

---

[33] *See, e.g.*, SL0069031-048, at 035.

[34] Crawford Report, at para 73.

[35] Crawford Report, at para 5.

[36] 15.0 equals 342 divided by 2,277.

not available, shatter from baseball, deer, collision, vandalism, etc."[37] While Mr. Crawford appears to justify this adjustment by suggesting that it is common for 6 to 14 inch cracks to be "too old" (and therefore, presumably, contaminated with dirt), data collected by Mr. Campfield in the normal course of business suggest that contaminated cracks are limited to roughly ■ percent of otherwise repairable cracks. As a result, I have adjusted the fraction of windshields with unrepairable cracks between 6 and 14 inches down from ███████████████ .

27. Notwithstanding the other potential problems with the Safelite survey, applying these adjustments results in an estimated ■ percent of Safelite's replacements in the one-day sample that were windshields with repairable 6 to 14 inch cracks.[38] I note that this estimate results in revenue estimates that are between the estimates I used for the "Method 1" and "Method 2" approaches described in the McLean Report. This also appear to indicate that, contrary to Mr. Crawford's characterizations, use of Mr. Campfield's data did not result in estimates that were "impossibly high."

28. Notwithstanding the flaws of Safelite's one-day survey, in Supplemental Exhibit 1, I provide calculations that rely on these adjusted numbers in the event that the Court determines that the results from the Safelite survey are relevant.[39] These are shown as "Method 3."

## B. Mr. Crawford's Analysis of Causation

29. In order to estimate the fraction of repairable 6 to 14 inch cracks that were replaced because of the wrongful conduct, Mr. Crawford applied certain data

---

[37] Syfko Exhibit 3. I have not seen evidence from Safelite that suggests these would be common reasons for cracks. In fact, the Safelite website focuses on crack length, number of chips and location of the damage. https://www.safelite.com/windshield-repair (viewed September 24, 2018). It also is not clear how some of these examples could ever be relevant for otherwise repairable windshields with 6 to 14 inch cracks.

[38] Supplemental Exhibit 21.

[39] In the event that the finder of fact determines that an estimate of the fraction of windshields with repairable 6 to 14 inch cracks other than one I have used is appropriate, my profit calculations can be easily adjusted using the same methodology.

obtained from the Van Liere Report to address whether people exposed to the wrongful conduct would be affected by it.[40] There are several flaws with Mr. Crawford's causation analysis.

30. As I discussed in the McLean Report, not all Safelite customers who replaced windshields with 6 to 14 inch repairable cracks would have done so but-for the wrongful conduct. To adjust for this, I apportioned the estimated revenues that Safelite generated from replacing windshields with 6 to 14 inch repairable cracks.[41] In particular, I used the results from a test and control survey performed by Dr. Befurt that assessed the extent to which the behavior of respondents exposed to Safelite promotional material containing allegedly false messages was different as compared to respondents who saw corrected messages. The results of the Befurt survey suggest that, having viewed tested ads, at leas          of Safelite replacement customers with repairable 6 to 14 inch cracks would not have replaced their windshield in the presence of control ads.[42] Applying this adjustment reduced Safelite revenues and profits that were possibly at issue to an amount that was less than half.  In certain calculations, I also apportioned revenues and profits using available data on the exposure of Safelite customers and/or potential customers to certain allegedly false ads.[43]

31. Instead of adopting the Befurt results, Mr. Crawford used results from a survey conducted by Safelite survey expert Dr. Kent Van Liere.[44] Dr. Van Liere conducted a survey that sought to (1) assess whether respondents perceived Safelite's promotional materials to communicate a firm policy or an industry-wide policy that all firms followed, and (2) assess the impact on respondent purchase behavior of any confusion that the promotional materials communicated an

---

[40] Crawford Report, at para 109, and Exhibits F and G.

[41] McLean Report, at para 58-59.

[42] McLean Report, at para 58.

[43] McLean Report, at para 61, footnote 114, and Exhibits 17-18, 22-25.

[44] Crawford Report, at para 103, and Exhibits F and G.

industry-wide policy that all firms followed.[45] Dr. Van Liere found that there was no evidence that Safelite's alleged wrongdoing would influence the behavior of any respondents.[46] Mr. Crawford used a point estimate reported in the Van Liere Report that 0.4 percent of respondents were influenced by the wrongful conduct.[47]

32. Based on my review of the Van Liere survey and conversations with Dr. Befurt, it appears that the results of Dr. Van Liere's study are neither reliable nor relevant for a profit calculation of the type conducted by Mr. Crawford.[48] In particular, as described in the Befurt Supplemental Report, the Van Liere survey appears to suffer from a number of flaws which likely cause confusion among survey respondents and bias the results.[49] As just one example, Dr. Van Liere's focus on assessing whether Safelite's promotional materials are interpreted as either communicating a company policy or an industry policy that all firms follow - and not provide the option for respondents to indicate that the materials communicate a fact or rule - likely would confuse respondents and lead them to believe that some policy is being communicated (even though, on the face of the ads he tested, there is no mention of either a company or industry policy).[50] I also note that, notwithstanding these shortcomings, Dr. Van Liere's own results don't appear to

---

[45] *See*, generally, the Van Liere Report. I note that while Mr. Crawford appears to think that Dr. Van Liere's survey addresses "whether consumers interpreted certain Safelite materials to mean that it is Safelite's policy that cracks longer than six inches cannot be repaired, or interpreted the materials to mean (as a rule) it is not possible to repair cracks longer than six inches," Dr. Van Liere's Experiment Study appears instead to address whether respondents think the 6 inch repair cutoff is either a company policy or an industry policy. *See* Crawford report, at para 64 and Van Liere Report, at Exhibit C.

[46] Van Liere Report, at para 15. ("…there is no evidence that any significant proportion of respondents would make a different decision to schedule service upon learning that the 6 inch guidance is Safelite's policy"). *See also*, Van Liere Report, at para 58 ("Using the control to net off guessing, pre-existing beliefs or other forms of survey noise, I find that net zero percent are less likely to schedule an appointment with this company.")

[47] Van Liere Report, at para 58 and Crawford Report, at para 103, and Exhibits F and G.

[48] My focus here is on what Dr. Van Liere refers to as his "experiment study." Dr. Van Liere also performed a "consumer behavior study." *See* Van Liere Report, at pp. 27-30. While it does not appear that Mr. Crawford relied on the results of that study, I note that Dr. Befurt critiques the reliability of that study. *See* Befurt Supplemental Report, at pp. 26-30. I also note that the study appears to focus on the behavior of respondents with chips or cracks in their windshield, and not specifically on respondents who encountered Safelite promotional materials.

[49] Befurt Supplemental Report, at para 9.

[50] Befurt Supplemental Report, at para 22.

support his own suggestion that a reasonable consumer would not be misled.[51] Instead, he appears to find that less than a majority of respondents believe the materials communicate a company policy.[52]

33. In addition to critiquing my use of the results of the Befurt Report, Mr. Crawford appears to have critiqued my approach as not sufficiently addressing the issue of causation by not analyzing consumer exposure to the wrongful conduct.[53] For example, according to Mr. Crawford, "[t]he extreme 'Scenario 1' and 'Scenario 2' calculations of purported disgorgement damages [presumably corresponding to calculations in Exhibits 13 to 16 of the McLean Report] are based on no evidence or analysis of any causal link between alleged false advertising and the Safelite sales and profits."[54] This critique is unfounded and/or disingenuous as (1) elsewhere in the Crawford Report, he recognizes - and critiques - my reliance on the Befurt Report to inform my "causation" analysis in every profit calculation that I presented;[55] and (2) in generating profit estimates that Mr. Crawford himself offered as "alternative calculations of Safelite profits that may be relevant to a damages award,"[56] he made no adjustments himself for causation beyond adopting survey results (from the Van Liere Report).[57]

34. In the McLean Report, I offered several profit calculations, each of which apportioned for causation. The profit scenarios presented in Exhibits 22 to 25 of the McLean Report used data produced by Safelite that may provide information as to how many visitors to Safelite's website visited certain videos and webpages with accused promotional material and the propensity of those customers to make

---

[51] Van Liere Report, at para 15.

[52] Van Liere Report, at Table 2; Befurt Supplemental Report, at para 9. Notwithstanding the problems with the Van Liere survey, In Supplemental Exhibit 24, I provide profit calculations that use Mr. Crawford's interpretation of the Van Liere results in lieu of Dr. Befurt's results.

[53] Crawford Report, at para 5, 18, 82, 106, and pp. 52-53.

[54] Crawford Report, at para 5.

[55] Crawford Report, at p. 52.

[56] Crawford Report, at para 7.

[57] *See, e.g.,* Crawford Report, at Exhibits F-1, F-2, G-1, G-2.

service appointments.[58] As far as I know, that data was produced without explanation, and also was not used by Mr. Crawford in the calculations he has asserted "may be relevant to a damages award."[59]

35. I am not aware of other information either produced by Safelite or otherwise that would be useful to further apportion the incremental profit that Safelite generated related to its wrongdoing. As noted in the McLean Report, Safelite has for years consistently and through a variety of means and media formats, promoted the "dollar bill" and/or six inch rule to both consumers and insurance companies. This includes promoting the "dollar bill" and/or six inch rule through content Safelite has provided to third parties.[60] As such, it appears that exposure to the wrongful conduct among Safelite customers who replaced repairable 6 to 14 inch cracks may have been extensive.[61]

36. Even in the event that the additional wrongdoing described in the Amended Complaint is not determined to be actionable, Safelite's incremental sales may not be limited to revenues that can be traced to Internet reservations linked to views of particular web content.[62] That is because the reservations data apparently are based on cookies-based tracking which will tend to undercount the exposure to web pages and other promotional materials of those who make online appointments and not track consumers who make appointments by phone after viewing web content.[63] In addition, I note that even limiting incremental revenues to revenues implied by views of the accused videos, as reflected in the video

---

[58] SL0085556.

[59] Crawford Report, at para 103.

[60] McLean Report, at para 38.

[61] Mr. Crawford also critiques one of my profit scenarios as failing to account for appointments that ultimately did not result in a sale. However, there is little information provided on the source of the "booking to sales conversation rate" that Mr. Crawford used to scale down my profit estimates. *See* Crawford Report, at para 10-11. As well, Mr. Crawford did not discuss or apparently account for rescheduled appointments or any revenue and profit that Safelite generate from cancellation fees. See https://www.safelite.com/cancellation-refund-policy (viewed September 24, 2018).

[62] These are the revenues that go into Scenarios 9 and 10 on Supplemental Exhibit 1.

[63] *See e.g.*, Millard deposition, at pp. 57-61 and 70-72.

viewing data produced by Safelite,[64] may underestimate the true impact of the wrongdoing, as I understand that the data produced by Safelite did not encompass all of the accused content and some of it appears to be truncated at August 2014.[65]

### C.     Mr. Crawford's Profit Analysis

37. As part of his calculation of Safelite's unjust enrichment, Mr. Crawford estimated Safelite's profits by applying a per-unit net pre-tax profit to his estimate of Safelite's ill-gotten units. Mr. Crawford also critiqued my profitability analysis, opining that my analysis (1) inappropriately relied on a document that focused on only a subset of the period of interest, did not break out insurance and consumer businesses, and did not focus on the windshield replacement business and (2) incorrectly relied on a concept of "contribution margin" that fails to take into account certain overhead expenses.  As described below, Mr. Crawford's profitability analysis is flawed.

38. As an initial matter, it is worth noting that Mr. Crawford's analysis is based on data contained in Safelite spreadsheets that I understand were produced subsequent to when my report was filed.[66] I do not dispute the usefulness of the Annual Segment Profitability spreadsheets relied upon by Mr. Crawford, and, as discussed below, I use data in those newly produced spreadsheets to update my profitability analysis.[67]

39. In the absence of detailed data on the profitability of windshield replacement for the 2010 to 2016 period, in the McLean Report, I used data on the 2014

---

[64] These are the revenues that go into Scenario 8 on Supplemental Exhibit 1.

[65] For example, that data apparently does not report views for SL0084638.  According to an email from Safelite's counsel the video "A Safelite AutoGlass Windshield Repair" had 326,084 views on YouTube, whereas the data that was produced shows at most 192,584 views of "repair" videos. *See* November 22, 2017 email from David Boylan to Peter Kahana et. al.; SL0085556 (192,584 is the sum of all the "Play Starts" of "repair" videos). Millard Deposition, at 62-63, 72; Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendants, February 23, 2018, at 6-7.

[66] *See e.g.*, the "Notes & Sources" to Crawford Report, Exhibit E, which cite to Annual Segment Profitability spreadsheets in SL0087855-59 and SL0087863-64.

[67] In the Mclean Report, I noted that in the absence of detailed cost data, incremental profits are often estimated by "contribution margin" or "gross margin," and I ultimately used an available measure of contribution margin. Mclean Report, at para 66.

contribution margin of the Safelite AutoGlass segment (which performs replacements and repairs).[68] Because the "contribution margin shows you the aggregate amount of revenue available after variable costs to cover fixed expenses and provide profit to the company,"[69] incremental profits are often estimated by contribution margin.[70] Contribution margin often deducts from revenues most, if not all, of cost of goods sold, as well as variable expenses. The question is what fraction of other expenses should be deducted.[71]

40. In his profitability analysis, Mr. Crawford applied to what he deemed were at-issue revenues an estimate of the average trading profit (or net profit) rate that Safelite reports historically generating on consumer and/or insurance sales. By using historical average net profitability to calculate Safelite's profits from its wrongdoing, Mr. Crawford has implicitly assumed that increases in sales lead Safelite to incur costs in proportion to historical average costs. That assumption would be correct only if, over the relevant range of units, (1) all of Safelite's costs are variable; and (2) Safelite historically has not experienced economies of scale. Those assumptions are, as a matter of economics, almost certainly wrong, and lead Mr. Crawford to underestimate Safelite's relevant profit rate.[72]

---

[68] McLean Report, at para 66.

[69] https://hbr.org/2017/10/contribution-margin-what-it-is-how-to-calculate-it-and-why-you-need-it. (viewed September 24, 2018).

[70] Without citation, Mr. Crawford apparently quotes to some unidentified source to suggest that the contribution margin in the presentation that I used was intended to estimate the profit rate associated only with "a single incremental unit of activity." Crawford Report, at para 93B and p. 53.

[71] As can be seen in Supplemental Exhibit 19 the contribution margin reported in the Safelite AutoGlass segment Annual Profitability Reports takes into account product costs in addition to some other expenses.

[72] From an economic point of view, what is relevant is the difference in the profits that Safelite actually generated and the profits that it would have generated but for the wrongdoing. That is fundamentally an incremental calculation and therefore the relevant measure of profit rate should be an incremental one. Mr. Crawford does not appear to take issue, conceptually, with the idea that the relevant notion of profit is incremental profit. *See, e.g.,* Crawford Report, at paras 11, 67. Instead, his main critique appears to be that I have incorrectly calculated incremental profit. However, Mr. Crawford apparently did not undertake such as analysis himself and assumed that even if the wrongdoing was related to only a small change in units it would be appropriate to use "net profit" as a measure of incremental profit. Notwithstanding my critiques as to Mr. Crawford's use of pre-tax profits in his analysis, should the Court determine that pre-tax profits are a relevant measure here, I have provided calculations that use that measure as well. *See* Supplemental Exhibit 23.

41. Perhaps more importantly, the extent to which Safelite's expenses have historically varied with sales can be tested using the recently-produced Safelite historical data that was relied upon by Mr. Crawford. In particular, Supplemental Exhibit 18 shows the results of regression models that analyze the relationship between the natural log of various expense categories within the consumer plus insurance segments and sales revenues. Results of such regression analyses can be interpreted as providing the percentage change in expenses that are historically associated with a one percent change in revenues. While Mr. Crawford has assumed that Safelite's overall expenses would increase in proportion to any assumed sales increase, Supplemental Exhibit 18 shows that assumption is only (approximately) true for certain expense categories, such as "Total Product Cost" plus "Total Other Cost of Sales." On the other hand, historically, when sales increase, expense categories such as store "Total Expenses" and "Allocation Expenses" increase at a rate substantially lower than one for one.[73]

42. In particular, as shown in Supplemental Exhibit 18, ████████████████

43. These results make intuitive sense. In order to make incremental sales, certain products (such as replacement glass) typically have to be manufactured and/or

---

[73] Supplemental Exhibit 18.

purchased and sold, and so expense categories directly related to those sales may be expected to increase by as much as one to one with sales. On the other hand, overhead expenses, including corporate overhead and certain store level expenses, need not increase at all. For small changes in units, these expense categories may be completely fixed. For larger changes in units, they likely will be somewhat variable.

44. While Mr. Crawford appeared to concede that, in theory, the extent to which certain expense categories are variable may depend on the size of change in units envisioned,[74] he ultimately assumed all expense categories were *entirely* variable (and economies of scale were completely absent) even for increments as small as 859 replacement units over a seven year period (or less than ▓▓ percent of Safelite's total replacement sales over the relevant period).[75]

45. Of note, my regression analysis spans a period in which Safelite annual windshield replacements varied by as much as ▓▓▓▓▓▓▓ units.[76] As such, my analysis looks at how costs vary over fairly large sales increments.[77] For small changes in unit sales, like those contemplated by Mr. Crawford, Safelite's expenses would be expected to vary by even less as a percentage of sales. That appears to be confirmed by the financial statements relied upon by Mr. Crawford. For example, certain years of the Annual Segment Reports indicate that ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[78]

---

[74] According to the Crawford Report, "analysis of the separation of expenses between "variable" and "fixed" could vary depending on the extent of any finding of liability… For a very low number of additional replacements spread throughout the Safelite organization, the costs of some support and corporate functions may be unaffected." Crawford Report, at para 95.

[75] *See, e.g.*, Crawford Report, at p. 7 and Exhibit G-2. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓ Supplemental Exhibit 19.

[76] *See, e.g.*, McLean Report, Exhibit 6.

[77] Mr. Crawford, without citation, asserted that "[t]he 'Contribution' amount…utilized in the McLean Report was intended to estimate a profit margin associated with the addition of a single incremental unit of activity…and contains no deductions whatsoever for the substantial support costs required to operate Safelite's auto glass replacement and repair business." Crawford Report, at para 93. Again, without citation, he claimed that over a relevant range of units, "substantially all of those overhead costs would appropriately be considered variable costs properly allocable as deductions from any claim for disgorgement of profits." Crawford Report, at para 93-94.

[78] *See, e.g.*, Supplemental Exhibit 19.

suggesting that incremental costs for single unit changes would be much lower than Mr. Crawford has assumed.[79]

46. Mr. Crawford's estimates of Safelite profitability also are improperly deflated by his unsupported assumption that Safelite's profit rate from windshield replacements is equal to its profit rate from windshield repairs.[80] Mr. Crawford presents no evidence that this is the case. In fact, this assumption is inconsistent with the testimony of Safelite executives and Safelite documents, both of which support the notion that replacements are more lucrative than repairs.[81] Indeed, while Mr. Crawford appeared to critique my analysis as improperly not isolating "profits for just Safelite's windshield business," his analysis did not focus on those services either.[82] However, the difference between his and my use of that assumption is very different-- using the overall profit rate makes my analysis conservative,[83] the impact of Mr. Crawford doing so was to understate Safelite's profit rate. Had we isolated the replacement window only profits, both of us would have determined that Safelite profited even more.

47. Mr. Crawford also separated his analysis into consumer purchased replacements and insurance purchased replacements because he appears to believe that Safelite gained no insurance sales from the wrongdoing.[84] In addition, Mr. Crawford also omits telephone initiated sales, apparently because he misconstrues that if "only allegations regarding Safelite's Statements in videos posted to its website" are at

---

[79] Supplemental Exhibit 22. I also note that the document that I used to obtain the contribution margin in the McLean Report appears to suggest that variable profits for both insurance and consumer-pay for sales are substantially higher than what I used as my profitability estimate. SL0077314-21, at 319.

[80] For example, the source documents relied on in Crawford Report, pp. 60-61, and Exhibits F-1, F-2, G-1, G-2, report profit rates that are from windshield replacements, windshield repairs and curve tempered glass sales combined. *See, e.g,* SL0087857.

[81] Herron Deposition, at 87-88. SL0011508-09 and McLean Report, at para 67.

[82] It is also noteworthy that even though Mr. Crawford critiqued my analysis as not relying - for the purposes of calculating incremental profit - on a profitability document that was created by Safelite for the purposes of litigation, Mr. Crawford himself used alternative data. In fact, Mr. Crawford's profitability analysis appears to rely heavily on documents that were produced after my report was filed. *See, e.g.*, the Notes and Sources to Crawford Exhibit E.

[83] I also noted this in the McLean Report. *See* McLean Report, at para 67.

[84] *See, e.g.,* Crawford Report, at para 9.

issue that would imply that only *sales* originating through the website are at issue (and that phone originated sales should be omitted).[85] Both assumptions substantially reduce profits and neither assumption is supported. For example, the fact that an at-issue video mentions that customer insurance may cover the cost of Safelite's services makes it clear that Safelite expects insurance holders to view the videos.[86] In addition, the fact that Safelite's website provides instructions on how to schedule appointments by phone suggests that some Safelite customers visit the website and then call to schedule a replacement appointment.[87]

## V.    SAFELITE REVENUE AND PROFIT FROM USE OF FALSE MESSAGES

48. In the McLean Report, I analyzed Safelite's revenues and profits from the allegedly false or misleading statements of fact in its commercial advertising. I presented a number of scenarios in order to reflect different assumptions as to the nature and extent of Safelite's wrongful conduct. The appropriateness of the particular scenarios may depend on a number of factors, such as whether conduct described in the Amended Complaint is determined to be actionable.[88] Supplemental Exhibit 1 summarizes various Safelite revenue and profit calculations, including ones presented in the McLean Report.[89]

49. In the event that conduct described in the Amended Complaint is found to be actionable in this matter, I understand that Safelite promotional activity in many forms, including online videos, website pages, brochures, press releases, and point of sale communications may be relevant and the damages period may span from

---

[85] Crawford Report, at para 121.

[86] SL0084636. More generally, Safelite's webpage mentions insurance coverage in various places, as do other promotional maeterials. *See, e.g,* https://www.safelite.com/help-center/submitting-a-claim (viewed September 11, 2018) and https://www.safelite.com/auto-glass-repair-replacement-cost (viewed September 11, 2018); SL0008022-23, at 22.

[87] https://www.safelite.com/contact-us (viewed September 24, 2018).

[88] Amended Complaint, at pp. 27-51. Conversations with counsel.

[89] The scenarios from the McLean report Exhibits 13-18, 22-25 are reproduced as Scenarios 1 to 5 on Supplemental Exhibit 1. Scenarios 6 to 10 of Supplemental Exhibit 1 are equivalent to Scenarios 1 to 5 except they use updated profit data.

at least from 2010 to 2016.[90] Over that period, as described in the McLean Report, I determined that Safelite generated as much as ▮▮▮▮▮ in incremental revenues from as many as ▮▮▮▮▮ windshield replacements.[91] These amounts would be reduced if the finder of fact were to determine that certain sales are not sufficiently connected to Safelite conduct deemed actionable in this matter.

50. As discussed above, since I submitted the McLean Report, Safelite has produced financial data relevant for calculating the profitability of its windshield replacement business. I use this recently-produced data in the incremental Safelite profit scenarios 6 to 10 shown in Supplemental Exhibit 1.[92] Because Safelite has not proven the elements of its profit attributable to factors other than the wrongdoing and Mr. Crawford has not performed a reasonable approximation thereof, I have calculated Safelite's profits from its sales of replacement windshields by assuming deducted expenses should be limited to only those that appear to be reasonably related to Safelite's sales of windshield replacements. That results in Safelite estimated profits of as much as ▮▮▮▮▮ from windshield replacements.[93] Should less conduct be found actionable, lower incremental revenues and profits would result. That is reflected in other scenarios presented in Supplemental Exhibit 1.[94]

51. In the event that wrongdoing described in the Amended Complaint is not determined to be actionable, Safelite incremental revenue and profit would be lower. To reflect this possibility, I have also estimated Safelite's incremental revenues and profits from its sales of replacement windshields related to certain Internet promotional activity. Those are reflected in scenarios 7 to 10 on

---

[90] Amended Complaint, at pp. 27-51. Conversations with counsel. *See also* McLean Report, at pp. 15-16.

[91] McLean Report, Exhibit 13.

[92] I note that the profit rates used in Scenarios 6 through 10 of Supplemental Exhibit 1 are quite similar to the profit rate that I used in calculating profits in the McLean Report.

[93] Supplemental Exhibit 1. In Supplemental Exhibit 23, I show profit calculations that rely on net profits. These may be relevant in the event that the finder of fact determines that fully loaded profits, as opposed to incremental profits, are the relevant metric of profits here.

[94] In general, the methodologies and calculations used to generate the scenarios in Supplemental Exhibit 1, which are shown in more detail in Exhibits 2 to 16, can be adapted to calculate other scenarios that the finder of fact may find relevant, including by adjusting the time period of interest, the profit rate, and the incremental revenue.

Supplemental Exhibit 1. The high end of the range assumes that both videos and other Internet promotional activity is found actionable and substantially all Internet purchasers may have been impacted directly or indirectly by the wrongdoing. The lower end of the range, as reflected in Scenarios 9 and 10 in Supplemental Exhibit 1, reflects the result of calculations that use the data that appear to be from Safelite's limited online tracking linking video views and replacement appointments. As discussed above, because the reservations data apparently are based on imperfect cookies-based tracking, they will tend to undercount the exposure to web content and other promotional materials and not track consumers who make appointments by phone after viewing web content.[95] These and other scenarios also are based on Safelite data that I understand did not encompass all of the accused content and appears to be truncated at August 2014.[96]

## VI.    HARM TO ULTRA BOND

52. In the McLean Report, I found that Safelite's false advertising harmed Ultra Bond. In particular, the evidence that I reviewed showed that Ultra Bond lost sales and associated profits from the alleged wrongdoing as:

- Safelite's false advertising led to substantially fewer Long Crack repairs in the marketplace and impacted Ultra Bond's market opportunities in that area; and
- faced with higher demand for Long Crack repairs, Ultra Bond's windshield repair supplies customers would purchase more windshield crack supplies, such as resins, from Ultra Bond.[97]

---

[95] *See e.g.*, Millard Deposition, at pp. 57-61 and 70-72.

[96] For example, Safelite's data apparently does not report views for SL0084638. I also note that according to an email from Safelite's counsel the video "████████████████████████████████████████ ████████████████████████████████████████████. *See* SL0085556. November 22, 2017 email from David Boylan to Peter Kahana et. al.; Millard Deposition, at 62-63, 72; Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendants, February 23, 2018, at 6-7.

[97] McLean Report, at paras 69-77.

53. In his report, Mr. Crawford found that Safelite's wrongdoing has not led to actual harm to Ultra Bond. In particular, he opined that "there is no credible and competent evidence of any actual loss to the Plaintiffs."[98]

54. I disagree with Mr. Crawford's opinion. His analysis appears to rely on the argument that Ultra Bond is too small to be harmed by a large firm.[99] It also ignores the evidence from actual Ultra Bond repair industry customers that their businesses have been affected by Safelite's advertising and that if customer demand for Long Crack repair were to increase, Ultra Bond's customers would purchase more Ultra Bond, Inc. products.[100]


Justin McLean                                   DATED: September 25, 2018

---

[98] Crawford report, at para 126.

[99] Crawford report, at paras 129-131.

[100] *See, e.g.*, McLean Report, at para 75.

**JUSTIN N. McLEAN**
**Managing Principal**

Phone: 202 530 2591

Fax: 202 530 0436

justin.mclean@analysisgroup.com

800 17th Street, N.W.

Suite 400

Washington, D.C., 20006

Mr. McLean specializes in applying finance and economics to problems in complex business litigation, including securities, valuation, tax, and intellectual property matters. His experience spans several industries, from banking, insurance, and high technology to telecommunications and health care. He has served as an expert witness, and has provided assistance in many phases of litigation, including development, presentation, and review of pretrial discovery; preparation of testimony; and critique of analyses of opposing experts.

Mr. McLean's case work has included general damages analyses, lost profit and reasonable royalty calculations related to intellectual property misappropriation, and assessments of fiduciary duties and investment management. In addition, he has evaluated the economic characteristics and risk transfer of a range of financial instruments, such as private mortgage insurance, subprime loans, and preferred equity in a new venture. He has led large case teams in a number of high-profile matters, including consulting to the U.S. Department of Justice regarding the financial issues involved in tribal trust fund disputes, and supporting counsel for a large electronics manufacturer in litigation associated with features on smartphones and tablets.

In addition, Mr. McLean has presented on topics related to damages assessment and patents. He has also worked with entrepreneurial companies, helping to develop financial projections, business plans, and marketing strategies.

## EDUCATION

| | |
|---|---|
| 2000 | M.S., industrial administration (University Honors, *Beta Gamma Sigma*), Tepper School of Business at Carnegie Mellon University<br>*Concentrations: finance, accounting, and entrepreneurship* |
| 1995 | B.A., economics, Swarthmore College |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2000–Present | Analysis Group, Inc. |
| 1999 | Deloitte & Touche Consulting Group |
| 1996–1998 | Analysis Group, Inc. |
| 1995–1996 | Putnam, Hayes & Bartlett |

**SELECTED EXPERT CASEWORK**

**Litigation Engagements with Testimony**

- ***Western Shoshone Identifiable Group v. United States of America***
  *U.S. Court of Federal Claims*
  Testimony, Deposition, and Expert Report: Calculation of damages associated with alleged
  bad acts related to trust fund management.

- ***Taylor Precision Products, Inc. v. The Larimer Group, Inc., et al.***
  *U.S. District Court, Southern District of New York*
  Deposition and Expert Report: Calculated diminution in value to assets related to undisclosed
  changes in customer activities.

- ***SNMP Research International, Inc., et al. v. Nortel Networks, Inc., et al.***
  *U.S. Bankruptcy Court, District of Delaware*
  Deposition and Expert Report: Calculated reasonable royalty and profit damages related to copyright,
  trade secret, and breach of contract claims associated with protocol software.

- ***Computer Sciences Corporation v. Federal Home Loan Mortgage Corp.***
  *U.S. District Court, Eastern District of Virginia*
  Deposition and Expert Report: Addressed damages related to master service agreement for
  information technology solutions.

- ***PerdiemCo LLC v. Industrack LLC, et al.***
  *U.S. District Court, Eastern District of Texas*
  Deposition and Expert Report: Calculated reasonable royalty damages related to patent directed to
  fleet management systems and software.

- ***Nancy Thompson, et al. v. Gordon Witherspoon and UBS Financial Services, Inc.***
  *Circuit Court, Baltimore City*
  Testimony, Deposition, and Expert Report: Addressed calculation of damages associated with breach
  of duties regarding a life insurance policy.

- ***Markem-Imaje, Corp. v. VideoJet Technologies Ltd., et al.***
  *U.S. District Court, District of New Hampshire*
  Deposition and Expert Report: Calculated lost profits and reasonable royalty for patent directed to a
  tape drive and controller used in a printing apparatus.

- ***NorthmobileTech, LLC v. Simon Property Group, Inc.***
  *U.S. District Court, Western District of Wisconsin*
  Deposition and Expert Report: Calculated reasonable royalty for patent directed to a marketing
  method involving the location of the customer.

- **William Black, Jr. v. Gramercy Advisors, LLC, et al.**
  *American Arbitration Association*
  Testimony and Expert Report: Addressed net out-of-pocket damages calculations associated with misrepresentations and breach of fiduciary duties regarding an investment transaction.

- **LG Electronics, USA, Inc., et al. v. Whirlpool Corporation**
  *U.S. District Court, District of New Jersey*
  Depositions and Expert Reports: Calculated reasonable royalty damages for patents directed to ice and water dispensing in bottomfreezer refrigerators. Performed analysis of the commercial success of products due to the patented invention.

- **Charity Funding, Inc., et al. v. Military Order of the Purple Heart Service Foundation, Inc.**
  *U.S. District Court, Eastern District of Virginia, Alexandria Division*
  Deposition and Expert Report: Calculated damages and unjust enrichment related to charitable vehicle donation program.

- **United States of America, ex rel. Jon H. Oberg v. Nelnet, Inc., et al.**
  *U.S. District Court, Eastern District of Virginia, Alexandria Division*
  Deposition and Expert Report: Addressed economic damages related to improper submission of claims for student loan subsidy payments.

- **Edward D. Jones & Co., L.P. v. Jason L. Williams and Wells Fargo Advisors, LLC**
  *Financial Industry Regulatory Authority, Department of Arbitration*
  Testimony: Addressed lost profits and unjust enrichment related to improper solicitation of customers and misappropriation of proprietary customer information.

- **FutureLogic, Inc. v. TransAct Technologies, Inc.**
  *U.S. District Court, Central District of California*
  Deposition and Expert Report: Calculated lost profit damages related to patent directed to coupon printing by slot machine printers.

- **Auction Management Solutions, Inc. v. Adesa, Inc., et al.**
  *U.S. District Court, Northern District of Georgia, Atlanta Division*
  Deposition and Expert Report: Calculated reasonable royalty for patent directed to remote bidding system and software for live auctions.

- **CareFirst Blue Cross Blue Shield v. Merck-Medco Managed Care, L.L.P, et al.**
  *Superior Court of New Jersey, Law Division-Camden County*
  Deposition and Expert Report: Calculated unpaid manufacturer rebates related to prescription drug benefit plan agreements.

- **Bright House Networks and Suddenlink Merger Analysis**
  *Federal Trade Commission*
  Expert Presentation: Performed price analysis of service combinations offered by the two cable providers.

- ***BCBS Minnesota, et al. v. Mylan Laboratories, Inc., et al.***
  *U.S. District Court, District of Columbia*
  Deposition and Declarations: Performed analysis of various claims data for calculation of antitrust damages stemming from exclusive supply agreements for raw materials.

- ***Rodski v. Rodski***
  *Court of Common Pleas, Luzerne County, Pennsylvania*
  Testimony and Expert Report: Performed valuation of privately-held amateur radio equipment business.

- ***The Apollo Theatre Foundation, Inc. v. Western International Syndication, et al.***
  *U.S. District Court, Southern District of New York*
  Deposition and Expert Report: Calculated damages related to trademark infringement and breach of duties regarding variety show.

**Other Litigation Engagements as Testifying Expert**

- ***Bloostein, et al. v. Morrison Cohen LLP, et al.***
  *Supreme Court of the State of New York, County of New York*
  Calculated damages associated with alleged breach of fiduciary duties related to a tax deferral strategy.

- ***In the Matter of: Certain Potassium Chloride Powder Products***
  *U.S. International Trade Commission*
  Analysis of harm to domestic industry from alleged unfair competition.

- ***PerdiemCo LLC v. GPS N.A., et al.***
  *U.S. District Court, Eastern District of Texas*
  Calculated reasonable royalty damages related to patent directed to fleet management systems and software.

- ***Beijing UniSpreadtrum Technology Ltd. v. Sasken Communications Technologies Limited***
  *American Arbitration Association, International Centre for Dispute Resolution*
  Calculated damages stemming from alleged breach of joint venture technology agreement and royalty for alleged infringement.

- ***Pavonix, Inc., et al. v. Alexander, Aronson, Finning & Company, P.C.***
  *American Arbitration Association*
  Calculated damages stemming from alleged incorrect financial statements used in sale of business.

- ***Edward D. Jones & Co., L.P. v. Betty Schutte-Box and Wells Fargo Advisors, LLC***
  *Financial Industry Regulatory Authority, Department of Arbitration*
  Addressed lost profits and unjust enrichment related to improper solicitation of customers and misappropriation of proprietary customer information.

- ***MaxLinear, Inc. v. Silicon Laboratories, Inc.***
  *U.S. District Court, Southern District of California, San Diego Division*
  Calculated reasonable royalty for patents directed to fine tuning control for synthesizing high frequency signals for wireless communications.

- ***NorthmobileTech, LLC. v. General Growth Properties, Inc.***
  *U.S. District Court, Western District of Wisconsin*
  Calculated reasonable royalty for patent directed to a marketing method involving the location of the customer.

- ***MicroSpherix, LLC v. Biocompatibles, Inc.***
  *U.S. District Court, Southern District of Florida*
  Calculated reasonable royalty for patent directed to brachytherapy seed coating technology.

- **Confidential Analysis of Financial Condition**
  *Federal Trade Commission*
  Analyzed the financial condition of a multinational company and two of its subsidiaries.

- ***East Side Entrees, Inc. v. Acosta, Inc. and Matchpoint Marketing, LLC***
  *U.S. District Court, Eastern District of New York*
  Analyzed economic damages from breach of contract for marketing and advertising plan related to new food product launch.

- ***Ubisoft v. Optical Experts Manufacturing***
  *U.S. District Court, Western District of North Carolina*
  Analyzed damages stemming from copyright infringement and breach of contract related to early leak of PC version of Assassin's Creed video game.

- ***Samuel Washington v. Citizens Bank***
  *State of South Carolina, Court of Common Pleas, County of Beaufort*
  Calculated economic benefit from credit report trade-line deletions related to automobile repossessions.

- ***BB&T Investment Services, Inc. v. Michael Neal***
  *National Association of Securities Dealers Arbitration*
  Calculated lost profits and unjust enrichment related to misappropriation of proprietary customer information.

- ***R.H. Murphy, Co. v. ITW, Inc.***
  *U.S. District Court, District of Massachusetts*
  Calculated reasonable royalty for patent directed to BGA integrated circuit trays. Addressed lost profit, reasonable royalty and price erosion claims.

## SELECTED CONSULTING EXPERIENCE

### Finance, Valuation, and Tax

- **Various valuations of privately-held companies**
  *Including:*
  Valuations of privately-held rolling steel door business, exotic sports cars business, government contracting software business, and genetic testing company.

- ***Quapaw Tribe of Oklahoma; G. Goodeagle; T. Bear v. United States of America***
  *U.S. Court of Federal Claims*
  Evaluation of activities of the trustee and calculation of the economic harm associated with alleged bad acts related to fund and asset management.

- ***Chickasaw Nation and Choctaw Nations v. United States of America***
  *U.S. District Court, Western District of Oklahoma*
  Evaluation of the adequacy of the accounting regarding various trust assets.

- ***FINRA Department of Enforcement v. David Lerner Associates, et al.***
  *Financial Industry Regulatory Authority, Office of Hearing Officers*
  Evaluation of REITS, non-traded REITS, and the practices of specific non-traded REITs.

- ***Jicarilla Apache Nation, et al. v. United States of America***
  *U.S. Court of Federal Claims*
  Evaluation of the fiduciary duties of investment fund trustee and calculation of the economic harm associated with alleged bad acts related to fund management.

- ***Quechan Tribe of the Fort Yuma Indian Reservation v. United States of America***
  *U.S. Court of Federal Claims*
  Evaluation of the fiduciary duties of investment fund trustee and calculation of the economic harm associated with alleged bad acts related to fund management.

- ***Santa Clara Valley Housing Group, Inc., et al. v. United States of America***
  *U.S. District Court, Northern District of California*
  Analysis of the economic characteristics of a transaction and its business purpose related to a tax dispute, including the valuation of certain real estate projects.

- ***Chemtech Royalty Associates, et al. v. United States of America***
  *U.S. District Court, Middle District of Louisiana*
  Analysis of the economic characteristics of a transaction and its business purpose related to a tax dispute.

- ***Herschel Blumberg, et al. v. Arent Fox, LLP***
  *U.S. District Court, Eastern District of Pennsylvania*
  Review and evaluation of both real estate development activities and fiduciary duties.

- ***Donna Moore, et al. v. GMAC Mortgage, LLC, et al.***
  *U.S. District Court, Eastern District of Pennsylvania*
  Evaluation of the economic characteristics and risk transfer associated with private mortgage insurance.

- ***Delhaize America Inc., et al. v. Secretary of the Revenue of North Carolina***
  *Superior Court, North Carolina, Wake County*
  Analysis of corporate restructuring and formation of particular subsidiaries associated with tax dispute.

- ***Hillsborough Holdings Corporation, et al. v. United States of America***
  *U.S. Bankruptcy Court, Middle District of Florida, Tampa Division*
  Analysis of the subprime mortgage industry. Addressed economic characteristics and accounting of particular loans.

- ***Amana I, et al. v. Cairnwood Group, et al.***
  *Superior Court, State of Georgia*
  Analysis of the venture capital industry and evaluation of the economic returns of comparable funds. Calculated damages associated with alleged misrepresentations for a particular investment fund.

- ***The Boston Company Asset Management, LLC. v. Munder Capital, et al.***
  *Superior Court, Commonwealth of Massachusetts*
  Analysis of breach of fiduciary duty and breach of non-solicitation agreements associated with investment management. Calculated lost profits related to misappropriation of proprietary customer information and other alleged bad acts.

- ***In Re: WCI Steel, Inc.***
  *U.S. Bankruptcy Court, Northern District of Ohio, Eastern Division*
  Valuation related to bankrupt steel firm, including an analysis of various restructuring proposals.

- ***NRG Power Marketing Company v. Federal Energy Regulatory Commission***
  *U.S. Court of Appeals, District of Columbia Circuit*
  Analysis of the financial status of a bankrupt entity seeking to reject a power contract.

- ***MKP Hedge Fund v. Salomon Smith Barney***
  *U.S. District Court, Southern District of New York*
  Analysis of margin calls related to mortgage-backed security hedge fund.

- ***Southeast Land Development Associates, L.P. v. The District of Columbia, et al.***
  *U.S. District Court, District of Columbia*
  Valuation related to land values for the proposed baseball stadium in Washington, D.C.

- ***Trustees of the Mafco Litigation Trust, et al. v. Ronald Perelman, et al.***
  *U.S. District Court, District of Delaware*
  Analysis of debt issuance and the impact of certain restrictive covenants.

- ***Maymin, et al. v. Fuji Bank***
  *U.S. District Court, Southern District of New York*
  Analysis of hedge fund performance and determination of lost profits related to the management of the fund.

- **Various confidential engagements**
  *Including:*
  Analysis of competitive position of private lender and its portfolio of securitized loan products, analysis of allocations and performance of initial public offerings, analysis of the conformance to representations and warranties for a pool of mortgages, and analysis of a right-of-first refusal encumbrance in a real estate lease related to a merger.

**General Damages**

- ***In Re: JPMorgan Chase Mortgage Modification Litigation***
  *U.S. District Court, District of Massachusetts*
  Analysis of mortgage modification programs and evaluation of identification of class members and damages from various alleged failures by JPMC.

- ***Flycell, Inc. v. Shlossberg LLC, et al.***
  *U.S. District Court, Southern District of New York*
  Analysis of damages from alleged breaches of duties associated with overpayment for affiliate marketing services.

- ***Adam Jernow, et al. v. Wendy's International, Inc.***
  *U.S. District Court, Southern District of New York*
  Analysis of damages from alleged price premium associated with inaccurate representations regarding trans fat content in French fries.

- ***BCBS Michigan, et al. v. Hoechst A.G., et al.***
  *U.S. District Court, Eastern District of Michigan, Southern Division*
  Calculated antitrust damages stemming from delayed entry of generic alternative pharmaceuticals.

- ***Marathon Enterprises, Inc. v. Schroter GMBH & Co.***
  *U.S. District Court, Southern District of New York*
  Calculated damages from breach of a contract regarding the delivery of skinless frank production machinery.

- ***Independent Media Services, Inc. v. Aegis Group PLC, et al.***
  *Supreme Court, State of New York*
  Calculated damages from the breach of a non-solicitation clause in a non-disclosure agreement.

- ***Pearson PLC v. Hicks, Muse, Tate & Furst, Inc.***
  *U.S. District Court, Southern District of New York*
  Calculated damages from breach of contract involving the acquisition and valuation of publishing companies.

- **PBM Products, Inc. v. Mead Johnson & Company**
  *U.S. District Court, Eastern District of Virginia*
  Calculated damages stemming from a false advertising campaign. Performed marketing analysis and evaluated financial projections for companies within the infant formula industry.

## Intellectual Property

- **Wisconsin Alumni Research Foundation v. Apple, Inc.**
  *U.S. District Court, Western District of Wisconsin*
  Evaluated smartphone pricing, processor speed, and reasonable royalty damages for patents directed to smartphones and tablets.

- **Apple, Inc. v. Samsung Electronics Co., Ltd., et al.**
  *U.S. District Court, Northern District of California, San Jose Division*
  Addressed conjoint study results, claims for lost profits, and reasonable royalty damages for patents directed to smartphones and tablets.

- **MacDermid, Inc. v. Cookson Group, PLC, et al.**
  *U.S. Superior Court, Judicial District of Waterbury*
  Calculated damages related to misappropriation of trade secrets in context with bidding process and acquisition of company.

- **Abbott Biotechnology Ltd. and Abbvie Inc. v. Centocor Ortho Biotech, Inc.**
  *U.S. District Court, District of Massachusetts*
  Calculated lost profits and reasonable royalty damages for patents directed to methods for treating rheumatoid arthritis by co-administering methotrexate and human antibodies.

- **Wi-LAN Inc. v. Alcatel-Lucent, et al.**
  *U.S. District Court, Eastern District of Texas, Marshall Division*
  Calculated reasonable royalty damages for patents directed to High Speed Packet Access (HSPA) transmission in cell phones and base stations.

- **Novozymes A/S, et al. v. Danisco A/S, et al.**
  *U.S. District Court, Western District of Wisconsin*
  Addressed lost profit, reasonable royalty, and convoyed sales damages for patent directed to an Alpha Amylase used in the production of fuel ethonol.

- **Northeastern University, et al. v. Google, Inc.**
  *U.S. District Court, Eastern District of Texas, Marshall Division*
  Calculated reasonable royalty damages for patent directed to indexing data and performing queries.

- **Medtronic Inc., et al. v. Abbott Laboratories and Abbott Vascular, Inc.**
  *U.S. District Court, Northern District of California, San Francisco Division*
  Addressed lost profits and reasonable royalty damages for patent directed to coronary and peripheral stents.

- **Medtronic USA Inc., et al. v. ACS and Guidant Corp.**
  *U.S. District Court, District of Delaware*
  Calculated lost profits and reasonable royalty damages for patents directed to coronary and peripheral stents.

- **In the Matter of: Certain 3G Mobile Handsets and Components Thereof**
  *U.S. International Trade Commission*
  Analyzed royalty license proposals to assess if the economic terms were fair, reasonable and non-discriminatory.

- **Johnson & Johnson, et al. v. Actavis Group hf and Actavis, Inc.**
  *U.S. District Court, Southern District of New York*
  Calculated disgorgement of profit remedies for trademark and trade dress infringement related to antibiotic ointments and creams.

- **Guidant Corp. v. St. Jude Medical, Inc.**
  *U.S. District Court, District of Delaware*
  Calculated lost profits and reasonable royalty damages for patent directed to cardiac resynchronization therapy technology. Addressed intervening rights claims, and calculation of research and development expenses.

- **True Position, Inc. v. Andrew Corp.**
  *U.S. District Court, District of Delaware*
  Calculated lost profits and prejudgment interest for patent directed to cellular telephone location hardware and software.

- **Water Fun Products Corp. v. ProSlide Technology Inc.**
  *U.S. District Court, Central District of California, Western Division*
  Calculated reasonable royalty and prejudgment interest for patent directed to manufacture of water slide rides.

- **The Topps Company, Inc. v. Cadbury Stani and Cadbury Schweppes**
  *U.S. District Court, Southern District of New York*
  Calculated disgorgement of profit remedies for trade secret infringement of proprietary formula for bubble gum.

- **Texas Instruments Inc. v. Tessera, Inc.**
  *U.S. District Court, Northern District of California, Oakland Division*
  Calculated damages from breach of contract and patent infringement damages for patent directed to semiconductor packaging technology.

- **Atofina v. Great Lakes Chemical Corp.**
  *U.S. District Court, District of Delaware*
  Calculated reasonable royalty and prejudgment interest for patent directed to manufacturing of difluoromethane.

- **Bennetton Sportsystem USA, Inc. (Prince Sports Group) v. Wilson Sporting Goods Co.**
  *U.S. District Court, District of New Jersey*
  Addressed lost profit, reasonable royalty, price erosion, and prejudgment interest claims for patent directed to tennis racquets.

- **Bauer Inc. v. Rollerblade, Inc.**
  *U.S. District Court, Eastern District of Virginia*
  Calculated lost profits, reasonable royalty, and prejudgment interest for patent directed to a skate boot design.

## SELECTED PRESENTATIONS AND PUBLICATIONS

"Lost Profits and Damages Calculation: Everything You Need to Know in 2018," with Caryln Irwin, Alexis Lavko, and Alex Bardon, webcast hosted by The Knowledge Group (January 17, 2018)

"Estimating the Cost of Capital," with R. Jeffrey Malinak, Chapter 10 in *Litigation Services Handbook: Sixth Edition* (2017)

"Patent Valuation for Software Inventions: What You Need to Know in 2016," with Brian Dies, webcast hosted by The Knowledge Group (June 6, 2016)

"Litigation Strategies, Tactics and Techniques: Experts - Strategies and Best Practices," with Alexandra Cunningham and Sona Rewari (October 5, 2015)

"How to Prove Damages in Patent, Trademark and Copyright Cases," with John Augustyn, Brian Nolan, Christine Meyer, Carmen Bremer, and Kris Boushie, webcast hosted by The Knowledge Group (September 2, 2015)

"Working with Experts," with Ajay Jyoti (May 27, 2015)

"Presenting an Effective Damages Case in Light of Recent Federal Circuit Precedent," with Brian Kacedon and Lauren Stiroh (October 19, 2011)

"Economic Approach to Damages," with Ran Harel and Maureen Chakraborty (April 21, 2009)

"Economic Analysis in Patent Litigation: The Law & Economics of Permanent Injunctions," with Carla Mulhern (July 25, 2007)

"Terms and Structures for Software Technology Transfer," with Laura Stamm and Josh Lerner (October 27, 2004)

## SUPPLEMENTAL APPENDIX B

## ADDITIONAL DOCUMENTS CONSIDERED

**Bates Ranges**

SL0087779   –   SL0087965

Expert Reports and Statements:
Expert Rebuttal Report of Rodney L. Crawford, CPA/ABV/CFF, CIRA, CFE to the Expert Report of Justin McLean, with exhibits, August 14, 2018.
Expert Report of Dr. Kent D. Van Liere, with exhibits, August 13, 2018.
Expert Statement of Glen Moses, with exhibits, August 14, 2018.
Expert Statement of Paul Syfko, with exhibits, August 14, 2018.
Supplemental Rebuttal Expert Report of Rene Befurt, September 25, 2018.
Expert Report of Justin McLean, with exhibits, June 11, 2018.

Websites:
https://hbr.org/2017/10/contribution-margin-what-it-is-how-to-calculate-it-and-why-you-need-it (viewed September 24, 2018).
https://www.safelite.com/auto-glass-repair-replacement-cost (viewed September 11, 2018).
https://www.safelite.com/cancellation-refund-policy (viewed September 24, 2018).
https://www.safelite.com/contact-us (viewed September 24, 2018).
https://www.safelite.com/help-center/submitting-a-claim (viewed September 11, 2018).
https://www.safelite.com/windshield-repair (viewed September 24, 2018).

Other:
Data - 1988.pdf.













































**SUPPLEMENTAL EXHIBIT 18**

**REGRESSION ANALYSIS**
**INSURANCE + CONSUMER**
**REVENUE VS. COSTS**

| Independent Variable 1 | Independent Variable 2 | Dependent Variable | Coefficient |
|---|---|---|---|
| $LN(X_1)$ | $X_2$ | $LN(Y)$ | $\beta_1$ |
| Revenue (Total) | Time Trend (0,1,2,3,4,5,6) | Costs (Total Sales - Trading Profit) | 0.872 |
| Revenue (Total) | Time Trend (0,1,2,3,4,5,6) | Total Product Cost + Total Other Cost of Sales | 0.968 |
| Revenue (Total) | Time Trend (0,1,2,3,4,5,6) | Total Expenses | 0.696 |
| Revenue (Total) | Time Trend (0,1,2,3,4,5,6) | Allocation Expenses | 0.476 |

Notes & Sources:
Data for 2010 from SL0087858, at tab 'Year'.
Data for 2011 from SL0087859, at tab 'store'.
Data for 2012 from SL0087863, at tab 'store'.
Data for 2013 from SL0087864, at tab 'Store'.
Data for 2014 from SL0087855, at tab 'Store'.
Data for 2015 from SL0087856, at tab 'Store'.
Data for 2016 from SL0087857, at tab 'Store'.

























