**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**Richard Campfield,** *et al.***,**

      **Plaintiffs,**                **Case No. 2:15–cv–2733**

      **v.**                      **Judge Michael H. Watson**

**Safelite Group, Inc.,** *et al.***,**      **Magistrate Judge Vascura**

      **Defendants.**

## OPINION AND ORDER

Plaintiffs Richard Campfield ("Campfield") and Ultra Bond, Inc. ("Ultra Bond," collectively, "Plaintiffs") allege that Defendants Safelite Group, Inc., Safelite Solutions LLC, and Safelite Fulfillment, Inc. (collectively, "Safelite") misrepresented the nature and characteristics of Plaintiffs' products to consumers. Plaintiffs bring a claim for relief under section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B).

Safelite has countersued with the following claims: tortious interference with contract; misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act ("OUTSA"), R.C. § 1333.61, *et. seq.*; civil conspiracy; conversion; violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; unfair competition; and for a declaratory judgment that Plaintiffs have unclean hands and are prohibited from receiving equitable relief under the Lanham Act, including but not limited to disgorgement of Safelite's profits. Ans. and Counterclaim, ECF No. 93.

Safelite moves for summary judgment dismissing Plaintiffs' Lanham Act claim and finding that Plaintiffs are liable for conversion.[1]  Safelite Mot. Summ. J., ECF No. 127.  Plaintiffs move for partial summary judgment on two aspects of their Lanham Act claim: (1) "[t]hat Safelite's organized marketing campaign to promote the dollar bill rule as an objective standard for windshield repair . . . constitutes 'commercial advertising and promotion'"; and (2) that one category of statements Safelite made were literally false and violated the Lanham Act.  Pls. Mot. Summ. J., ECF No. 130.  Plaintiffs also move for summary judgment against Safelite on all of Safelite's counterclaims.  *Id.*[2]

For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Safelite's motion for summary judgment, ECF No. 127, and **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for partial summary judgment, ECF No. 130.

## I.  FACTUAL BACKGROUND

The specific facts the Court relies upon to decide Plaintiffs' and Safelite's motions for summary judgment are more easily discussed as part of the Court's analysis.  Therefore, in this introductory factual discussion, the Court will simply restate the factual background from its prior Opinion and Order granting in part

---

[1] Safelite does not move for summary judgment on its remaining counterclaims.
[2] Plaintiffs raised these same objections to Safelite's counterclaims in a motion to dismiss that was not ruled upon prior to the parties filing motions for summary judgment. MTD, ECF No. 98.  Because the matter is fully briefed with supporting evidence in Plaintiffs' motion for summary judgment, the Court **DENIES** Plaintiffs' motion to dismiss as **MOOT**.

and denying in part Safelite's motion to dismiss and add a general description of Safelite's allegations from its counterclaims. This factual background is meant to frame the parties' versions of events, not suggest these are facts supported by evidence in the record, much less undisputed.

## A. Plaintiffs' Lanham Act Claim

Safelite and Plaintiffs are both involved in vehicle glass repair and replacement ("VGRR") services. Safelite maintains a significant stake in the sale and installation of replacement windshields. Plaintiffs, on the other hand, maintain a significant stake in the sale of products used to repair cracks longer than six inches (called "long cracks"), as well as the service of performing such repairs.

Safelite is a multi-faceted automobile glass and claims management service organization that is composed of four major operations: (1) Safelite Fulfillment, Inc. (operating under the name Safelite AutoGlass®), which provides VGRR services (such as windshield replacement and repair) to consumers; (2) Service Auto Glass, which provides wholesaler vehicle glass and vehicle glass-related products; (3) Safelite Solutions LLC, which serves as a third party administrator and provides complete claims management solutions for fleet and insurance companies; and (4) Safelite Glass Corp., which previously manufactured aftermarket windshields.

Safelite has three primary categories of customers: insurance company clients for whom it serves as the third-party administrator of their glass breakage

coverage programs; commercial customers (such as businesses or governmental agencies who operate fleets of vehicles); and individual consumers (who may or may not have insurance that covers windshield damage). Safelite follows the "dollar bill rule," which means that Safelite neither recommends nor performs long-crack repairs.

In 1989, Plaintiffs developed a new method for repairing long cracks instead of replacing the windshield. In 2007, the American National Standards Institute approved windshield industry repair standards, the "Repair of Laminated Automotive Glass Standards" ("ROLAGS"), that stated windshield cracks up to fourteen inches are repairable. According to Plaintiffs, the dollar bill rule is no longer the prevailing view in the industry. Plaintiffs also allege that Safelite's internal documents show that Safelite knew that the repair of windshield cracks "up to 24 [inches] . . . can be safe and is viable." Am. Compl. ¶ 76, ECF No. 62.

Plaintiffs bring this suit under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (referred to throughout this Opinion and Order as § 43(a)), alleging that Safelite misrepresented the nature and characteristics of Plaintiffs' products to consumers. Specifically, Plaintiffs argue that Safelite makes false statements that fall into two categories: Type I Statements, that broadly state "if damage spreads beyond the size of a dollar bill, a replacement will be necessary"; and Type II Statements, which broadly state that "when a chip is

smaller than a dollar bill, it can usually be repaired without replacing the windshield."

## B. Safelite's Counterclaims

Safelite has grown its business over more than seventy years to become the largest vehicle glass repair and replacement organization in the United States.  Safelite has developed information that it considers to be confidential and proprietary trade secret information related to its services including training materials, pricing arrangements, financial data, technician rankings, customer satisfaction data, current and prospective customer lists, and customer information and preferences.

Campfield founded Ultra Bond to license the Ultra Bond process and sell long crack-related products, which compete with Safelite's products and services. From 2007 to 2013, Safelite employed Brian Ladage ("Ladage") as a technician in Safelite's retail store in Grand Junction, Colorado, and from 2000 to 2013, Safelite employed Don Christensen ("Christensen") as a manager of Safelite's Grand Junction shop.  As part of their employment, Ladage and Christensen had access to some of Safelite's information that it considers to be confidential and proprietary trade secret information.  Ladage and Christensen were required to sign a confidentiality agreement because of their access to these materials.

At some point, Ladage and Christensen became disgruntled employees of Safelite, which led Campfield to direct them to steal Safelite's confidential information.  Ladage and Christensen gave Campfield confidential information

that he wanted to use against Safelite. After Campfield was able to obtain this information, other Safelite competitors learned what he was doing and requested additional trade secret information such as the chemical composition of Safelite's resin. Ladage provided this information to Campfield for him to pass along to Safelite competitors.

Plaintiffs solicited Ladage and Christensen to leave Safelite, which they eventually did. Ladage went to work for Ultra Bond.

## II.   PROCEDURAL BACKGROUND

After Plaintiffs' filed their original Complaint, Safelite moved to dismiss the claims, which the Court granted in part and denied in part. ECF No. 36. Plaintiff then amended their Complaint and Safelite once again moved to dismiss, which the Court granted in part and denied in part. ECF No. 113. The two prior Opinions and Orders granting in part and denying in part Safelite's motions to dismiss have narrowed the issues on summary judgment. The following are some of the key holdings from those prior Opinions and Orders:

- Safelite's statements to policyholders in its role as a claims administrator are not commercial advertising or promotion under the Lanham Act

- Safelite is not liable for any statements made by insurance companies regarding the dollar-bill rule, even if drafted by Safelite

- Safelite may be liable for statements it made directly to insurers, including in brochures and educational materials, if these statements were made for the purpose of ultimately influencing customers or even insurance companies to buy (or contract for the provision of) Safelite's

goods and service, as opposed to for the purpose of explaining an insurance company's existing policies

- Statements made by "Safelite's front-line sales force" directly to consumers may be "commercial advertising or promotion"

- Type I statements, which broadly state "if damage spreads beyond the size of a dollar bill, a replacement will be necessary," are affirmative representations that could be proven literally false

- Type II statements, which broadly state "when a chip is smaller than a dollar bill, it can usually be repaired without replacing the windshield, are not alleged to be literally false, so for Plaintiffs to prevail on this theory, they "must prove that a 'significant portion' of reasonable consumers were *actually* deceived by the defendant's messaging"

Op. & Order, ECF No. 113.

## III.    STANDARD OF REVIEW

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth

specific facts showing there is a genuine issue of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence. *Pittman v. Cuyahoga Cty. Dep't of Children and Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 640 F.3d at 723 (quoting *Anderson*, 477 U.S. at 251–52).

The Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."[3] *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). The Court may rely on the parties to call attention to the specific portions of the record that demonstrate a genuine issue of material fact. *Wells Fargo Bank, N.A. v. LaSalle Bank N.A.*, 643 F. Supp. 2d 1014, 1022 (S.D. Ohio 2009).

The parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter

---

[3] This is particularly important in this case where the parties have attached thousands of pages of evidence to their motions.

of law.  The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion.  In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).  "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record."  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.*), 757 F.2d 698, 705 (5th Cir. 1985)).  The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation.  *Taft Broad.*, 929 F.2d at 248.

## IV.    ANALYSIS

### A. Plaintiffs' Lanham Act Claims

The Court begins by analyzing Plaintiffs' Lanham Act claim.  Section 43(a) of the Lanham Act precludes any person from making any "false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or

her or another person's goods, services, or commercial activities." 15 U.S.C. §

1125(a)(1)(B).  Plaintiffs asserting a § 43(a) claim must meet a five-part test,

known in this circuit as the "*Podiatric Physicians*" test:

> 1) the defendant has made false or misleading statements of fact
> concerning his own product or another's; 2) the statement actually
> deceives or tends to deceive a substantial portion of the intended
> audience; 3) the statement is material in that it will likely influence the
> deceived consumer's purchasing decisions; 4) the advertisements
> were introduced into interstate commerce; 5) there is some causal link
> between the challenged statements and harm to the plaintiff.

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015) (quoting *Am.*

*Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric*

*Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999)).

 Before the Court gets to the substance of the claim, however, it must address

Safelite's affirmative defense that laches bars Plaintiffs' claims.

### 1. Laches

 Safelite argues that Plaintiffs' claims are barred by the doctrine of laches.

The Lanham Act does not include a statute of limitations, so courts have applied

the equitable doctrine of laches to determine whether a Lanham Act claim is

barred due to a delay in filing.  *Kehoe Component Sales Inc. v. Best Lighting*

*Prods.*, 796 F.3d 576, 584 (6th Cir. 2015).  The United States Court of Appeals

for the Sixth Circuit has defined laches as the "negligent and unintentional failure

to protect one's rights." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397,

408 (6th Cir. 2002).  To succeed on the laches defense, a defendant must

demonstrate: (1) the plaintiff failed to diligently protect its rights under the Lanham Act; and (2) the defendant suffered prejudice as a result.  *Id.*

The starting point of the laches analysis is the analogous statute of limitations of the forum state.  *Id.*  If the lawsuit was filed before the analogous statute of limitations lapsed, there is a strong presumption that the delay in filing was reasonable.  *Id.*  If, however, the action was not brought within the period provided by the state statute of limitations, a strong presumption arises that the delay was prejudicial and unreasonable.  *Id.*  "The period of delay begins to run when plaintiff had 'actual or constructive knowledge of the alleged infringing activity.'"  *Id.* (quoting *Dana Corp. v. IPC Ltd. P'ship*, 674 F. Supp. 581, 583 (E.D. Mich. 1987)).

A plaintiff may defeat the presumption that an action is barred by laches by: (1) rebutting the presumption of prejudice; (2) demonstrating a good excuse for the delay; or (3) establishing the defendant engaged in conduct so egregious that it changes the balance of the equities in the plaintiff's favor.  *Id.* at 409.

### a. The Analogous Statute of Limitations

In this case, the parties agree that the analogous state statute of limitations for Lanham Act claims in Ohio is two years.  Safelite Mot. Summ. J. 32, ECF No. 127 (citing R.C. § 2305.10); Ultra Bond Resp. 18, ECF No. 154 (same).  This case was filed on August 18, 2015.  Compl., ECF No. 1.  Therefore, if Plaintiffs had actual or constructive knowledge of the alleged infringing activity before

August 18, 2013, there is a strong presumption that their delay in filing was prejudicial and unreasonable.

Safelite argues that "Plaintiffs knew of Safelite's dollar bill policy and thought it was false and misleading decades before they filed suit." Safelite Mot. Summ. J. 32, ECF No. 127. Campfield testified that he learned Safelite was allegedly misrepresenting that long cracks could not be repaired in the late 1990s. Campfield Dep. 246:18–24, ECF No. 131-12; *id.* at 277:22–278:2 (Campfield "believed that Safelite was making false or misleading statements to consumers by using the dollar bill rule" by August 12, 1998). By 1998, Campfield was telling insurance companies that Safelite was lying to consumers by using the dollar bill rule, *id.* at 278:3–7, an allegation at the heart of Plaintiffs' Lanham Act claims.

Campfield has also sued based on similar claims in the past. In 2003, Campfield unsuccessfully sued State Farm Insurance Company and Lynx Services based on Campfield's claim that they advertised the dollar bill rule to consumers (the "State Farm Lawsuit"). *Id.* at 280:3–7. At the time of the State Farm Lawsuit, Campfield was aware that Safelite was also representing that cracks over six inches were not repairable. *Id.* at 280:17–22. Then, in 2004, Campfield and Ultra Bond sued Safelite and included an allegation that Safelite uses its dollar bill rule to mislead insureds into replacing repairable windshields. *Id.* at 283:1–284:19. Plaintiffs did not win that lawsuit either. *Id.*

Plaintiffs do not dispute that the presumption of prejudice applies. *See generally* Resp.18–22, ECF No. 154. Instead, they argue that they have rebutted the presumption of prejudice, that there was good cause for their delay, and that Safelite's "egregious" conduct excused the delay.

### b. Rebutting the Presumption of Prejudice

Plaintiffs attempt to rebut the presumption of prejudice by arguing that "the undisputed facts show that Safelite would not stop making its false statements regardless of any action taken by the industry (such as ROLAGS) or by Mr. Campfield." Resp. 20, ECF No. 154. In support, Plaintiffs reference an email from Paul Syfko ("Syfko")[4] to two individuals at Belron[5] Canada in which he stated that "Belron US has made it clear to insurance companies that it is not going to change its repairable dimensions to include crack repair until we research the safety implications." ECF No. 130-8, Tab 44. Belron US took this position in response to new ROLAGS standards that allowed for repair of cracks up to fourteen inches. *Id.* Plaintiffs claim this email conflicts with an earlier email from Syfko in which he stated that the safety of long crack repair was "not an issue." ECF No. 130-8, Tab 43.

Regardless of whether Syfko's two emails conflict, based only on these two emails, Plaintiffs assert that "it is reasonable to assume that a lawsuit by Mr.

---

[4] Syfko was the general manager of Glass Medic, which was a subsidiary of Belron. Syfko Dep. 11–12, ECF No. 130-2, Tab 6.
[5] Belron is Safelite's foreign parent company.

Campfield would not cause Safelite to stop misleading insurance companies and consumers about the repairability of windshield cracks longer than six inches." Resp. 21, ECF. No. 154. That logical leap falls well short. Syfko's statement that Belron (or Safelite) would not begin performing long-crack repair simply because of the changed ROLAGS standard has no bearing on whether Safelite would have ceased making allegedly false and misleading statements about such repairs if ordered to do so by a court, which is the relevant question. *See Nartron v. STMicroelectronics, Inc.*, 305 F.3d 397, 411–412 (6th Cir. 2002) (disagreeing with the plaintiff's argument that the defendant's continued use of the allegedly infringing term demonstrated a lack of prejudice and stating that an earlier lawsuit would have given the defendant earlier notice of whether it was infringing). Every year that Plaintiffs delayed in bringing this lawsuit is another year that Safelite continued its use of the dollar bill rule, prejudicing Safelite by increasing potential damages that Plaintiffs could claim as well as increasing money Safelite invested in promoting the dollar bill rule. Plaintiffs have not raised a genuine issue of material fact sufficient to rebut the presumption of prejudice.

### c. Good Cause for Delay

Plaintiffs argue that they had good cause for delay because they may not have been successful in suing Safelite earlier. Specifically, Plaintiffs contend that their loss in the State Farm Lawsuit shows that if they had brought their claims "decades ago" they may well have lost for the same reasons they lost that

case—"i.e. the lack (at the time) of an industry standard." Resp. 19, ECF No.

154 (citing *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 570 (6th Cir. 2000)).

There are two main problems with Plaintiffs' theory. First, as Safelite

points out, Plaintiffs have expressly denied that their claims depend on the

ROLAGS industry standard. Resp. 47, ECF No. 154. "Rather, [Plaintiffs' claim]

is that Safelite states to insurers and consumers in its marketing that, as a matter

of objective fact, cracks greater than six inches long cannot be safely or properly

repaired which is demonstrably false." *Id.* Plaintiffs point to no evidence that the

nature of Safelite's statements to insurers or consumers materially changed after

the State Farm litigation.[6]

This is important, because the one case Plaintiffs cite in support of this

argument, *Kellogg*, depends on the concept of "progressive encroachment." In

*Kellogg*, a trademark infringement case, the Sixth Circuit summarized

progressive encroachment as applying

> where the defendant has engaged in some infringing use of [a
> plaintiff's] trademark—at least enough of an infringing use so that it
> may attempt to avail itself of a laches or acquiescence defense—but
> the plaintiff does not bring suit right away because the nature of
> defendant's infringement is such that the plaintiff's claim has yet to
> ripen into one sufficiently colorable to justify litigation.

---

[6] Safelite also argues that Campfield did not lose the State Farm case because of a lack
of an industry standard. Reply 4–5, ECF No. 159. While the lack of an industry
standard was not the sole reason Campfield lost the State Farm case, it was relevant to
why his Colorado Consumer Protection Act claim failed. *Campfield v. State Farm Mut.
Auto. Ins. Co.*, 532 F.3d 1111, 1121 (10th Cir. 2008) (Campfield admitted in deposition
that the industry standard up until the time of the lawsuit "dictated that repairs of cracks
longer than six-inches would not hold" and could not provide sufficient evidence that
State Farm nonetheless "knew that long cracks could be successfully repaired").

*Kellogg*, 209 F.3d at 570. As the Sixth Circuit later explained, while citing to *Kellogg*, "progressive encroachment requires something about the defendant's use of the mark to have changed significantly." *Nartron*, 305 F.3d at 410. Again, Plaintiffs here cannot point to such a significant change in Safelite's statements that would justify bringing a lawsuit now instead of much earlier.

Second, even if the lack of an industry standard was what caused Plaintiffs to delay filing suit, that excuse ended in 2007, eight years before this lawsuit was filed. *See* Resp. 19, ECF No. 154 (claiming that "the industry reached a consensus on repairable crack length through the ROLAGS" in 2007). Plaintiffs assert that an eight-year delay "is not considered 'extreme' for purposes of laches, *id.* (citing *Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 422 (6th Cir. 2010)), but *Laukus* does not support this proposition. *Laukus* never references the concept of an "extreme" delay. After finding that a mere five-month delay after the analogous statute of limitations had run in a trademark infringement case "was presumptively unreasonable and prejudicial to defendants," the Sixth Circuit nevertheless found that the plaintiff's delay was excused because he had submitted an affidavit averring that he believed the infringement had stopped at one point. *Laukus*, 391 F. App'x at 422. Plaintiffs point to no such evidence that they believed Safelite's allegedly false and misleading statements ceased for a period of time, which caused Plaintiffs not to timely file suit.

For these reasons, Plaintiffs have failed to demonstrate that their delay in bringing their claims was excusable.

### d. Safelite's Allegedly Egregious Conduct

Plaintiffs argue that Safelite's conduct was sufficiently egregious to defeat a laches defense in two main ways: (1) "by blatantly lying about the safety of the ROLAGS standard and long-crack repair"; and (2) by putting consumers' safety at risk.[7] Resp. 21–23, ECF No. 154. However, the Court finds that Plaintiffs have not raised a genuine issue of material fact as to whether Safelite's conduct was sufficiently egregious to defeat laches.

First, Plaintiffs claim that Safelite's allegedly false and misleading statements constitute egregious conduct. But Plaintiffs cannot rely on "the conduct which forms the basis for [their] claims" to also bar a laches defense. *See Rocky Brands, Inc. v. Red Wing Shoe Co.*, No. 2:06-cv-275, 2008 U.S. Dist. LEXIS 87031, at *30 (S.D. Ohio Oct. 27, 2008) (finding that plaintiff fell short of demonstrating egregious conduct because it had not adduced evidence of fraudulent intent in addition to providing evidence which formed the basis of its claims). Otherwise, a laches defense would always be unavailable in Lanham Act cases such as this so long as a plaintiff could survive summary judgment on the substance of its claims.

---

[7] Plaintiffs also make a cursory argument that Safelite's conduct was egregious because it forced consumers to pay more for replacements than they would have paid for repairs. However, Plaintiffs cite no case suggesting such alleged economic harm to a third party could constitute egregious conduct, and the Court finds that it is not.

Third, Plaintiffs claim that Safelite's false and misleading statements about the repairability of long cracks put consumers' safety at risk, Resp. 22–23, ECF No. 154, but fail to create a genuine issue of material fact as to whether Safelite's windshield repairs are safe. Plaintiffs cite to the statement of their expert, Bob Beranek ("Beranek"), to support their safety argument. Beranek states in his report that, "in [his] professional opinion the risk of personal injury or death to a driver or passenger in a vehicle accident can result more from improper windshield replacement than an improper windshield repair. Beranek Rep. ¶ 12, ECF No. 130-6, Tab 36. Beranek also testified in his deposition to certain issues that could arise when a windshield is repaired by a mobile technician, including weather problems and contaminants affecting the repair. Beranek Tr. 74:23–81:11, ECF No. 157-5, Tab 115. Plaintiffs do not point to any specific statements from Beranek that Safelite windshield replacements "put consumers' safety at risk." *See* Resp. 23, ECF No. 154.

Rather, as Safelite points out, Beranek testified that Safelite's windshield replacement process complies with the Auto Glass Replacement Safety Standard ("AGRSS"), which in his view means that it is safe for "everyone who rides in that car." Beranek Dep. 64:19–22; 105:23–25, ECF No. 132-1. Beranek also testified that he was not aware of a single instance in which a Safelite windshield replacement failed and caused injury or death to a consumer. *Id.* at 106:16–19. Beranek's generalized comments about potential risks of improperly

performed windshield replacement, without some specific evidence that Safelite fails to meet national safety standards or has actually caused injury or death to a consumer, are insufficient to raise a genuine issue of material fact as to whether Safelite's conduct was egregious.

Therefore, because the presumption of laches applies in this case and Plaintiffs have failed to rebut the presumption of prejudice, demonstrate good cause for delay, or establish that Safelite engaged in egregious conduct, laches bars Plaintiffs from obtaining some of their requested damages. However, "[l]aches only bars damages that occurred before the filing date of the lawsuit," and "[i]t does not prevent [Plaintiffs] from obtaining injunctive relief or post-filing damages."[8] *Nartron*, 305 F.3d at 412. In order to bar Plaintiffs from obtaining injunctive relief, Safelite would have to prove elements of estoppel, not mere silence by Plaintiffs. *Id.* Safelite has not proved such elements of estoppel. Therefore, the Court must consider the substance of Plaintiffs' Lanham Act claims.

---

[8] Safelite briefly argues that "[w]hen faced with extreme circumstances and egregious delay in false advertising cases, a court may find that laches also bars requests for injunctive relief." Reply 12, ECF No. 159. Safelite also contends that the Sixth Circuit has not "held that laches cannot bar prospective relief in false advertisement cases" as opposed to Lanham Act trademark cases such as *Kellogg* and *Nartron*. The Court sees no reason to distinguish between laches defenses in Lanham Act trademark cases as opposed to false advertising claims brought under the same. Further, in the apparent absence of such a distinction, the Court declines to apply out-of-circuit case law to this issue.

### 2. Proximate Cause

Safelite argues that Plaintiffs have failed to demonstrate that their alleged injuries were proximately caused by Safelite. Safelite Mot. Summ. J. 36–39, ECF No. 127.

Plaintiffs disagree and argue that they have demonstrated proximate cause in two different ways. First, Plaintiffs assert that nine of their customers (individuals who perform long-crack repair) have testified "that Safelite's mass marketing of the misleading six inch rule has materially affected the nature of their business, and their purchases and use of Plaintiffs' products . . . ." Pl. Resp. 29, ECF No. 154. The statements by Plaintiffs' customers each explain that Safelite's use of the dollar-bill rule makes it more difficult for them to sell long-crack repair to their own customers.[9] Each customer affidavit includes a very short statement that relates to Plaintiffs and their products:

> In addition, if customer demand for long crack repair were to increase as a result of customers being informed that long crack repairs can be safely done according to industry standards up to 14 inches, I would most certainly have to compete for this increased customer demand by buying more of the Ultra Bond, Inc. products that are used for repairing long cracks up to 14 inches in length.

ECF Nos. 130-14 and 130-15.[10]

---

[9] *See* Statements from Eric Bray, Ken Drews, Ron Fleet, Larry Hamilton, Kevin Lewis, Allen McCracken, Dale Scott, Olivia Sollars, and Gerald Zwart, Tabs 84–92, ECF Nos. 130-14 and 130-15.

[10] Bray Statement ¶ 19; Drews Statement ¶ 12; Fleet Statement ¶¶ 15–16 (changing wording slightly to state he believes "customer demand for long crack repair would increase as a result of customers being informed that long crack repairs can be safely done," and he would need to compete for this demand by purchasing more Ultra Bond

Second, Plaintiffs argue that Safelite's false advertisements denigrate Plaintiffs' products or services, which proximately causes damages—e.g. "Plaintiffs' business is premised on long-crack repair . . . Safelite advertises, markets, and promotes just the opposite"; survey evidence "shows strong consumer demand for long-crack repair absent the false messaging by Safelite"; Plaintiffs are the "face of long-crack repair" whose success depends "on the industry's acceptance of that practice." Resp. 29–32, ECF No. 154.[11]  Plaintiffs support this contention by referencing one of their experts, Rene Befurt, whose surveys found that individuals who did not see statements advertising the dollar bill rule were more likely to repair instead of replace a windshield with a long crack.  See Rene Befurt Report ¶ 85, Tab 113, ECF No. 154-3.

The Supreme Court of the United States has explained that Lanham Act claims require a showing that a plaintiff's injuries were proximately caused by a violation of the statute.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–33 (2014).  The Court held that "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs

_____

products); Hamilton Statement ¶ 9; Lewis Statement ¶ 18; McCracken Statement ¶¶ 14–15 (wording similar to Fleet Statement); Scott Statement ¶¶ 17–18 (wording similar to Fleet Statement); Sollars Statement ¶ 15; Zwart Statement ¶ 21, ECF Nos. 130-14 and 130-15.

[11] This line of argument can be summarized by one sentence in Plaintiffs' response: "the 'industry' did not reject long-crack repair on its own . . . the evidence shows that the industry did so as a consequence of Safelite's false statements—thereby proximately damaging Plaintiffs' business."  *Id.* at 32.

when deception of consumers causes them to withhold trade from the plaintiff. That showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff." *Id.* at 133–34.  The Court went on to provide an example, stating that "a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, [but] the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's inability to meet [its] financial obligations." *Id.* at 134 (internal quotation marks and citation omitted).

A plaintiff may obtain relief "not only where a defendant denigrates a plaintiff's product by name . . . but also where the defendant damages the product's reputation by, for example, equating it with an inferior product." *Id.* at 138 (internal citations omitted).  Put a different way, "a defendant who 'seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product' may be said to have proximately caused the plaintiff's harm." *Id.* (quoting *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 657 (2008)).

With respect to Plaintiffs' first asserted basis for finding proximate cause— lost business for Plaintiffs' customers that in turn reduced business for Plaintiffs—as in *Lexmark*, the purported injury to the plaintiff is "not direct, but includes [an] intervening link." *Id.* at 139.  This sort of indirect link does not normally satisfy proximate causation because of the general tendency to not

stretch "beyond the first step" in the causal chain. *Id.* (quoting *Holmes v. Securities Investor Protection Co.*, 503 U.S. 258, 271 (1992)). The reason for that tendency, according to the Supreme Court, was "that there ordinarily is a 'discontinuity' between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former (and thus also to the defendant's conduct), but might instead have resulted from 'any number of [other] reasons.'" *Id.* at 140 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–59 (2006)). This discontinuity did not exist in *Lexmark* because the plaintiff would be damaged "more or less automatically" if the third party was damaged, so there was no need for any "speculative . . . proceedings" or "intricate, uncertain inquiries." *Id.* (quoting *Anza*, 547 U.S. at 459–60). Accepting the *Lexmark* plaintiff's "assertions at face value, there [was] likely to be something very close to a 1:1 relationship between" lost sales to a third party and lost sales to the plaintiff. *Id.* at 139. This direct relationship, which the Supreme Court described as "relatively unique circumstances," are what led the Court to find that the third parties were not "more immediate victims" than the plaintiff. *Id.* at 140.

The causal chain Plaintiffs seek to link from their nine customers' purported lost business to Plaintiffs' own injuries is less direct than in *Lexmark*. Here, Plaintiffs rely on statements from their customers that they would buy more of Plaintiffs' products *if* their own sales went up as a result of Safelite no longer

advertising the dollar bill rule. The strongest statement came from Dale Scott, who said he "absolutely believe[s] that customer demand for long crack repair would increase" if customers were told that long-crack repair could be performed and that he "therefore would be pursuing more of the long crack business to compete for, and try to capture, that increased demand." Scott Statement ¶ 17, Tab 90, ECF No. 130-15. In order to pursue that business, Scott says he would need to buy more of Plaintiffs' products. *Id.* ¶ 18.

Scott's statement highlights the discontinuity between Plaintiffs' purported damages and Safelite's conduct. First, customers would need to make a different decision about whether they wish to repair a long crack instead of replace the whole windshield. Then, those customers would need to choose one of Plaintiffs' customers to perform the repair. Finally, there would need to be enough additional long-crack repairs that the technicians would order more of Plaintiffs' products. Trying to prove this causal chain results in exactly the kind of "speculative . . . proceedings" and "intricate, uncertain inquiries" the Court suggested should be avoided in *Lexmark*. 572 U.S. at 140 (quoting *Anza*, 547 U.S. 459–60); *see also Muhler Co. v. Ply Gem Holdings, Inc.*, 637 F. App'x 746, 748 (4th Cir. 2016) (finding insufficient evidence of proximate cause despite affidavits stating that the plaintiff had lost sales to the defendant where the evidence did not establish that the lost sales were solely due to the defendant's misconduct as opposed to other intervening factors).

And it is not just the Court or Safelite claiming that properly attributing

Plaintiffs' damages to Safelite through this attenuated causal chain would be

difficult—it is Plaintiffs' own expert.  Justin McLean, who was tasked (in part) with

determining whether Plaintiffs would have generated more revenue and profits

but for Safelite's use of the dollar bill rule, said the following in his report:

> The fact that, Safelite notwithstanding, the crack repair industry is "highly fragmented" and that the competition between Safelite and Ultra Bond is multi-faceted makes assessing the particular impact of Safelite's actions to Ultra Bond difficult.  For example, if a customer in Florida elects to replace, instead of repair, a car windshield with a Long Crack that is unlikely to directly displace an Ultra Bond sale to a car owner.  However, it may displace a sale of repair services by an automotive glass shop in Florida.  With enough lost Long Crack sales, however, the third party shop will, in turn, purchase fewer Long Crack repair supplies.  While Ultra Bond's position as a leading seller of Long Crack repair supplies suggests that Safelite's gains result in lost market opportunities for Ultra Bond, estimating Ultra Bond's losses is difficult because not every lost repair would have been from Ultra Bond.  The exercise is made more difficult because, but for Safelite's actions, it is likely that some automotive glass shops not currently in the business of Long Crack Repair would enter that business.  As well, Ultra Bond would likely attract new customers, who may purchase supplies from Ultra Bond to do other work in addition to Long Crack repairs.

McLean Rep. ¶ 73, ECF No. 133-2.  This case does not fit the "relatively unique

circumstances" described in *Lexmark*.  For this reason, the statements of

Plaintiffs' customers do not demonstrate proximate causation.

Plaintiffs' argument that Safelite caused them direct injury by denigrating

their product's reputation sits on a firmer legal foundation but still fails.  As

already alluded to, '[w]hen a defendant harms a plaintiff's reputation by casting

aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements." *Lexmark*, 572 U.S. at 138.  For that reason, Courts have found defendants liable under the Lanham Act "not only where a defendant denigrates a plaintiff's product by name, but also where the defendant damages the product's reputation by, for example, equating it with an inferior product." *Id.* (internal citations omitted).  Put differently, "a defendant who seeks to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product may be said to have proximately caused the plaintiff's harm." *Id.* (internal quotation marks omitted).

But Plaintiffs have failed to put forth evidence demonstrating that Safelite told a known falsehood about Plaintiffs or their products.  Plaintiffs have not demonstrated that Safelite denigrated their product by name or told a known falsehood about Plaintiffs or their products specifically (as opposed to a concept of long-crack repair).  Nor have Plaintiffs pointed to statements by Safelite that damaged the reputation of Plaintiffs' products by equating them with an inferior product.  In *Lexmark*, the Court cited two examples of a defendant that equated the plaintiff's products with an inferior product.  *Lexmark*, 572 U.S. at 138 (citing *Camel Hair and Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*, 799 F.2d 6, 7–8, 11–12 (1st Cir. 1986) and *PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 122, 125 (2d Cir. 1984)).  Neither example fits the facts of this case. *See Camel Hair*, 799 F.2d at 7–8 (the defendant was falsely stating that its coats

contained a higher percentage of cashmere, which injured the nonprofit plaintiff that was formed to "promote the use of camel hair and cashmere fibres"); *PPX*, 746 F.2d at 121–122 (the plaintiffs claimed to have a financial interest in sales of Jimi Hendrix recordings and claims that the defendants were marketing albums falsely claiming to contain Hendrix performances).

  In short, Plaintiffs have not raised a genuine issue of material fact as to whether Safelite's alleged false statements proximately caused them any injury.

  Safelite suggests that Plaintiffs' inability to clear the proximate cause hurdle is a bar to monetary damages, not necessarily injunctive relief. *See* Safelite Mot. Summ. J. 36, ECF No. 127; Safelite Reply 12–13, ECF No. 159 (citing *Innovation Ventures, LLC v. Bhelliom Enters. Corp.*, 529 F. App'x 560, 568 (6th Cir. 2013) (stating, in a Lanham Act false advertising case, that the Sixth Circuit has not required "distinct evidence of harm as a prerequisite for injunctive relief")). However, *Lexmark*, decided after *Innovation Ventures*, explicitly stated that proximate causation "is an element of the cause of action" and if a plaintiff does not sufficiently demonstrate proximate causation, his claim must be dismissed. *Lexmark*, 572 U.S. at 134 n.6. In the absence of proximate causation, no Lanham Act claim—whether for monetary damages or injunctive relief—can proceed. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1527 n.1, 203 L. Ed. 2d 802 (2019) (citing *Lexmark* for the proposition that "although a plaintiff that 'cannot quantify its losses with sufficient certainty to recover damages . . . may

still be entitled to injunctive relief," the requirement of proximate causation 'must

be met in every case'"); *City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112,

1137 (9th Cir. 2020) (stating that *Lexmark* "applied its proximate-cause reasoning

to plaintiff's false advertising claim without making any distinction based on the

type of relief, even though the plaintiff sought both damages and injunctive

relief"); *Millennium Access Control Tech., Inc. v. On the Gate, LLC*, No. 15-CV-

6067(SJF)(AKT), 2017 U.S. Dist. LEXIS 224069, at **31–32 (E.D.N.Y. Feb. 14,

2017) (dismissing the plaintiff's false advertising claim, which included a request

for injunctive relief, "in its entirety" because it failed to sufficiently allege

proximate causation).

      Plaintiffs' failure to raise a genuine issue of material fact as to proximate

causation is a total bar to their Lanham Act claim. For that reason, Safelite's

motion for summary judgment is granted to the extent it seeks a judgment

dismissing Plaintiffs' Lanham Act claim, and Plaintiffs' motion for partial summary

judgment is denied to the extent it sought judgment in their favor on certain

aspects of their Lanham Act claim and immediate injunctive relief. Safelite's

request for a declaratory judgment that Plaintiffs have unclean hands and are

prohibited from receiving equitable relief under the Lanham Act is denied as

moot.

## B. Safelite's Counterclaims

Safelite brings the following counterclaims: tortious interference with

contract; misappropriation of trade secrets under the Ohio Uniform Trade Secrets

Act ("OUTSA"), R.C. § 1333.61, *et. seq.*; civil conspiracy; conversion; violation of

the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; unfair

competition; and for a declaratory judgment that Plaintiffs have unclean hands

and are prohibited from receiving equitable relief under the Lanham Act,

including but not limited to disgorgement of Safelite's profits. Ans. and

Counterclaim, ECF No. 93. As discussed above, Safelite's request for a

declaratory judgment is now moot. Plaintiffs move for summary judgment on all

of Safelite's remaining counterclaims. Also, Safelite moves for summary

judgment in its favor on its conversion counterclaim.

### 1. OUTSA Preemption

Plaintiffs argue that Safelite's claims for tortious interference with contract,

civil conspiracy, and conversion are preempted by OUTSA and therefore fail as a

matter of law. Pl. Mot. Summ. J. 43–44, ECF No. 130. Plaintiffs assert that

Safelite's tortious interference with contract, civil conspiracy, and conversion

claims are all based on the same operative facts—i.e. that Plaintiffs unlawfully

obtained Safelite's confidential and proprietary trade secret information. *Id.*

Safelite responds by arguing that there is an independent factual basis

supporting each tort claim, so preemption is inappropriate. Resp. 41–43, ECF

No. 152. Safelite suggests that while its "OUTSA claim focuse[d] on information used without Safelite's authorization and for the purpose of benefitting Safelite's competitors, including Ultra Bond, its conversion [and civil conspiracy] claims seeks to remedy Plaintiffs' physical theft of resins and tools . . ." *Id.* at 42. Similarly, Safelite contends that, while "there may be some overlap," the facts establishing its tortious interference claim and the harm it alleges it suffered from the tortious interference are distinct from its OUTSA claim. *Id.*

In reply, Plaintiffs argue that "Safelite's express allegations in its Counterclaim[s for conversion, civil conspiracy, and tortious interference] which simply repackage the same allegations in its OUTSA claim contradict Safelite's argument." Reply 21, ECF No. 161. Plaintiffs then suggest that Safelite's arguments at summary judgment cannot rely on facts that were not included in Safelite's counterclaims because Safelite never sought to amend its counterclaim. *Id.*

"The OUTSA incorporates the Uniform Trade Secrets Act's displacement of 'conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.'" *Stolle v. Mach. Co., LLC v. Ram Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015) (quoting R.C. § 1333.67(A)). If a civil remedy is not based on misappropriation of a trade secret, it is not preempted. *Id.* (quoting R.C. § 1333.67(B)(2)). The Sixth Circuit has adopted a broader interpretation of OUTSA preemption, finding that it

"should be understood to preempt not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way on misappropriation of trade secrets." *Id.* "The test to determine whether a state law claim is displaced by OUTSA is to determine whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Id.* at 485 (quoting *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008)). "Where the state-law claim has a factual basis independent from the facts establishing the OUTSA claim, 'the portion of the claim supported by an independent factual basis survives preemption.'" *Id.* (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 940 (S.D. Ohio 2012)).

The Court agrees with Plaintiffs that Safelite's tortious interference, conversion, and conspiracy claims are preempted. First, with respect to Safelite's conversion and conspiracy claims, the underlying factual basis for the claims is the same as Safelite's OUTSA claim. Safelite's conversion claim is based on Safelite's ownership and rights in "confidential and proprietary trade secret information including, but not limited to, training materials, pricing arrangements, financial data, technician rankings, customer satisfaction data, customer and prospective customer lists, and customer information and preferences." Safelite Ans. and Counterclaim ¶ 255, ECF No. 93. Safelite

alleges that Plaintiffs, "through Ladage and Christensen, interfered with Safelite's right to possess the customer files and the individual documents in those files by taking them from Safelite's offices." *Id.* ¶ 256. Similarly, Safelite's conspiracy claim depends on the allegation that Plaintiffs "actually obtained Safelite's training materials, pricing arrangements, financial data, technician rankings, customer satisfaction data, customer and prospective customer lists, customer information and preferences, and other documents referencing the dollar bill rule . . . ." *Id.* ¶ 251. When you compare these claims with Safelite's OUTSA claim, which alleges that Plaintiffs "used improper means to appropriate Safelite's confidential and proprietary trade secret information" including "training materials, pricing arrangements, financial data, technician rankings, customer satisfaction data, current and prospective customer lists, customer information and preferences, and other documents referencing the dollar rule," *id.* ¶¶ 243, 245, it is clear that all three claims are based on the same underlying operative facts.

Safelite seeks to avoid this inevitable conclusion by saying that "while [its] OUTSA claim focuses on information used without Safelite's authorization and for the purpose of benefitting Safelite's competitors . . . its conversion claim seeks to remedy Plaintiffs' physical theft of resins and tools . . . ." Resp. 42, ECF No. 152. However, the physical theft of resin and tools is outside the factual basis of Safelite's counterclaim, which Safelite has not sought to amend. While "a plaintiff does not have to allege in his complaint every fact on which he will rely

at summary judgment . . . that does not mean that a plaintiff may plead one

theory and one set of facts in his complaint, and then proceed to trial on an

entirely different theory supported by entirely different facts." *Faulconer v. Centra*

*Health, Inc.*, 808 F. App'x 148, 154 (4th Cir. 2020) (upholding the district court's

determination that the plaintiff could not change the factual basis of his retaliation

claim when this "newfound approach . . . "[bore] no resemblance to the factual

allegations in [the plaintiff's complaint]). Such a change "is tantamount to a

constructive amendment of a complaint," which the Court has the discretion not

to allow. *Id.* Here, the Court will not permit Safelite to rely on the alleged theft of

resin and tools when the factual allegations in its counterclaim related solely to

documents Safelite alleges were taken. Safelite's conversion and conspiracy

counterclaims are based on the same underlying facts as its OUTSA claim and

are therefore precluded.

The same is true of Safelite's tortious interference claim, which is based on

Ladage and Christensen's alleged breach of their contractual obligations by

"disclosing or using Safelite's confidential and proprietary trade secret

information, including information that referenced the dollar bill rule, during the

course of their employment." Ans. and Counterclaim ¶ 234, ECF No. 93.

Safelite's tortious interference claim is preempted because, while proof of tortious

interference would require proving additional elements, the core of Safelite's

claim is that Ladage and Christensen misappropriated trade secret information,

which are the operative facts at the heart of Safelite's OUTSA claim. *See Stolle*,

605 F. App'x at 485–86; *see also Murray Energy Holdings Co. v. Bloomberg,*

*L.P.*, No. 2:15-cv-2845, 2016 U.S. Dist. LEXIS 79199, **31–32 (S.D. Ohio June

17, 2016).

For these reasons, Safelite's tortious interference, conversion, and

conspiracy counterclaims are preempted by the OUTSA and are dismissed.

### 2.  Safelite's CFAA Claim

Plaintiffs argue that Safelite's CFAA claim fails because (among other

reasons) Safelite has not put forth facts demonstrating that Plaintiffs (or Ladage

or Christensen) knowingly accessed Safelite's protected computers without

authorization.  Pls. Mot. Summ. J. 48–51, ECF No. 130.  A defendant is liable

under the CFAA if he "intentionally accesses a computer without authorization or

exceeds authorized access" and obtains "information from any protected

computer."  18 U.S.C. § 1030(a)(2)(C).

Plaintiffs point to the deposition testimony of Dale Sweigart ("Sweigart")

and Curtis Conklin ("Conklin"), who testified as 30(b)(6) witnesses for Safelite.

Sweigart Dep., Tab 93, ECF No. 130-15; Conklin Dep., Tab 96, ECF No. 130-15.

When these corporate representatives were asked to provide evidence that

Ladage or Christensen had obtained information by accessing a computer

without authorization, they did not provide any such evidence.  When Conklin

was specifically asked whether Safelite had information showing that Christensen

downloaded the relevant documents, Conklin said it was possible that Safelite could "go back and try and locate that information" but admitted that Safelite had not done that to his knowledge. Conklin Dep. 116:20–117:8.

Plaintiffs also highlight testimony from Sweigart indicating that the documents on which Safelite bases its counterclaims were stored in hard copy and would not have been accessed by a computer. Pls. Mot. Summ. J. 31–32, ECF No. 130.

In response, Safelite points to two emails involving Campfield to demonstrate that Ladage and Campfield "knowingly accessed and took [] information with the intent to harm Safelite by providing it to Safelite's competitors." Resp. 44, ECF No. 152 (citing ECF Nos. 93-11 and 93-12).

The Court has reviewed the evidence cited by Safelite and finds that it fails to raise a genuine issue of material fact as to whether Ladage (or Christensen) accessed Safelite's computers in violation of the CFAA. The first email Safelite cites as evidence of a CFAA violation is a January 6, 2012 email from Ladage to Campfield. ECF No. 93-11. The email states that a national trainer would be coming to Ladage's "shop to 'teach' us better methods of using the repair system." Ladage suggested that he should record that, potentially by wearing a wire. The email says nothing about inappropriately accessing a computer system and does not support a CFAA claim.

The second document Safelite cites in support of its CFAA claim is a series of emails in October 2013 between Penny Chatterton ("Chatterton"), a chemist at Novus Inc., and Campfield.  ECF No. 93-12.  The email string begins with Chatterton asking Campfield: "Would you use your secret source to try to get me the safety data sheet for the HPX-3? If the source is an employee, his employer is required to have it on file and Safelite/Belron is required to provide it."  Campfield responded to the email by attaching a document, but there is nothing in the email indicating how Campfield obtained the information or how that information was accessed.  In short, there is nothing demonstrating that it was obtained by someone accessing a computer without authorization.

Safelite has failed to raise a genuine issue of material fact as to whether Plaintiffs (or Ladage or Christensen) "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access" and obtained "information from any protected computer."  Therefore, Plaintiffs' motion for summary judgment on Safelite's CFAA claim is granted.  *See* 18 U.S.C. § 1030(a)(2)(C).

### 3.  Remaining State-Law Counterclaims

The only two remaining claims in this case are Safelite's OUTSA and unfair competition counterclaims.  The Court has concerns about whether it has jurisdiction over these state-law counterclaims.  The Counterclaim invokes diversity jurisdiction and supplemental jurisdiction over such claims.  Ans. and Counterclaim ¶ 158, ECF No. 93.

To the extent Safelite relies on supplemental jurisdiction, now that the

Court has dismissed the federal claims, it would decline to exercise supplemental

jurisdiction over the state-law counterclaims and dismiss them without prejudice.

*See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726

(1966).

Thus, the Court must determine whether it has independent jurisdiction

over the state-law counterclaims based on diversity jurisdiction. "[D]iversity of

citizenship requires complete diversity between all plaintiffs on one side and all

defendants on the other side." *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 664

(6th Cir. 2004).

Defendant Safelite Solutions LLC is a limited liability company. Amend.

Compl. ¶ 36, ECF No. 62. The Complaint alleges that Safelite Solutions LLC "is

a Delaware limited liability company with its headquarters in Columbus, Ohio."

*Id.* However, it is not sufficient to merely allege the state of incorporation and

principle place of business of an LLC for citizenship purposes. Rather, "a limited

liability company has the citizenship of each of its members." *Delay v. Rosenthal*

*Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) (citations omitted). Thus:

> When diversity jurisdiction is invoked in a case in which a
> limited liability company is a party, the court needs to know the
> citizenship of each member of the company. And because a member
> of a limited liability company may itself have multiple members—and
> thus may itself have multiple citizenships—the federal court needs to
> know the citizenship of each 'sub-member' as well. Indeed, if even
> one of [the LLC's] members—or one member of a member—were a

citizen of [the same state as the plaintiff], then complete diversity, and with it federal jurisdiction, would be destroyed.

*Id.* (citations omitted).

In this case, no party has identified the true and complete citizenship status of Safelite Solutions LLC. Accordingly, the Court is not satisfied that complete diversity exists. *See, e.g., V & M Star, LP v. Centimark Corp.*, 596 F.3d 354, 356–57 (6th Cir. 2010) ("[T]he district court had an obligation to go further, despite [the defendant] having waived the issue . . . The court should have insisted that [the plaintiff] establish the citizenship of its partner LLCs, including any 'sub-members' . . . .").

Plaintiff and Defendants are **DIRECTED** to file **WITHIN FOURTEEN DAYS** a notice detailing the corporate structure of each party as well as the citizenship of each party under the pertinent legal citizenship test. The parties' notice must "drill down" until all members' and sub-members' citizenship is accounted for.

## V. CONCLUSION

For these reasons, the Court **GRANTS IN PART AND DENIES IN PART** Safelite's motion for summary judgment, ECF No. 127, and **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for partial summary judgment, ECF No. 130. Plaintiffs' motion to dismiss, ECF No. 98, is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**