UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Richard Campfield, *et al.*,

    Plaintiffs,

v.

Safelite Group, Inc., *et al.*,

    Defendants.

Case No. 2: 15–cv–2733

Judge Michael H. Watson

Magistrate Judge Vascura

## OPINION AND ORDER

The Court previously withheld ruling on the remaining claims in this case to ensure that it had jurisdiction. Opinion & Order 37–38, ECF No. 168. The parties have now provided information about the citizenship of all members and sub members of each party. ECF Nos. 173 & 175. There is complete diversity between all Plaintiffs and all Defendants; the Court has diversity jurisdiction and will accordingly rule on the remaining claims.

Pending before the Court are two counterclaims brought by Safelite Group, Inc., Safelite Solutions LLC, and Safelite Fulfillment, Inc. (collectively, "Safelite") against Richard Campfield and Ultra Bond, Inc. (collectively, "Campfield") : (1) misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Revised Code § 1333.61, *et. seq.*, and (2) unfair competition.

The Court now picks up where it left off in its prior Opinion and Order. *See* ECF No. 168.

## I. FACTS

By way of framing the parties' versions of events, (but not to suggest these facts are fully supported by evidence in the record, much less undisputed) the Court repeats its prior overview regarding the remaining counterclaims:

> Safelite has grown its business over more than seventy years to become the largest vehicle glass repair and replacement organization in the United States. Safelite has developed information that it considers to be confidential and proprietary trade secret information related to its services including training materials, pricing arrangements, financial data, technician rankings, customer satisfaction data, current and prospective customer lists, and customer information and preferences.
>
> [Richard Campfield ("Campfield")] founded Ultra Bond to license the Ultra Bond process and sell long crack-related products, which compete with Safelite's products and services. From 2007 to 2013, Safelite employed Brian Ladage ("Ladage") as a technician in Safelite's retail store in Grand Junction, Colorado, and from 2000 to 2013, Safelite employed Don Christensen ("Christensen") as a manager of Safelite's Grand Junction shop. As part of their employment, Ladage and Christensen had access to some of Safelite's information that it considers to be confidential and proprietary trade secret information. Ladage and Christensen were required to sign a confidentiality agreement because of their access to these materials.
>
> At some point, Ladage and Christensen became disgruntled employees of Safelite, which led Campfield to direct them to steal Safelite's confidential information. Ladage and Christensen gave Campfield confidential information that he wanted to use against Safelite. After Campfield was able to obtain this information, other Safelite competitors learned what he was doing and requested additional trade secret information such as the chemical composition of Safelite's resin. Ladage provided this information to Campfield for him to pass along to Safelite competitors.
>
> [Campfield] solicited Ladage and Christensen to leave Safelite, which they eventually did. Ladage went to work for Ultra Bond.

Opinion & Order 5–6, ECF No. 168.

## II. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine dispute of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pittman v. Cuyahoga Cty. Dept. of Children and Family Serv.*, 640 F.3d 716, 723 (6th Cir. 2011). The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal

citations and quotation marks omitted); *see also Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

The Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). The Court may rely on the parties to call attention to the specific portions of the record that demonstrate a genuine issue of material fact. *Wells Fargo Bank, N.A. v. LaSalle Bank N.A.*, 643 F. Supp. 2d 1014, 1022 (S.D. Ohio 2009).

The parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of*

*Trs. for State Colls. & Univs.*), 757 F.2d 698, 705 (5th Cir. 1985)). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

## III. ANALYSIS

The Court will address each of Safelite's remaining counterclaims in turn.

### A. Safelite's OUTSA Claim

To succeed on a misappropriation of trade secrets claim, a plaintiff must show by a preponderance of the evidence that: 1) a trade secret exists; 2) the trade secret was acquired by the defendant as a result of a confidential relationship; and 3) the trade secret was used without authorization. *Heartland Home Fin., Inc. v. Allied Home Mortgage Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (citing *Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003)). Campfield argues that Safelite cannot establish the existence of the first or third requirement, or, in the alternative, that the claim is barred as untimely.

The statute of limitations for claims under OUTSA is "four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Ohio Rev. Code § 1333.66. This statutory directive "incorporates the discovery rule, which provides that a cause of action does not arise until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, that he or she was injured by the wrongful conduct of

the defendant." *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 457 (6th Cir. 2013); *see also Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 60 (6th Cir. 2007) ("'Discovery' as used here requires 'knowledge of such facts as would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry.'"). Even when there is a continuing misappropriation, there is only a single claim. Ohio Rev. Code § 1333.66. This means that "the first discovered (or discoverable) misappropriation of a trade secret commences the limitation period . . . ." *Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 796 F.3d 576, 582–83 (6th Cir. 2015) (citing *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 482 (6th Cir. 2015) (unpublished)).

On April 10, 2010, Campfield sent a letter to Safelite to inform it that it was "going to be named as defendant[] in complaints being filed beginning in approximately 60 days." ECF No. 93-9, PAGEID # 1355. In that same letter, Campfield made clear that he had "photographs, tape recordings, insured consumer witnesses, documents from a trash dumpster and former employee witnesses" to use against Safelite in the forthcoming litigation. *Id.* Receipt of that letter—which explicitly stated that Campfield had documents from Safelite's trash and had been speaking with former Safelite employees—should have put Safelite on notice that Campfield possibly possessed Safelite's trade secrets. Indeed, "the discovery rule requires the owner of a trade secret to conduct a timely and reasonable *investigation* after learning of possible misappropriation."

*Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 62 (6th Cir. 2007) (further explaining that this rule is "consistent with the nature of trade secrets; because trade secrets are not subject to a filing system, owners' diligence in taking affirmative steps to protect them is crucial"). Safelite made no such investigation at that time. Rather, it waited eight years and filed its counterclaims only after deposing Campfield. Accordingly, Safelite's misappropriation claims are barred as untimely.

Safelite's arguments to the contrary are unavailing. First, Safelite argues that Campfield's letter did not put it on notice of possible trade secret misappropriation because the letter did not *specify* the materials that Campfield possessed. Reply in Opp. 48, ECF No. 152. But the letter stated that Campfield had been talking to former employees and had somehow gotten some Safelite documents from its trash. This information was sufficient to put a reasonable company on notice that potential corporate espionage was afoot. Yet Safelite did not conduct *any* inquiry after it received Campfield's letter (or at least, did not argue it conducted any such inquiry), and, therefore, this argument is unavailing. *See Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 62 (6th Cir. 2007). Campfield's letter put Safelite on notice that an investigation was warranted to protect its trade secrets.

Next, Safelite argues that because the "wrongful conduct is ongoing" the statute of limitations has been reset. Reply in Opp. 50, ECF No. 152. This argument is contrary to the law, which expressly says that "a continuing

misappropriation constitutes a single claim." Ohio Rev. Code § 1333.66. For all these reasons, Safelite's OUTSA claim is time barred.

**B.    Safelite's Unfair Competition Claim**

Ordinarily, an unfair competition claim requires the plaintiff to show that the defendant made representations "for the purpose of deceiving the public, that his goods are those of another." *Water Mgmt., Inc. v. Stayanchi*, 472 N.E.2d 715, 717 (Ohio 1984) (citations omitted). The concept has been extended, though, to include "unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Id.; see also NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 818 (6th Cir. 2008).

When the "circulation of false rumors" is at issue, summary judgment is appropriate where there is no evidence that the defendant circulated false rumors or published statements designed to harm the plaintiff's business. *Key Realty, Ltd. v. Hall*, 173 N.E.3d 831, 852 (Ohio Ct. App. 2021) (citing *Molten Metal Equip. v. Metaullics Systems Co.*, 8th Dist. Cuyahoga No. 76407, 2000 WL 739470, *5 (Ohio Ct. App. June 8, 2000)). Additionally, a claim for unfair competition requires a complainant to have suffered harm as a result of the circulation of the false rumors. *See Morris v. Wise*, No. 1:19-CV-2467, 2020 U.S. Dist. LEXIS 35744, at **19–20 (N.D. Ohio Mar. 2, 2020) (finding that the plaintiff failed to allege a claim of unfair competition when there was no allegation that the defendant's actions had harmed the plaintiff or evidence that the published

statements were false); *Deems v. Eco Water Sys.*, No. CV2013-02-1202, 2014 Ohio Misc. LEXIS 26805, at **19–21 (Ct. Com. Pl. Dec. 8, 2014) (finding the defendant was entitled to judgment as a matter of law when the plaintiff "failed to point to the specific portions of the record to establish a genuine issue of material fact" that plaintiff's services were disparaged or harmed by the defendant); *Hometown Health Plan v. Aultman Health Found.*, No. 2006 CV 06 0350, 2009 Ohio Misc. LEXIS 550, at *40 (Ct. Com. Pl. Apr. 15, 2009) ("An unfair competition claim cannot succeed unless the plaintiff can show that defendant's conduct was the proximate cause of any damage to plaintiff."); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1025 (6th Cir. 1999) ("[A]bsent the identification of any irreparable harm, this counterclaim must fail.").

Turning then to whether false rumors were circulated, Safelite points the Court to a few statements it believes constitute false rumors. Most of the statements that Safelite points the Court to are statements in which Campfield is

questioning the quality[1] of the materials and processes[2] Safelite uses. But Safelite points the Court to no credible evidence that these statements were demonstrably false.

Instead, Safelite argues that they are false because, "[d]espite repeatedly telling state insurance commissioners, state attorneys generals, and the DOJ that

---

[1] For example, Safelite points to Campfield's email where he says that:

> The National Windshield Repair Association just sent out a complaint to each state attorney general about Safelite/Belron, including tests and real wor[l]d photographs of their new resin. It cannot pass the ROLAGS resin test. I will send you the report as soon as an attorney general sends it to them for some answers. I just re-repaired one [of] their repairs with this resin this morning.

ECF No. 136-8, PAGEID # 9996; see also ECF No. 136-7, PAGEID # 9989 (Campfield emailing Ladage an "Exhibit" saying that "Safelite Fails ROLAGS Resistance to Thermal Cycling Test").

[2] Safelite points to the following statement that had been featured on the Ultrabond website:

> There is a huge market for the re-repair of Safelite repairs as many of their repairs are not completely filled, many are just pit-filled as their technicians are not allowed to drill and their resin deteriorates rapidly. The reason for this is their Glass Medic tool pulls up instead of pushing down on the glass like every other windshield repair tool on the market does. Pulling up puts the outerlite of glass in tension. This closes the legs and shrinks the break, causing an under-fill. We have seen and re-repaired as many as six in one day.

ECF No. 93-10, PAGEID ## 1358–59. Campfield also emailed the National Windshield Repair Association ("NWRA") saying that "Belron STEERS over 10,000 repairable windshields PER DAY into replacements in the U.S. alone . . . ." ECF No. 135-16, PAGEID # 9889. Additionally, Campfield points to an infographic labeled "Windshield Claims & Your Insurance Company" that outlines why, in Campfield's view, consumers are being "Duped into Paying $350 for a $20 Windshield in 7 Easy Steps." ECF No. 136-18, PAGEID # 10197.

Safelite's practices are meant to defraud consumers and steer them away from Ultra Bond, there is no evidence that any government entity ever prosecuted or investigated Safelite for such practices." Reply in Opp. 46, ECF No. 152 (footnote omitted) (citing Campfield Dep. 348:11–352:21, ECF No. 131-13). The fact that Safelite was never prosecuted obviously does not mean that Campfield's statements are false, however.

Safelite further argues that the record reflects that "Safelite expends significant time and energy developing training materials so that Safelite technicians are properly trained to deliver quality repair and replacement services, and Safelite has the customer satisfaction statistics to show its success." *Id.* at 46. Again, though, this does not establish that Campfield's statements are false. Neither "proper training" nor high customer satisfaction necessarily mean Safelite's repairs are safe, let alone pass the "ROLAGS" tests Campfield claims it fails. Safelite has simply not offered any evidence from which a reasonable juror could determine that Campfield's statements are, in fact, false.

Further, Safelite provides no evidence it was harmed *because of* the circulation of the "false rumors." The evidence Safelite points to that Campfield "diverted sales from Safelite because of rumors he circulated," is unpersuasive. Reply in Opp. 47, ECF No. 152.

The first piece of evidence Safelite points to is an email thread in which Campfield communicates about the perceived ineffectiveness of Safelite's products. ECF No. 136-8. But that email thread does not show any diversion of

sales from Safelite. Even Campfield's statement that he "just re-repaired one [of Safelite's] repairs with resin this morning" *id.*, does not show Campfield's statements cause a loss of business to Safelite.

Safelite next points the Court to the following deposition testimony of Brian Ladage, a former Safelite employee:

> Q: So in your repairs [at Safelite], when a crack was longer than a dollar bill, you would replace the windshield, correct?
>
> A: With Safelite?
>
> Q: Yes.
>
> A: Yes.
>
> Q: Did you tell those customers that rather than replacing the windshield, they could go get the windshield repaired by Mr. Campfield if the crack was longer than six inches?
>
> A: Yes, I would.
>
> Q: And did those customers get a replacement in any event?
>
> . . .
>
> A: Some of them did leave and go down to [Mr. Campfield].
>
> Q: How many?
>
> A: Oh, I couldn't tell you. From what I know for sure, a couple handfuls, that I can recall.

Ladage Dep. 134–35, ECF No. 132-7.[3] This testimony makes clear that *Ladage* diverted some sales to Campfield from Safelite. But Safelite does not point to

---

[3] Safelite also directs the Court's attention to an email from Ladage to Campfield that reads as follows: "So you're pretty firm on not going mobile? I'm still with s[afe] l[ite] but I'm more actively seeking self-employment than I have been for quite a long time. It's time to move on. . . Let me know when that Volvo is

any testimony that Ladage's diversion was related to circulation of false rumors by Campfield. Thus, this testimony does not support a claim against Campfield.

Although the Court understands Safelite's frustration with this practice, it is not unfair competition under Ohio law. So, although Safelite may have been harmed by these diverted sales, that harm was not the result of false rumors on Campfield's behalf, and therefore, cannot be the basis of an unfair competition claim.

Because Safelite has failed to point the Court to evidence of falsity or harm, it's unfair competition claim must fail.

## IV. CONCLUSION

For these reasons, the Court **GRANTS IN PART** Campfield's motion for partial summary judgment, ECF No. 130. As there are no remaining claims, the Clerk is **DIRECTED** to enter judgment in favor of Campfield on all of Safelite's counterclaims and judgment in favor of Safelite on Campfield's claims.

**IT IS SO ORDERED.**

MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT

---

heading your way." See ECF No. 152-45, PAGEID # 17692. The purpose for this citation is unclear to the Court, however, the Court did review the email.