**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  January 16, 2024


Ms. Shalini Goyal
Jones Day
Ohio
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215

Mr. Michael Ryan Harmanis
Ms. Tiffany Danielle Lipscomb-Jackson
Jones Day
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215

Mr. Lawrence John Joseph
Mr. Kurt B. Olsen
1250 Connecticut Avenue, N.W
Suite 700
Washington, DC 20036

Mr. Matthew A. Kairis
Jones Day
2727 N. Harwood Street
Suite 600
Dallas, TX 75201-1515


Re:  Case Nos. 22-3204/22-3225, *Richard Campfield, et al v. Safelite Group, Inc., et al*
Originating Case No. : 2:15-cv-02733

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0010p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

RICHARD CAMPFIELD; ULTRA BOND, INC.,

        *Plaintiffs-Appellants/Cross-Appellees*,

     *v.*

SAFELITE GROUP, INC.; SAFELITE SOLUTIONS LLC; SAFELITE FULFILLMENT, INC.,

        *Defendants-Appellees/Cross-Appellants*.

Nos. 22-3204/3225

———————————

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:15-cv-02733—Michael H. Watson, District Judge.

Argued:  July 26, 2023

Decided and Filed:  January 16, 2024

Before:  MOORE, GIBBONS, and BUSH, Circuit Judges.

———————————

### COUNSEL

**ARGUED:**  Kurt B. Olsen, OLSEN LAW PC, Washington, D.C., for Appellants/Cross-Appellees.  Matthew A. Kairis, JONES DAY, Dallas, Texas, for Appellees/Cross-Appellants.  **ON BRIEF:**  Kurt B. Olsen, OLSEN LAW PC, Washington, D.C., Lawrence J. Joseph, Washington, D.C., for Appellants/Cross-Appellees.  Matthew A. Kairis, JONES DAY, Dallas, Texas, Tiffany D. Lipscomb-Jackson, Ryan Harmanis, Shalini B. Goyal, JONES DAY, Columbus, Ohio, for Appellees/Cross-Appellants.

     GIBBONS, J., delivered the opinion of the court in which MOORE, J., joined.  BUSH, J. (pp. 18–21), delivered a separate opinion concurring in all but Section III.B. of the majority opinion.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   Ultra Bond, Inc., and its owner, Richard Campfield (collectively "Ultra Bond") operate alongside the defendant companies ("Safelite") in the vehicle glass repair and replacement ("VGRR") industry.   The parties represent two different segments of the VGRR market:   Safelite provides windshield repair and replacement services, while Ultra Bond supplies proprietary bonding resin to repair windshield cracks.

This suit arises from Ultra Bond's claim that Safelite violated the Lanham Act by falsely advertising that windshield cracks longer than six inches could not be safely repaired and instead required replacement of the entire windshield.   Safelite counterclaims that Ultra Bond stole trade secrets from Safelite in violation of state and federal law.   On cross-motions for summary judgment, the district court rejected both parties' claims—granting summary judgment to Safelite on Ultra Bond's Lanham Act claim and granting summary judgment to Ultra Bond on Safelite's trade secrets claims.   The parties cross-appeal the district court's order.   We affirm in part and reverse in part and remand for further proceedings.

I.

This case concerns two sets of claims: Ultra Bond's allegations that Safelite engaged in false advertising in violation of the Lanham Act, and Safelite's allegations that Ultra Bond stole trade secrets in violation of state and federal law.

We begin with background concerning Ultra Bond's false advertising claim.[1]   Safelite dominates the national VGRR industry.   In 2016, it held 35.4% of the market with the next largest competitor holding just 3% of the market.   Although Safelite makes some repairs on windshield cracks, it will not repair windshield cracks that are longer than six inches (so-called

---

[1]Because the district court granted summary judgment to Safelite on Ultra Bond's Lanham Act claims, we recite the evidence here in the light most favorable to Ultra Bond.  *See Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 728 (6th Cir. 2012).   We likewise take the facts in the light most favorable to Safelite with respect to its counterclaims.

"long cracks") and instead will only replace the windshield.  Windshield replacement is where Safelite makes its money, while its repair business operates at break-even or at a loss.  Ultra Bond, on the other hand, manufactures patented products for vehicle glass repairs, specifically for long cracks, and performs those repairs.  An Ultra Bond expert opined that Ultra Bond is one of a handful of firms that supplies long-crack repair products and accounts for over 50% of national long-crack repair product sales.

Since at least 2005, Safelite has promoted its policy of repairing only cracks six inches or shorter under a marketing campaign of "the dollar-bill rule"—if the crack is shorter than the length of a dollar bill (approximately six inches), Safelite can repair it.  In 2007, however, an industry group formed by the American National Standards Institute ("ANSI"), comprised of sixteen industry members including both Safelite and Ultra Bond, conducted a safety study and concluded that cracks up to fourteen inches could be safely repaired without requiring windshield replacement.  The group then created the Repair of Laminated Automotive Glass Standards ("ROLAGS") and set the fourteen-inch crack repair standard as best practice nationally for the windshield repair industry.  Safelite was one of the industry members that voted to support this standard.  Despite the new industry standard for repairs, Safelite continued to market the "dollar-bill rule" as the safety standard for windshield repairs and continued to tell consumers that cracks longer than six inches require windshield replacement.

An important piece of this story is Safelite's relationship with insurance companies.  The vast majority of Safelite's sales come from insurance reimbursement, as Safelite functions as a third-party administrator ("TPA") for most of the nation's largest insurance companies.  In this role, Safelite takes calls from insurance policyholders whose windshields have cracked and drafts informational brochures and bulletins for insurance agents and companies to give to policyholders.  And while insurance companies ultimately set the standards for what kinds of damage it will cover, Safelite knows that its dominant market position meant that it can set the standard for insurance companies.  DE 130-8, Internal Email, Page ID 4575-76 ("Over the last 15 years, Safelite has helped the insurance company [sic] define what can be repaired vs. not repaired."); DE 130-3, CFO Doug Herron Dep., Page ID 3413 ("Q. Do you think that Safelite should be making the decision for the policyholder as to what is a durable repair or not?

A. Yes, I do.  It may sound arrogant, but *we're the subject matter experts in this area, and it's what their insurance company has entrusted us to do . . . .*  I think that's what we get paid to do, and that's the responsibility we accept."  (emphasis added)).

Despite the ROLAGS's agreed-upon fourteen-inch standard, Safelite told its insurance company clients that crack repair could not be safely performed on cracks longer than six inches. *See* DE 130-8, Email from Global Repair Development Manager Paul Syfko, Page ID 4221 ("Belron US [Safelite's parent company] subscribes to [the industry] standard with the exception of 14 in [sic] crack repair. . . . Belron US has made it clear to insurance companies that it is not going to change its repairable dimensions to include crack repair until we research the safety implications.  This statement shelves the issue until Belron Technical can complete its task.  *So far insurance companies have excepted [sic] our 'uncertainty argument' on the safety aspect of crack repair.*" (emphasis added)); DE 130-8, Internal Email from PR Manager Melina Metzger, Page ID 4231 ("Dave [Erwin] feels comfortable saying something like Safelite's SafeTech certification aligns with and exceeds industry standards including ROLAGS with the exception of ROLAGS recommendation to repair cracks up to 14 inches, which Safelite's research indicates is not safe."); DE 130-8, Email from Media Director Matt Johnson, Page ID 4223 ("Up to 24" repair can be safe and is viable.  Some Insurance [sic] clients push for long crack repair given that 24" is safe and 13.5" is NGA standard.").  And although it told insurance companies otherwise, Safelite never conducted its own technical study on the safety of long crack repairs to support its assertions.

Safelite made these statements to insurance companies knowing that its insurance clients' policyholders would choose long crack repair if it were covered.  DE 130-8, Internal Email, Page ID 4573 ("[Insurance client name redacted] currently believe that crack repair is something many of their policyholders would opt to try (especially those with higher deductibles [redacted]) where available.").  And by Safelite's own admission, its insistence on setting as strict a crack repair standard as possible was tied to protecting its higher-margin windshield replacement business.  DE 130-8, Internal Email, Page ID 4575 ("For the long term preservation of our replacement business I believe we need to embrace a smaller standard [for crack repair] . . . .  We can't be naïve in believing that all of these millions of repairs [at the existing six-inch standard]

that are getting done are not impacting our replacement business."); *id.* (describing replacement as "driving [Safelite's] business profitability").

Ultra Bond sued Safelite, alleging that Safelite's statements to insurance companies and consumers were literally false and misled consumers in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Ultra Bond alleged that those false statements economically injured Ultra Bond by decreasing consumer and commercial demand for its products. On Safelite's motion to dismiss, the district court clarified which of Safelite's statements could properly be considered as commercial advertising or promotion. The district court concluded that Safelite's statements to insurers and directly to customers counted as commercial advertising or promotion, but that statements made by Safelite through ghostwritten insurance brochures and to customers purely in its capacity as a TPA did not.

Safelite counterclaimed that Ultra Bond violated state and federal trade secrets laws. These claims included tortious interference with contract, misappropriation of trade secrets, civil conspiracy, conversion, unfair competition, and violation of the Computer Fraud and Abuse Act ("CFAA"). More specifically, Safelite claimed that Campfield recruited the help of two technicians at a Safelite retail store to steal Safelite's confidential and proprietary trade secret information, including "training materials, pricing arrangements, financial data, technician rankings, customer satisfaction data, current and prospective customer lists, and customer information and preferences." DE 97, Answer and Counterclaim, Page ID 1417. It also claimed that Ultra Bond engaged in unfair competition by "circulat[ing] false rumors regarding Safelite's business practices and use of the dollar bill rule." *Id.* at 1427.

Both parties moved for summary judgment. The district court granted in part and denied in part both motions. First, the district court granted Safelite summary judgment on Ultra Bond's Lanham Act claim but denied summary judgment to Safelite on its trade secrets counterclaims. The court concluded that although Ultra Bond had sufficiently presented allegations concerning deceptive false advertising by Safelite, it had failed to establish a genuine issue of material fact for a causal link between that false advertising and harm to Ultra Bond. It further concluded that Ultra Bond's claims were partially barred by the doctrine of laches because the company delayed

nearly two decades in bringing its claims.[2]  However, laches bars only recovery of pre-filing damages; it does not prevent Ultra Bond from obtaining injunctive relief or post-filing damages. See DE 168, Op. and Order, Page ID 20839 (citing *Nartron v. STMicroelecs., Inc.*, 305 F.3d 397, 412 (6th Cir. 2002)).

The district court then granted summary judgment to Ultra Bond on Safelite's counterclaims and denied summary judgment to Ultra Bond on its Lanham Act claims.  To begin, the court found that three of Safelite's common law counterclaims—tortious interference with contract, civil conspiracy, and conversion—were preempted by the Ohio Uniform Trade Secrets Act ("OUTSA"), because the civil remedy sought was based on misappropriation of a trade secret.  Next, the court rejected Safelite's CFAA claim for failing to raise a genuine issue of material fact as to whether Ultra Bond or the two Safelite employees it contacted "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access" and obtained "information from any protected computer."[3]  *Id.* at Page ID 20856 (quoting 18 U.S.C. § 1030(a)(2)).  Of Safelite's remaining two counterclaims, the court concluded that the OUTSA claim was barred by the statute of limitations and that Safelite failed to show genuine issues of material fact concerning its unfair competition claim.

The parties timely cross-appealed.[4]

---

[2] Ultra Bond does not appeal the district court's determination that laches limits its claim.  *See generally* CA6 R. 35, First Br.; CA6 R. 49, Third Br.

[3] Safelite does not appeal the district court's grant of summary judgment to Ultra Bond on the CFAA claim. *See generally* CA6 R. 39, Second Br.; CA6 R. 52, Fourth Br.

[4] Ultra Bond's appeal includes both the summary judgment order and the partial dismissal order earlier in the proceedings.  Safelite argues that any challenge to the partial dismissal order is outside the scope of this appeal because it was not explicitly included in Ultra Bond's notice of appeal.  *See* CA6 R. 39, Second Br., at 48-49.  We disagree. The notice of appeal need only "designate the judgment—or the appealable order—from which the appeal is taken."  *See* Fed. R. App. P. 3(c)(1)(B).  Designation of the final judgment "confers appellate jurisdiction over prior interlocutory orders that merge into the final judgment."  Fed. R. App. P. 3 advisory committee's note to 2021 amendments; *see also* Charles Alan Wright & Arthur P. Miller Federal Practice & Procedure § 3949.4.  And the district court's partial dismissal order was a non-final order that merged with the final judgment.  *See Kalama v. Matson Navigation Co.*, 875 F.3d 297, 305 (6th Cir. 2017).  Therefore, the partial dismissal order can be properly considered in this appeal.

II.

We review the grant of summary judgment de novo. *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021). Summary judgment is properly granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court ruling on a motion for summary judgment must consider all the facts in the light most favorable to the nonmovant and must give the nonmovant the benefit of every reasonable inference." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 (6th Cir. 1999).

The fact that the parties have submitted cross-motions for summary judgment does not necessarily mean that resolution of the case at the summary judgment stage is appropriate. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 270 (6th Cir. 2018). In that analysis, we look to the allegations in the complaint, take them as true, and construe all reasonable inferences in favor of the nonmovant. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

III.

We begin with Ultra Bond's Lanham Act claim against Safelite. First, we consider whether the district court properly dismissed from the claim certain statements made by Safelite in its capacity as a TPA and ghostwriter for insurance companies. Next, we analyze whether Ultra Bond has produced sufficient evidence of causation to survive Safelite's summary judgment motion. Finally, we discuss whether summary judgment should be granted to Ultra Bond on any aspect of the Lanham Act claim.

### A.  Commercial Advertising or Promotion

To state a Lanham Act claim for false advertising, a plaintiff must identify a deceptive or false statement made in "commercial advertising or promotion" upon which his or her allegations are premised.  15 U.S.C. § 1125(a)(1)(B); *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015).  While in some cases this definition will obviously be met, "communications need not necessarily resemble traditional television, radio, print, or Internet advertisements to fall within the purview of the Lanham Act."  *Grubbs*, 807 F.3d at 799.  In *Grubbs*, we developed a three-part test to determine whether a statement qualifies as "commercial advertising or promotion":

> (1) commercial speech; (2) for the purpose of influencing customers to buy the defendant's goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry or to a substantial portion of the plaintiff's or defendant's existing customer or client base.

*Id.* at 801.  The *Grubbs* test reflects a balance between including creative or innovative advertising techniques and not stretching the language of the Lanham Act "to encompass all commercial speech."  *Id.* at 800 (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)).

In applying this standard, the district court held that two kinds of statements—those made by Safelite to customers in its capacity as a TPA and those made in ghostwritten brochures distributed by insurance companies—do not qualify as "commercial advertising or promotion." We agree.  The brochures and statements as a TPA lack any indication that they were made with "the purpose of influencing customers to buy the defendant's goods and services."  *Id.* at 801. These statements to policyholders are mere reiterations of the standard set by insurance companies.  Even if we accept every claim of Ultra Bond as true, statements to policyholders are not "simply two channels in Safelite's broad marketing campaign to promote the dollar-bill rule."  CA6 R. 35, First Br. at 41-42.  Rather, these statements to policyholders are the *result* of Safelite's marketing campaign.  As Ultra Bond tells it, Safelite's consistent statements to insurance companies and insurance agents resulted in insurance companies keeping the dollar-bill rule even when the ROLAGS allowed otherwise.  That allegedly false advertising campaign

*resulted in* insurance companies setting a six-inch standard, which in turn meant that Safelite, when functioning as a TPA or providing ghostwritten informational brochures to insurance companies, was simply acting on the success of its allegedly misleading or false earlier statements.

Therefore, we affirm the district court's partial dismissal of Ultra Bond's claim based on Safelite statements made to policyholders as a TPA or through ghostwritten brochures.[5]

### B.  Causation

To make out its Lanham Act claim, Ultra Bond must show that: (1) "the defendant has made false or misleading statements of fact concerning his product or another's; (2) the statement actually [deceives] or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.  *Podiatric Physicians*, 185 F.3d at 613.  Both the district court opinion and Safelite's brief on appeal focus on the fifth element: causation.  We will do the same.

The causation standard in a false-advertising claim is a proximate causation standard, meaning that the Lanham Act "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct."  *Lexmark Int'l, Inc v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).  However, the *Lexmark* Court clarified that "the intervening step of consumer deception is not fatal to the showing of proximate causation," nor is the plaintiff's status as an indirect competitor.  *Id.*  Instead, a plaintiff suing for false advertising "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from

---

[5]Ultra Bond urges us to review additional record evidence in evaluating the district court's partial dismissal.  That is, months after the district court partially granted Safelite's motion to dismiss, documents attached to Ultra Bond's motion for summary judgment revealed that Safelite customer service representatives providing support to policyholders as a TPA would try to upsell or promote windshield replacement to customers.  Although this information might have affected the district court's analysis in the first instance, it was not alleged in the complaint or attached to it.  Therefore, we decline to consider that information.  *See Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) ("Generally, in considering a motion to dismiss, the district court is confined to considering only the pleadings . . . .").

the plaintiff." *Id.* The Court applied this to the hypothetical difference between economic harm of false advertising to a competitor and the knock-on effects on "the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's 'inability to meet [its] financial obligations.'" *Id.* at 134 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006)).

The scope of harm cognizable by the Lanham Act also extends to a supplier of a company's direct competitor where the decreased demand caused by false advertising directly harms the supplier. *Id.* at 139-40. That is the closest analogy to this case. However, *Lexmark* was careful not to limit false-advertising claims to any one fact pattern or theory. *See generally id.* at 134-40. Rather, the Court held that the "more immediate victim[s]" of false advertising in any given case can satisfy the causation requirement. *Id.* at 140 (citation omitted). In this case, the structure of the market suggests that there is unlikely to be a more directly injured commercial victim than Ultra Bond. (Safelite's direct competitors are VGRR businesses, often small shops, that provide both crack repair and windshield replacement, so false statements that favor one service over the other would not necessarily harm them.)

Commercial consumer affidavits and expert evidence support the causal relationship between Safelite's statements and decreased demand for Ultra Bond products. First, nine commercial customers stated that they have experience with customers hearing from Safelite that long crack repair is not safe, educating those individuals that such repair is safe, and having those individuals choose long crack repair, which these customers perform using Ultra Bond products. Second, when misleading ads regarding crack repair were ordered to be removed from the marketplace in New Zealand, Ultra Bond's direct sales and distribution sales to the country doubled. Third, Ultra Bond's second expert, Rene Befurt, conducted a consumer survey and estimated that 24.5% to 30.6% of respondents who replaced windshields would have had them repaired but-for Safelite's allegedly false statements.

Safelite argues that the declarations from commercial customers are insufficient because they are conclusory and fail to establish harm to Ultra Bond. More specifically, Safelite seizes on a phrase that is repeated with slight variations across the declarations: "[I]f customer demand for long crack repair were to increase as a result of customers being informed that long crack

repairs can be safely done . . . up to 14 inches, I would most certainly have to compete for this increased customer demand by buying more . . . Ultra Bond, Inc. products[.]"  DE 130-14, Aff., Page ID 5278-79.  But this statement does not stand alone.  In the declarations, the Ultra Bond customers, all VGRR shop owners, explain how they have consistently met customers who learned from Safelite that their long cracks could not be repaired.  Some shop owners have successfully reeducated customers and completed a long-crack repair using Ultra Bond products, but others have detailed how they have lost customers who called their insurance, were directed to Safelite as the TPA, and were told that long crack repair is unsafe or that the windshield must be replaced,

The documented experiences of Ultra Bond's commercial customers create a genuine issue of material fact as to whether Safelite's marketing and statements to insurance companies have caused Ultra Bond economic injury.  As *Lexmark* explains, "competition is not required for proximate cause" and proximate cause can include cases like this, where "the causal chain linking [Ultra Bond's] injuries to consumer confusion is not direct."  572 U.S. at 139.  While *Lexmark* itself involved an alleged 1:1 ratio between sales gained by the defendant and sales lost by the plaintiff, it does not hold that § 1125(a) requires such a ratio in order to establish causation.  *Id.* at 139-40.  Further, the evidence that Ultra Bond's sales doubled in other markets after Safelite's parent company was forced to stop making misleading statements about the six-inch limit to safe crack repair provides additional evidence by which a jury could find causation.

Drawing the facts and inferences in the light most favorable to Ultra Bond, a reasonable jury could conclude that Safelite has made false statements to consumers and insurance companies that have led to decreased demand for long crack repairs and that this decreased demand harmed the dominant seller of long crack repair products—Ultra Bond.  Because reasonable minds may differ "as to the foreseeability of a particular risk or the character of an intervening cause, the question is one for submission to the jury under proper instructions as to proximate cause."  *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 543 (6th Cir. 2000) (quoting *Ohio Fair Plan Underwriting Ass'n v. Arcara*, 417 N.E.2d 115, 120 (Ohio 1979)).

We reverse the district court's grant of summary judgment to Safelite on Ultra Bond's Lanham Act claim.[6]

IV.

We now turn to whether the district court properly granted summary judgment to Ultra Bond on the counterclaims.

### A.  Conversion, Civil Conspiracy, and Tortious Interference with Contract Claims

The district court found that Safelite's claims for conversion, civil conspiracy, and tortious interference with contract were preempted by OUTSA and thus granted summary judgment to Ultra Bond on these claims.  On appeal, Safelite challenges this ruling.  We agree with the district court that all three claims are preempted by OUTSA.

OUTSA "incorporates the Uniform Trade Secrets Act's displacement of 'conflicting tort, restitutionary, and other laws of [Ohio] providing civil remedies for misappropriation of a trade secret.'"  *Stolle Mach. Co. v. Ram Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015) (quoting Ohio Rev. Code § 1333.67(A)).  Although *Stolle* involved preemption of tortious interference with business relationship and conspiracy to misappropriate trade secrets claims, the opinion explained that "OUTSA should be understood to preempt not only [these] causes of action . . . but also causes of action that are *based in some way* on misappropriation of trade secrets[.]"  *Id.* (emphasis added).  Therefore, courts analyzing whether OUTSA preempts a particular claim must look to whether that claim relies on the same operative facts that formed the basis for the party's trade secrets misappropriation claim.  *See id.*  However, "[w]here the state-law claim has a factual basis independent from the facts establishing the OUTSA claim, 'the portion of the claim supported by an independent factual basis survives preemption.'"  *Id.* at 485 (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 940 (S.D. Ohio 2012)).

---

[6]On appeal, Ultra Bond does not challenge the district court's denial of its motion for partial summary judgment on the Lanham Act claim, and we therefore do not address it.  *See generally* CA6 R. 35, First Br.; CA6 R. 49, Third Br.

For Safelite's conversion claim, it had to allege and create a genuine dispute of material fact concerning: Safelite's ownership of property, Ultra Bond's conversion of that property by a wrongful act, and harm to Safelite. *See Dice v. White Fam. Cos.*, 878 N.E.2d 1105, 1108-09 (Ohio Ct. App. 2007). In its pleading advancing this counterclaim, Safelite alleged only ownership interest in "confidential and proprietary trade secret information including, but not limited to, training materials, pricing arrangements, financial data, technician rankings, customer satisfaction data, customer and prospective customer lists, and customer information and preferences." DE 97, Answer and Counterclaims, Page ID 1425. It did not allege conversion of any non-trade secret materials, nor did it allege physical theft. Because this allegation is a near-literal restatement of the same operative facts pled in Safelite's OUTSA claim, *see id.* at Page ID 1423-24, Safelite's conversion claim (as stated in the complaint) is preempted by OUTSA.

Safelite, however, asserted additional factual grounds for its conversion claim at the summary judgment stage. Specifically, Safelite claimed that Ultra Bond had physically stolen tools and HPX-3 resin. The district court, however, rejected Safelite's newly presented factual basis for the conversion claim, construing the new allegations as a constructive amendment of the pleadings and exercising its discretion to deny that amendment.

Federal Rule of Civil Procedure 15 vests district courts with discretion in managing amendments to pleadings, and denials of motions to amend are generally reviewed for abuse of discretion. *See Leary v. Daeschner*, 349 F.3d 888, 904 (6th Cir. 2003); *Ross v. Am. Red Cross*, 567 F. App'x, 296, 306 (6th Cir. 2014). Considerations for the district court in granting or denying an amendment include whether there was "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Safelite does not point to any case law that would prevent a district court from applying these same principles to a constructive amendment to the pleadings, particularly here where Safelite had over a year between filing its counterclaims and filing its summary judgment motion and failed to move to amend its counterclaim in that time. Because of Safelite's undue delay, which created the potential for undue prejudice to Ultra Bond given the lack of notice of theories upon which Safelite would

rely at summary judgment, the district court did not abuse its discretion when it denied Safelite leave to constructively amend its counterclaim. We accordingly affirm the district court's grant of summary judgment to Ultra Bond on Safelite's conversion claim.

For Safelite's civil conspiracy and tortious interference of contract claims, it has likewise not alleged any independent facts to support its claims that go beyond misappropriation of trade secrets. Both claims are entirely premised on Ultra Bond's alleged misappropriation or encouragement of others to misappropriate trade secrets. *See* DE 97, Answer and Counterclaims, Page ID 1422 (describing tortious interference as "disclosing or using Safelite's confidential and proprietary trade secret information, including information that referenced the dollar bill rule"); *id.* at Page ID 1424 (alleging civil conspiracy by Ultra Bond as "plott[ing] to obtain confidential and proprietary trade secret information protected by Safelite's corporate policies" and "agree[ing] to obtain and use Safelite's confidential and proprietary trade secret information"). We therefore affirm the district court's grant of summary judgment to Ultra Bond on those claims.

### B.  OUTSA Claim

OUTSA has a four-year statute of limitations that begins to run "after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Ohio Rev. Code § 1333.66. The discovery rule "requires the owner of a trade secret to conduct a timely and reasonable investigation after learning of possible misappropriation." *Stolle*, 605 F. App'x at 482 (quoting *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 62 (6th Cir. 2007)). And misappropriation is discoverable if the owner has "knowledge of such facts as would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry." *Adcor Indus.*, 252 F. App'x at 60 (quoting *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1300–01 (Ohio 1984)).

Here, the district court held that Safelite's OUTSA claim (filed in August 2018) was time-barred because Safelite should have discovered the misappropriation in 2010. More specifically, it reasoned that Safelite was on notice of potential misappropriation of trade secrets when Richard Campfield sent a letter to Safelite in April 2010 informing it that he planned to

initiate litigation against the company and had "photographs, tape recordings, insured consumer witnesses, documents from a trash dumpster and former employee witnesses" to utilize in his suit. DE 177, Op. and Order, Page ID 20924 (quoting DE 93-9, Letter, Page ID 1355). According to the district court, Safelite's knowledge of Campfield's dumpster diving and interviews with former employees should have reasonably triggered an investigation into possible misappropriation. *Id.* We disagree.

As Safelite correctly argues on appeal, the OUTSA claim is not time-barred when considering the facts and drawing all reasonable inferences in the light most favorable to the nonmovant, Safelite. Nothing in the letter suggested that the information at Campfield's disposal had been stolen, and a reasonable person would not assume that trade secrets are being thrown in the trash. Safelite claims that it did not learn of the alleged misappropriation of trade secrets through its former employees until Campfield's deposition in this case on Jine 1, 2018. because Ultra Bond can point only to the 2010 letter to challenge that argument, no evidence "conclusively demonstrates that [Safelite] should reasonably have discovered [Ultra Bond's] alleged trade secret misappropriation" earlier than 2014. *Stolle*, 605 F. App'x at 483. Therefore, we reverse the district court's grant of summary judgment on Safelite's OUTSA claim.[7]

### C. Unfair Competition Claim

Finally, Safelite challenges the district court's grant of summary judgment to Ultra Bond on Safelite's unfair competition claim. Unfair competition occurs when a party makes representations "for the purpose of deceiving the public" or "circulat[es] false rumors . . . [or] statements" that are "designed to harm the business of another." *Water Mgmt., Inc. v. Stayanchi*, 472 N.E.2d 715, 717 (Ohio 1984). On appeal, Safelite identifies three allegedly false statements circulated by Ultra Bond:

- Statements on Ultra Bond's website that insurance companies "dupe[]" customers "into paying $350 for a $20 windshield," DE 136-17, Website, Page ID 10195, and a linked infographic that claims Safelite, acting as the TPA, "falsely" tells customers long cracks cannot be repaired and replaces the

---

[7]Ultra Bond urges that none of the information allegedly taken by Ultra Bond qualifies either as "misappropriated" or as a "trade secret." These arguments should be evaluated in the first instance by the district court on remand. *See Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 575 (6th Cir. 2001).

original windshield with a "cheap, $20 aftermarket windshield from China." DE 136-18, Infographic, Page ID 10197.

- Statements by Ultra Bond in an email attachment concerning an experiment it performed using Safelite's HPX-3 resin, where Ultra Bond writes that there appears to be a problem with the repair tool, writing: "[W]e believe [the imperfect design of Safelite's tool] has to be intentional as there is no way they could not know when it appears to not work on two out of three repairs; but even if it is perfectly repaired their resin failed after one round of the ROLAGS Resistant to Thermal Cycling Test." DE 136-7, Attachment, Page ID 9993.

- Statements to the Department of Justice Antitrust Division's Citizen Complaint email account asserting that Safelite and its parent company Belron US are lying to customers and committing "fraud, insurance fraud and fraud by insurance." DE 134-8, Email, Page ID 9602.

Safelite further claims that it was harmed because "Campfield used these false statements and rumors to divert sales from Safelite," including by using a former employee of Safelite to "funnel[] business to Campfield." CA6 R. 39, Second Br. at 71.

Safelite's unfair competition claim suffers from two flaws. First, we agree with the district court that Safelite presented no evidence at summary judgment from which a reasonable juror could conclude that these statements are false. And on appeal, Safelite once again fails to indicate any evidence in the record that these statements are false. Second, Safelite provides no evidence to support its claim that "Campfield's false statements and rumors led to [a Safelite employee working with Campfield] diverting business from Safelite to Plaintiffs." CA6 R. 52, Fourth Br. at 22. No evidence in the record suggests that Ultra Bond's statements on its own website, statements in an email to a party who was not a Safelite employee, or statements in an email to the Department of Justice somehow diverted customers from Safelite. With no evidence to support its assertion that Ultra Bond's statements were false, Safelite's unfair competition claim cannot succeed. We therefore affirm the district court's grant of summary judgment to Ultra Bond on Safelite's unfair competition claim.

V.

For the foregoing reasons, we affirm the district court's partial grant of Safelite's motion to dismiss, affirm the district court's grant of summary judgment to Ultra Bond on Safelite's

tortious interference, civil conspiracy, conversion, and unfair competition claims, reverse the grant of summary judgment to Safelite on Ultra Bond's Lanham Act claims, reverse the grant of summary judgment to Ultra Bond on Safelite's OUTSA claim, and remand for further proceedings consistent with this opinion.

―――――――――――――――――――

## CONCURRENCE / DISSENT

―――――――――――――――――――

JOHN K. BUSH, Circuit Judge, concurring in part and dissenting in part.  I join in the majority's well-reasoned opinion except for Section III.B, which concerns whether Ultra Bond has evidence to demonstrate that Safelite proximately caused the alleged injuries.  Because Ultra Bond did not establish a sufficient causal link between Safelite's advertisements and Ultra Bond's injuries, I would affirm the district court's grant of summary judgment to Safelite on Ultra Bond's Lanham Act claim.

## I.

As the majority explains, to assert a false advertising claim under 15 U.S.C. § 1125(a)(1)(B), plaintiffs must satisfy a five-part test, which includes establishing "some causal link between the challenged statements and harm to the plaintiff."  *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015) (quoting *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999)). Notwithstanding the broad language of this factor, not all "factually injured plaintiffs" can recover under the Lanham Act.  Section 1125(a) requires a showing of proximate causation. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).  Thus, Ultra Bond "must show economic or reputational injury flowing directly from the deception wrought by [Safelite's] advertising."  *Id.* at 133.

Courts generally do not "stretch proximate causation 'beyond the first step'" of the causal chain.  *Id.* (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 271) (1992)).  "[T]he reason for that general tendency is that there ordinarily is a 'discontinuity' between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former (and thus also to the defendant's conduct), but might have resulted from 'any number of [other] reasons.'"  *Id.* at 139–40 (alteration in original) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–59 (2006)).  This makes good sense because an attenuated causation theory

creates difficulties in attributing damages to a defendant and distributing damages among plaintiffs.

But *Lexmark* recognized a narrow exception, finding proximate causation when the defendant's false advertising "more or less automatically" causes an indirect victim injury. *Id.* at 140. The Supreme Court determined that a departure from the usual proximate-cause framework was warranted in the "relatively unique circumstances" in which the plaintiffs, the indirect victims of the defendant's false advertising, necessarily lost a sale every time the direct victims lost a sale. *Id.* at 139-140. Put differently, there was "something very close to a 1:1 relationship between" the injuries to the direct and indirect victims. *Id.*

Ultra Bond asserts that Safelite's alleged false advertising caused its direct loss of sales in two ways. First, Ultra Bond argues that because of Safelite's statements to insurers, individual consumers sought replacement services rather than repair services, thereby depriving Ultra Bond's commercial customers of a sale.[1] Second, Ultra Bond asserts, with minimal explanation, that it "lost direct sales to: (i) consumers who might [otherwise] visit its repair facilities, and (ii) prospective commercial customers."

In support, Ultra Bond relies in large part on declarations from representatives of commercial customers who state:

> [I]f customer demand for long crack repair were to increase as a result of customers being informed that long crack repairs can be safely done according to industry standards up to 14 inches, I would most certainly have to compete for this increased customer demand by buying more of the Ultra Bond, Inc. products that are used for repairing long cracks up to 14 inches in length.

Ultra Bond also points to its customer statements asserting that "demand would increase as a result of customers being informed that long crack repairs can be safely done," which would lead to more competition for long crack repair and require buying more Ultra Bond products. And according to Ultra Bond, customers did not think that long cracks could be repaired safely because of Safelite's dollar-bill rule. But these declarations appear to be based largely on

---

[1] Relevant to the causation inquiry, these commercial customers are allegedly equivalent to distributors because "they purchase Ultra Bond products to deliver services to the ultimate consumer."

speculation, which cannot alone allow a reasonable jury to find that Ultra Bond has established proximate causation.  *See* Fed. R. Civ. P. 56(c)(4); *see also Wall & Assocs., Inc. v. Better Bus. Bureau of Cent. Va., Inc.*, 685 F. App'x 277, 279 (4th Cir. 2017); *Am Soc'y of Home Inspectors, Inc. v. Int'l Ass'n of Certified Home Inspectors*, 36 F.4th 1238, 1243 (10th Cir. 2022).

Building upon the conclusory nature of some of the commercial customers' statements, Ultra Bond's theory of injury also requires several increasingly attenuated assumptions that stretch beyond the proximate-cause standard in *Lexmark*.  There, every sale of an ink cartridge lost by a remanufacturer guaranteed a lost sale to the plaintiff.  By contrast, to accept Ultra Bond's theory, one must make several assumptions to conclude that Safelite's statements displace sales that Ultra Bond otherwise would make.  One must assume first that there are customers with long cracks in their windshields who would seek to get them repaired rather than replaced but decided not to because of Safelite's statements; second, that those customers would choose one of Ultra Bond's commercial customers for repair services; and third, that this untapped customer base is so substantial that commercial customers, who ostensibly use Ultra Bond for repairs under six inches, would have to buy additional product from Ultra Bond.[2]  And, for the injury caused by Safelite's statements to insurers, Ultra Bond's theory additionally requires one to accept without proof that, absent Safelite's statements, the insurers would opt to change their policies to cover repair for cracks longer than six inches for their customers.  This extended inferential chain is a far cry from the "automatic" injury at issue in *Lexmark*.  *See Lexmark*, 572 U.S. at 139–40.

Furthermore, though Ultra Bond alleged economic injury, it had insufficient evidence in the record to back it up.[3]  Indeed, Ultra Bond's own expert explained that the crack repair industry is "highly fragmented," which "makes assessing the particular impact of Safelite's actions to Ultra Bond difficult."  Moreover, Ultra Bond's products can be used to repair both long cracks and cracks under six inches.  Several of the commercial customers claim to use only

---

[2]This inference is further complicated because most of the declarants state that long crack repair is only a small part of their business.  Accordingly, one also would have to infer that Ultra Bond's direct customers could and would have absorbed their customers' added demand for long crack repairs, if such demand occurred.

[3]As already referenced, the commercial customer declarations do not provide specific evidence of harm, but only the belief that they were harmed.  Nor is their belief evidence of harm to Ultra Bond.

Ultra Bond products, but Ultra Bond pointed to no proof suggesting that absent Safelite's allegedly false statements, the commercial customers would experience such a surge in demand that they would require more Ultra Bond product.  Both Ultra Bond and the majority rely on evidence that Ultra Bond's sales in New Zealand "doubled" after the New Zealand Advertising Standards Authority Complaints Board ordered Safelite's parent company to stop advertising that windshield cracks under fourteen inches were not repairable.  But the fact that Ultra Bond's sales "doubled" relies on a bare assertion from Ultra Bond's owner to the expert and, more importantly, does not translate into a triable issue that Safelite's advertisements in the United States "more or less automatically" cause an injury to Ultra Bond as in *Lexmark*.  572 U.S. at 139–40.  Indeed, the same expert also concluded that "estimating Ultra Bond's losses is difficult because not every lost repair [caused by Safelite's statements] would have been from Ultra Bond."

Simply put, Ultra Bond does not have the requisite proof to proceed to trial under § 1125(a).  The evidence it presents, even when viewed in the light most favorable to Ultra Bond, does not warrant departure from the general proximate causation analysis that limits actionable injury to direct victims.

## II.

I therefore would affirm the district court's grant of summary judgment based on Ultra Bond's failure to introduce enough evidence for a reasonable jury to find that it suffered any harm that was proximately caused by Safelite's statements.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 22-3204/3225

RICHARD CAMPFIELD; ULTRA BOND, INC.,

    Plaintiffs - Appellants/Cross - Appellees,

    v.

SAFELITE GROUP, INC.; SAFELITE SOLUTIONS LLC;
SAFELITE FULFILLMENT, INC.,

    Defendants - Appellees/Cross - Appellants.

```
┌─────────────────────────────┐
│           FILED             │
│        Jan 16, 2024         │
│   KELLY L. STEPHENS, Clerk  │
└─────────────────────────────┘
```

Before:  MOORE, GIBBONS, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk